FILED
2006 Aug-21  PM 05:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT C

**Transcript of Walker County Civil Service Board Hearing dated 7/12/04**

1           CIVIL SERVICE BOARD

2             OF WALKER COUNTY

3           GRIEVANCE HEARING

4             JULY 12, 2004

5         REGARDING TAZ DAY BURCH

6          A.K.A. TOMMY BARRON

7

8             HEARING BEFORE

9          CHARLES STEPHENS, SR.

10

11                APPEARANCES

12  REPRESENTING THE HIRING AUTHORITY:

13       HANK WILEY

14       GARY WILLFORD

15  REPRESENTING THE GRIEVANT:

16       ANTHONY J. PIAZZA

17  BOARD MEMBERS:

18       ANDREW ARCHIE, Chairman

19       DAVID KELLY

20       RUFUS REED

21       MORRIS STUDDARD, JR.

22       DOYLE CUMMINGS

23

24       SHARON TUCKER, CLERK

25

```
1    REPORTED BY:  Rhonda G. Woods

2              Certificate No. AL-CSR-228

3

4                 I N D E X

5                                        PAGE

6    WITNESSES:

7        DERANE INGLE

8            Direct by Mr. Piazza        5, 57

9            Cross by Mr. Willford          56

10       STEVEN ALLEN THOMAS

11           Direct by Mr. Piazza          72

12           Cross by Mr. Willford         75

13

14       CERTIFICATE                       76

15

16

17

18

19

20

21

22

23

24

25
```

1                THE COURT:    The Civil Service Board is

2    convened for the purpose of hearing the complaint of Taz

3    D. Burch that was filed and submitted to the Walker

4    County Civil Service Board by written complaint on March

5    12, 2004.

6                Mr. Burch is present and represented by Mr.

7    Anthony Piazza.  And the hiring authority, Honorable

8    John Mark Tirey is here represented by the Honorable

9    Hank Wiley and Gary Willford.

10               We'll go ahead and proceed.  I notice we

11   have a number of witnesses in the courtroom.  Have the

12   parties been able to check the subpoena list to be sure

13   that all persons are present that's been subpoenaed?

14               MR. PIAZZA:   Do you mind if I take roll?

15               THE COURT:   Be happy for you to.

16               (Mr. Piazza calling roll.)

17               MR. WILLFORD:   We're satisfied.

18               THE COURT:   We'll go ahead and proceed.

19   Mr. Piazza, for your information and benefit, we will

20   handle this on somewhat an informal basis.  The Civil

21   Service Board is sitting there.  They'll hear the case.

22   They'll make a determination based on the facts

23   presented here tonight.

24               We will proceed, allowing you to -- we don't

25   have plaintiffs and defendants by designation in our

1   process but you would actually be taking the place as a

2   plaintiff since your client has filed the complaint.

3   And then the Sheriff and his representative will

4   respond.   You'll have an opportunity to cross-examine

5   witnesses and really handle it just like a regular case

6   in court, which will be the procedure that you're

7   familiar with.

8               With that let's go ahead and everybody

9   that's here that anticipates serving as a witness, let

10  me put you under oath at one time.   If you'll stand and

11  raise your right hand.

12              (Witnesses sworn by the Judge.)

13              THE COURT:   Does anybody want the Rule?

14              MR. PIAZZA:  Yes, I would.  And I would also

15  like to ask if Derane Ingle is here, is he present?

16              MR. WILLFORD:   He's present.

17              THE COURT:   All right.  Who is going to be

18  your first witness?

19              MR. PIAZZA:  Derane Ingle.

20              MR. WILLFORD:  As the complainant has

21  invoked the Rule, I believe his witnesses need to step

22  out.

23              THE COURT:   We're going to get rid of all

24  of them except Mr. Ingle.  Where is Mr. Ingle?

25              MR. WILLFORD:  Mr. Ingle is here.

1          THE COURT:   Everyone other than Mr. Ingle,

2    if you will, just wait outside and we will call you as

3    we need you.

4          Mr. Ingle, just for proper identification,

5    if you will, identify yourself, please.

6          MR. INGLE:   Derane Ingle.

7          THE COURT:   Mr. Piazza.

8                    DERANE INGLE

9      called on behalf of the grievant, having been

10   duly sworn, was examined and testified as follows:

11                  DIRECT EXAMINATION

12   BY MR. PIAZZA:

13          Q.   And you're currently employed by Walker

14   County?

15          A.   Yes, sir.

16          Q.   As deputy sheriff.

17          A.   Yes, sir.

18          Q.   And how long have you been employed?

19          A.   With Walker County Sheriff's Office since

20   October of last year.

21          Q.   2003?

22          A.   Yes, sir.

23          Q.   And who is your immediate supervisor?

24          A.   Carey Scruggs.

25          Q.   Can you spell that, please?

1      A.  C-a-r-e-y, Scruggs, S-c-r-u-g-g-s.

2      Q.  What is his or her title?

3      A.  His title is chief deputy.

4      Q.  Chief deputy?

5      A.  Yes, sir.

6      Q.  And who does he answer to?

7      A.  Sheriff John Mark Tirey.

8      Q.  Tirey?

9      A.  Yes, sir.

10     Q.  When did you first apply to Walker County to

11 be a deputy sheriff?

