FILED

2006 Aug-21  PM 05:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT D

**Transcript of Walker County Civil Service Board Hearing dated 10/26/04**

1           CIVIL SERVICE BOARD

2             OF WALKER COUNTY

3           GRIEVANCE HEARING

4            OCTOBER 26, 2004

5

6        REGARDING TAZ DAY BURCH

7          A.K.A. TOMMY BARRON

8

9            HEARING BEFORE

10         CHARLES STEPHENS, SR.

11

12              APPEARANCES

13   REPRESENTING THE HIRING AUTHORITY:

14        HANK WILEY

15        GARY WILLFORD

16   REPRESENTING THE GRIEVANT:

17        ANTHONY J. PIAZZA

18   BOARD MEMBERS:

19        ANDREW ARCHIE, Chairman

20        DAVID KELLY

21        RUFUS REED

22        MORRIS STUDDARD, JR.

23        DOYLE CUMMINGS

24

25        SHARON TUCKER, CLERK

```
 1   REPORTED BY:  Rhonda G. Woods

 2              Certificate No. AL-CSR-228

 3

 4                    I N D E X

 5                                              PAGE

 6   WITNESSES:

 7          DERANE INGLE

 8              Direct by Mr. Piazza              5

 9

10          JAMES RICHARDSON

11              Direct by Mr. Piazza             11

12

13          POLLY HALEY

14              Direct by Mr. Piazza         18, 25

15              Cross by Mr. Willford            24

16

17          TAZ DAY BURCH

18              Direct by Mr. Piazza        31, 136

19              Cross by Mr. Willford            98

20

21          SONYA GOLD

22              Direct by Mr. Piazza       137, 169

23              Cross by Mr. Willford           167

24

25          CERTIFICATE                         176
```

<u>OCTOBER 26, 2004</u>

1

2          THE COURT:    We're reconvening the Civil

3    Service Board for the purpose of the continued hearing

4    on the complaint or grievance of Taz Burch.    We

5    commenced this hearing on July 12, and hopefully we're

6    going to be able to conclude it this evening.

7          Mr. Piazza, have you checked to be sure your

8    witnesses are here?

9          MR. PIAZZA:    I believe they're here.

10          THE COURT:    Are you ready then?

11          MR. PIAZZA:    I think so.

12          THE COURT:    Ready for the Hiring Authority?

13          MR. WILLFORD:    We are.

14          THE COURT:    We'll just go ahead and call

15    our next witness now.    Mr. Burch, you come on up here.

16    We had him up here last time, didn't we?

17          MR. WILLFORD:    I believe we did.

18          THE COURT:    Come on up here, Mr. Burch.

19          Are any of those persons back here going to

20    be witnesses?

21          MR. PIAZZA:    I know Patsy is going to be a

22    witness.

23          THE COURT:    All right.    Let's go ahead and

24    call our first witness and then the other witnesses need

25    to wait outside.    Who is going to be your first

1    witness?

2            MR. PIAZZA:    Actually, I would like to

3    recall Mr. Ingle.  I have a few questions I need to

4    clarify with him.

5            MR. WILLFORD:    I think we object to that.

6    I mean, we're two witnesses beyond that.

7            MR. PIAZZA:  Well, actually, the Judge

8    testified last time.

9            MR. WILLFORD:    I thought there was one other

10   person besides the Judge.  At any rate --

11           MR. PIAZZA:  We only have a few questions

12   that we want to put on record from Mr. Ingle.  It may

13   take five minutes max.

14           MR. WILLFORD:    I think we had an hour and a

15   half's worth of testimony last time.  We moved on.  We

16   would object to having him called again.

17           THE COURT:    We're going to go ahead and

18   overrule.  We're going to be pretty lenient with it, but

19   we are going to keep this is some kind of a fast moving

20   fashion tonight.

21           MR. PIAZZA:  I understand and I'm right with

22   you.

23           THE COURT:    Derane, go ahead and take the

24   witness stand if you will.  Anybody else that's going to

25   testify, you need to wait outside.

<u>DERANE INGLE</u>

recalled on behalf of the grievant, having

previously been duly sworn, was examined and testified

further as follows:

<u>FURTHER DIRECT EXAMINATION</u>

<u>BY MR. PIAZZA:</u>

Q.  Mr. Ingle, you realize that you're still

under oath from your testimony back in July?

A.  Yes, sir.

Q.  I just have a few more questions I want to

touch on.  And one, when you went to Mr. Burch's home on

February 17 -- excuse me, February 16, was it -- did you

have an occasion to use any type of restraining pepper

spray or anything of that nature?

A.  Yes, sir.

Q.  What did you use?

A.  Freeze.

Q.  Okay.  Is that Freeze Plus?

A.  Yes, sir.

Q.  How -- when did you first use that?

A.  You talking about on Mr. Burch?

Q.  Yes.

A.  I was there for several minutes when --

Q.  Excuse me.  Can you turn that microphone

this way so we can all hear you?  Go ahead.  Answer my

1    question, please.

2            A.   I don't remember at what point but it was

3    during the -- after the altercation and me telling him

4    that he was under arrest and I reached and grabbed for

5    his arm and he grabbed away from me and that's when I

6    sprayed.

7            Q.   Once you had him subdued, and when I use the

8    term "subdued," I'm talking about in control, and had

9    the cuffs on him, did you place the cuffs on him inside

10   the home?

11           A.   Yes, sir.

12           Q.   Were they in front, were his hands cuffed in

13   front of him or in back of him?

14           A.   In front.

15           Q.   Was there an occasion for you to use the

16   Freeze Plus -- how does this come, in a small can or an

17   aerosol device?

