FILED
2006 Aug-21  PM 05:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

1    what he was going to do, because my brother Gene told me

2    that.  He said, "Your buddy got a job with the county.

3    He get a chance, Taz, he's going to beat you up, going

4    to hurt you."  He was right.

5          Q.  Mr. Burch, how would the Sheriff's

6    Department know about your history with Mr. Ingle?

7          A.  John Mark didn't put him up to doing this.

8    John Mark didn't even know what he was doing.  He was

9    out doing what he wanted to do or what he was suppose to

10   do, but he took it on his own to do this, and he should

11   not have done that.  I'm sure John Mark -- I've been to

12   school with John Mark.  John Mark is a good man.  John

13   Mark did not put him up to do it, and if there's another

14   deputy on sheriff, he knows we had problems in the past.

15   He should have sent another deputy out there.

16         Q.  So just make sure I understand correctly.

17   What you meant by that was Deputy Ingle should have told

18   the Sheriff's Department about his previous dealings

19   with you; is that right?

20         A.  That's correct.  He should have sent

21   somebody else out there, not him, and we wouldn't be

22   here today.

23         Q.  Mr. Burch, how many times have you been

24   convicted of a crime?

25         A.  What kind of crimes are you talking about?

1      Q.  Any crime.  Let's exclude traffic tickets.

2      A.  One public intoxication, one U.P.P.B., but

3  it wasn't mine.  The man that was driving the truck, it

4  belonged to him.

5      Q.  What's a U.P.P.B.?

6      A.  U.P.P.B. is unlawful possession of beer.  He

7  had two cans of beer in his truck.  They took both of us

8  to jail because it was his beer, not mine.  They jerked

9  me out of that vehicle I don't know how many times and

10 took me to jail.

11     Q.  I'm not asking you about the specifics

12 yet.  We've got one public intox.  We've got an unlawful

13 possession of a prohibited beverage.  You have to

14 forgive me, I'm not from a dry county.

15     A.  And on another arrest put me in there --

16 come and get me, come and get me, come and get me, come

17 and get me.  I called trying to get the farm moved.  I'm

18 going to jail because it was his wife.  His mother and

19 daddy got on my property.  They couldn't get the farm

20 moved, but the Judge requested I move.  I've been there

21 a lot longer than they have, and I had to move out of

22 town.

23     Q.  Have you ever been convicted of carrying a

24 concealed weapon?

25     A.  (Witness shakes head.)

1      Q.  I need you to answer out loud, sir.

2      A.  Never been convicted of carrying a

3  concealed weapon.

4      Q.  On April the 18th of 1995 you were not

5  convicted of carrying a concealed weapon?

6      A.  I never was charged with it, but that's the

7  way I'm supposed to carry it, concealed.  I ain't

8  suppose to have it on my side.  I'm supposed to carry it

9  concealed.

10          THE COURT:   Let's take just a short break.

11          (Short recess.)

12      Q.  I've got one more area, Mr. Burch, and then

13  I'll stop for the night.  When you got to the jail --

14  let me back up.

15          You've been booked into the Walker County

16  jail before, correct?

17      A.  Correct.

18      Q.  And you know the procedures for booking

19  folks into the jail, correct?

20      A.  Correct.

21      Q.  Did you go through that procedure on the

22  morning of February 16?

23      A.  Nope.

24      Q.  You don't recall anybody asking you any

25  questions about your Social Security number for example?

1      A.   I didn't have an ID on me.

2      Q.   Did anybody ask you what your Social

3  Security number was?

4      A.   No.

5      Q.   Did anybody ask you about your medical

6  condition?

7      A.   No.

8      Q.   When you spoke with Nurse Gold, did you

9  complain to her about your middle finger on your right

10 hand?

11     A.   Yes.

12     Q.   Did you complain to her about that?

13     A.   Yes.

14     Q.   Did you complain to her about your thumb on

15 your right hand?

16     A.   Not necessarily.

17     Q.   Not necessarily?

18     A.   I didn't complain about my thumb.

19     Q.   You did not complain about your thumb to

20 Nurse Gold?

21     A.   Right.

22     Q.   I've got one last question for you, Mr.

23 Burch.  Would you object to signing a medical release so

24 the Board can take a look at your previous medical

25 records?

1      MR. PIAZZA:    I'm going to object to that

2   because they're not relevant.

3      MR. WILLFORD:    Whether he had a previous

4   injury I think is very relevant.    They've got his

5   post-injury records.

6      MR. PIAZZA:    We've got the pre-injury

7   records too.

8      MR. WILLFORD:    We would like to see those.

9      THE COURT:    Have the pre-injury records

10  been introduced?

11     MR. WILLFORD:    I don't think they have been.

12     MR. PIAZZA:    I don't think I have those

13  with me.    I'll be happy to share them if I do.

14     MR. WILLFORD:    What we're interested in

15  here is -- I mean, he's listed a large number of

16  doctors; we've got Carraway, we've got that

17  questionable x-ray, and I think the records from

18  that visit would be very relevant for the Board to

19  review.

20     THE WITNESS:    The records is in there.    We

21  got a paper to come with that x-ray.    It's in that

22  file.

23     MR. PIAZZA:    I stand corrected, I don't --

24     MR. WILLFORD:    You don't have those?

25     MR. PIAZZA:    I thought I did.

1          Q.   Mr. Burch, do you go to a methadone clinic?

2          A.   I wouldn't go to a methadone clinic ever.

3               MR. WILLFORD:   That's all I have.

4               MR. PIAZZA:   I've got a few follow-up

5      questions and that's it.

