FILED

2006 Aug-21 PM 05:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

1          A.   No.   He was standing still like --

2          Q.   Was there any -- could you see any

3     justification for Deputy Ingle to use this Freeze Plus

4     on your husband?

5          A.   I didn't understand it.

6          Q.   Did your husband provoke him in any kind of

7     way?

8          A.   No.   All I know is I was in between them two

9     until I bent down over here and got the phone.   After he

10    started spraying him, I bent over and got the phone.

11    And he was just standing there in his underwear with his

12    hands in front of him like this (indicating).

13         Q.   You say with his hand -- you mean before he

14    had the handcuffs on him?

15         A.   Yes.   I told him to scoot back and I said,

16    "Don't come over here and get in his face.   Scoot back."

17         Q.   Oh, so he was standing up there in his

18    underwear like this (indicating)?

19         A.   Yes.   He was standing stiff like that.

20         Q.   How long did it take them to get into the

21    car?

22         A.   Quite a while.   Well, I don't know.   A few

23    minutes.   I don't know.   He was falling.   He had his

24    eyes closed tight, and he was trying to lead him around.

25         Q.   Was he -- did you observe him exclaiming

1    anything about pain, that he was in pain, was he making

2    -- was your husband screaming?

3        A.   Nuh-uh.

4        Q.   Could you tell whether or not he was

5    fighting with Deputy Ingle?

6        A.   No.  He was just -- he had his eyes closed

7    and he couldn't see where he was going, and we've got

8    stumps outside and he was trying to lead him to the car

9    and get him in the car.

10       Q.   How far away was the car?

11       A.   My car was by the trailer.  His car was back

12   a ways.

13       Q.   The Board here probably doesn't know --

14   can't tell from that statement.

15       A.   Well, my car pulled up in the front door.

16       Q.   Do you have a judgment as to the distance,

17   would his car have been the distance from your

18   trailer, we'll say your trailer being this wall here,

19   and his car being this other wall?

20       A.   My car was parked in by the trailer, and

21   then his car was a good ways back.

22       Q.   All right.  What was the distance between

23   your car and his car?

24       A.   A good little ways, so many feet.

25       Q.   It would be the same distance between these

1    two walls here?

2         A.  Oh, no.  Not that far.

3         Q.  Not that far?

4         A.  No.

5         Q.  What about half the distance?

6         A.  I don't know.

7         Q.  Okay.  So you know it wasn't as far as this

8    wall right here?

9         A.  No.  It wasn't that far back, no.

10        Q.  Now, tell the Board what obstacles were

11   between your trailer and his car other than your car.

12        A.  My car, some stumps.

13        Q.  Trees?

14        A.  Trees.  Lots of trees.

15        Q.  Bulldozers or equipment or --

16        A.  No.  There was trees.

17        Q.  Tools, anything like that?

18        A.  No.  Just trees and a stump.  One stump and

19   three or four trees.

20        Q.  How dark was it?

21        A.  It was dark.

22        Q.  You have a light outside?

23        A.  I don't think it was on.

24        Q.  Did you turn it on when the deputy arrived?

25        A.  I don't think so.  I don't remember.

1        Q.  But you said you didn't recognize him?

2        A.  I don't think.  It was dark outside.  But he

3    had -- because I couldn't even see who he was.  I

4    didn't -- I wouldn't have knew him if I had seen him

5    probably.

6              MR. PIAZZA:   That's all I have.

7              THE COURT:  I've got one other thing the

8         Board might be interested in.  Let's let this be

9         the last question if we can.

10             You testified that y'all were inside before

11        the spraying took place and there was no

12        provocation to justify the spraying in your

13        opinion?

14             THE WITNESS:  That's right.

15             THE COURT:  What was going on that made you

16        feel like you needed to restrain or hold --

17             THE WITNESS:  Well, he came over close to

18        me and was in the middle of the floor, and he went,

19        "Oh my God.  My past has come to haunt me."  And

20        when he did that, I said, "You're Derane Ingle."

21        And I looked at him.  I knew who he was then.

22             THE COURT:  What about that made you feel

23        like you needed to restrain him or hold him back?

24             THE WITNESS:  So he wouldn't get by him so

25        he wouldn't -- you know.  I didn't want him getting

```
1        into trouble, so I told him to scoot back.  I said,
2        "Don't get in his face," and I scooted him back.  I
3        didn't want him to get too close to him, so I
4        scooted him back.
5              THE COURT:  Next witness.
6              MR. PIAZZA:  Can I just ask one more
7        question, just one?
8          Q.  You did that because you knew that there
9    was trouble between the two in the past?
10         A.  Yes.  When I recognized that --
11         Q.  You knew that Deputy Ingle had arrested
12   him --
13         A.  He went, "Oh my God.  My past has come back
14   to haunt me," I looked at him and I said, "You're Derane
15   Ingle?"  And then I made Tommy scoot back across the
16   living room, because I didn't want him to get --
17             MR. PIAZZA:   That's all the questions I
18        have.
19             (Short break.)
20             THE COURT:   Andy, do you want to make an
21        inquiry now about the expectations as far as
22        witnesses are concerned?
23             BOARD MEMBER ARCHIE:  We're going to hear
24   one more witness and we going to call it quits.
25             THE COURT:   Let's go through this witness
```

1    --

2          MR. WILLFORD:  If I could offer a

3    suggestion.  I believe the complainant has one more

4    witness after this one, so if we could finish the

5    complainant's case tonight --

6          THE COURT:    When we left he said he had

7    one more witness but he discovered another witness,

8    so it's going to be two witnesses.