12     A.  I don't remember the date.  I done the test

13 and the paper but I don't know what day it was.

14     BOARD MEMBER REED:  Charlie, we ask if he

15 would speak up just a little bit.  I can't hear.

16     THE COURT:  Derane, if you will speak up

17 because this body over here is going to be making the

18 final decision, so they need to hear what you're saying.

19     Q.  Who did you interview with when you

20 originally applied, do you recall?

21     A.  Sheriff Tirey and Carey Scruggs.

22     Q.  Tirey and Scruggs?

23     A.  Yes, sir.

24     Q.  Do you recall when that was?

25     A.  I done my PT and my run and everything

1    about, I guess, two or three weeks before they hired me,

2    before I started.

3          Q.   So you had to meet certain physical

4    qualifications?

5          A.   Yes, sir.

6          Q.   And did you meet those physical

7    qualifications?

8          A.   Yes, sir.

9          Q.   I assume there was a physical fitness test?

10         A.   Yes, sir.

11         Q.   What else was there?

12         A.   Agility course.

13         Q.   Agility?

14         A.   Yes, sir.

15         Q.   Anything else?

16         A.   None that I can think of.

17         Q.   Was there a written application that you

18   filled out?

19         A.   Yes, sir.

20         Q.   Was there any type of a written exam or an

21   electronic exam?

22         A.   Yes, written.

23         Q.   Written exam?

24         A.   Yes, sir.

25         Q.   Did you complete that?

1    A.   Yes, sir.

2    Q.   Do you recall the score you made on that?

3    A.   I don't believe they give a score, just fail

4    or pass.

5    Q.   So you passed that?

6    A.   Yes, sir.

7    Q.   Did you have to -- were you required to

8    submit any documents other than your written

9    application?

10    A.   On my certificates I have, my

11    certifications.

12    Q.   Certifications?

13    A.   Yes, sir.

14    Q.   We'll get into those.  And did you, in fact,

15    submit those certifications?

16    A.   Yes, sir.

17    Q.   Do you recall on the written application if

18    there was a question concerning a background check?

19    A.   Was there a question about a background

20    check?

21    MR. WILLFORD:   Let me interject here for

22    just a minute.  This is starting to sound like a

23    deposition, and I know we're wide open here, but I

24    believe the allegations that are against the deputy

25    are whether or not he engaged in any kind of

1    excessive force against the complainant, and I fail

2    to understand the relevancy of all these

3    deposition-like questions about the application,

4    and we'll stipulate for the record that he was

5    hired as a deputy sheriff at the time of the

6    incident.

7         MR. PIAZZA:  I think the question before the

8    Board, and forgive me if I'm incorrect, but I think

9    the question before the Board is whether this

10   gentleman deserves to maintain his job or to keep

11   his employment with the county.  I think that's the

12   central issue.  There has been an allegation by my

13   client that there was excessive abuse and treatment

14   of him as a prisoner; however, that doesn't exclude

15   any other reasons that the Board may find that he

16   could be excused as an employee, and my questioning

17   concerns that other aspect.

18        THE COURT:  Mr. Piazza, I can understand

19   your --

20        MR. PIAZZA:  In fact, I'm trying to lay a

21   background for that.

22        THE COURT:  Let me help you a little bit,

23   and this is Charlie Stephens, the attorney for the

24   Board.  Mr. Ingle would have made application to

25   this body, the Civil Service Board, for employment.

1    All the employees are hired through the Civil

2    Service Board.  He would have make his application

3    to this Board.  He would have taken the exam that

4    he's referred to, which was given by this Board,

5    graded by this Board, and the qualifications for

6    this position has been checked by the Civil Service

7    Board, so he was qualified for employment.  I think

8    the Board could find that as a matter of judicial

9    notice, for lack of a better term.

10        They have certainly certified his

11   qualifications and submitted his name to the

12   Sheriff as an eligible employee for that position

13   after having been tested and examined.  So if that

14   helps you any, I don't know if it does or not, I

15   was assuming you were going through for the

16   qualification aspect of it, but he is qualified.  I

17   think the Board will take judicial notice of that.

18        MR. PIAZZA:  Well, my only other question in

19   that particular vein would be was there a question

20   concerning his criminal background?

21        THE COURT:  Okay.  You can ask him if he

22   knows.  Go ahead.

23        Q.  Was there such a question on your

24   application to the county concerning any criminal record

25   or background that you may have had?

1      A.   It asked you if you had been arrested

2  before.

3      Q.   Have you ever been arrested?

4      A.   No.

5      Q.   You've never been arrested?

6      A.   No, sir.

7      Q.   You've never been convicted of a crime?

8      A.   Never had a speeding ticket.

9      Q.   Never had a speeding ticket.  I'm assuming

10  you responded negatively to that particular question; is

11  that correct?

12      A.   (Witness nods head.)

13      Q.   Now, having gotten that out of the way, how

14  long have you known the complainant, Taz Burch?

15      A.   I've known Tommy for probably 10 or 12

16  years, something like that.