18           A.   Yes.

19           Q.   How many cans do you normally carry with you

20   in your patrol car?

21           A.   Just one, one on you.

22           Q.   On your person?  Do you have any extra cans

23   in your patrol car, in storage?

24           A.   No, sir.

25           Q.   Are you certified to use Freeze Plus?

1      A.   Yes, sir.

2      Q.   When were you certified?

3      A.   Probably 1995, something like that.

4      Q.   And how often do you have to be certified?

5      A.   As far as I know just that once.

6      Q.   Just one time?

7      A.   As far as I know, yes, sir.

8      Q.   Did you have any other occasion to use the

9   Freeze Plus on Mr. Burch after you took him under

10  your --

11     A.   Are you asking did I spray him again?

12     Q.   Yes.

13     A.   No.

14     Q.   After you took him under your custody?

15     A.   No, sir.

16     Q.   You didn't use it any more that evening?

17     A.   No, sir.

18     Q.   It wasn't necessary?

19     A.   For me to spray him twice, no.  I done had

20  handcuffs on him.

21     Q.   When you placed him in the car, did you

22  place him in seat belts?

23     A.   Yes, seat belt in the back.

24     Q.   Now, the only other thing I want to ask you,

25  when you were the police chief at Carbon Hill, did you

1  use what's referred to as arrest tickets at any time?

2        A.  Anybody that had a -- you arrested when you

3  took them into jail when you done your paperwork, here

4  at the county you go sign a warrant.  When I was at

5  Carbon Hill, and these were not my rules, you signed a

6  complaint.  On anybody you put in jail, you done an

7  arrest ticket on them.  It's just a small piece of

8  paper.  It gives their name and their Social Security

9  number.  You have to put a Social Security number on it,

10 and it tells their charges and the court date.

11       Q.  Is that all the information it's got?

12       A.  No.  It's got address and I don't know what

13 all it's got on it.  It's got several items on it.

14       Q.  Are they numbered?

15       A.  I'm sorry?

16       Q.  Are they numbered?

17       A.  The arrest tickets numbered?

18       Q.  Yes, sir.

19       A.  I'm sure they are.  I don't know.

20       Q.  How long were you police chief at Carbon

21 Hill?

22       A.  About a year and a half.

23       Q.  You don't recall whether or not they had

24 numbers on them?

25       A.  No.  I'm sure it would be easy to get one to

1    check.

2         Q.   Are those records permanent records at

3    Carbon Hill?

4         A.   Should be.  Should be in with the rest --

5    all of his filing, it should be, because he gets a copy

6    and then there is a copy for the City Hall.

7         Q.   So in addition to the arrest ticket and the

8    complaint, what other -- and fingerprint record and mug

9    shot, what other documents would be at Carbon Hill --

10        A.   I don't know --

11        Q.   -- that would have Mr. Burch's name on it?

12        A.   I don't know if there would be a mug shot or

13   not.  There would be an arrest report, complaint, arrest

14   ticket, or if there is a traffic citation there is a

15   copy of that kept.

16        Q.   Is that the UTC?

17        A.   Yes, sir.

18        Q.   Is there a jail record --

19        A.   Yes, sir, there should be.

20        Q.   -- if he was placed in jail?

21        A.   Should be some index cards with the charges

22   on it.

23        Q.   Those are kept on index cards?

24        A.   That's what they used to be kept on.

25        Q.   Anything else that you can think of?

1    A.  Nothing I can recall.

2    Q.  When did -- have you always used Freeze Plus

3  or have you ever used the pepper spray?

4    A.  Yes.  We used Body Guard, what they call

5  Body Guard.

6    Q.  Body Guard.  Is that a form of pepper spray?

7    A.  Yes, sir.

8    Q.  And where did you use that?

9    A.  Carbon Hill.

10    Q.  When you got to the county you started using

11  Freeze Plus because that's what the county uses; is that

12  correct?

13    A.  Yes, sir.

14    Q.  You were certified in 1995 while you were

15  still at Carbon Hill?

16    A.  Yes.

17    Q.  Why is that?

18    A.  That's when I went through the academy.

19    Q.  Okay.  Now, it's your testimony that you

20  didn't use the Freeze Plus after you had Mr. Burch under

21  handcuffs; is that correct?

22    A.  No, sir, I did not.

23    Q.  And you placed him in handcuffs inside of

24  his home?

25    A.  Yes, because when I put the handcuffs on

1  him, his wife told me to be careful because he had a

2  cast or a brace or something on his hand, and that's why

3  I put the cuffs in the front, but when he got down to

4  the jail he didn't have a seat belt on when we got to

5  the jail.

6        Q.   Sir?

7        A.   He didn't have a seat belt on when he got to

8  the jail but he had one on when I left his house.

9        Q.   Are you saying he took the seat belt off?

10       A.   It wasn't on him when he got to the jail.

11            MR. PIAZZA:    That's all I have.

12            MR. WILLFORD:   No questions.

13            MR. PIAZZA:    My next witness will be Mr.

14  Richardson.

15                    JAMES RICHARDSON

16        called on behalf of the grievant, having been

17  duly sworn by the Judge, was examined and testified as

18  follows:

19                    DIRECT EXAMINATION

20  BY MR. PIAZZA:

21        Q.   Mr. Richardson, how are you doing tonight?

22        A.   I'm fine.

23        Q.   Could you please state your full name?

24        A.   James Richardson.

25        Q.   What is your current position?

1         A.    State of Alabama, Department of Public

2    Safety.

3         Q.    Department of Public Safety?

4         A.    Uh-huh.

5         Q.    How long have you been with them?

6         A.    Since 1990.

7         Q.    And you're -- what is your position with the

8    Department of Public Safety?

9         A.    Communications officer.

10        Q.    Where is your office?

11        A.    Hamilton.

12        Q.    And are you also the mayor of the City of

13   Carbon Hill?

14        A.    I was the last four years.  I'm not now.

15        Q.    When did you become mayor?

16        A.    October of 2000.

17        Q.    And how long were you mayor?

18        A.    Four years.

19        Q.    Up to what time?

20        A.    October of this year.

21        Q.    And what was the reason you stepped down

22   from that job?