6                        REDIRECT EXAMINATION

7  BY MR. PIAZZA:

8          Q.   The people, the names that he mentioned,

9  Skalnik, Chapman, Darty --

10              MR. PIAZZA:   And what was the last one?

11              MR. WILLFORD:   Shuggart.

12              MR. PIAZZA:   How do you spell that?

13              MR. WILLFORD:   S-h-u-g-g-a-r-t.

14         Q.   You've never heard of these people, you

15  don't know them?

16         A.   I never heard of them before in my life.

17         Q.   Your wife told Officer Ingle to leave how

18  many times?

19         A.   Four or five or six times.

20         Q.   Was this after you got up?

21         A.   This was while I was still in bed and she

22  went outside to meet him and told him -- asked him to

23  leave.

24         Q.   So you could hear what was going on from

25  your bedroom?

1      A.   No I couldn't hear what was going on.

2      Q.   She told you she said that?

3      A.   Yes.  She asked him to leave and he didn't

4  ask her could he come in.

5      Q.   I'll get that testimony from her.

6           You never told him you were going to whip

7  his ass or knock the hell out of him when he was in your

8  house?

9      A.   No.

10     Q.   Did you tell Mr. Ingle to leave your home?

11     A.   My wife advised him to leave my house.

12     Q.   After you got up did you tell him to leave?

13     A.   I didn't have time to tell him nothing.

14          MR. PIAZZA:   That's all I have.

15          THE COURT:   Mr. Burch,  you can step down.

16                       <u>SONYA GOLD</u>

17     called on behalf of the grievant, having been

18  duly sworn by the Judge, was examined and testified as

19  follows:

20                  <u>DIRECT EXAMINATION</u>

21  <u>BY MR. PIAZZA</u>:

22     Q.   Ms. Gold, would you please state where

23  you're employed?

24     A.   Where I'm employed at?

25     Q.   Yes, ma'am.

1          A.   I work at the Walker County Sheriff's
2    Department.
3          Q.   And what position are you employed there?
4          A.   It's a contract labor type.
5          Q.   Okay.
6          A.   I'm not employed for the Sheriff's
7    Department.  I work for Gold Medical Services.
8          Q.   So you are not an employee of the county --
9          A.   No.
10         Q.   -- or the Sheriff's Department?
11         A.   No.
12         Q.   How long have you been in that position?
13   And you work there as an RN or nurse?
14         A.   LPN.  I've been there six years.
15         Q.   And tell me and tell the Board what your
16   responsibilities are in regard to that position.
17         A.   My responsibilities at the jail is to
18   administer medical care.
19         Q.   Could you please speak up a little bit?
20         A.   To administer medical care to the inmates.
21   Basically when inmates enter our facility if they have a
22   problem, I triage the patient.  If they have medications
23   or need to see a doctor, we have a doctor that's on
24   staff 24 hours and he physically comes to the jail twice
25   a week and he sees the inmates that have requested to be

1    seen.  We administer the -- I administer the medications

2    twice a day at the jail.  I'm physically there 5:30 in

3    the morning until roughly 9:00 or 10:00 in the morning,

4    and this is administering the morning medications and

5    seeing those who request to see a nurse or needs to be

6    seen.  Then throughout the day I'm on call, and if the

7    officers have a complaint from an inmate or anything or

8    they need to see a nurse or have a question concerning

9    an inmate, they call me and I respond to their situation

10   as needed.

11            Then I return back to the jail approximately

12   about 4:30 or 5:00 that afternoon and we do an evening

13   pill call administration.

14            Q.  How did you characterize that?

15            A.  We do -- we label it as pill call.  We

16   administer their evening medication, and we call it a

17   pill call.  And we usually finish up around 8:00 or 8:30

18   and then I will see the inmates that request to be seen

19   and so forth, and then I'm on call throughout the night

20   if they need me.

21            Q.  Okay.  Thank you.  Let me ask you this:

22   Have you ever met Mr. Taz Burch?

23            A.  I have met Tommy Barron, who is also known

24   as Taz now.  I was not familiar with the Taz, the new

25   name.

1      Q.  All right.  And when did you meet him?

2      A.  I have to look at my records here.  The

3  first time he --

4      Q.  Let me, before you go any further, let me

5  ask you what kind of records do you have with you?

6      A.  I just basically have the medical records

7  where he -- when he enters our jail if I spoke with him,

8  if he's on medication and if he brought any medication

9  with him, we list the medications, and if he saw the

10  doctor and was evaluated.

11      Q.  Are these records kept by you yourself?

12      A.  Yes.  We have them at the Walker County

13  jail.

14      Q.  Okay.  So they're permanent records there?

15      A.  Permanent records.

16      Q.  What is the title of those records?

17      A.  Medical records, medical charts.

18      Q.  Do they have a name?  If I was going to

19  subpoena those records, what would I --

20      A.  Just medical records, just like with any

21  doctor's office.

22      Q.  Pardon me.

23      A.  Just like with any doctor's office, if you

24  were to subpoena the medical records.

25      Q.  And how are they indexed, by name?

1        A.   Right, by their name and their -- I don't

2    know if I'm getting -- they're labeled in filing

3    cabinets by their last name.

4        Q.   By last name?

5        A.   Yes.

6        Q.   And they're kept on all inmates?

7        A.   Right.

8        Q.   Or guest we'll say --

9        A.   Yes.

10        Q.   -- to the Walker County jail.  Does that

11    include if a guest does not need any medical treatment

12    or has no pills, do you still make a record of it?

13        A.   We -- as opposed to me making a chart on

14    every inmate that comes through there, they have an

15    inmate, or a patient, you know, but if they come in,

16    they do a history on them, they ask them a series of

17    questions and then they determine if they need to see me

18    through the series of questions.