9          MR. PIAZZA:  Another witness that was

10   subpoenaed that has not gotten to testify yet.

11         THE COURT:    Instead of one more for the

12   complainant, we've got two more.  Let's go.

13         Gene, you were here the other night.  Are

14   you under oath?  He's under oath and ready to go.

15                ALAN GENE BARRON

16      called on behalf of the grievant, having

17   previously been duly sworn by the Court, was examined

18   and testified as follows:

19                DIRECT EXAMINATION

20   BY MR. PIAZZA:

21         Q.  Would you please state your full name?

22         A.  Alan Gene Barron.

23         Q.  Are you related to Taz Burch?

24         A.  Yes, I am.

25         Q.  What relation are you?

1          A.   He's my brother.

2          Q.   And are you familiar with the complaint that

3     he made against Deputy Derane Ingle?

4          A.   Yes.

5          Q.   So he's told you about it; is that correct?

6          A.   I was aware of it.

7          Q.   He's told you of the charges he's facing?

8          A.   Yes.

9          Q.   He's told you of the charges he's facing in

10    connection with that arrest?

11         A.   Yeah.

12         Q.   Now, are you retired?

13         A.   Retired, Walker County Sheriff's Department.

14    Ten years this coming February.

15         Q.   How long were you employed -- were you a

16    deputy?

17         A.   Yes.

18         Q.   How long were you employed as a deputy?

19         A.   About 21 and a half, 22 and a half years,

20    something like that.  I had military time so I took an

21    early retirement.

22         Q.   And what was your responsibilities and

23    duties as a deputy?

24         A.   To serve court papers and make arrests and

25    just general police work.

1        Q.  Did you have a patrol car?

2        A.  Yes.

3        Q.  Did you have a certain area that you

4   patrolled?

5        A.  At times we had certain areas and sometimes

6   you had one area, according to how --

7        Q.  In your 21 or 22 years, do you have a

8   judgement as to how many arrests you've made over that

9   period of time?

10       A.  I couldn't tell you.

11       Q.  Is that -- would that be in the neighborhood

12  of a thousand, five thousand, how many would you -- did

13  you ever keep any records of that?

14       A.  Never did keep records of it.  Clerk's

15  office should be.

16       Q.  Would you have a -- would you take an

17  educated guess?

18       A.  Sometimes it would be six to eight a day.  I

19  worked in town here in the north area.

20       Q.  Did you ever arrest anybody without a

21  warrant?

22       A.  Yes.

23       Q.  What was the usual circumstance of you

24  arresting someone without a warrant?

25       A.  Call or patrol one.

1    Q.  Did you ever make -- did you ever respond to

2    any domestic violence calls?

3    A.  Yes.

4    Q.  Do you have a judgment as to how many

5    domestic violence calls you responded to?

6    A.  It was about --

7    Q.  Does the Walker County Sheriff's Department

8    have a particular protocol when it comes to domestic

9    violence cases?

10    MR. WILLFORD:   I would object to the basis

11    of this witness' knowledge given that he just

12    testified he retired ten years ago.

13    MR. PIAZZA:    I'm going to ask that the --

14    THE COURT:    Sustained.

15    MR. PIAZZA:    -- Board treat this witness

16    as an expert since he has 21, 22 years with the

17    Walker County Sheriff's Department, and if, you

18    know, the counsel for Mr. Ingle wants to present

19    evidence in contradiction to what he testifies to,

20    he's certainly welcome to.  But I think that Mr.

21    Burch has a right to present his own expert

22    testimony as to what policies and procedures are as

23    far as this witness either knows now or what he

24    knew at the time he -- when he was employed as a

25    deputy sheriff.

1           MR. WILLFORD:  I have no objection to him

2     testifying as to what the policies were at the time

3     he was a deputy, but as to what they are now, ten

4     years after he stopped being a deputy, I object.

5           MR. PIAZZA:   We've got the policy and

6     procedure book here that has the current testimony

7     in it.  He can certainly review that for us and

8     probably go directly to whatever policy they have.

9           THE COURT:    I think he's qualified as a

10    law enforcement officer ten years retired.  I don't

11    know where you plan to go with on him as an expert

12    as far as giving opinions and all relative to the

13    current rules and procedure.  I don't think he

14    would be qualified to do that.  But let's just take

15    it as we go and we'll rule as we go.

16         Q.  Would you have a judgment as to how many

17    domestic violence calls you were dispatched on?

18         A.  Estimate probably three or five a week.

19         Q.  Now, at the time that you were employed as a

20    deputy sheriff, what was the general protocol at that

21    time with regard to responding to a domestic violence

22    situation?

23         A.  Domestic violence situation.  If there was

24    something that happened outside the home, it was

25    different than something that happened inside the home.

1          Q.    Would you explain what you mean by that?

2          A.    If it was on private -- it's according to

3    where it's at.

4          Q.    Could you speak up, please?

5          A.    This thing working?

6          Q.    Would you mind taking your gum out, because

7    you may be hard -- thank you.  Would you explain the

8    difference between responding to a domestic violence on

9    private property and one on public property, if that was

10   the intent of your statement?

11         A.    How it is in the county -- out in the county

12   whenever you're by yourself sometimes, you talk about

13   what is going on at the jail or dispatch puts you -- you

14   got to know about what type of call it is before you get

15   there.  Sometimes it would be worse or it could get

16   better or it gets worse when you get there.