17      Q.   And when did you make his acquaintance?

18      A.   It would have been after I worked at Carbon

19  Hill, the City of Carbon Hill.

20      Q.   And forgive me if I lead a little bit.  Were

21  you the chief of police at Carbon Hill?

22      A.   Yes, sir, for a period of time.

23      Q.   Okay.

24      A.   But when I first begun to know him I wasn't

25  the chief of police.  I started out as a dispatcher.

1      Q.   Dispatcher?

2      A.   Yes.

3      Q.   When did you go to work for Carbon Hill?

4      A.   I believe I started dispatching with them in

5  '93, and I worked for them for a while and I quit and I

6  went back.  I was a part-time patrolman and then I went

7  full-time patrolman and then I went to assistant chief.

8  I was assistant chief job for several, several years and

9  then I was chief of police for almost two years, I

10  guess.  Close to two years.

11      Q.   Was that the last two years prior to your

12  being employed by the county?

13      A.   I worked about a year in Oakman.

14      Q.   Oakman?

15      A.   Yes, sir, City of Oakman.

16      Q.   What was your position there?

17      A.   I was patrolman.

18      Q.   Why did you leave the City of Oakman?

19      A.   I took a job with the Sheriff's Office.

20      Q.   Why did you leave the chief of police

21  position at Carbon Hill?

22      A.   I got sick and the working conditions.

23      Q.   Excuse me?

24      A.   I was sick.  I got sick and the working

25  conditions.

1    Q.   The working conditions?

2    A.   Uh-huh.

3    Q.   What -- can you be more descriptive, please?

4    A.   As far as the working conditions?

5    Q.   And also your illness.

6    A.   Stress bothered me and the mayor tried to

7    get me to do some things that wasn't right and I let it

8    make me sick.

9    Q.   The mayor, who was that at the time?

10   A.   James Richardson.

11   Q.   What was he trying to get you to do?

12        MR. WILLFORD:   Again, I don't see the

13   relevance of this.

14        THE COURT:   Unless it's going to help us

15   someway, Mr. Piazza, we -- how is that going to

16   help us?

17        MR. PIAZZA:   Well, Mr. Stephens, what I'm

18   trying to determine, and I may have to go another

19   way with this --

20        THE COURT:   Yes.   I'm going to sustain his

21   objection as to that.

22   Q.   So, during the time that you've known Mr.

23   Burch, how many times have you arrested him if you

24   recall?

25   A.   At Carbon Hill or altogether?

1      Q.   Let's start with Carbon Hill.

2      A.   Three times.  One of them would have

3   probably been on a warrant.

4      Q.   And the other two?

5      A.   Public intoxication, unlawful possession of

6   prohibited beverage, and then another unlawful

7   possession of prohibited beverage.

8      Q.   That's three occasions in Carbon Hill.  Any

9   other times that you've arrested Mr. Burch?

10      A.   The only two I have a recollection of at

11  this time.

12      Q.   What about when you were at Oakman?

13      A.   No, sir.

14      Q.   You didn't arrest him while you were there?

15      A.   No, sir.

16      Q.   Now, in your dealings with Mr. Burch, tell

17  me what you know about Mr. Burch, about his physical

18  condition.

19      A.   About every time I've ever had any dealings

20  with him it was either because him complaining about

21  something that --

22      Q.   I'm not asking you that.  I'm asking you

23  what your knowledge is about his physical condition.

24  This is a man that you've known for 10 or 12 years.

25      A.   I don't understand.  I don't understand what

1   you want me to tell you.

2           Q.   Do you understand him to be a normal,

3   healthy, walking, individual or do you know him to have

4   physical health problem?

5           A.   I know he has some problems with one arm.

6           Q.   What -- how would you describe that problem?

7           A.   He's got a big scar on it.

8           Q.   Is that it?  Do you know if he can use that

9   arm?

10          A.   I mean, my extent of knowing him -- well,

11  somewhat personal but not an extent of knowing what his

12  physical capabilities would be, no, sir.

13          Q.   Do you know if he has use of that arm?

14          A.   I've seen him use the arm if that's what

15  you're asking me.

16          Q.   When did you notice he had a scar on that

17  arm?

18          A.   I guess the first time I ever seen him.  I

19  mean, it's obvious.  You can see it.

20          Q.   Is it his right or left arm?

21          A.   It would be his right arm.

22          Q.   Does he have any other physical impairments?

23          A.   I don't know.

24          Q.   Do you know whether or not -- do you know or

25  can testify as to his mental condition?

1          A.   No, sir.

2          Q.   Have you ever known him to have a mental

3    condition?

4          A.   No, sir, I mean I --

5          Q.   When I say "mental condition," I'm referring

6    to a mental disease or illness.

7          A.   I don't know.  I don't know whether he does

8    or not, no, sir.

9          Q.   Have you ever known him to take medication?

10         A.   Other than what he's told me?

11         Q.   What has he told you about his medication?

12         A.   He called me up to his house one day, was at

13   Carbon Hill, he told me that he was on a lot of

14   medication.  Of course, I don't remember the reason he

15   called for us to come up there.  We used to sit and

16   talk.  There was times he would call.  He would have a

17   problem and we would go up there and then Tommy would

18   talk.  Because I played music and he played music, he

19   wanted us to get together and play music.  That would be

20   the most part about knowing anything about his medical

21   history.  I'm no doctor so I can't testify to what he's

22   on or what his capabilities are.