23        A.    I was beat in the election.

24        Q.    Sir?

25        A.    I was beat in the city election, lost the

1    election.

2         Q.   When was that election held?

3         A.   August.

4         Q.   Do you know why you were subpoenaed for this

5    hearing?

6         A.   I don't have the slightest idea.

7         Q.   Do you know Mr. Taz Burch here?

8         A.   Well, I know Tommy Barron.  I don't know Taz

9    Burch.

10        Q.   They're one in the same.

11        A.   Okay.

12        Q.   He changed his name.

13             When did you change your name?

14             MR. TAZ BURCH:   February 6.

15        Q.   But you know him as Tommy Barron.  How long

16   have you known Mr. Barron?

17        A.   About twenty or twenty-five years, I guess.

18        Q.   Twenty-five years?

19        A.   A long time.

20        Q.   And you're familiar with where he lived

21   there in Carbon Hill?

22        A.   If you're talking about up around -- yes.

23        Q.   Now, while you were mayor of Carbon Hill,

24   who was your police chief?

25        A.   Well, I had -- Lonny Devito was chief when I

1    started and then Derane.  I think Don Frazier.

2         Q.  Just the two?

3         A.  Stan Bryan, I believe.

4         Q.  Did they serve -- in Carbon Hill does the

5    police chief serve at your discretion, does he serve at

6    your --

7         A.  He serves at the mayor's and council's

8    discretion.

9         Q.  Mayor and council?

10        A.  Uh-huh.

11        Q.  Tell me how that works basically.  If you

12   wanted to hire someone --

13        A.  After an election at your first meeting

14   you'll appoint your chief of police, your city clerk,

15   your judges, prosecutors, and stuff like that.

16        Q.  So you did all that back in October of 2000?

17        A.  Yes.

18        Q.  You made your appointments?

19        A.  Or me and the council did.  It takes a

20   majority to appoint.

21        Q.  And you appointed Mr. Derane Ingle?

22        A.  No, sir.

23        Q.  He was not --

24        A.  Lonny Devito was chief when I was there.

25        Q.  Okay.  He was your first appointment?

1     A.  Yes, sir.

2     Q.  How long was he the police chief?

3     A.  Lonny?

4     Q.  Yes, sir.

5     A.  Before I got there or after?

6     Q.  How long had he been there before you were

7  there?

8     A.  He had been there a long time.

9     Q.  How long did he remain after you arrived?

10     A.  How long was it, Derane?  I don't remember.

11     THE COURT:  Just your best knowledge.

12     A.  I'm going to say at least six months or so.

13  It wasn't --

14     Q.  Six months, and then you brought Mr. Ingle

15  in?

16     A.  Yes, sir.  He was promoted from assistant

17  chief to chief.

18     Q.  At any time while you were mayor of Carbon

19  Hill, was there any investigation on Mr. Ingle?

20     MR. WILLFORD:  I'm going to object to this,

21    has absolutely nothing to do with Deputy Ingle's

22    employment with the Walker County Sheriff's

23    Department.  It's outside the purview of why we're

24    here today.

25     MR. PIAZZA:  I'm trying to establish a

1   history between Mr. Ingle and Mr. Burch.

2        THE COURT:   This will be a good time for me

3   to make a point here.  You've got four Board

4   members here to hear a grievance that's been filed

5   by Mr. Burch against Derane Ingle.  In looking at

6   my notes and my looking at what we've done here

7   today so far, appears to me to be discovery type

8   information.  And this Board is very patient.  They

9   want to give you a full hearing, but they want to

10  hear the grievance, the facts, the circumstances

11  surrounding this grievance.  So far they've heard

12  nothing.

13        If this is going to be a precursory to

14  something else, I'm going to advise you to do your

15  discovery instead of doing it in front of Board and

16  keeping this Board here for an inordinate amount of

17  time.  They want to be involved, they want to hear,

18  but they want to hear a grievance, and a lot of

19  this just sounds to me like it's discovery.

20        MR. PIAZZA:   I will keep his testimony very

21  short then.  Let me just get to the meat of this.

22     Q.  While you were mayor of Carbon Hill, do you

23  have any recollection of how many times Mr. Burch was

24  arrested by Derane Ingle?

25        A.  By Derane himself, I couldn't tell you how

1    many times, no, sir.  I know he was arrested several

2    times but I can't say how many times Derane arrested him

3    or any of the other officers.

4        Q.  Let me ask you this:  Are you familiar with

5    a -- are you familiar with the ordinances of the City of

6    Carbon Hill?

7        A.  Most of them.

8        Q.  And are you familiar with a nuisance type

9    ordinance that you have there?

10       A.  Yes, sir.

11       Q.  Are you familiar -- also familiar with an

12   ordinance prohibiting the presence of live stock within

13   the city limits?

14       A.  Yes.    There is an ordinance or there was

15   several years ago, but it has never been enforced.

16       Q.  Never been enforced.  Why is that, sir?

17       A.  I guess because -- it just -- ain't really

18   had a problem with it.

19       Q.  Do you ever recall Mr. Burch attempting to

20   make a complaint or file a warrant against some

21   individuals maintaining live stock within the city

22   limits?