19        Q.   Who does the history?

20        A.   The booking officer.

21        Q.   The booking officer?

22        A.   Uh-huh.  They have a standard form.

23        Q.   Is that a matter of practice on every --

24        A.   Everyone.

25        Q.   -- every person --

1          A.   Every person.

2          Q.   -- inmate that comes in?

3          A.   (Witness nods head.)

4          Q.   And when is this booking history made?

5          A.   When they're brought into the jail.

6          Q.   When they're booked?  So that's part of the

7     booking process?

8          A.   Booking process.

9          Q.   What all is included in the booking process?

10         A.   I wouldn't be able to answer.  I'm not an

11    officer.

12         Q.   You just have knowledge concerning the

13    medical aspect of it?

14         A.   Right.

15         Q.   Do you have the record with you that was

16    made on the morning that Mr. Burch or Mr. Barron was

17    brought in?

18         A.   Just briefly looking just then, yes, I

19    have --

20         Q.   Can I see that, please?

21         A.   Here is a medical history for -- this is

22    dated on 4/2/03.

23         Q.   4/2/03?

24         A.   Yes.  I don't know if that's the date you're

25    looking for.

1          Q.   What was the piece of paper that you just --

2          A.   That's where I spoke with the patient on

3    4/2/03.

4          Q.   Now, this is a Tommy Barron.  Are we talking

5    about April 3, 2003?

6          A.   Uh-huh.

7          Q.   Hold on to those for one second.  So this

8    is -- is that the first time that you met Mr. Barron?

9          A.   Right.

10         Q.   And was that at the Walker Regional -- I

11   mean was that at the Walker County jail?

12         A.   Right.

13         Q.   Do you have any records for February 16, the

14   morning of February 16?

15         A.   Yes, I do.

16         Q.   Do you have those with you?

17         A.   Yes.  I have a list of his medications and I

18   have an evaluation form where he seen the doctor.

19         Q.   Can I see that, please?

20         A.   Sure.  As opposed to his history booking

21   process, it's probably in his chart.  I don't have that,

22   but I can get access to it.

23         Q.   You didn't bring the chart for the last time

24   he was in jail, which would have been February 16?

25         A.   No.  This is all his chart that I have.

1      Q.   That's everything on Mr. Barron?

2      A.   Yes, that I have.

3      Q.   Is that all the records that the Walker

4  County jail would have on Mr. Barron?

5      A.   No.  We would have log sheets that we put on

6  each individual cell, and we write on those log sheets

7  and those are kept in his permanent record.  Their

8  record as opposed to my medical is totally different.

9      Q.   Okay.  So they have a permanent record and

10  you have a personal record?

11      A.   Right.

12      Q.   And what you've brought tonight is your

13  personal record?

14      A.   Right.

15      Q.   Now, and your testimony is that you made

16  this personal record on the morning of February 16?

17      A.   Right.  I spoke with him at -- approximately

18  I arrive at the jail at 5:30, so it could have been

19  anywhere between 5:30 and 5:45, but I had documented on

20  his log sheet.

21      Q.   Okay.  When you first came into contact with

22  Mr. -- we'll say Barron for your benefit.  That morning

23  what kind of condition did you find him?

24      A.   I was -- when I arrived at the jail, I was

25  met by several officers saying we have an inmate that

1    you need to see.

2              Q.   Who were those officers?

3              A.   I do recall one specifically was Sergeant

4    Kendrick, Chris Kendrick and Charlie Skalnik.

5              Q.   Charlie --

6              A.   Skalnik, S-k-a-l-n-i-k.  And they told me

7    that they had -- an inmate had come in in the middle of

8    the night and that he was pretty combative and could be

9    under the influence, and they had said, you know, we're

10   going to take you to him but just stand back and be

11   careful.

12             Q.   So that was at 5:30 when you arrived.  At

13   what time did you make contact with Mr. Barron?

14             A.   Approximately between arrival of 5:30 and no

15   later than 6:00, so within a 30 minute time frame.  The

16   booking cell that he was in was BK5.  There's four other

17   cells above him, and I just routinely check every inmate

18   and speak with them briefly.

19             Q.   What was the number of his cell?

20             A.   BK5.

21             Q.   So, as far as what order you saw him, was

22   he the first or the fifth or the sixth inmate that you

23   saw that morning?

24             A.   Actually I can't recall, you know, if he was

25   the first.  I do recall going to his cell pretty

1   promptly since they, you know, stated that I needed to

2   see him.  I don't know if there was any -- even if

3   anybody was in those other cells at the time.   There

4   could have been.

5        Q.   When you first saw him, what kind of

6   condition did you find him?

7        A.   When they opened the cell, they called for

8   him to come and speak to the nurse, and they said you

9   said you had routine medications and you need to tell

10  her.

11       Q.   Who said this?

12       A.   The officers.  I can't remember which one.

13       Q.   They were telling him this?

14       A.   Right.  And he was lying on his mattress.

15       Q.   So you went to his cell?

16       A.   Right.  And, of course, when I was there by

17  these officers, Officer Kendrick said, "He did have a

18  cast on when he came in but he's torn it off."

19       Q.   Kendrick said that?

20       A.   Right.  He had a previous injury to his hand

21  and he has taken it off.

22       Q.   Kendrick told you he had a previous injury

23  to his hand?

24       A.   Uh-huh, and he had taken it off.  When I,

25  you know, peered into the cell, he was lying there.  I

1    did see something in the floor.  It appeared to be some

2    type of debris.  I can't recall if it was casting

3    material or, you know, because it was not -- the cells

4    are dark, and he was in there.

5         Q.   Now, did he have any clothing on?

6         A.   Yes, a uniform.

7         Q.   He had the orange jail uniform?

8         A.   Right.

9         Q.   Was he asleep?

10        A.   He appeared to be asleep, and at first it

11   appeared that he didn't want to speak to me, just --

12        Q.   Why do you say that?

13        A.   He didn't -- they asked him to come talk

14   with me and he was --

15        Q.   Now, when you say "they," are you talking

16   about Kendrick and Skalnik?