17         Q.    So depending on what the situation you

18   found would dictate how you reacted to it; is that what

19   you're --

20         A.    Yes.

21         Q.    Now, if you responded to a domestic

22   violence -- or let's say just a domestic call, 911 call,

23   at the time that you were employed, if the parties had

24   resolved all of their arguments and issues, what would

25   be your standard procedure at that point in time?

1     A.   If both parties said it was resolved or one

2   party said it was resolved, in that situation I would

3   have to say, okay, if it isn't call us back.

4         Q.   And so you would leave the premises?

5         A.   Right.

6         Q.   And do you know whether or not that's the

7   policy of the Walker County Sheriff's Board -- Walker

8   County Sheriff's Department today?

9         A.   Domestic violence really came out after I

10  retired.

11        Q.   Okay.

12        A.   Or about the time I retired and domestic

13  violence laws came into effect.  It was real close in

14  there.

15        Q.   And do you know what those changes were?

16  Are you aware of those changes?

17        A.   It used to just be assault, something like

18  assault and battery, husband and wife, family members,

19  cussing and fighting, or maybe friends at the house or

20  something, but the Domestic Violence Act was not passed

21  until close to the time I ended my tour of duty.

22        Q.   Excuse me?

23        A.   The Domestic Violence Act was not passed

24  until nearly the end of my tour of duty in 20 something

25  years.

1    Q.   Now, I take it that if you witnessed an act

2    of violence or seen evidence of an act of violence even

3    at the time prior to the Domestic Violence Act was

4    enacted, you could make an arrest at that point; is that

5    correct?

6    A.   Out in public.

7    Q.   Out in the public?

8    A.   Public, yes.

9    Q.   What if it occurred on private property?

10   A.   No.

11   Q.   And that was the policy at that time?

12   A.   The best I remember it was.

13   Q.   Do you know whether or not that aspect of it

14   has changed?

15   A.   About domestic violence?

16   Q.   About arresting someone in their own home.

17   A.   As far as I know the law hasn't changed.

18   Q.   What do you know is the present state of

19   that law?

20   A.   Domestic violence, I mean, person or persons

21   are having problems at a residence or in a public place

22   or a public highway, something like that, if they're a

23   person or a passenger or what.

24   Q.   Well, I mean, what would be a charge if you

25   will -- let me withdraw the question.

1              Did you ever make an arrest for disorderly

2    conduct?

3         A.  Yes.

4         Q.  Did you ever arrest anyone in their own home

5    for disorderly conduct?

6         A.  No, I didn't have to, not in the home.

7         Q.  Did you ever make an arrest, period, in

8    anyone's home other than serving a warrant for someone?

9         A.  Make an arrest other than serving a warrant?

10        Q.  Right, in someone's home.

11        A.  I'm sure I did.  I can't tell you which one.

12   It's been so long.

13        Q.  Do you recall what that would have been

14   for?

15        A.  Excuse me?

16        Q.  Do you recall what that arrest would have

17   been for?

18        A.  I can't remember.

19        Q.  But you know it would not have been for

20   disorderly conduct?

21        A.  I don't think it would have been for that,

22   no.

23        Q.  Would it have been for arresting --

24   resisting arrest?  Have you ever made an arrest in

25   someone's home or within their surroundings, their

1    living surroundings, for resisting arrest?

2         A.  Resisting arrest?  The way I understand that

3    you already have somebody under arrest and they not

4    going with you the way they should.

5         Q.  Now, if someone is already under your

6    control -- and when I say control, subdue.  If you've

7    already subdued someone either by handcuffs or other

8    means, is it your understanding that that person can

9    still be charged with resisting arrest?

10        A.  After you arrest them they can be.

11        Q.  Even after he's already been subdued and

12   handcuffed?

13        A.  If he starts giving trouble on the way to

14   the jail, where he causes something -- cause an officer

15   to be in trouble, yeah, you have to.  Charge him with

16   resisting arrest if he makes bodily contact with you.

17        Q.  Now, in your years as a deputy sheriff, did

18   you have -- was there a policy where you put someone's

19   handcuffs in the front of him or in the back?

20        A.  You put them on both ways.

21        Q.  Put them on both ways.  What would dictate

22   that?

23        A.  The ones behind --

24        Q.  Can you speak up, please?

25        A.  The ones that would be behind, I put them

1    behind them if they were a threat to me.

2         Q.   Okay.

3         A.   Handcuff them behind.

4         Q.   And what about --

5         A.   According to how -- being good, I put them

6    in the front.

7         Q.   Do you know whether or not that has

8    changed?

9         A.   I don't know.

10        Q.   Now, was that part of your training as a

11   law enforcement officer?

12        A.   Put his handcuffs on front or rear?

13        Q.   Yes.

14        A.   They teach you how at the police academy.

15        Q.   Okay.  So if you feel that you're -- someone

16   is a threat, you're going to handcuff him from the rear?

17        A.   Yes.

18        Q.   Now, would it be your testimony that if

19   someone uses Mace on another individual, that they

20   perceive that person to be a threat?

21        A.   Mean the officer using Mace on another

22   person?

23        Q.   Yes.

24        A.   Would it be a threat?  It would take certain

25   situations before the Mace would come out.  I don't know

1   what you're really wanting out of me.

2           Q.   What I'm asking you is your knowledge on the

3   use of Mace.  Did you ever use -- did you ever have an

4   occasion to use Mace or Freeze Plus?

5           A.   A couple of times.  Mace was no fun to come

6   back with the person in the car with them, get where

7   you're going and get back to the jail.

8           Q.   Is it your understanding that the use of

9   Mace or Freeze Plus is only authorized when the officer

10  perceives an imminent threat of bodily injury?