23         Q.   Well, I mean did he -- does he appear to

24   be -- let me rephrase that question.

25              Have you ever known him not to conduct

1    himself in a normal fashion?

2              A.   As in intoxicated wise?  What does that

3    mean?

4              Q.   If intoxication would be the way that you

5    would describe it, then describe it.  Have you ever seen

6    him intoxicated?

7              A.   Yes, sir.

8              Q.   Have you ever seen him acting abnormally

9    without being intoxicated?

10             A.   I wouldn't say that.  I wouldn't know -- him

11   act abnormal without being intoxicated, no.  There's

12   been times that I've been to his house and he's been

13   intoxicated but he's not act as bad as he had at other

14   times.  When I -- from the time I put him in jail, when

15   I first had an encounter with him is nothing the way

16   that he acted, you know, when I put him in jail the last

17   time.  Very irate.  Not as if it was when I had -- maybe

18   had first dealings with him.

19             Q.   You were the chief of police in Carbon

20   Hill.  You arrested him three times; is that correct?

21             A.   When I was chief of police, I don't believe

22   I ever arrested him.

23             Q.   Was this while you were a patrolman --

24             A.   I arrested him for a --

25             Q.   -- or assistant chief?

1   A.   Once I was a patrolman, I might have been

2   part -- I was patrolman at that time.   I arrested him on

3   a -- I believe that would have been a warrant.   A

4   warrant was signed on him because he kept calling the

5   dispatcher and cussing them at Carbon Hill, so the

6   magistrate issued a warrant on him and he was arrested

7   for that.   The other two times would have been the time

8   that I was assistant chief.

9   Q.   What were those two times for?

10   A.   Public intoxication and unlawful possession

11   and then, again, for unlawful possession.

12   Q.   And at any time did you have an occasion to

13   incarcerate him in the facility there at Carbon Hill?

14   A.   All of those would have been Carbon Hill.

15   Q.   At any time did you search his person to see

16   if he had medications or drugs, any type of --

17   A.   Put somebody in jail, yes.

18   Q.   And did you ever determine that he did have

19   medications on his person?

20   A.   I don't recall that.

21   Q.   Did he ever request medications from you

22   while he was incarcerated in Carbon Hill?

23   A.   He wouldn't have requested them from me,

24   because I wouldn't have been the one.   After I take him

25   to jail, I don't handle him no more.   It would be the

1   dispatcher or the jailer.

2          Q.   So it's your testimony that you wouldn't

3   have any knowledge of his medications?

4          A.   He didn't ask me for no medications.   I

5   mean, I would have no reason for him to ask me because I

6   don't work in the jail.

7          Q.   In your discussions with people who work at

8   the jail, do you have any knowledge from your

9   discussions with him that he required medications?

10         A.   No, sir.

11         Q.   Or that he required physical or bodily or

12  mental treatment?

13         A.   On the booking sheet --

14         Q.   Can I ask what you're looking for?

15         A.   His booking sheet where he's made calls from

16  911, it was either transferred over to the Sheriff's

17  Office or whether he called the Sheriff's Office about

18  something.   You want me to tell you what they were?

19         Q.   Right now I would like to know about any

20  treatment that he received.

21         A.   On the booking sheet it says medical needs

22  and it says physician, Dr. Camp.   It don't say nothing

23  about his medicines.   It says problems or concerns, he's

24  had a heart attack, a collapse lung, and he has

25  breathing problems.

1          Q.   Heart attack, collapse lung, and breathing

2     problems?

3          A.   Yes.

4          Q.   What's the date of that?

5          A.   It doesn't have a date on here.

6          Q.   Which arrest was that, does it say?

7          A.   No, sir.  No.  It's just a booking sheet is

8     all it is.

9          Q.   Can I see that?

10         A.   (Witness complies.)

11              MR. PIAZZA:  Is it possible that we could

12         have these documents entered into the record

13         here, documents that he's brought to court?

14              THE COURT:   That he's been referring to?

15              MR. PIAZZA:  Yes.

16              THE COURT:   Any objection?  He's been

17         referring to them.

18              MR. WILLFORD:  No.

19         Q.   You said you arrested him three times while

20    you were at Carbon Hill.  Have you arrested him other

21    times other than the time that we're here on this

22    evening?

23         A.   No, sir, none that I recall.

24         Q.   So you've only arrested this gentleman four

25    times?

1    A.   Seems like when he was arrested on one of

2 these times here he had some marijuana on him, but it's

3 not on his --

4    Q.   I didn't ask you that.  Well, I mean, that

5 you didn't make the arrest --

6    A.   On the marijuana?

7    Q.   -- is what you're saying?

8    A.   Nuh-uh.

9    Q.   So you did make --

10    A.   But it's not on the booking sheet so --

11    THE DEFENDANT:  I've never smoked pot and

12 never had none on me.

13    Q.   So it's your testimony then, without it

14 being documented with these records, that you've

15 arrested this man for -- what was the charge

16 specifically regarding the marijuana?