23       A.  Not to me, not trying to get no warrant or

24   nothing.  There's been complaints about live stock, but

25   I don't -- I do not have anything to do with the

1    warrants.  That goes through the court magistrate and

2    the police officer, and that part I didn't have nothing

3    to do with.

4         Q.  Fair enough.  Did you have any kind of

5    supervisory or decision making capacity over the police

6    department?

7         A.  Only -- other than just things that I wanted

8    done, would tell them that, but other than that, they

9    run themselves.

10         MR. PIAZZA:  I think that's all the

11    questions I have for him.

12         MR. WILLFORD:   I have no questions.

13                   POLLY HALEY

14    called on behalf of the grievant, having been

15    duly sworn by the Judge, was examined and testified as

16    follows:

17              DIRECT EXAMINATION

18    BY MR. PIAZZA:

19         Q.  Ms. Haley, my name is Anthony Piazza.  I

20    represent Derane Ingle (sic).  This is a personnel board

21    hearing.  Mr. Ingle -- excuse me.  Mr. Burch has filed a

22    complaint, a grievance against Mr. Ingle.  That's the

23    reason that you're here today.

24         Let me -- tell me your full name, please.

25         A.  Polly Haley.

1        Q.  Polly.  How do you spell that?

2        A.  Polly, P-o-l-l-y, Haley, H-a-l-e-y.

3        Q.  What is your current position?

4        A.  City clerk magistrate.

5        Q.  Carbon Hill?

6        A.  Yes.

7        Q.  How long have you held that position?

8        A.  Fourteen years.

9        Q.  Do you know Mr. Burch here?

10       A.  Yes.

11       Q.  Do you know him as Tommy Barron?

12       A.  Yes.

13       Q.  How long have you known him?

14       A.  Probably ever since I've been working for

15  the city.

16       Q.  Fourteen years?

17       A.  Yes.

18       Q.  Do you know about how many times Mr. Barron

19  has been arrested in the City of Carbon Hill by a police

20  office with Carbon Hill?

21       A.  Several times.

22       Q.  Between five and ten or between ten and

23  twenty?

24       A.  Probably between five and ten times.

25       Q.  Five and ten times.  And do you have all the

1  records?

2          A.  I have some of them, yes.

3          Q.  You brought some records with you?

4          A.  Yes, sir.

5          Q.  What records did you bring?

6          A.  Here's one for harassment.

7          Q.  Let me ask you this:  We've heard Mr.

8  Ingle's testimony about what records are kept once

9  someone is arrested or a complaint is filed against

10  them.  Let me ask you if you know what records are

11  maintained by the City of Carbon Hill?

12          A.  All arrest reports.

13          Q.  Arrest reports?

14          A.  Complaints.

15          Q.  Okay.

16          A.  Complaints, witness statements, anything

17  that deals with the complaint.

18          Q.  What about arrest tickets?

19          A.  Yes.

20          Q.  Do you have any of those with you?

21          A.  No arrest tickets.

22          Q.  Ma'am?  No arrest tickets?

23          A.  Just the arrest reports.

24          Q.  But you do maintain arrest tickets, though;

25  is that correct?

1          A.   Yes.

2          Q.   You don't have those with you?

3          A.   No.   Usually what they do is they just give

4     them -- their arrest ticket shows them the court date

5     and what they are charged with.

6          Q.   Court date and what they're charged with?

7          A.   Yes.

8          Q.   You keep a duplicate copy of that I take it?

9          A.   Yes.

10         Q.   Are those numbered?

11         A.   Yes.   We haven't used them in quite a while,

12    a long time.

13         Q.   When did you stop using them?

14         A.   Probably about four years ago, four or five.

15         Q.   Four or five years ago?

16         A.   I think so.

17         Q.   Is that a state form?

18         A.   No, I don't think so.

19         Q.   Not a state form.   Why did you stop using

20    those?

21              MR. WILLFORD:   Charlie, I'm going to renew

22         my objection.   If I understand this line of

23         questioning, it's to establish some kind of a link

24         between Deputy Ingle and Mr. Burch.   If we could

25         get to those kind of questions.

1          MR. PIAZZA:    I'll withdraw that question.

2          Q.   Do you know of any ongoing dispute between

3     Mr. Burch, or Mr. Barron as you know him, and Mr. Derane

4     Ingle?

5          A.   No.

6          Q.   No dispute whatsoever?

7          A.   No.

8          Q.   Have you ever known Mr. Barron to attempt to

9     file a complaint or a warrant against anyone in Carbon

10    Hill for a nuisance, a violation, or live stock within

11    the city limits type violation?

12         A.   I don't know that he's filed.  I mean, he's

13    asked questions about it before.

14         Q.   Has he ever attempted to file?

15         A.   He may have.

16         Q.   Have you ever refused to allow him to file

17    such a complaint or a warrant?

18         A.   No.  He would file that with the police

19    department before it would ever come to me.

20         Q.   Do you recall the people he was trying to

21    file a complaint against?

22         A.   Probably the Nelsons.

23         Q.   The Nelsons.

24         A.   Next door neighbors.

25         Q.   Now, are the Nelsons related to Mr. Ingle?

1     A.  Yes.

2     Q.  How are they related?

3     A.  By marriage.

4     Q.  Not blood related?

5     A.  No.

6     Q.  They lived adjacent to Mr. Barron?

7     A.  Yes.

8     Q.  Do you recall ever having an arrest or a

9  warrant issued for the Nelsons because of a nuisance

10  that they were allegedly caused Mr. Burch?

11     A.  Not right off, not without going back and

12  looking back through the records, I don't recall.