17        A.   Yes.

18        Q.   Where were they located, where were they all

19   this time?

20        A.   There were several officers because they had

21   stated that he had been very argumentative and

22   combative.

23        Q.   I didn't ask you that.  I asked you where

24   they were.

25        A.   Right.   They were standing in front of me

1  holding the door and I was behind them.

2          Q.  All right.  But before they brought you to

3  his cell they told you to be careful?

4          A.  Right.

5          Q.  Now, did he appear to be combative or

6  aggressive or, you know, presenting any type of

7  aggressive behavior or combative while in your presence?

8          A.  It did escalate after he came to the door

9  because I was not allowed to go into the cell.

10         Q.  Now, you said it did not escalate.

11         A.  It begin to escalate.  After he got up and

12 came over and he was, you know, speaking about his

13 medications.

14         Q.  Okay.  Tell me what he said about his

15 medications.

16         A.  He stated he was on numerous medications and

17 I questioned him what they were.  He didn't know the

18 names of them.  I asked him who his primary doctor was

19 and --

20         Q.  Did he tell you his primary doctor?

21         A.  Dr. Keating, I believe.  I can't recall.  I

22 want to say Dr. Keating.

23         Q.  Did you already have his history?  You had

24 his history in front of you, right?

25         A.  Oh, no.  I had -- no, not at that time.

1    Q.   When did you first see his history?

2    A.   When he came to the doctor and saw the

3  doctor.

4    Q.   Okay.  What's the purpose of making a

5  history when the inmate arrives if they don't give it to

6  the nurse and the nurse not have it when the nurse sees

7  the inmate?

8    A.   How can I best describe that to you.  We had

9  an inmate who I needed to speak with, and he could give

10  me the medical history to me.  I would question him

11  and --

12    Q.   But you don't have the medical history with

13  you when you visit the inmate?

14    A.   The questions are:  Are you conscious, are

15  you unconscious.  I can evaluate that as a nursing

16  professional.

17    Q.   Is that all the history is comprised of; are

18  you conscious or are you unconscious?

19    A.   Is the inmate conscious or unconscious or

20  does he have any medications with him.

21    Q.   So the history is written without the input

22  of the inmate?

23    A.   It's a standard medical screen that we have,

24  that most jails have, that we have developed.

25    Q.   So if the history is written prior to the

1   time that you made contact with the inmate and you don't

2   have the benefit of that history and the inmate is

3   unconscious by the time you get there, what do you do?

4        A.   It's basically that if they are unconscious

5   when they arrive there, when I get there and they are

6   conscious, then that history prior is useless to me.

7   That's why I ask my questions and find out, you know,

8   what medical --

9              (Short interruption.)

10       Q.   If the inmate is conscious and he's talking

11  to you, able to communicate, do you verify the

12  information on the history?

13       A.   Oh, yes.  I can look back to their standard

14  questions.  This is their standard questioning of the

15  jail.

16       Q.   But a non-medical person, from your

17  testimony, takes the history upon entry into the jail?

18       A.   Right.

19       Q.   A non-medical person?

20       A.   A booking officer.

21       Q.   Right.  A booking officer.  Do you have a

22  copy of the history?

23       A.   Sure.

24       Q.   You do?

25       A.   Yeah.  It's standard questions that the

1    inmate --

2                Q.   Is that his history?   Mr. Burch's history?

3                A.   It's 04/02.

4                Q.   4/2/03, okay.   But you don't have the one

5    for --

6                A.   Say yes or no type questions.

7                Q.   You don't have the one for February 16?

8                A.   It's in his chart.

9                Q.   Is there any particular reason you don't

10   have that one?

11               A.   No.

12               Q.   Is there any particular reason you brought

13   the history from April 3, 2003?

14               A.   If I have the medical history, I would place

15   them in the charts, but if I don't, if they're stapled

16   to their booking and it's placed in their main charts at

17   the jail.   If they don't have any medical problems, they

18   are not given to me if they don't have any medical

19   problems, but I usually get a copy of all of them.

20               Q.   Okay.   You can't testify what was written on

21   that history?

22               A.   I wouldn't testify on what was written on

23   that history.   I did my own history.   I did my own

24   questioning and evaluation.   I would not base my

25   knowledge and treatment of choice on anybody else's

1    opinion or yes or no question anyway.

2            Q.  Did you have an opportunity to review the

3    medical history that was taken on the morning of

4    February 16 before arriving here tonight?

5            A.  No.

6            Q.  Why not?  Why did you bring your personal

7    chart and not review the history that was written?

8            A.  I can only bring what I implemented and what

9    I have done.

10           Q.  Okay.

11           A.  I felt no need to look into his chart and

12   see what his charts are.

13           Q.  Did you verify that there was even a history

14   done?

15           A.  No.

16           Q.  So you really can't testify that there was a

17   history done on Mr. Burch the morning that he entered

18   the jail?

19           A.  No.

20               MR. WILLFORD:  Other than the one she took?

21           A.  Right.

22           Q.  Other than this document here?

23           A.  Right.

24           Q.  Now, you said the -- something began to

25   escalate.  Can you elaborate on that for the Board,

1    please?

2         A.  He kept repeating that he needed his routine

3    medication and he had to have them and just basically

4    raising of the voice.

5         Q.  Did he ever become combative or violent with

6    you?   Did he ever threaten you?

7         A.  I never allowed that to happen.

8         Q.  But did it happen?

9         A.  No.

10        Q.  Did you even feel -- did you feel threatened

11   in his presence?