11          A.   If he's a threat to a person, yes.  If a

12  threat to a police officer and that's the least option

13  to get him subdued, yes, Mace him.

14          Q.   What do you mean by the least option?

15          A.   If it's gotten so bad you've got to use

16  something like a nightstick or pull your pistol out and

17  shoot, use Mace, get them under control.

18          Q.   But without any other indication of a threat

19  of bodily harm or injury, were you trained that it was

20  okay to use Mace on anyone?

21          A.   At the police academy and at the school that

22  I went to in '73 -- I really don't know.  Like I say

23  different cases, different cause, because you have to do

24  something different every time, they're not ever the

25  same.

1          Q.  Well, let me ask you this:  With your

2    experience as a law enforcement officer and with your

3    experience as with the number of years that you've had

4    and your training, would you say that -- and a deputy

5    who had used Mace and handcuffs on someone without

6    having any threat of harm or injury to him, had used

7    excessive force?

8          A.  If he was in handcuffs in the car or going

9    to get in the car, no need for no Mace.

10         Q.  And if a person is already in handcuffs,

11   would there be any need for Mace?

12         A.  Because all they've got left is their feet,

13   they can run off and leave, if they run.  Put the

14   handcuffs on him, he'll stop.

15         Q.  But to reiterate, the only time that you

16   feel that it's justified in using Freeze Plus or Mace if

17   the person that you're about to arrest is combative or

18   threatening?

19         A.  Right.

20         Q.  Is that correct?

21         A.  Yes.

22         Q.  Now, did you have -- when was the last time

23   you saw your brother prior to his being arrested?

24         A.  He was at my house, him and his wife.  They

25   came by.  They had been to the Winfield Carraway

1    Hospital.  He hurt his thumb and had it looked out,

2    because the cast was a take on and take off, something,

3    just to leave it on keep it mobilized.

4            Q.   And did you have an opportunity to look at

5    the cast?

6            A.   Yes.

7            Q.   Did you have an opportunity to observe his

8    hand?

9            A.   Yes.

10           Q.   The cast was on?

11           A.   It was just like the thumb right there in

12    place to keep it from moving.

13           Q.   Did you have an opportunity to observe his

14    other -- his remaining fingers that were not in the

15    cast?

16           A.   Yes.

17           Q.   Were they normal?

18           A.   Yes.

19           Q.   That was the day that he went --

20           A.   He had a bad arm and a bad hand already.

21           Q.   You say he had a bad arm already?

22           A.   Bad arm and bad hand already.

23           Q.   How was his -- when you say he had a bad

24    hand already, what do you mean by that?

25           A.   You could look at both his hands and tell

1    there was a difference in the one on his right.  He had

2    all the surgery but it was still different because it

3    was an old injury.

4            Q.   You're saying he had an old injury to his

5    arm or his hand?

6            A.   His arm and caused his fingers to be drawn.

7            Q.   So he had that prior to --

8            A.   Yes.

9            Q.   -- his being arrested?

10           A.   (Witness nods head.)

11           Q.   Now, did you have an opportunity to observe

12   him after he got out of jail?

13           A.   The next day after he got out.

14           Q.   After he got out of jail, did you have an

15   opportunity to observe his hand?

16           A.   Yes.

17           Q.   Was it different from the hand that you

18   observed prior to his being placed in jail?

19           A.   Definitely.

20           Q.   Tell the Court exactly what was different

21   about it.

22           A.   Swelled all up in here (indicating).

23           Q.   It was swelled up?

24           A.   Swelled up fingers, swelled up there.

25           Q.   Did you notice anything else different about

1    him?

2         A.   Yes.   His elbow was messed up.   He had --

3    because mine was messed up or I'd show you what it

4    looked like.   That don't feel too good when that

5    happens.

6         Q.   Did you have an occasion to take any

7    photographs of your brother?

8         A.   No, I didn't.

9         Q.   Did you take any photographs around the

10   yard?

11        A.   No.

12        Q.   Do you know Deputy Ingle?

13        A.   Yes, sir.

14        Q.   How long have you known him?

15        A.   A long time.

16        Q.   How long is long?

17        A.   Fifteen or eighteen years.   Maybe longer.

18        Q.   Are you aware of the ongoing conflict

19   between Deputy Ingle and your brother?

20        A.   I know they had some differences.

21        Q.   Were you aware that he had been arrested by

22   Deputy Ingle on a number of occasions?

23        A.   Yes.

24        Q.   In Carbon Hill?

25        A.   Yes.

1    Q.  Were you aware that most of those charges

2    had been dismissed?

3    A.  Yes.

4    Q.  Were you aware that your brother moved from

5    Carbon Hill to get away from Deputy Ingle?

6    A.  He moved from Carbon Hill for some reason,

7    and he said that was the reason he wanted to get out of

8    there.

9    Q.  Is that the reason he changed his name?

10   A.  That's what he told me.  I still call him

11   Tommy, because he's my brother.

12   Q.  Have you ever known of any other complaints

13   or grievances against Deputy Ingle?

14   A.  No.

15   Q.  Have you ever known Deputy Ingle to be

16   incarcerated or in trouble with law enforcement,

17   arrested for any reason?