17    A.   It's not on this booking sheet.  The only

18 way I would know is if I subpoenaed Carbon Hill's

19 records and seen if it was in his file somewhere.  I

20 couldn't tell you -- I don't -- I just have to -- we

21 would have to subpoena the records.

22    Q.   Are you just recalling this from memory?

23    A.   No, because it's not on here and I don't

24 really -- we'd have to subpoena the records to be able

25 to know.

1        Q.  So it's your testimony that there's never

2    been an arrest for marijuana?  From your recollection

3    only that you recall without going to the records.

4        A.  There should have been one on here

5    because --

6                THE COURT:  His question to you is do you

7        have any independent recollection of arresting him

8        for possession of marijuana, whether it's on these

9        records or not.  Do you have any independent

10        recollection of having arrested him for marijuana?

11                THE WITNESS:  Do I remember doing it?

12                THE COURT:  Yes.

13        A.  When I put him in jail when I charged him

14    with a P.I., he was actually driving a vehicle.  I mean

15    I remember that.  I remember that.  But I charged him

16    with P.I. because -- to keep him from losing his

17    license.  It was unlawful possession of prohibited

18    beverage, and they should have been, if I ain't

19    mistaken, but to verify, I would have to subpoena the

20    records at Carbon Hill to verify that to be the facts.

21    No, I don't know for a fact.  I couldn't tell you that

22    for a fact without subpoenaing the records.

23        Q.  So you don't have any independent

24    recollection you can tell this Court about marijuana

25    possession that he was ever charged with --

1    A.  I would have to subpoena the record.

2    Q.  -- or ever found on his person?

3    A.  I would have to subpoena records before I

4  could tell you that for sure.

5    Q.  During the three arrests that we talked

6  about, has he ever been noncooperative with you as the

7  arresting officer?

8    A.  I don't believe so.

9    Q.  So he's always cooperated with you when

10  you've arrested him?

11    A.  The best of my knowledge on those, yes, sir.

12    Q.  Has he been -- do you know of any -- do you

13  have any knowledge of him being uncooperative with any

14  other police officers or law enforcement officials while

15  he was in their custody?

16    A.  In custody, no.

17    Q.  After an arrest, or after an arrest?

18    A.  Not during, no, not arrest.  He wasn't

19  arrested on that one.

20    Q.  Would you characterize Mr. Burch as a fairly

21  peaceful individual that likes to drink and he gets

22  caught being drunk occasionally?

23    A.  I don't know how you would characterize it.

24  Normally it would be his neighbors that would complain

25  on him if there was a complaint.  Those two times I

1    arrested him would have been -- would have had to have

2    been not at residence for him to be charged with those

3    charges.

4         Q.   Well, getting back to these charges, were

5    these for infractions or violations that were committed

6    in your presence?  I know that you said one was by

7    virtue of a warrant, but wasn't the other two committed

8    in your presence?

9         A.   For me to make the case, yes, sir, they had

10   to have been.

11        Q.   And how did it come upon you to be at the

12   time and place where this man was at the time of the

13   violation?

14        A.   I don't know that.  It would have been while

15   I would have been patrolling I'm sure.

16        Q.   Do you have any recollection of how the

17   public intoxication charge came about?

18        A.   No, sir.  All I have is a booking sheet.  I

19   don't have his arrest report on that.

20        Q.   Did you make an arrest report?

21        A.   Yes, sir.  If he's been booked in jail,

22   there would be one, yes, sir.

23        Q.   What about the possession charge?

24        A.   Alcohol, yes, sir.  There would have been an

25   arrest report on any charge that he had been --

1      Q.  How did you come to be in the particular

2  place where this -- was this made at the same time the

3  two charges -- was this for one arrest or two separate

4  occasions?

5      A.  Yes, sir, two of them was right there what

6  you've got down and then he has another unlawful

7  possession of beer.

8      Q.  So there is a third one of unlawful

9  possession?

10     A.  On one arrest he was charged with P.I., yes,

11 sir, and then he was charged with beer on the next --

12 another one.

13     Q.  And how did you come to be in the location

14 where Mr. Burch was, or as you know him, Mr. Barron, how

15 did you come to be in that location at the particular

16 time that these violations were going on?

17     A.  I wouldn't know how to answer.  I mean other

18 than patrolling, I couldn't tell you.  I don't have the

19 arrest reports.  I mean, I don't know -- I don't know

20 how to answer other than what I -- I don't know anything

21 else to tell you.  I would have to look at the arrest

22 report to see why or where I arrested him.  I wouldn't

23 remember where it could have been.

24     Q.  So you don't recall any circumstances

25 surrounding these arrests?

1         A.  No.

2         Q.  Regarding the arrest that we're here on this

3    evening, which occurred, correct me if I'm wrong,

4    February 16.

5         A.  Yes, sir.

6         Q.  Is that correct?

7         A.  Yes, sir.

8         Q.  What evening -- what day of the week was

9    that?

10        A.  Monday, I believe.

11        Q.  Tell me what you recall about that

12   particular arrest.