13     Q.  Okay.  Do you recall a number of times Mr.

14  Barron attempted to or discussed filing a warrant with

15  you concerning Mr. Ingle's relatives?

16     A.  I guess there is a couple of times that he

17  called and spoke about problems that he was having, that

18  they were -- both parties were there wanting to file on

19  each other.

20     Q.  The Nelsons were there wanting to file on

21    Mr. Barron?

22     A.  Uh-huh.

23     Q.  Did they file a complaint?

24     A.  Yes, I feel certain.

25     Q.  And was Mr. Barron arrested?

1              A.   I believe so, at one point, yes.

2              Q.   Excuse me one minute.   The arrest tickets,

3    do you still have those records?   Do you still have

4    those arrest tickets?

5              A.   It goes back for -- a few years back, yes.

6    We should have them.

7              Q.   How far do they go back?

8              A.   They would have been back past 1995.

9              Q.   1995.   But they still are maintained?

10             A.   Yes, sir.

11             MR. PIAZZA:   I think that's going to be

12        all I have for her.

13             MR. WILLFORD:   Just a couple of questions.

14                      CROSS-EXAMINATION

15   BY MR. WILLFORD:

16             Q.   Ms. Haley, I'm Gary Willford.   I represent

17   the Hiring Authority in this hearing, Sheriff Tirey.

18   Were there -- you testified that there was some

19   complaints from the Nelsons about Mr. Burch; what were

20   the nature of those complaints?

21             A.   There was a complaint filed for menacing, he

22   was swinging a baseball bat and pulled a knife.   One

23   time I think there was -- where he shot into their

24   house.

25             Q.   Were those all the complaints that you're

1  aware of?

2          A.  Yes.

3          Q.  Each one of those were for menacing?

4          A.  This one was, yes.

5          Q.  What other complaints were there?

6          A.  Just on the menacing where that he -- like

7  swung the base ball bat, pulled a knife.

8          Q.  Okay.  At any time while Deputy Ingle was

9  the chief of police there at Carbon Hill, did he speak

10 with you and ask you not to accept complaints from Mr.

11 Burch or attempt to interfere with you in any way in the

12 performance of your duties with respect to Mr. Burch?

13         A.  No.

14         MR. WILLFORD:    That's all the questions I

15 have.

16                 REDIRECT EXAMINATION

17 BY MR. PIAZZA:

18         Q.  What's the case number in the year of the

19 menacing charge you mentioned now?

20         A.  Case number was MC-95-238.

21         Q.  95-238?

22         A.  Yes.

23         Q.  What was the disposition of that charge?

24         A.  Pled guilty.

25         Q.  Pled guilty?

1          A.   Uh-huh, and was to stay away from the

2    prosecuting witness.

3          Q.   What other charges do you have there for Mr.

4    Burch?

5          A.   I have an unlawful possession of alcoholic

6    beverages, and that's MC-98-025.

7          Q.   MC-98-025.

8          A.   And it was dismissed on plea agreement.

9          Q.   Dismissed?

10         A.   Uh-huh, on a plea agreement.

11         Q.   Could I see that record, please?

12         A.   (Witness complies.)

13         Q.   What other charges do you have?

14         A.   I have a harassment communication.

15         Q.   What was the disposition on that one?

16         A.   Dismissed on recommendation of the city.

17         Q.   Was that one filed by Mr. -- was that the

18   complaint of Mr. Ingle?

19         A.   Yes.  He was the officer.

20         Q.   On the unlawful possession, was the

21   complaint of Mr. Ingle?

22         A.   Yes.

23         Q.   Could I see those two, please?  Do you have

24   any more charges that were dismissed in your possession

25   for Mr. Burch?

1          A.   I have an unlawful possession again, twice,

2     and then he has a public intoxication that he pled

3     guilty on.

4          Q.   Unlawful possession again?

5          A.   Two of them.

6          Q.   Two of those.  Who were the complainants on

7     those?

8          A.   Derane Ingle.

9          Q.   Ingle.  Were those also dismissed?

10          A.   Yes.

11          Q.   Could I see those?

12          A.   (Witness complies.)

13          Q.   Let me ask you to look at this one.  Now,

14     it's your job as a magistrate when you accept a

15     complaint by someone, it should be a sworn complaint; is

16     that correct?

17          A.   Correct.

18          Q.   Now, if you notice on that one, what's the

19     number of that particular complaint?

20          A.   MC-97-270.

21          Q.   MC-97-270.  Is it your practice to accept

22     unsworn complaints?

23          A.   No.  They swear to the complaints to me, but

24     on this occasion I forgot to sign this one and I believe

25     that's the reason it was maybe dismissed.

1    Q.   So you generally notarize the complaint

2    yourself?

3    A.   Yes.

4    Q.   You're a Notary Public?

5    A.   Yes.

6    Q.   But you just didn't --

7    A.   I forgot to sign this one.

8    Q.   And that one was dismissed also?

9    A.   Yes.

10   Q.   Which one of these -- do you have any more

11   complaints with you?  I counted five.  Was there any

12   more than that?

13   A.   (Witness shakes head.)

14   Q.   No?

15   A.   No.

16   Q.   There was five of them.  Now, four of which

17   were dismissed --

18   A.   Uh-huh.

19   Q.   -- is that correct?

20   A.   That's correct.

21   Q.   Ma'am?

22   A.   Yes, that's correct.

23   Q.   And the one menacing, 95-238 --

24   A.   He pled guilty.

25   Q.   Pled --

1    A.  Public intoxication he pled guilty.

2    Q.  Public intoxication.  What year was that?

3    A.  '97, I believe.

4    Q.  Now, if you could go to the harassment

5  complaint filed by Mr. Ingle.