12        A.  No.  I had several officers with me.

13        Q.  Was he -- did he appear to be upset because

14   he didn't have his medication?

15        A.  Right.

16        Q.  Would you characterize it as his being more

17   upset than combative?

18        A.  Really argumentative.

19        Q.  Now, how long did you spend with Mr. Barron?

20        A.  Roughly 10, 15 minutes, briefly.

21        Q.  I've got your record here and you made this

22   record while you were speaking with him?

23        A.  No.

24        Q.  When did you make this record?

25        A.  That's the doctor's.

1          Q.   This is the doctor's record?

2          A.   Right.

3          Q.   And this was made sometime later I take it?

4          A.   Right.   He did see the doctor that

5    afternoon.

6          Q.   What time?

7          A.   Approximately 5:00 or 5:30 maybe.   I'm

8    estimating, though.   I really can't be sure of the time

9    of the arrival of the doctor that night.

10         Q.   Do you know who it was?

11         A.   His records -- yes.   Dr. Vance.

12         Q.   Dr. Vance, Clifford Vance?

13         A.   Princeton ER.   The best records for the time

14   of the arrival of the doctor would be our central

15   control officer who allowed the officer in the jail.

16   They document the time.

17         Q.   The central patrol officer?

18         A.   Central control.

19         Q.   Oh, central control officer?

20         A.   Right.

21         Q.   He controls who gets in and out of the

22   jail?

23         A.   In and out.   Documents the time of arrival

24   and times that they leave.

25         Q.   So these are actually his records that he

1  made?

2          A.  Right.

3          Q.  You had nothing to do with taking the

4  information down on these records here?

5          A.  Well, I did speak with Mr. Barron.  That

6  morning he complained he was in pain, and he complained

7  about the thumb hurting, and so I had documented on that

8  sheet that he needed to see the doctor related to the

9  thumb.

10          Q.  Thumb?

11          A.  Pain.

12          Q.  Any other complaints other than thumb and

13  the lack of medication?

14          A.  Just stated that he needed his routine

15  medicines and that he had injured his thumb.

16          Q.  And where did you make those notations?

17          A.  It would be on the log sheet.

18          Q.  On his log sheet?

19          A.  Right.

20          Q.  So we have a third medical record for the

21  jail?

22          A.  No.  Actually if you read at the top there,

23  patient complains he has thumb pain.

24          Q.  So this is the note that you made?

25          A.  That's when his medications arrived.  His, I

1  believe, brother, I think, brought his routine

2  medication to him.  And then shortly he saw the doctor,

3  so I think the time should be on there.

4         Q.  Actually the time is 4:45.

5         A.  So he saw the doctor shortly after that.

6         Q.  Is this your signature here?  Do you want to

7  take a look at that?

8         A.  Yes, where it says nurse.

9         Q.  What is your first name?

10        A.  Sonya.

11        Q.  Is that your signature?

12        A.  Yeah.

13        Q.  How do you get Gold out of that?  It's about

14  as bad as my signature.

15        A.  Sorry.  I'm on call for the jail.

16            (Short interruption.)

17        Q.  So this record is the one that you made at

18  4:45 p.m., right?

19        A.  Right.

20        Q.  Do you have a record that you made at 5:30

21  a.m.?

22        A.  No, not with me, I do not.

23        Q.  Why not?

24        A.  The doctor --

25        Q.  Why didn't you bring that record?

1          A.   If I document anything, I would document on

2     his log sheet.

3          Q.   On the log sheet?

4          A.   Right.

5          Q.   Why didn't you bring the log sheet in?

6          A.   It's in his permanent record.

7          Q.   It's part of the permanent report?

8          A.   Right, like the officers' documents.

9          Q.   So we've got the log sheet, which is a

10    permanent record.  We have the history.  That's another

11    permanent record, right?

12         A.   Right.

13         Q.   History.  We've got your notes.  Why wasn't

14    this documented on the log sheet?

15         A.   Because the brother gave me the medication

16    and I went and documented on his chart by his

17    medications that I had listed.

18         Q.   We've got the nurse's notes and we've got

19    the physician notes from the time that Dr. Clifford --

20    what's his name?

21         A.   Vance.

22         Q.   So we have four separate medical records

23    that are made.  Is this on a normal basis?

24         A.   Four separate documentations.

25         Q.   Four separate documents, medical documents,

1  that are made when an inmate enters the jail, is that
2  correct, on a normal basis?
3      A.  No.  I mean, not on a normal basis.  I
4  couldn't say, I mean, basically when I evaluate a
5  patient I'll document on the notes right there, pen and
6  paper there, available, and we'll document on the log
7  sheet what I'm observing or seeing or speaking with
8  them.  I would not take, you know, the time to go pull
9  their chart and document in their medical chart at that
10  particular time.  I may make a quick note at the door.
11      Q.  Do you recall what you logged and what you
12  placed on his log sheet for that morning?
13      A.  I don't recall, no, what I had documented.
14  Probably -- I can't recall.  I would have to just see
15  it.
16      Q.  You don't recall?
17      A.  Right.  I had already scheduled for that
18  resident to follow up with a primary doctor since we
19  were unable to find out the medications or we were
20  unable to find out the list of medications or the
21  primary doctor, or any information I could go on, so I
22  knew that in less than eight hours a doctor would be
23  available and we could get him some care, that he could
24  write some scripts and get the medication.
25      Q.  So when you first saw him that morning, he

1    didn't tell you what medications he needed?

2        A.   It wasn't -- just high blood pressure pills

3    and statements like that, didn't know the names of them,

4    because our primary doctor is Dr. Keating, and I

5    referred to him as Mark Keating then slurred speech

6    Martha Keating, and we don't have a Martha Keating.

7        Q.   Now let me ask you this:  At the time you

8    interviewed him that morning, he told you that he was on

9    some medications that he didn't have; is that correct?