18   A.  No, sir.

19   MR. PIAZZA:    That's all I have.

20                 CROSS-EXAMINATION

21   BY MR. WILLFORD:

22   Q.  My name is Gary Willford and I represent the

23   Sheriff and the Hiring Authority in this Board hearing.

24   I just want to ask you a few questions.

25           You weren't present at your brother's house

1  on the early morning hours of February 16 of 2004, were
2  you?
3          A.  I was over there shortly after he went --
4  left to go to jail.
5          Q.  Were you there while Deputy Ingle was
6  present?
7          A.  No.  Him and Tommy was gone by the time I
8  got over there because I had to go -- my wife had a
9  water leak pop out in the bathroom and she's calling me
10 wanting to know what was going on.  I said there's a
11 water leak somewhere and she found it and I told her how
12 to get the water cut off and I'd be on it, fix it to
13 where you can make it on through the night.
14         Q.  That was that morning, the 16th?
15         A.  It was about 2:30 in the morning, between
16 2:30 and 3:00 o'clock.
17         Q.  You testified about something and I want to
18 make sure I got this right, because I apparently got
19 some of the testimony wrong earlier this evening.  You
20 said in a domestic violence situation back when you were
21 a deputy that if just one of the parties said everything
22 was okay you would leave; is that -- did I get that
23 correct?
24         A.  I didn't say that.  There was one party --
25 usually if you've got a domestic situation and both

1    parties are still there -- one, says it's okay, the

2    other one you don't see no sign on their face, you

3    figure it's okay.

4            Q.  So that answer then would be based on

5    actually laying eyes on the second party?

6            A.  (Inaudible.)

7            Q.  Listen to my question.  Your answer then is

8    based upon actually having seen the second party?

9            A.  Yes.

10           Q.  So, you actually have contact with both

11   parties --

12           A.  You see both of them.

13           Q.  -- before you leave?

14           A.  Yes.

15           Q.  You wouldn't leave before you talked to both

16   parties or you at least saw both parties, correct?

17           A.  Right.

18           Q.  And the laws have changed since you've

19   retired as a deputy, correct?

20           A.  Yes, they changed.  That Domestic Violence

21   Act was passed sometime near the end of my serving, when

22   I was working, three or four or five years or something

23   like that.

24           Q.  Would it be your understanding that those

25   laws were changed because we had situations where we

1  would leave and something would happen?

2          A.  I know what brought that out.

3          Q.  That's why?

4          A.  Troubles between man and wife or a family

5  member or people being in somebody's house.

6          Q.  Okay.  Are you still APOST certified?

7          A.  APOST certified?

8          Q.  Yes.  Peace officer standards, certified

9  still?

10         A.  I'm sure my status has run out because the

11  way things have changed over the years as far as -- the

12  only thing I have is the commission card from the

13  Sheriff and a retirement card from the Sheriff coming

14  in.

15         Q.  Do you take any kind of continuing education

16  as a law enforcement officer?

17         A.  When I retired I tried not to do that no

18  more.

19         Q.  You testified as to some of the ways that --

20  or the reasons why you would use chemical spray on a

21  suspect.  Would it also be true that you could use

22  chemical spray on a suspect to stop them from hurting

23  themselves?

24         A.  Well, I never -- like I said, I never did

25  use that much.  One of the times I used it and I had to

1    drive back -- couldn't see where I was going because my

2    eyes was watering so bad, and that was old Mace.   This

3    Freeze Plus stuff is worse.

4            Q.   I'm not asking you if you actually had to do

5    that before, but I'm asking if it would be an acceptable

6    use of chemical spray to stop someone from hurting

7    themselves?

8            A.   Just because they hurt themselves, shouldn't

9    spray them with it because you going to cause somebody

10   to get hurt.

11           Q.   Well, what would be -- suppose you had

12   someone who was threatening to shoot themselves?

13           A.   Never did run across that one.

14           Q.   Wouldn't getting shot be worse then getting

15   a little chemical spray in the eye?

16           A.   A whole lot worse.   Never did get that kind

17   of call.

18           Q.   We've heard some testimony that your brother

19   has some mental problems; do you know that to be true?

20           A.   He has bipolar disease the way I understand

21   it.

22           Q.   Does he have anything else that you're aware

23   of?

24           A.   He's been going to Northwest Alabama Mental

25   Health Center up here in Jasper, I think, what he told

1    me.

2        Q.  Do you know of any kind of medications that

3    he might be on?

4        A.  Medications he's on?

5        Q.  Yes, sir.

6        A.  I don't know what the name brands are.  I

7    know they give him medicines up there or prescriptions

8    there at the doctor's office with a regular appointment,

9    I know about that.

10       Q.  Have you noticed if those medications had

11   any affect on his behavior?

12       A.  Yes.  I think it's helped him a little bit.

13       Q.  Helped him in what way?

14       A.  He gets paranoid and it drops the paranoid

15   out of him, the paranoid part of it.  He's always

16   been -- not always but sometime back in -- got to being

17   that way pretty regular, paranoid.  And he went to the

18   mental health center on his own.

19       Q.  When he would have these paranoid episodes,

20   was he violent?

21       A.  No.

22       Q.  To your knowledge has he ever harmed anyone?

23       A.  No.

24       Q.  When you were a deputy, did anyone ever --

25   any citizen ever file a complaint against you?

1          A.   No, sir.

2          Q.   Did you ever have any law enforcement

3    officers that you worked with that had citizen

4    complaints filed against them?

5          A.   I'm sure there was.  I don't know which one

6    it was or anything like that.

7          Q.   Okay.  Ever known suspects to lie?

8          A.   Oh, yeah.

9          Q.   That's not beyond the realm of possibility,

10   is it?