13        A.  Do you want me to start from the beginning?

14        Q.  Yes, sir.

15        A.  I was dispatched out.  Dispatch give me the

16   call that Mr. Barron called.

17        Q.  What time was that?  Excuse me for

18   interrupting.  I may interrupt you because I want -- I

19   would like to know --

20        A.  I don't know.  It come through 911, so I

21   don't know what time it would have been.  Mr. Barron

22   has --

23        THE COURT:   Let me help the record here.

24   We're referring to the complainant as Mr. Burch and

25   then you're referring to him as Mr. Barron.  Is Taz

1  Burch and Tommy -- or Taz Burch and Tommy Burton

2  (sic) one and the same person?

3          MR. PIAZZA:  Barron.

4          THE COURT:    Tommy Barron.

5          MR. PIAZZA:  He's formerly known as Tommy

6  Barron.  He went through a formal change of name

7  process.

8          THE DEFENDANT:  I changed my name February

9  the 6th.

10          THE COURT:    I just wanted to clear that up

11  for the record because it could be confusing later

12  on.

13          MR. PIAZZA:  I was going to clear that up

14  with him.

15      Q.  What shift were you working on the evening

16  of February 16?

17      A.  Midnight.

18      Q.  Midnight?

19      A.  12:00 to 8:00.

20      Q.  And what time after you got your -- after

21  you got notified of the dispatcher's 911 call, what time

22  did you arrive at Mr. Burch's residence?

23      A.  I got at his house at 1:51 a.m.

24      Q.  Was that on the 17th?

25      A.  The 16th.

1    Q.   That would have been the 16th?

2    A.   Yes, sir.

3    Q.   And what information did you have as a

4  result of the dispatchers notifying you of the call,

5  what information did you have prior to your going to

6  their residence?

7    A.   Dispatch give it to me that he had a

8  combative wife, unwanted guest, and he wanted her

9  removed.

10    Q.   Combative wife, unwanted guest?

11    A.   Yes, sir.

12    Q.   And Mr. Burch was the one that made the

13  call?

14    A.   Yes, sir, from what dispatch --

15    Q.   Did it say what time the call came in?

16    A.   No, sir.  I don't have that, no, sir.

17    Q.   And when you arrived at the residence, what

18  did you find?

19    A.   When I pulled up Ms. -- I know her as Ms.

20  Wilkerson so I may refer to her as Ms. Wilkerson -- but

21  Ms. Barron came outside and told me everything was

22  okay.  I asked her what was going on, and she told me

23  that Tommy had been drinking all day and he was drunk

24  and he had got mad.  So I said, "Well, let me talk to

25  him."  She said, "Well, he's in the bed."  I said,

1    "Well, I need to talk to him because he made the call
2    and make sure everything is all right."  Well, we
3    stepped in the door.  There was food in the floor, and I
4    asked her what had happened.  She said he got mad and
5    threw his food in the floor and started cussing her.
6    So, Tommy come from the -- well, he first said, "What in
7    the h-e-l-l is going on?"  And Ms. Barron was talking --
8          Q.  Let me interrupt you for a second and back
9    up here.  So after she told you everything was okay, did
10   she ask you in?
11         A.  I don't recall.  I don't know.  I told her I
12   needed to speak to him, so she went back up in front of
13   me.
14         Q.  What kind of condition was Ms. Barron in?
15         A.  Actually she was kind of pleasant, I mean,
16   she wasn't ugly.  She -- I don't recall her saying
17   anything out of the way.
18         Q.  Did she say Tommy, or Taz, was in the
19   bedroom asleep?
20         A.  She said he had laid down, and I told her
21   that I needed to speak to him because he was the one
22   that made the call and let me speak to him and make sure
23   everything was all right and I would be gone.
24              He asked, "What in the h-e-l-l was going
25   on?"

1    Q.  Before you go any further, did -- how was it

2  that Taz came out of the bedroom?  I'm assuming he came

3  out of the bedroom or did you go into the bedroom?

4    A.  No, sir.  I never left the living room.  I

5  was in the living room.

6    Q.  You were in the living room?

7    A.  Yes, sir.

8    Q.  And Ms. Burch, or Ms. Barron, was in the

9  living room?

10   A.  (Witness nods head.)

11   Q.  How did Mr. Burch --

12   MR. WILLFORD:   You're going to need to

13     answer verbally.  You shook your head up and down

14     for the last question.  We're getting this all on

15     tape so if you would give us answers.

16   A.  I'm sorry.

17   Q.  Did you call for Mr. Burch to come out of

18  the bedroom?

19   A.  No, sir.

20   Q.  Or did Ms. Barron do that?

21   A.  While she was telling me what happened with

22  the food in the floor, that's when Tommy asked, "What in

23  the h-e-l-l is going on?"  Well, I was talking to her

24  and he asked it again, and that's when he come through

25  the hallway.

1        Q.  So there was a hallway separating -- the

2    living room, I take it, is where you were?

3        A.   The best I remember when you go in, that's

4    the living room, and I believe the kitchen was on the

5    right and the hallway would have been to your left.

6        Q.  And how far away was Tommy from you when you

7    first saw him?