6    A.  Okay.

7    Q.  What case number is that?

8    A.  MC-95-333.

9    Q.  And that one was filed the same year as the

10  menacing complaint; is that correct?

11    A.  Yes.

12    Q.  And that one was dismissed by a plea

13  agreement?

14    A.  The harassment.

15    Q.  The harassment one?

16    A.  Yes, sir.  And was dismissed on the

17  recommendation of the city.

18    Q.  Recommendation of the city.  Were you in

19  court -- are you normally in court when these cases are

20  heard?

21    A.  Yes.

22    Q.  Do you recall that particular case?

23    A.  The best I can remember, yes.

24    Q.  Okay.  What judge was sitting at that time?

25    A.  Steve Thomas.

1      Q.  Steve Thomas?

2      A.  Yes.

3      Q.  And do you recall the exact terms of the

4 recommendation, do you recall why they recommended that

5 case be dismissed?

6      A.  They worked that out with the prosecutor,

7 the police officer and the prosecutor and the defendant

8 worked that out in the prosecutor's office.

9      Q.  But you don't have any personal knowledge of

10 the terms?

11      A.  No, sir.

12      Q.  Or the conditions in which that case was

13 dismissed?

14      A.  No.

15      Q.  Okay.

16      MR. PIAZZA:  I think that's all I have for

17    her.

18      MR. WILLFORD:  I don't have any.

19      THE COURT:  Polly, you're excused.

20      (Short recess.)

21      THE COURT:  Mr. Burch, did I put you under

22    oath earlier?  Let's just be sure.

23

24

25

1                        TAZ DAY BURCH

2          called on his own behalf, having been duly sworn

3      by the Judge, was examined and testified as follows:

4                        DIRECT EXAMINATION

5      BY MR. PIAZZA:

6          Q.   Mr. Burch, may I call you Taz?

7          A.   Yes.

8          Q.   You're the complainant in this hearing?

9          A.   Yes.

10         Q.   And I'm assuming that the Board has a copy

11     of the complaint.

12              THE COURT:    We do.

13         Q.   And it's your testimony, it's your

14     complaint, that Mr. Derane Ingle, who is a deputy

15     sheriff for the county, Walker County, injured you on

16     the evening of February 16, 2004?

17         A.   Correct.

18         Q.   Is that correct?

19         A.   Correct.

20         Q.   And it's also your testimony that the

21     dispute between you and Mr. Ingle goes back several

22     years; is that correct?

23         A.   Well --

24         Q.   Without getting into that background, what I

25     would like for you to do is to the best of your

1  recollection do you recall what day February 16, 2004

2  fell on?

3        A.  Not quite the day but it was the 2nd and

4  16th.

5        Q.  Pardon me?

6        A.  The 2nd and 16th.

7        Q.  Do you recall what day that was?  Was it a

8  Monday or Tuesday?

9        A.  Monday morning at 2:00 o'clock.

10        Q.  Monday morning at 2:00 o'clock.

11        A.  The 16th.

12        Q.  2:00 o'clock a.m.?

13        A.  Yes.

14        Q.  Tell the personnel Board what occurred the

15  day before on February 15th, if anything, regarding an

16  injury that you received.

17        A.  I was trying to push around with the hot

18  water, the heater, and I fractured this thumb right here

19  (indicating).  And I went to the emergency room at

20  Winfield, and they x-rayed my whole hand.  And they had

21  -- it showed a plain fracture in my thumb, and they put

22  a little stint and then they wrapped it around with an

23  ace bandage.

24        And I went there it was about 2:00 o'clock.

25  From there I came back to visit my brother, Gene Barron,

1    and I stayed there from around 5:30 or 6:00 to about

2    9:30.  And me and my wife Patsy went home, and we was

3    sitting up watching TV.

4             And then she was going to go to bed, and I

5    didn't want her to.  I wanted her to stay up and talk to

6    me.  I may have had a little bit of medical problems

7    like I didn't realize I was having and I had to go to

8    the mental health, but I didn't want her to go to bed

9    but she didn't want to stay up.  I called 911.  I

10   shouldn't have called them, because we weren't fighting.

11            But they said they had to send an officer

12   out to check on me, and they did.  And Derane came, and

13   they should have sent another officer out to check the

14   situation and see if they had one on duty, because of

15   all the conflict we had in the past.

16            If we had a camera on, it would have been

17   nice to get to see the show.  We had the camera off.  I

18   was handcuffed in the back, and I know that stuff is

19   pretty powerful, because I've been sprayed with it

20   before in the past.

21            Q.  Let me stop you right there.

22            A.  He was pushing me and throwing me, and I

23   couldn't see.

24            Q.  Let me stop you right there and let's go

25   back.  You say after you left -- is that the Winfield

1    Medical Center?

2         A.   I went there Sunday the 15th.

3         Q.   And then from there after you received

4    treatment for your thumb, they did take x-rays; is that

5    correct?

6         A.   Complete, whole hand x-rays.

7         Q.   After there, you left there and you went to

8    see your brother, Gene Barron?

9         A.   Yes.

10        Q.   You and your wife Patsy; is that correct?

11        A.   Yes.

12        Q.   And after that you came back home and you

13   wanted Patsy to stay up with you.

14        A.   Yeah.

15        Q.   Were you drinking?

16        A.   I was drinking.

17        Q.   How much had you had to drink that night?

18        A.   Probably about four.  I think about four

19   beers.

20        Q.   Four beers, okay.  And do you recall what

21   time you called 911?

22        A.   Somewhere around, I guess, had to be about

23   1:00 o'clock, I guess, about 1:00 o'clock.