10        A.   Uh-huh.

11        Q.   Did he ask you to call his wife or his

12    brother to get medications over there for him, do you

13    recall him asking you that?

14        A.   I don't recall him asking me for, you know,

15    any type of, you know, information.  I'll try to, you

16    know, get any information I can to go on to get the

17    routine medication.

18        Q.   Did he tell you that he needed those

19    medications right away?

20        A.   He just stated that he was on routine

21    medications, not that they were warning medications,

22    that he just basically had routine medicines.

23        Q.   Did he tell you that he had had a heart

24    attack and he was on heart medication, blood pressure

25    medication, any of those?

1      A.  I don't recall.

2      Q.  But he did tell you, though, that he was on

3  some medication?

4      A.  Right.

5      Q.  Did you call his wife to ask her what kind

6  of medication is your husband taking because he doesn't

7  know the names, did you do that?

8      A.  No.

9          MR. WILLFORD:  Charlie, I'm going to -- what

10     does this got to do with Deputy Ingle?

11         THE COURT:  I'm not sure.

12         MR. PIAZZA:  I'm --

13         THE COURT:  He is just trying to inquire

14     about what record they have and how they

15     interrelate, I think.

16         MR. WILLFORD:  It doesn't seem to have

17     anything to do with what Deputy Ingle did or did

18     not do or whether he should be terminated.

19         MR. PIAZZA:  I'm going to get to that.

20     Q.  Did you ask his wife about -- you didn't

21  call his wife about --

22     A.  No.

23     Q.  Did he tell you that his middle finger on

24  his right hand had been broken or injured?

25     A.  He said his thumb -- the thumb was hurt on

1    his hand.

2         Q.   He said the thumb.  Is that the only finger

3    me mentioned?

4         A.   It's the only finger that I looked at and

5    documented.

6         Q.   Okay.  Did he relate to you or -- relate to

7    you his experience on being arrested and brought over to

8    the jail by Deputy Ingle?

9         A.   No.  There was no, you know, discussion of

10   how the injury occurred.

11        Q.   There was no discussion of how the injury

12   occurred?

13        A.   Right.

14        Q.   Did you ask him how the thumb injury

15   occurred?

16        A.   No, he didn't tell me how it occurred.

17        Q.   He just told you he had a thumb injury?

18        A.   He said his thumb was sore.

19        Q.   Pardon me?

20        A.   He said his thumb was hurting, his thumb was

21   sore.

22        Q.   Did you notice any bruises or marks on Mr.

23   Barron?

24        A.   No, none that I know of.  I mean, he's

25   inside a cell.  I'm two or three people from him.

1    Q.   Okay.   You didn't physically examine his

2    hand?

3        A.   He held it out and I looked.

4        Q.   Did you touch it?

5        A.   I can't recall.

6        Q.   Did you touch his hand like this and feel it

7    for tenderness or anything like that?

8            MR. WILLFORD:   I think she just testified

9    you can't recall.

10        Q.   Do you recall touching his hand?

11        A.   I can't recall.   I mean, I was warned that

12    this inmate could harm me.

13        Q.   You were warned that he could harm you?

14        A.   In -- not in those exact words.   That he had

15    been yelling, cursing, hitting the walls, basically

16    since he got there and --

17        Q.   I understand.

18        A.   -- being argumentative.

19        Q.   I understand.   But he didn't exhibit any of

20    that activity in front of you, did he?

21        A.   Not whenever I was in there.

22        Q.   Okay.   Can you read Dr. Vance's writing?

23        A.   I will try.

24        Q.   Are you familiar with his writing?

25        A.   Yes.

1      Q.  I'm going to ask you if you can interpret

2   some of that for us.  If you would just read through it.

3      A.  "The chief complaint," and it says in the

4   offset, "Friday broke right thumb.  Had cast on.

5   Removed cast himself, and complains of right thumb

6   pain."  And then as below, the doctor has -- that was my

7   documentation of why he was there seeing the doctor, and

8   as below --

9      Q.  So what you're saying is that was your note?

10      A.  Right.

11      Q.  Your handwritten note?

12      A.  Right.

13      Q.  On that form?

14      A.  Right.

15      Q.  That's a copy isn't it?

16      A.  Copy of?

17      Q.  Of the original.  You don't have the

18   original?

19      A.  This is the original.

20      Q.  That's the original form?

21      A.  Right.

22      Q.  Can I see that?

23      A.  (Witness complies.)

24      Q.  Show me where your writing is.

25      A.  (Witness complies.)

1    Q.    Up here, okay.

2    A.    The doctor has written, "Has a swollen right

3    middle finger, zero recollection of how this happened."

4    It has his blood pressure.  And, of course, I listed his

5    routine medications that his brother brought to him.

6    And he's wrote, increased edema.  Ecchymosis, which is

7    bruising.  Increase middle -- I'm not for sure -- I

8    think it says finger.  And it says, "Vascular intact,"

9    and basically he ordered an x-ray and something for

10   pain, but since the patient was currently taking pain

11   medications, they were held, the pain medications

12   prescribed were held.  Prescribed Darvon, and he was

13   currently taking Darvocet, which Darvocet is Darvon with

14   Tylenol.

15   Q.    It says that an x-ray was ordered?

16   A.    Right.

17   Q.    By Dr. Vance?

18   A.    Right.

19   Q.    Do you have the results of that x-ray?

20   A.    X-rays would be obtained in the morning.  We

21   have a company that we retain x-rays who was scheduled

22   for an x-ray, and we send all x-rays at 10:00 a.m.