11         A.   You can catch one now if you're good.

12              MR. WILLFORD:   I have no further questions.

13              MR. PIAZZA:   I have one more question.

14                   REDIRECT EXAMINATION

15   BY MR. PIAZZA:

16         Q.   Did you ever arrest anyone who had actually

17   made a 911 call for help while you were a police

18   officer?

19         A.   911 was just coming in right before I

20   retired.

21         Q.   If someone called the Sheriff's office and

22   said I need some help over here --

23         A.   There was a case or two that we had to

24   make an arrest.

25         Q.   Do you recall ever arresting the person that

1   actually called to ask for the help?

2           A.   No.

3               MR. PIAZZA:   That's all.

4               MR. WILLFORD:  One last question.

5                       RECROSS EXAMINATION

6   BY MR. WILLFORD:

7           Q.   Going back to the mental issues that your

8   brother had, have you ever known him to hear voices?

9           A.   No, I don't think that he would hear voices.

10          Q.   Have you ever known him to see things that

11  weren't there?

12          A.   No.  His imagination might go a little bit,

13  there might be something there.  I just went on about my

14  business.  He was all right.  He wouldn't do anything.

15          Q.   His imagination, could you describe an

16  incident?

17          A.   It's just -- he made me think that somebody

18  might be after him or something every once in a while or

19  something, you know.  I'd tell him don't worry about it;

20  if they was going to be after you, you would see them.

21              MR. WILLFORD:  Thank you, Mr. Barron.

22              MR. PIAZZA:   Let me ask you this, Mr.

23  Barron.

24

25

1           FURTHER REDIRECT EXAMINATION

2    BY MR. PIAZZA:

3           Q.   After -- you testified that you know of or

4    knew of the history between your brother and Mr. Ingle.

5    With regard to that history and with regard to what

6    transpired between these two individuals, would it be

7    your testimony that your brother was paranoid with

8    regard to Mr. Ingle?

9           A.   I would think so.

10          Q.   Would it also be your testimony that that

11   paranoia would be justified in this case?

12          A.   I would think so.

13              MR. PIAZZA:   Thank you.

14              THE COURT:   Anybody for the Board,

15       anything?

16                     LONNY DEVITO

17       called on behalf of the grievant, having been

18   duly sworn by the Court, was examined and testified as

19   follows:

20                 DIRECT EXAMINATION

21   BY MR. PIAZZA:

22          Q.   Would you please state your full name for

23   the Board?

24          A.   Lonny Devito.

25          Q.   And, Mr. Devito, what is your title and

1    position with the Sheriff's Department?

2         A.   Correction officer.

3         Q.   In that position what are your duties and

4    responsibilities?

5         A.   To take care of the prisoners.

6         Q.   Could you please speak up, sir?

7         A.   To take care of the inmates, see that

8    they're housed.

9         Q.   Well, our court reporter is on this end,

10   and I'm not sure if she can -- could you speak up so

11   that she can hear you?  Would you repeat that last

12   response, please?

13        A.   Take care of the prisoners, see that they're

14   housed properly.

15        Q.   And you work at the jail?

16        A.   Yes, sir.

17        Q.   How long have you worked at the jail?

18        A.   Two years.

19        Q.   And prior to your going to work as a

20   correction officer at the jail, what did you do?

21        A.   Police officer.

22        Q.   What unit?

23        A.   Carbon Hill.

24        Q.   How long were you at Carbon Hill?

25        A.   Sixteen and a half years.

```
1              Q.   And were you the chief of police?

2              A.   I was for about six years.

3              Q.   What six years was that, if you recall the

4     from and the to years for me?

5              A.   2001 back.

6              Q.   2001 to 1995?

7              A.   Yes.

8              Q.   Do you recall any instances where -- let me

9     back up.

10                  Was Deputy Ingle at that time working for

11    you?

12             A.   He was at the last part.  He worked there

13    about six years, I think.

14             Q.   Six years from --

15             A.   I believe that's probably right.

16             Q.   -- from 1997 to 2003?

17             A.   Yes, something like that.

18             Q.   And did he take over as police chief after

19    you left?

20             A.   He did.

21             Q.   And you left to take another -- to take the

22    job with the Sheriff's Department?

23             A.   Yes.

24             Q.   And did you receive an increase in pay?

25             A.   Yes.
```

1          Q.   So you voluntarily left?

2          A.   (Witness nods head.)

3          Q.   Do you know why Deputy Ingle left the Carbon

4    Hill Police Department?

5          A.   For a better job, yes.

6          Q.   For a better job.  Did you know whether or

7    not he was terminated?

8          A.   No, he was not.

9          Q.   Do you know if there was any conflict

10   between himself and the mayor?

11              MR. WILLFORD:   Objection.  Relevance.

12              THE COURT:   Sustained.  Let's go forward.

13         Q.   Do you recall Mr. Ingle having arrested Mr.

14   Burch, or Mr. Barron, on any occasion while you were

15   chief of police?

16         A.   Probably on a couple of occasions, yes.

17         Q.   And do you know what for?

18         A.   Disturbing the peace.

19         Q.   Could you please speak up?

20         A.   Disturbing the peace, drunk, that sort of

21   thing.

22         Q.   I see.  Do you recall Mr. Barron ever

23   calling the Carbon Hill Police Department to complain of

24   noises and nuisance next door to him?