8        A.   I don't really know.  The trailer it ain't

9    -- I don't think it's a real wide trailer, so it

10   wouldn't have been a large space, but I don't -- I

11   wouldn't know how many feet.

12       Q.  Did you have any type of weapon drawn --

13       A.  No, sir.

14       Q.  -- or anything of that nature?

15       A.  No, sir.

16       Q.  Did she ever ask you to leave?

17       A.  No, sir.

18       Q.  At any time?

19       A.  No, sir.

20       Q.  Did you make the statement -- did you scream

21   at Taz to get up out of bed and get in here into the

22   living room?

23       A.  No, sir.

24       Q.  After you heard Taz say, "What the hell is

25   going on in here," what did you do or say?

1    A.   Well, Ms. Barron was still talking so I

2    never acknowledged the first one.  He said it again and

3    that's when he came through the hallway and he came into

4    the living room.

5    Q.   Okay.

6    A.   You want me to continue?

7    Q.   Yes.

8    A.   Then he asked me what the h-e-l-l am I doing

9    in his house, that I needed to leave his house, this is

10   his d-a-m house and I had no business being there.

11   Q.   Did you ask him about the 911 call?

12   A.   Yes, sir, I tried to, and Tommy told me if I

13   didn't leave he was going to knock the h-e-l-l out of me

14   and he was going to whop my a-s-s.

15   Q.   So it's your testimony that he threatened

16   you?

17   A.   Yes, sir.

18   Q.   And as a result of that threat you pulled --

19   what is it, mace that you have or pepper spray?

20   A.   As a result of his threat?

21   Q.   Yes.

22   A.   No, sir.

23   Q.   Tell me what happened next.

24   A.   I asked Tommy to sit down and let's talk

25   about the call he made, and he would not talk.  He

1    didn't want to talk to me.  He wanted me to leave his

2    house.

3           Q.  Did he say everything was okay?

4           A.  No, sir.  He didn't tell me nothing about

5    the call.

6           Q.  Did it appear to you that everything was

7    okay?

8           A.  Other than him being irate, I didn't see any

9    marks on Ms. Wilkerson.

10          Q.  Did he appear intoxicated?

11          A.  Very.  I asked him several times, let's talk

12   about -- you know, make sure everything was -- he was

13   very irate.  He wouldn't -- he told me again that he was

14   going to whop my a-s-s.  And he pointed his finger at me

15   and he told me, "I'll whop your a-s-s if you don't

16   leave."  So I reached for Tommy's left arm and I grabbed

17   him by his arm and told him he was under arrest for

18   disorderly conduct.  He snatched it away from me and had

19   his arm back, and that's when I sprayed him and then I

20   grabbed his arm.

21          Q.  After you sprayed him, did he hit the floor?

22          A.  No, sir.

23          Q.  Where did you spray him?

24          A.  In the face.

25          Q.  Was he able to see after that?

1          A.  I wouldn't think so, no, sir.

2          Q.  When he hit -- let me ask you this:  What

3   kind of clothing did he have on when he came out of the

4   bedroom?

5          A.  I believe he had some -- a pair of underwear

6   and a t-shirt, if I ain't mistaken, I believe that's

7   what he had on.

8          Q.  Was he wearing shoes?

9          A.  No.  I think he had -- I'm not a hundred

10  percent sure but it seemed like he might have had some

11  socks on but I wouldn't say hundred percent about that.

12         Q.  Did he have any kind of weapon in his hand?

13         A.  No, sir.

14         Q.  At the time of the -- of your statement that

15  me made threats to you to whip your ass, did he have a

16  weapon?

17         A.  No, sir.

18         Q.  Did he have anything in his hand?

19         A.  He had nothing in his hand, no, sir.

20         Q.  Did you know at that time he only had use of

21  one arm?

22         A.  No, sir.  I mean, other than what ability he

23  has now, no, sir, I mean --

24         Q.  Did you notice anything else different about

25  him?

1      A.   He had a brace of some sort on his right

2   hand.

3      Q.   A brace?

4      A.   A brace or --

5      Q.   Can you describe it other than a brace?

6      A.   Just a white brace or it looked like an ace

7   bandage might have been wrapped around the top of it or

8   something.

9      Q.   So it's more of an ace bandage?

10      A.   Well, I don't know.  I didn't take it off

11   and I don't -- it looked to me like a brace made with

12   ace bandages around the back of it or the side of it or

13   something.

14      Q.   Did you ask him about it?

15      A.   No, sir.

16      Q.   So, you sprayed him and he's on the floor.

17   What happened next?

18      A.   No, sir, when I sprayed him, he didn't go to

19   the floor.  When I sprayed him, I grabbed him back by

20   his left arm and then I tried to pull him down in the

21   floor and -- you want me to show you how he went?  He

22   was up on his feet and his hands was down like this and

23   his butt was in the air, and I couldn't get him to give

24   me his hand to handcuff it.  Well, I put one handcuff on

25   him and Ms. Wilkerson said, she said, "Please be careful

1    with him.  He's hurt his hand."  So I said, "Well, stand

2    up, Tommy, and I'll put the handcuffs in front of you."