24        Q.   Do you recall what you stated to the 911

25   operator?

1          A.   Yes.

2          Q.   What did you state to the 911 operator --

3    was it male or female?

4          A.   It would be male or female.

5          Q.   Sir?

6          A.   It was a male or female.  It was a woman.

7          Q.   A female.  Do you recall what you stated to

8    her?

9          A.   Yes.  By that time I had hung the phone up,

10   and she was still talking to them, and Patsy told them

11   that we didn't need nobody out there.  We wasn't

12   fighting or fussing.

13         Q.   So she got on the phone too --

14         A.   Yeah, she was telling them we didn't need --

15         Q.   -- with the 911 operator?

16         A.   So I just went on and went to bed.  I said

17   to heck with it.  I went on in and went to bed and went

18   to sleep.

19         Q.   So she told them that --

20         A.   She stayed up.

21         Q.   -- y'all really didn't need anybody to come

22   out there?

23         A.   Very well.  She explained it to Derane when

24   he got there.

25         Q.   All right.  Well, let's take this one step

1    at a time.  After you made your 911 call, was Patsy

2    still on the phone?

3            A.   Yes, sir.

4            Q.   What did you do while she was on the phone?

5    You said you went to bed?

6            A.   Went to sleep.

7            Q.   You just went on to sleep?

8            A.   After talking to the 911 on the phone.

9            Q.   Okay.  What is the next thing that you

10   remember?

11           A.   A bunch of hollering and screaming out loud

12   and cussing and carrying on.

13           Q.   All right.  Let's start right there.

14           A.   That's enough to wake me up.

15           Q.   Tell me how -- tell me how -- were you

16   awakened by all this?

17           A.   Yes.

18           Q.   What time was that?

19           A.   About 2:00 or 2:30.

20           Q.   2:00 or 2:30.  And whose voice awakened you?

21           A.   Derane's.

22           Q.   Derane Ingle.  Were you in your bedroom

23   asleep?

24           A.   Yes.

25           Q.   Where was he at the time?

1        A.  My wife asked him not to come in.

2        Q.  Answer my question.  Where was he at the

3  time you first heard his voice?

4        A.  He barged in behind my wife.

5        Q.  No.  I want you to answer my question.

6        A.  He was in my living.

7        Q.  He was in your living room?

8        A.  Screaming and hollering, raising Cane.

9        Q.  What was he saying to you?

10       A.  First off he told my wife Patsy to hang up

11  the G.D. phone.  She was calling my brother Gene.

12       Q.  Now, when you first heard his voice, you

13  were in your bedroom?

14       A.  I had to get out of bed.

15       Q.  Where was he?  Where was he?

16       A.  He was in the living room.

17       Q.  He was in the living room.  Was the door

18  opened?

19       A.  Yes.

20       Q.  Could you see him?

21       A.  The door was still opened, and he was

22  standing in the middle of my living room.

23       Q.  When he started calling you to get up, could

24  you still -- could you see him?

25       A.  No.  I was in the bedroom.  About from here

1   to that wall there to the back bedroom to the living

2   room would be about from here to back there would be my

3   bedroom, against that wall (indicating).

4          Q.   Against this wall here (indicating)?

5          A.   From this far to the living room.

6          Q.   That's a pretty good distance.  You're

7   talking about a good 20 yards.

8          A.   He was hollering loud.

9          Q.   So is your bedroom at one end of your

10  trailer?

11         A.   Yes, sir.

12         Q.   He was at other end; is that what you're

13  testifying?

14         A.   Yes.

15         Q.   Is there like a hallway?

16         A.   Uh-huh.

17         Q.   Was he at one end of the hallway and you

18  were at the other?

19         A.   He was standing right square in the middle

20  of the living room.

21         Q.   In the living room.  Is the living room at

22  the opposite end of your trailer?

23         A.   Yes.

24         Q.   Okay.  Now, when you heard his voice, that

25  awakened you; is that correct?

1     A.  Yes.

2     Q.  You got up.  What did you do next?

3     A.  I got out of bed, walked in the living room

4 to see what was going on, and I just had my underwear

5 and t-shirt on.

6     Q.  Okay.  When you got to the living room, what

7 did you see?

8     A.  I seen Derane standing on the other side of

9 my wife, but my wife was in between and she was doing

10 like this (indicating).  She asked him to leave, and he

11 would not leave.  Said he had to talk to me, and he told

12 me to sit down, which there wasn't no place to sit right

13 there.  And I was going -- I thought if I could get over

14 to the couch, I would get to couch.

15     Q.  All right.

16     A.  I didn't make it to the couch before he

17 sprayed me with that stuff.

18     Q.  Before we get to that point, when you got

19 into the living room, your wife was standing between him

20 and you?

21     A.  Yes.

22     Q.  She was going like this (indicating), spread

23 eagle; is that correct?

24     A.  Yes, that far apart.

25     Q.  He was behind her?

1    A.   He was -- she was in between me and him.

2    Q.   So, he was behind her; is that correct?

3    A.   He came in the door behind her in the living

4    room, and when I came in the living room, she was in

5    between me and him going like this (indicating).

6    Q.   All right.  So, he was at one end of her arm

7    and you were at the other end, like this, you were here

8    (indicating)?

9    A.   Right in the middle.

10   Q.   And she was there.  Now, did he have --

11   A.   I was just in my underwear and t-shirt.

12   Q.   Did he have a weapon drawn?

13   A.   At that time I didn't see no weapon drawn.

14   Q.   What happened next?

15   A.   He ordered me to sit down and right there I

16   had to sit in the floor in the hallway, and I was going

17   to sit down on the couch but for some reason or another

18   he reached around trying to spray me in the face with

19   that stuff and I was blinded.