23   Q.    Where would he have -- how would that

24   process occur, how would that happen with him being an

25   inmate to go take an x-ray?

1        A.   We transport them to Family Health

2   Associates.

3        Q.   Where is that located?

4        A.   Here in Jasper.

5        Q.   Do you have any indication or notes or

6   records that he was, in fact, transferred to have an

7   x-ray?

8        A.   No.   It's just standard when an x-ray is

9   ordered the night, the morning of we take them and get

10  their x-rays.

11       Q.   All right.   Do you know when Mr. Barron was

12  released?

13       A.   He was released before he was taken.

14       Q.   So he never did go get the x-ray, but an

15  x-ray was ordered?

16       A.   Right.

17       Q.   Now before -- when did you receive your

18  subpoena to come to this hearing?

19       A.   The first one?

20       Q.   Yes, ma'am.

21       A.   Let's see here.   The first one here is July

22  12, but the date on it is 2002.   We assumed that was a

23  typing error.

24       Q.   You received a second subpoena?

25       A.   Actually it's not really a subpoena.   It's

1    just a letter stating that the hearing would be

2    continued.

3          Q.   All right.  Now, after you received the

4    subpoena and the notice to come -- that the hearing was

5    going to be continued, had you discussed this matter

6    with anyone?

7          A.   I didn't feel a need to discuss this

8    situation with anyone.  As opposed to the attorney has

9    asked me --

10          MR. WILLFORD:  I'm going to instruct you not

11    to discuss what we talked about.

12          Q.   Other than the county attorney, have you

13    discussed the case with anyone else?

14          A.   No, not that I'm aware of, no.

15          Q.   Have you discussed the case with Deputy

16    Ingle?

17          A.   No.  I haven't met him until actually

18    tonight when I passed him in the hallway.

19          Q.   And how long have you been a nurse there at

20    the jail?

21          A.   Six years.

22          Q.   And you've never met Deputy Ingle?

23          A.   No.  He's a road deputy.  They're not

24    someone I have contact with.

25          MR. PIAZZA:  That's all the questions I

1    have.

2                    CROSS-EXAMINATION

3    BY MR. WILLFORD:

4        Q.  Nurse Gold, did Mr. Barron appear to be

5    intoxicated to you when you saw him that morning on the

6    16th?

7        A.  He didn't appear to be under the influence;

8    slurred speech, unsteady gait.

9        Q.  And you testified that the jailers had told

10   you he had been combative?

11       A.  Yes.  Really yelled and banged his head and

12   hit the walls.

13       Q.  Hit the walls with what?

14       A.  I didn't --

15       Q.  Did they say punch the walls by any chance?

16       A.  For what I was told that he really was irate

17   and argumentative.

18       Q.  Did you see any markings on his hands that

19   would be indicative of someone who had been striking a

20   hard surface?

21       A.  When I appeared to look at his thumb, I did

22   see some swelling and bruising.

23       Q.  That would be indicative of somebody hitting

24   something hard?

25       A.  Could be.

1      Q.  I think you covered the treatment.  He

2  didn't tell you anything about that middle finger on his

3  left -- I'm sorry, right hand?

4      A.  No.

5      Q.  Do you still have that medical record from

6  Dr. Vance?  You said something in there that kind of

7  peaked my interest.  I want to make sure that I

8  understood it.  This part right here (indicating).  What

9  is this part right here?

10     A.  "Basically no recollection of how this

11  happened."

12     Q.  Of how his middle finger was injured?

13     A.  Right.  It has broken right middle finger.

14     Q.  And the date on this record is the 16th of

15  '04, correct, February 16?

16     A.  Right.

17     Q.  I think this examination occurred at 4:45 on

18  the 16th?

19     A.  Approximately after that.  I was with his

20  brother at 4:45.

21     Q.  So, right around 12 hours after you first

22  saw him, roughly, he saw Dr. Vance?

23     A.  (Witness nods head.)

24     Q.  On the same day that this injury supposedly

25  occurred, correct?

1    A.   Right.

2    Q.   And he had no recollection of how the injury

3    occurred 12 hours later?

4    A.   That's what's documented by the doctor.

5    MR. WILLFORD:   I have no further

6    questions.

7    THE COURT:   Any redirect?

8    MR. PIAZZA:   There is one thing that kind

9    of peaked my interest on that too.

10                   REDIRECT EXAMINATION

11   BY MR. PIAZZA:

12   Q.   You mentioned you couldn't read what was the

13   third finger --

14   A.   I assume it's finger, looks like x-ray

15   finger.

16   Q.   I think you said that increased -- what is

17   this word here?

18   A.   Range of motion.

19   Q.   What does that mean?

20   A.   Decrease range of motion.

21   Q.   Decrease range of motion.  What is this

22   word?

23   A.   Edema, which is swelling.

24   Q.   What's this word?

25   A.   Ecchymosis, which is bruising.

1     Q.  So he had bruising, decreased range of

2  motion on his right middle finger.  What is this word

3  right here?

4     A.  Vascular intact, but I don't recall why this

5  word is written there, basically he has had blood flow.

6     Q.  Okay.  And these are all the records you

7  have concerning this particular visit to the jail?

8     A.  Right.

9        MR. PIAZZA:  Do you have any objection to --

10        MR. WILLFORD:  Well, those are originals.

11  What we're going to have to do is get copies.

12  Those are going to have to go back in her files,

13  the originals.

14        I'm not sure logistically, Charlie, how we

15  do that.

16        THE WITNESS:  Well, first of all they have

17  not been subpoenaed, those records.

18        MR. WILLFORD:  That sort of goes to my

19  question about getting some kind of a medical

20  release from your client.  I don't think this Board

21  frankly has the authority to subpoena those

22  records.