25         A.   Yes, sir.

1         Q.   And did Carbon Hill at that time have a
2    nuisance ordinance or a noise ordinance?
3         A.   I'm not aware of any.
4         Q.   You're not aware of one?
5         A.   I don't recall that particular ordinance.
6         Q.   Did y'all ever make any arrests for people
7    who were making too much noise or had live stock in town
8    in their front yard?
9         A.   Not that I'm aware of.
10        Q.   Did you ever recall him making a complaint
11   of that nature?
12        A.   Yes, sir.
13        Q.   Against Mr. Ingle's relatives?
14        A.   Yes, sir.
15        Q.   But nothing ever came to any fruition about
16   that; is that correct?
17        A.   As I recall they went to court.
18        Q.   Was his relatives ever charged, let me ask
19   you that?
20        A.   I don't recall.
21        Q.   Mr. Ingle's relatives?
22        A.   I don't recall.
23        Q.   Was he charged for making accusations and
24   allegations against them?
25        A.   I don't recall the case.

1    Q.  While you were correction officer at the

2    jail, do you recall Mr. Barron being brought in on the

3    morning of February 16?

4        A.  I'm not sure of the date, but I did see Mr.

5    Barron that morning for about 30 seconds.

6        Q.  About 30 seconds?

7        A.  That's probably the length of time.

8        Q.  What time was your shift that day?

9        A.  7:00 o'clock.

10       Q.  And what was the occasion for your seeing

11   him?

12       A.  He was standing at the booking counter when

13   I came in --

14       Q.  Was he dressed?

15       A.  -- about 15 to 7:00.

16       Q.  15 to 7:00?

17       A.  I would say that, yes.

18       Q.  About 6:45?

19       A.  Yes.

20       Q.  He was being booked?

21       A.  He had already been booked at the previous

22   night.  I never did understand why he was at the

23   counter.  I just happened to see him there.

24       Q.  He had been booked the previous night.  You

25   came in to work that Monday --

1        A.  Right.

2        Q.  -- at a quarter to 7:00?

3        A.  Somewhere around there.

4        Q.  And how do you know he was booked the

5 previous -- when you say "night," are you speaking about

6 earlier that morning when you came in?

7        A.  That morning.

8        Q.  How do you know he was booked?

9        A.  Well, he was in jail there.

10       Q.  Did he have his orange jail uniform on when

11 you saw him?

12       A.  I think he might have been still in his

13 street clothes.  I'm not sure.

14       Q.  But he was at the booking --

15       A.  He was standing at the booking counter when

16 I came in.

17       Q.  And that was at 6:45 a.m.

18       A.  Approximately.

19       Q.  Who else was there?

20       A.  I don't recall who all was there.  We were

21 trying to get the shift started.

22       Q.  Who was doing the booking?  Did you take

23 part in that whatsoever?

24       A.  No.

25       Q.  What was your responsibilities with regard

1    to Mr. Barron, or Mr. Burch?

2            A.    Responsibilities?

3            Q.    Yes, sir.

4            A.    That particular day I didn't have any

5    responsibilities as far as doing the booking.  I was

6    working another job in the jail.

7            Q.    Okay.  So you were assigned somewhere else?

8            A.    That's right.

9            Q.    Did you ever check on Mr. Barron to see if

10   he was being treated properly or to see if he needed any

11   medical attention?

12           A.    I did not.

13           Q.    Was that under your responsibilities?

14           A.    Not at that particular time.  I was working

15   in another part of the jail.

16           Q.    Did you notice anything about Mr. Barron's

17   physical condition?

18           A.    He was complaining of his finger hurting,

19   and I asked him did he see the nurse and he said yes.  I

20   left it at that, that was the extent of our

21   conversation.

22           Q.    Did you observe his -- did you observe any

23   marks on his body?

24           A.    I did not.

25           Q.    You said he still had his street clothes on?

1       A.  I'm not sure about that but I think he

2   probably did.

3       Q.  Did you notice a cast on his arm?

4       A.  No.  I was in the process of getting ready

5   to go to work.  I really didn't notice.

6       Q.  Did you notice a busted lip?

7       A.  No.

8       Q.  But you're positive that he was being booked

9   in at 6:45?

10      A.  I'm thinking he was already booked in.

11      Q.  He was already booked in?

12      A.  Why he was at the counter that day, I don't

13  know, why he was standing there.

14      Q.  Did you ask anyone?

15      A.  No.

16      Q.  Was he in handcuffs?

17      A.  No, not at that time.

18      Q.  Was he making any -- was he combative or

19  what was his attitude?

20      A.  He was at that time calm.

21          MR. PIAZZA:  I don't have any other

22  questions.

23

24

25

CROSS-EXAMINATION

BY MR. WILLFORD:

Q.  Officer Devito, while you were the chief of police of Carbon Hill, were there ever any complaints filed against Deputy Ingle for excessive force?

A.  No.

Q.  Were there ever any complaints filed against him for false arrest?

A.  No, sir.

Q.  Did you ever know Deputy Ingle to arrest someone for purely personal reasons?

A.  No.

Q.  Were any complaints at all ever filed against Deputy Ingle?

A.  No.  Well, complaints and a lot of calls. Police officers are going to get complaints of some sort, because of tickets and that sort of thing.

Q.  Do you know if anything like that happened with Deputy Ingle?

A.  I'm sure it did.  It happened to me.

Q.  But no excessive force or false arrest?

A.  Not really.

Q.  Was he ever disciplined for any of those complaints?

A.  No.

1          Q.   While you were the chief of police of Carbon

2    Hill, did you have any involvement with the complainant

3    in this case, Mr. Burch or Mr. Barron?

4          A.   Some.

5          Q.   Did you ever have cause to arrest him?

6          A.   Yes, I did.

7          Q.   What did you have cause to arrest him for?

8          A.   Public intoxication and that sort of thing.

9    I can't recall the dates or the incidents but --

10         Q.   Do you know if he was convicted of those

11   charges that you arrested him for?