3    So I got him up and put the handcuffs in front of him,

4    and I asked Ms. Pat to -- if she would go get him some

5    clothes, go get him some pants.  So she goes to the

6    bedroom and she's gone for a little bit, and I asked

7    her, I said -- I heard a phone -- I heard the phone

8    dialing, and I asked her, I said, "Will you bring his

9    pants on where we could go?"  So she come back in there

10   and she said -- she was talking to his brother Gene, and

11   she said, "Well, Gene, you know how he is.  I know he

12   ought not to fight with them, but you can't tell him

13   nothing."  I helped her put his pants on, and then I

14   asked her would she go get him some shoes, and she went

15   back and got him some shoes.

16        Q.  Did you tell her to hang up the phone?  Did

17   you tell her to put down the phone?

18        A.  I don't remember that part.  I may have told

19   her that she needed to come help me put his clothes on.

20   I may have told her that, but she grabbed one side and I

21   grabbed the other side and we helped him put his pants

22   on.  He was sitting in his recliner.

23        Q.  Was it after he had his pants on you put the

24   handcuffs on him?

25        A.  No, sir.

1      Q.   Before?

2      A.   Yes, sir.

3      Q.   And then I told him we would go, and he

4   stood up and he started walking to the door and then he

5   wouldn't go out the door.  I said, "Tommy, come on,

6   let's go now."  I had him by his left arm and I was

7   trying to get him out the door.  When he started down

8   his steps, he sat on his door steps.  And I told him, I

9   said, "Tommy, get up now.  Come on, let's go."  And I

10  had him by his arm all the way to the car to get him to

11  the car because he didn't want to walk to the car.

12     Q.   All right.  Now, you got him charged -- I

13  understand he's been charged with two violations; one is

14  public intoxication?

15     A.   Yes, sir -- no, sir.

16     Q.   Disorderly conduct and resisting arrest?

17     A.   Yes, sir.

18     Q.   And it's your statement and testimony that

19  both of these occurred within the confines of his home?

20     A.   Yes, sir.

21     Q.   And it's also your testimony that his wife

22  never told you to leave?

23     A.   No, sir.  I don't recall that, no, sir.  She

24  was actually pleasant.  She tried -- she told Tommy, she

25  said, "Tommy, don't fight with him."  But I don't ever

1   recall her being ugly at all.

2         Q.   So how far is his residence from -- did you

3   take him to Jasper or did you take him to --

4         A.   Walker County.

5         Q.   You took him to Walker County jail?

6         A.   Yes, sir.

7         Q.   Here in town?

8         A.   Yes, sir.

9         Q.   And how far is his residence from here?

10        A.   From here to his driveway Is 16.1 miles.

11        Q.   16.1 miles?

12        A.   Yes, sir.

13        Q.   That's pretty accurate.  How would you know

14   that it's 16.1 miles as opposed to 16.5 or 15.9 miles?

15        A.   I took the mileage down.

16        Q.   Okay.  Are you required to do that?

17        A.   I took the mileage today.

18        Q.   You took it today?

19        A.   Yes, sir.

20        Q.   Why did you take it today?

21        A.   At the request of the attorney.

22        Q.   Now, once you left his property, his

23   premises -- let me ask you this:  What route did you

24   take?

25        A.   When I left Tommy's house?

1        Q.  Yes, sir.

2        A.  We come back out of his house on to

3   Leonard's Chapel Road.

4        Q.  What road?

5        A.  The road he lives on is Leonard's Chapel

6   Road.

7        Q.  Leonard's Chapel?

8        A.  Yes, sir.

9        Q.  We came to Prospect Road and then went to

10  Cheatham Road.  Traveled Cheatham Road to Ripley Road.

11       Q.  Ripley?

12       A.  Ripley, R-i-p-l-e-y.  And to Highway 118,

13  took the Corridor, and then here.

14       Q.  Highway 118?

15       A.  Yes, sir.  That's the old 78 there until you

16  get on the Corridor, and it turns back to 78.

17       Q.  All right.  Now, was this the same route

18  that you had traveled while in route to Mr. Burch's

19  residence?

20       A.  I don't recall that.  I wouldn't know that.

21       Q.  Where were you when you first got the

22  dispatch?

23       A.  I don't have a dispatch sheet where I would

24  -- I don't know.  I usually either work -- if there's

25  two of us, I'll work west and south or west and north.

1  And then mainly most of the time I work west side of the

2  county, and that would have been on the west side of the

3  county.

4          Q.  But you weren't here in Jasper?

5          A.  I don't recall.

6          Q.  You don't recall?

7          A.  No, sir.

8          Q.  Now, is this route that you just described

9  for us, is that route a typical route that you would

10  take from his residence?  It doesn't appear to be a

11  straight shot.

12          A.  It would be the closest route.

13          Q.  This would be the closest?

14          A.  That I would think of, yes, sir.

15          Q.  And most expeditious route?

16          A.  I would think so.

17          Q.  What time did you leave the residence?  Did

18  you make a call in?

19          A.  Yes.  I went -- 15-C, 10-84 to the county

20  jail at 2:06.

21          Q.  You arrived at 2:06?

22          A.  No, sir.  I went in route to the county

23  jail --

24          Q.  At 2:06?

25          A.  Either I was pulling out of his driveway or