20   Q.   Right before he did that, did you and he

21   have any words?

22   A.   The only thing I said is, "My past is coming

23   back to haunt me."

24   Q.   Your past is coming back to haunt you?

25   A.   My past is coming back to haunt me, because

```
 1   I tried to get away and I moved out of town to get away

 2   from him and his in-laws, and dog if he didn't find a

 3   way to attack me, to get to me.

 4           Q.  So he reached around --

 5           A.  Attacked me, sprayed my face with that

 6   stuff.

 7           Q.  Did you threaten him at all?

 8           A.  No.  Didn't cuss him, didn't threaten him.

 9   I wished he could find it on tape there, that way we

10   would know for sure.

11           Q.  All right.

12           A.  Because I didn't cuss him or threaten him.

13           Q.  Hold on one second.  You say he reached

14   around your wife Patsy and sprayed you with something?

15           A.  Yes.  I know it was stronger than pepper.

16           Q.  Tell me what the immediate effect of that

17   was.

18           A.  I didn't know what it was but I couldn't see

19   nothing.

20           Q.  You couldn't see anything?

21           A.  Couldn't see.  He kind of pushed her out of

22   the way and handcuffed me like this behind my back.

23           Q.  Let me stop you right there.

24           A.  And throwed me over the recliner --

25           Q.  Taz, let me stop you right there.
```

1    A.   -- and I landed on my head in the floor.

2    Q.   Let me stop you right there.  You say he

3    sprayed you in the face.  How close was he, how close

4    was his hand to your face?

5    A.   Patsy's arm ain't as long as mine.  I would

6    say around four feet, maybe a little better than four

7    foot.

8    Q.   You didn't use any threatening words against

9    him?

10    A.   I was just like this until he sprayed me in

11    the face, and all I could do -- my nightmare has come

12    back to haunt me.

13    Q.   All right.  After he sprayed you in the

14    face, were you immediately blinded by this?

15    A.   Yes, sir, I couldn't see.

16    Q.   How long were you blinded?

17    A.   I was blinded halfway, he threw me out the

18    door in my underwear and shirt.

19    Q.   No, answer my question.  How long were you

20    blinded?

21    A.   Approximately all the way to the jail house,

22    because he stopped and sprayed me some more and hit --

23    slinging me, open the back door trying to drag me out.

24    Q.   You were blinded from the time you left the

25    trailer all the way to the jail house, is that correct,

1    you couldn't see?

2         A.   I think I measured 35 feet from my front

3    door before he put me in the back of that car, he was

4    still spraying me with that stuff, and I've got pictures

5    of it on the ground.

6         Q.   All right.  Now, once you were blinded, what

7    did you do?

8         A.   He tell me to do this and tell me to do

9    that, and I couldn't see.

10        Q.   What was he telling you, to be specific?

11        A.   Get up, and pushed me out the door.  I hit

12   her car, bounced back on the door step.  He was throwing

13   me around like a rag doll, telling me to get in the car;

14   where is the car, I didn't know.

15        Q.   Were you on the floor?

16        A.   He throwed me out the door, hit the car,

17   bounced back in on my steps and hit my back.

18        Q.   All right.  Wait.  Did you have --

19        A.   Patsy begged him to let me put some pants on

20   me, and then he throwed me back in the house.

21        Q.   Okay.  So you didn't have any -- your pants

22   on at this time?

23        A.   Nun-uh.

24        Q.   Did he handcuff you?

25        A.   Handcuffed behind my back.

1    Q.   When did he handcuff you?

2    A.   Right after he sprayed me in the face with

3    that stuff, turned me around and handcuffed me.

4    Q.   Okay.

5    A.   He throwed me around in the house and I

6    flipped over a recliner.

7    Q.   You flipped over a recliner?

8    A.   Yeah.  Her mother's recliner she inherited

9    because -- her mother's recliner, tumped me over into

10   it.  I couldn't get up, because if I was handcuffed in

11   the front, I could have helped myself got up, but back

12   here in handcuffs behind my back, I couldn't help myself

13   get up.

14   Q.   Okay.  So you were handcuffed in the back.

15   Did you have any clothes on other than your shorts and

16   t-shirt?

17   A.   Underwear and a shirt.

18   Q.   After he handcuffed you, what did you do?

19   What did he do with you?

20   A.   After he put the handcuffs on me?

21   Q.   Yes.

22   A.   Throwed me over there in the recliner and it

23   turned over in the floor and landed up on my head.

24   Q.   You hit your head?

25   A.   On the floor.  On the pieces of the tile in

1   the kitchen part, hard as that.  Well, then he picked me

2   back up from there and sat me back in the recliner after

3   he throwed me back in the house.  Patsy was begging him

4   to let me put him some pants on.  And she took

5   everything out of my billfold, and he didn't have

6   nothing proving my name had been changed on the 6th of

7   February.  He just assumed --

8           Q.  Let's stop right there.  You say Patsy was

9   begging him to let you go put some clothes on.  Did he

10  ever tell you you're under arrest?

11          A.  No, not that I know of.

12          Q.  He never did tell you you were under arrest?

13          A.  I could hear him.  He didn't say you're

14  under arrest.

15          Q.  Did he ever tell you --

16          A.  He just said, "You're going to jail."

17          Q.  You're going to jail.  Did he tell you what

18  you were being charged with?

19          A.  No, sir.  I even tried to ask the jailer

20  that after --

21          Q.  Well, we'll get to that point.  We'll get to

22  that point.  Did you -- when did you put your clothes

23  on?

24          A.  Patsy put my pants on.

25          Q.  While you had your handcuffs on?