23        MR. PIAZZA:  I would like at least for the

24  Board to view these while they're here tonight, and

25  she's certainly welcome to take them back.

1          MR. WILLFORD:  If Mr. Burch, the patient,

2    has no objection, I have no objection.

3          THE COURT:   I think it would be

4    appropriate since they've been testified to.

5          MR. PIAZZA:  I do too.

6          THE COURT:   It would be meaningful for the

7    Board to look at them.  Mr. Burch, and you as

8    counsel, if y'all don't object to it, then

9    certainly --

10          MR. PIAZZA:  Do you object?

11          MR. BURCH:   No.

12          MR. PIAZZA:   Before I show them to the

13    Board --

14          MR. BURCH:   They need to get to that

15    evidence so go get it.

16          THE WITNESS:  You have no problem with them

17    viewing your medical records?

18          MR. BURCH:   I have no problem.

19      Q.  (By Mr. Piazza)  When did you write your

20    note at the top of this record here?  When did you write

21    this note?  It's obviously a different handwriting.

22      A.  I usually arrive at the jail an hour or so

23    before the doctor arrives to pull charts and get all

24    the --

25      Q.  So you wrote this before the doctor made his

1  notes on the bottom of it?

2          A.   Right.   I had documented it and explained

3  the thumb and that he needed to see him on that, and so

4  he usually keeps a little note pad in a pocket to

5  document what he needs to see and why as I go through

6  it.

7          Q.   It's is your testimony then -- and what's

8  this initial here on the left-hand corner?

9          A.   He's a male, white.

10          Q.   And it's your testimony that you made your

11  handwritten note on this form before the doctor put his

12  notes on here; is that correct?

13          A.   That's correct.

14          Q.   I'll tell you if this is -- and I'm not

15  trying to be argumentative.   I just want you to be sure

16  of what your testifying to, okay.   That this is

17  obviously an original, your writing?

18          A.   Uh-huh.

19          Q.   It appears to me, and I don't know about

20  your attorney, but it appears to me that this is a

21  Xeroxed copy of the doctor's notes.   Is it possible?

22          A.   He has a different ink pen than mine, but

23  it's a Xerox copy, no.

24          Q.   So it's impossible that this could be a

25  Xerox copy and that you would have added your notes at a

1  later time after the doctor makes his --

2          A.   That's falsifying information, and that's

3  why I'm watching because these are my medical records.

4          Q.   Right.  This is obviously an original.  I

5  still don't understand how you get Gold, and I'm not

6  trying to be argumentative.  I can't get Gold out of

7  that as hard as I try, but I'm not going to argue with

8  you because I've got a terrible signature too.  But

9  thank you.

10          THE COURT:   Ms. Gold, as soon as you can

11  get your records back you'll be excused, and let's let

12  the Board peruse them just a minute and then we're going

13  to recess.

14          (Short recess.)

15          THE COURT:   This is a question by Morris

16  Studdard of Nurse Gold.

17          BOARD MEMBER STUDDARD:   Where I work we do

18  this a lot; we've got an original form, we may take that

19  and put it in the Xerox and run 25 more off.  Is that

20  the way that's reproduced?

21          THE WITNESS:   Yes.

22          BOARD MEMBER STUDDARD:   I mean, it's not

23  just a form that's ordered in?

24          THE WITNESS:   No, that would be --

25          BOARD MEMBER STUDDARD:   You just keep

1   reproducing them?

2            THE WITNESS:  Right.  We have one and Xerox

3   a hundred off of that one.

4            THE COURT:   But that would be the blank

5   form?

6            BOARD MEMBER STUDDARD:   Yes, just the blank

7   form itself?

8            THE WITNESS:  Yes.

9            THE COURT:   Now we have a question by Mr.

10  Andrew Archie.

11           BOARD MEMBER ARCHIE:  Still on the form, I

12  think you testified that you wrote your information

13  first?

14           THE WITNESS:  Right.

15           BOARD MEMBER ARCHIE:  Then he come back and

16  put this in the document?

17           THE WITNESS:  Right.  The darker

18  handwriting, which is the doctor's.  I have wrote the

19  medication though.

20           THE COURT:   Anything else?  Board, do you

21  have anything?  David?

22           BOARD MEMBER KELLY:  I don't have anything.

23           MR. PIAZZA:   Let me see that form for one

24  second.

25           THE COURT:   Anything else for Nurse Gold

1    before she's dismissed?

2              MR. WILLFORD:  No, sir.

3              MR. PIAZZA:  Is there any way I can get a

4    copy of those before she leaves?

5              SHERIFF TIREY:  Not without a subpoena.

6              THE WITNESS:  When I receive the subpoena,

7    I'll be glad to make you copies.

8              SHERIFF TIREY:  I have to be ugly but

9    there's a federal judge that carries a little more

10   weight than all this and that's why they're separate

11   medical records.  I can explain that to y'all, but I

12   want a subpoena.

13             THE COURT:  Even though he's your client

14   and he's sitting here wanting that, that would still

15   have to go through that procedure from what I

16   understand.

17             We're obviously not going to be able to

18   finish.  We've got some folks tonight under some time

19   constraints.

20             You can close the record and be excused, and

21   we're just going to talk about reconvening.

22

23

24

25

C E R T I F I C A T E

STATE OF ALABAMA      )

WALKER COUNTY         )

I hereby certify that the above and foregoing proceeding was taken down by me by stenographic means, and that the questions and answers therein were produced in transcript form by computer aid, and that the foregoing represents a true and correct transcript of the proceedings occurring on said date.

I further certify that I am not of counsel, nor related to any of the parties to this action; nor am I in anywise interested in the result of said cause.

RHONDA G. WOODS

Notary Public, State of Alabama at Large

My commission expires December 21, 2008.