12         A.   I'm not sure.

13         Q.   I'm going to offer you a hypothetical based

14   upon your experience as the chief of police of Carbon

15   Hill.  If you were to arrest someone for multiple

16   charges, would it be out of the ordinary to reduce or

17   combine those charges into a single charge?

18         A.   (No response.)

19         Q.   Were you aware of Mr. Barron or Mr. Burch's

20   general reputation in the community there at Carbon

21   Hill?

22         A.   Yes, sir.

23         Q.   And what was that reputation?

24         A.   He was sort of unstable at times because of

25   his drinking.

1    Q.  Was he unstable because of any other reason

2    that you're aware of?

3    A.  No.

4    Q.  Do you know if he had ever sought mental

5    health treatment?

6    A.  I had heard that he did.

7    Q.  Do you have any knowledge of an injury that

8    occurred with Mr. Burch's right arm several years ago?

9    A.  Yes.  He -- I didn't work that particular

10   incident, but he had gotten drunk at his house and

11   shoved his arm through a storm door.

12   Q.  Was that a glass door?

13   A.  Glass door.  That's the story that I got.

14   MR. WILLFORD:   Nothing further.

15                  REDIRECT EXAMINATION

16   BY MR. PIAZZA:

17   Q.  Mr. Devito, did you ever arrest anyone in

18   their own home without a warrant for their arrest?

19   A.  Yes, sir.

20   Q.  What was the occasion?

21   A.  Public and domestic violence or fighting

22   sometimes.

23   Q.  Are you familiar with domestic violence law?

24   A.  Yes, sir.

25   Q.  Are you familiar with policies concerning

1   response to domestic violence situations?

2           A.   Yes, sir.

3           Q.   What was the policy of the Carbon Hill

4   Police Department at the time that you were police chief

5   of Carbon Hill with regard to domestic violence

6   situations?

7           A.   If we went to an incident where --

8           Q.   Could you speak up, please?

9           A.   If we went to an incident where someone was

10  going to be hurt or that there might be something going

11  on where someone could get hurt, we would take them to

12  jail, if they're combative or that sort of thing.

13          Q.   So if you felt like someone was in eminent

14  danger of harm --

15          A.   Right.

16          Q.   -- you would take them to jail?

17          A.   Right.

18          Q.   And what would you charge them with?

19          A.   Domestic violence.

20          Q.   Even if they hadn't harmed anyone?

21          A.   (Witness nods head.)

22          Q.   So you would arrest someone and charge them

23  with domestic violence and take them to jail?

24          A.   If there was evidence of physical abuse,

25  yes.

1          Q.   If there was physical abuse.   Would you have

2     to notice or observe physical abuse from another person,

3     their spouse or significant other?

4          A.   If I feel like that the other was in danger.

5          Q.   The other in danger?

6          A.   Yes.

7          Q.   But that's what they would be charged with,

8     domestic abuse or violence; is that correct?

9          A.   Yeah, or harassment.

10         Q.   Harassment.   Now is -- you wouldn't have

11    authorization unless that other person expressed to you

12    that they were in fear of eminent harm or danger; is

13    that correct?   I mean, if they told you there is no

14    problem here, you know, no one is arguing --

15         A.   Sometimes you look beyond that because the

16    spouse may be abused and not tell you, look beyond that.

17         Q.   But if you saw no evidence of abuse of a

18    spouse or another person and if both sides were telling

19    you that there was no problem, no issues, even before

20    you -- even before you arrived on the scene, they would

21    tell the dispatcher that there is no problem here,

22    there's no issues and there is no reason to dispatch

23    anyone out here, would you make an arrest?

24         A.   If they told the dispatcher, I wouldn't

25    have.

1          Q.   What if you had already been dispatched?

2          A.   I would check the situation out.

3          Q.   You would check the situation.  When you

4    arrive on the situation and you're told that there is no

5    problems and you don't observe any problems or threats

6    of any nature, would you make an arrest?

7          A.   No.

8          Q.   Would you make an arrest even though --

9    would you arrest a person even though they were the

10   person calling for help to the dispatcher or calling

11   911?

12         A.   Would I arrest a person for calling?

13         Q.   No.  My question is -- I'm giving you

14   another situation.  Let's say you were to go into a home

15   and there were two parties in the home; one of which had

16   actually made the call for help, and you get into the

17   home and you don't observe any threats or any evidence

18   of abuse, would you make an arrest of either party, in

19   particular the party making the call?

20         A.   Probably not.

21              MR. PIAZZA:   That's all.

22              THE COURT:   You can be excused.

23              What does the Board want to do?  We're

24   going to adjourn.

25

<pre>
 1                C E R T I F I C A T E

 2    STATE OF ALABAMA        )

 3    WALKER COUNTY           )

 4        I hereby certify that the above and foregoing

 5    proceeding was taken down by me by stenographic means,

 6    and that the questions and answers therein were produced

 7    in transcript form by computer aid, and that the

 8    foregoing represents a true and correct transcript of

 9    the proceedings occurring on said date.

10        I further certify that I am not of counsel, nor

11    related to any of the parties to this action; nor am I

12    in anywise interested in the result of said cause.

13

14    _____

15           RHONDA G. WOODS, CSR

16           Certificate No.:   AL-CSR-228

17

18    Notary Public, State of Alabama at Large

19    My commission expires December 21, 2008.

20

21

22

23

24

25
</pre>