FILED
2006 Aug-21  PM 05:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT F

**Transcript of Walker County Civil Service Board Hearing dated 3/7/05**

1        CIVIL SERVICE BOARD

2          OF WALKER COUNTY

3        GRIEVANCE HEARING

4          MARCH 7, 2005

5      REGARDING TAZ DAY BURCH

6        A.K.A. TOMMY BARRON

7

8          HEARING BEFORE

9        CHARLES STEPHENS, SR.

10

11            APPEARANCES

12   REPRESENTING THE HIRING AUTHORITY:

13        HANK WILEY

14        GARY WILLFORD

15   REPRESENTING THE GRIEVANT:

16        ANTHONY J. PIAZZA

17        Attorney at Law

18        Post Office Box 550217

19        Birmingham, Alabama  35255-0217

20   BOARD MEMBERS:

21        ANDREW ARCHIE, Chairman

22        DAVID KELLY

23        ELLIS NICKLAUS

24        DOYLE CUMMINGS

25        SHARON TUCKER, CLERK

1    REPORTED BY:   Rhonda G. Woods

2              Certificate No. AL-CSR-228

3

4                  I N D E X

5                                              PAGE

6    WITNESSES:

7          CHARLIE SKALNIK

8              Direct by Mr. Willford              3

9              Cross by Mr. Piazza                 9

10         DONALD FOSTER SHUGART

11             Direct by Mr. Willford             23

12         SHERIFF JOHN MARK TIREY

13             Direct by Mr. Willford             26

14             Cross by Mr. Piazza                29

15   REBUTTAL:

16         PATRICIA WILKERSON BARRON

17             Direct by Mr. Piazza               41

18             Cross  by Mr. Willford             42

19         TAZ DAY BURCH

20             Direct by Mr. Piazza           43, 49

21             Cross by Mr. Willford              45

22

23

24             CERTIFICATE                        54

25

1          MR. PIAZZA:      I think we're done.

2          THE COURT:      Mr. Willford, you've got

3    your witnesses ready to go?

4          MR. WILLFORD:   Yes, sir, I believe we do.

5    Charlie Skalnik.

6          THE COURT:      This is a continued hearing

7    on the Taz Day Burch, Tommy Barron, matter.  And Mr.

8    Piazza has just announced that he has rested his case,

9    and with that being the situation we'll turn it over to

10   the defense.

11         MR. WILLFORD:   The Hiring Authority will

12   call Charlie Skalnik.  I believe he's already on the

13   stand.

14         THE COURT:      Mr. Skalnik, have you been

15   -- you have not been put under oath, have you?  Let me

16   put you under oath before you testify.

17                    <u>CHARLIE SKALNIK</u>

18        called on behalf of the Hiring Authority, having

19   been duly sworn by the Judge, was examined and testified

20   as follows:

21                   <u>DIRECT EXAMINATION</u>

22   <u>BY MR. WILLFORD:</u>

23        Q.  Sir, would you please state your name for

24   the record?

25        A.  Charlie Skalnik.

1      Q.  How are you employed, sir?

2      A.  I work for the Walker County Sheriff's

3  Department.

4      Q.  What do you do for the Walker County

5  Sheriff's Department?

6      A.  I'm in dispatch now.

7      Q.  On February 16 of 2004, how were you

8  employed?

9      A.  I was a jailer on the third shift.

10     Q.  Would that have been at Walker County?

11     A.  Yes, sir.

12     Q.  And while you were a jailer on February 16,

13  2004, did you have occasion to come into contact with

14  Mr. Taz Burch?

15     A.  Yes, sir.

16     Q.  Would you please describe for the panel how

17  that occurred?

18     A.  Deputy come in the sally port.

19     Q.  Which deputy would that have been, sir?

20     A.  Deputy Ingle.  And myself and I think

21  Kendrick -- I don't remember if he was sergeant at the

22  time or not -- we met him at the sally port like we

23  always do at night and escorted Mr. Taz to the booking

24  area.

25     Q.  Would you describe for the panel how he

1  looked when you saw first saw him there in the sally

2  port.

3          A.  He got out of the car, handcuffs in front,

4  and we walked right him on in to the booking area.

5          Q.  Were you able to tell if he had any kind of

6  cast on?

7          A.  He had some kind of make shift, something

8  home made, I think it was.

9          Q.  Do you recall which hand that was on?

10          A.  I don't remember if it was left or right.

11          Q.  I believe you testified, you said you met

12  him at the door and escorted him through the sally port.

13  Please continue and tell the panel what occurred next.

14          A.  We got a red line in the booking area.  You

15  always bring them up there and have them stand there and

16  we ask them have they been incarcerated here before, so

17  we can find them in our local records if they're there,

18  and he had and, you know, the booking process started.

19          Q.  Who actually booked him into the jail?

20          A.  I think Ms. Chapman was doing that.

21          Q.  Were you present during any part of the

22  booking --

23          A.  I was standing at the booking counter, yes,

24  sir.

25          Q.  Would you please describe that process with

1    Mr. Burch for the panel?

2         A.  We pulled him up on a previous charge there

3    before, had all these local information, and we was

4    reading it off to him step by step as we do, and we got

5    to the Social Security number, I think, and he said the

6    F word to us.

7         Q.  In what context?

8         A.  Very loud and just like he was not going to

9    cooperate with us no more.

10        Q.  Was that in response to a question about the

11   Social Security number?

12        A.  We just asked him was this his Social

13   Security number, you know, was this right.

14        Q.  Up to that point how would you describe his

15   demeanor?

16        A.  He was somewhat trying to cooperate up to

17   that point, somewhat.

18        Q.  Was his response then unexpected?

19        A.  You know, he got to that point and I don't

20   know what changed.

21             MR. PIAZZA:    I'm going to object to the

22        form of that question.

23             THE COURT:    Sustained.

24        Q.  So he used the F word you said during the

25   course of responding to a question about a Social

1    Security number?

2          A.   Right.

3          Q.   Did his demeanor change from that point

4    forward?

5          A.   He just got to where he wouldn't cooperate

6    with us at all from that point on.

7          Q.   Was he shouting?

8          A.   He was a little loud.

9          MR. PIAZZA:     Object to the form.

10         A.   I wouldn't say he was shouting but he was a

11   little loud.

12         THE COURT:     Overruled.

13         Q.   What happened after the questioning about

14   the Social Security number?

15         A.   Myself and Sergeant Kendrick, or Officer

16   Kendrick, we put him in the -- what we call our drunk

17   tank from that point.

18         Q.   Is there any particular reason why you put

19   him in the drunk tank?

20         A.   Because he was not willing to cooperate with

21   us at all.  We secured his belt, shoes, whatever he had

22   on and could hurt him or anything.  We just put him in

23   there for his safety mainly.

24         Q.   Were you able to observe any signs of

25   intoxication on Mr. Burch?

1          A.  No, sir, I couldn't.

2          Q.  After you put him into the drunk tank, as

3  you called it, what happened next?

4          A.  A few moments later, I don't know, it was

5  five or ten minutes later, he was up at the door, both

6  hands beating on the door.

7          Q.  Would that have included the hand with the

8  cast?

9          A.  Yes, sir.

10          Q.  And was he saying anything?

11          A.  He was muttering something.  I don't really

12  recall what it was.

13          Q.  What did you do in response to that?

14          A.  Myself and Sergeant Kendrick went in there

15  and see if we could calm him down.

16          Q.  Were you successful?

17          A.  He backed up in the far corner and sat down

18  on the floor there and quieted down.

19          Q.  Did that last?

20          A.  Yes, sir, best I remember, yes, sir.

21          Q.  Did you have any other reasons to come into

22  contact with Mr. Burch afterwards?

23          A.  I think that was my last contact of the

24  night with him, I think.

25          Q.  What time did you get off of work that

1    night?

2           A.   7:00 o'clock the next morning.

3           Q.   Would that have been on the 16th?

4           A.   It would have been the same day, I think,

5    that we brought him in.

6           Q.   Your recollection would be he came in in the

7    early morning; is that right?

8           A.   Right.

9                MR. WILLFORD:    That's all the questions we

10       have.

11                THE COURT:    Answer Mr. Piazza's

12       questions if he has any.

                        CROSS-EXAMINATION

14    BY MR. PIAZZA:

15           Q.   Sir, you're on the third shift which is

16    11:00 to 7:00; is that true?

17           A.   Yes, sir.

18           Q.   You said that his handcuffs were in the

19    front when you first observed him?

20           A.   Yes, sir.

21           Q.   You don't recall which hand the badge was

22    on?

23           A.   No, sir, I don't remember which arm the cast

24    was on, no, sir, I don't.

25           Q.   And did you actually see him get out of the

1  patrol car or the cruiser?

2      A.  Yes, sir.

3      Q.  You don't know how he was handcuffed prior

4  to the time he arrived at the jail?

5      A.  When we helped Deputy Ingle get him out of

6  the car, he was handcuffed in the front.

7      Q.  Prior to the time he arrived at the jail,

8  you do not know how or where he was handcuffed?

9      A.  No, sir, I would have no way of knowing.

10      Q.  You just saw him once he got to the jail?

11      A.  I assume when we got him out of the car

12  that's the way he transported the whole way.

13      Q.  Well, I don't want you to make any

14  assumptions and I didn't ask you to assume, sir.  And

15  you said that Ms -- is it Miss or Mrs. Chapman?

16      A.  Mrs. Chapman.

17      Q.  Mrs. Chapman.  She is the person that did

18  the booking?

19      A.  Yes, sir.

20      Q.  Prior to February 16, how long had you been

21  on the third shift as the jailer?

22      A.  Approximately a year, year and a half.

23      Q.  And you're familiar with the rules and

24  regulations concerning the operation of the jail?

25      A.  Yes, sir.

1       Q.   Someone comes in and uses a cuss word, what

2  is the normal procedure?  I would think that that's

3  pretty common.

4       A.   Well, it is but, you know, just the voice of

5  it come out that night, you know, you could tell he was

6  not going to be cooperative from that point.

7       Q.   Let me ask you this:  How did the -- how did

8  you react to that?

9       A.   Just walked around there and I think we took

10  his shoes off.  I don't remember if he had a belt on or

11  not, just anything that would hurt him in a cell, we

12  took it off like we would anybody else and put him in

13  the drunk tank.

14       Q.   When you say "we," who else was with you?

15       A.   Either Officer Kendrick, or Sergeant

16  Kendrick, ever what he was at the time.

17       Q.   Kendrick.  Is he here to testify tonight?

18       A.   I didn't see him out there.

19       MR. WILLFORD:   He testified last time.

20       Q.   And you say he stopped cooperating?

21       A.   Yes, sir.

22       Q.   And did he appear intoxicated to you?

23       A.   He had been under the influence of

24  something, yes, sir.

25       Q.   Could you tell he had a drink or two?

1          A.   Yes, sir.

2          Q.   Was he -- he wasn't acting crazy or loud and

3     shouting?

4          A.   Well, he wasn't talking loud, no.

5          Q.   Out of control, was he?

6          A.   No, sir.

7          Q.   I mean he was fairly docile, wasn't he?

8          A.   What do you mean by docile?

9          Q.   Peaceful.

10          A.   Well, up till he said the F word, yes, sir.

11          Q.   And even after he said the F word?

12          A.   Well, we escorted him to the drunk tank,

13     like I said, and a few moments later he went to banging

14     on the door there.

15          Q.   And you said you went back after you heard

16     this noise and the banging on the door and you talked to

17     him?

18          A.   Yes, sir.

19          Q.   Did he appear afraid of you?

20          A.   I wouldn't say afraid, no.

21          Q.   But he calmed down?

22          A.   He backed up and sat down on the floor in

23     there and quieted down.

24          Q.   Now, I take it that you were in pretty close

25     proximity to him when he came in?

```
 1            A.  Well, a foot or so.

 2            Q.  So you had the opportunity to observe his

 3   body, what he looked like?

 4            A.  Yes, sir.

 5            Q.  Did you assist in taking off his clothes?

 6            A.  No.  We never did take his clothes off.

 7            Q.  When you put him in the drunk tank, what did

 8   he have on?

 9            A.  I don't remember if it was blue jeans or

10   what; a t-shirt or something on and a pair of shoes,

11   tennis shoes, the best I remember.

12            Q.  So you'll just put him in the drunk tank --

13            A.  Took his shoes, and if he had a belt, we

14   took it for his safety.

15            Q.  The belt and the shoes but you left his

16   pants and the T-shirt on?

17            A.  Yes, sir.

18            Q.  Did you notice any bruises on his head?

19            A.  No, sir.

20            Q.  Did you notice any bruises on his hands or

21   arms other than the badge you mentioned?

22            A.  Just the one hand he had the cast or

23   whatever he had.

24            Q.  Did you ask him to write anything once he

25   got to the booking stage?
```

1          A.   No.   We never did get the booking process

2     finished where we could get him to sign the papers.

3          Q.   And that is because --

4          A.   He just quit being cooperative.

5          Q.   When you say uncooperative, what do you mean

6     by that?

7          A.   He just got to that point where he said the

8     F word and he wasn't going to do any more.

9          Q.   Did you -- does that mean that he was

10    unresponsive to your questions?

11         A.   Yes, sir.

12         Q.   And what were those questions?

13         A.   We asked him his Social Security number and

14    I think the next page on the booking sheet asks next of

15    kin and what have you.  He just wouldn't --

16         Q.   So your reaction to that was to put him in

17    the drunk tank?

18         A.   Yes, sir.

19         Q.   Did he -- at that point in time your

20    statement is that he did not appear to have any injuries

21    whatsoever?

22         A.   The only thing I seen was the make shift

23    cast or whatever you call it on his arm he had.  That's

24    the only thing I noticed out of the ordinary.

25         Q.   Could you see his eyes?

1        A.   Yes, sir.

2        Q.   What did his eyes look like?

3        A.   Just like a person that had had a drink or

4   two.  They might have been just a little bit glassy.

5        Q.   And you remained -- what time did you say he

6   came in?

7        A.   I don't remember the time frame, sir,

8   without looking back over the booking sheet.

9        Q.   You got off at 7:00 o'clock?

10       A.   Yes, sir.

11       Q.   Now, what is the policy once someone is

12  placed into the drunk tank, is it the policy to maintain

13  or monitor that person?

14       A.   Yes, sir, we have what we call a log sheet

15  and monitor him every 30 minutes.

16       Q.   And you're required to write something in

17  that log sheet?

18       A.   The officer that monitors it, signs off on

19  it.

20       Q.   Who was that officer?

21       A.   I don't know if that was Chapman or

22  Kendrick.

23       Q.   But it wasn't you?

24       A.   I don't think so.

25       Q.   Now, did he ever ask for any medical

1    assistance while you were there until you left at 7:00

2    o'clock?

3           A.  I don't remember, no, sir.

4           Q.  Where were you after the last time you saw

5    him in the drunk tank, where did you go?

6           A.  I was posted somewhere else.  Some other

7    door in the jail was my responsibility in the jail and I

8    had to go back to it and check them folks, you know.

9           Q.  Okay.  And what time would you say the last

10   time you saw him was?

11          A.  Probably 30 minutes to an hour after he came

12   in and then probably right before I left the next

13   morning.

14          Q.  Now, when you saw him right before you left

15   the next morning, where did you see him?

16          A.  I believe the day shift officer had him out

17   trying to finish the booking process up.

18          Q.  Okay.  Who would that have been?

19          A.  Mr. Darty, I think.

20          Q.  Mr. Darty?

21          A.  Uh-huh, Officer Darty.

22          Q.  And tell me what you observed about him at

23   that time before you left?

24          A.  I didn't really observe a whole lot.  I just

25   know he was trying to finish the booking process.

1        Q.  So he was out of the drunk tank.  He had the
2  same clothes on?
3        A.  Yes, sir.
4        Q.  T-shirt, pants, no shoes?
5        A.  As far as I remember, yes, sir.
6        Q.  No belt?
7        A.  No, sir.
8        Q.  Still had his bandage on?
9        A.  Still had his what?
10       Q.  His bandage.
11       A.  I don't remember about that.
12       Q.  Did he appear to have any injuries at that
13  time?
14       A.  Not that I remember.
15       Q.  Was he making any requests for medical
16  assistant at that time?
17       A.  Not that I remember at this time, no.
18       Q.  And what is the policy of the jail if a
19  inmate requests medical assistance?
20       A.  The officer will notify their supervisor and
21  determine what helps he needs, you know, nurse,
22  whatever.
23       Q.  And will a determination be made whether or
24  not it's an emergency situation?
25       A.  It just depends on how the supervisor feels

1  about it.

2       Q.   Okay.  Who was the supervisor on the third

3  shift?

4       A.   I don't remember if it was Officer Kendrick

5  or Ms. Hall was there that night.

6       Q.   Is Officer Kendrick normally a supervisor?

7       A.   He was the senior male officer there.

8       Q.   And who was the other person you mentioned?

9       A.   I don't remember if Lieutenant Hall was

10 there or not.

11      Q.   Lieutenant Hall?

12      A.   Uh-huh.

13      Q.   Now, if I showed you the jail records that

14 we subpoenaed, would you be able to tell me by looking

15 at those records who was the supervisor that evening?

16      A.   Probably so.

17      Q.   Or that morning?

18      A.   Probably so.

19      Q.   Who was the supervisor that morning?

20      A.   I'm going to say Officer Kendrick was.

21      Q.   Officer Kendrick.  Is his name on any of

22 these documents?

23      A.   Not in there nowhere.  It's just senior

24 officer is the officer in charge.

25      Q.   Now, let me ask you this:  When someone is

1    brought into the jail, is he required to answer the

2    booking officer's questions?

3           A.   Well, it helps a lot.

4           Q.   But I mean if he doesn't --

5           A.   He can't make a bond at all.

6           Q.   Does he get thrown in the drunk tank?

7           A.   If he's being rude and hateful, yeah, most

8    of the time that time of night.

9           Q.   Now, you said that Ms. Chapman did the

10   booking?

11          A.   Yes, sir.

12          Q.   Was Lonny Devito present that morning?

13          A.   It would have been after 7:00 o'clock.

14          Q.   Would he have been the booking officer the

15   next day?

16          A.   I believe I read on the paper there where

17   Darty was.

18          Q.   Sir?

19          A.   I believe I read on the reports there, the

20   booking sheets, that Darty had signed off on there as

21   the next morning.

22          Q.   Is that this signature here (indicating)?

23          A.   No.   There's some more in there.   It had

24   Darty's name on it somewhere.

25          Q.   I see it.   When he was being booked, he was

1   not -- other than saying the F word, that was pretty

2   much all he did?

3        A.   I do remember one other thing he was saying

4   too.  He was going to -- he was very upset at Mr. Ingle,

5   Deputy Ingle there.  He was shouting it several times

6   across the booking area too.

7        Q.   He was upset with Deputy Ingle?

8        A.   Yes, sir.

9        Q.   Was Deputy Ingle present?

10       A.   Deputy Ingle was filling out his arrest

11  report, yes, sir.

12       Q.   What all do you recall he said about Deputy

13  Ingle?

14       A.   That he -- Deputy Ingle had always been

15  after him and what have you and just didn't show no

16  signs of this there.

17       Q.   He had always been after him?

18       A.   From previous experiences was my

19  understanding.  That's the only encounter that I ever

20  had with him.

21       Q.   Anybody else hear him say that he has always

22  been after him?

23       A.   I'm sure there was people that was in the

24  booking area would.

25       Q.   That would have been Ms. Chapman and

1    yourself?

2            A.   (Witness nods head.)

3            Q.   Anybody else?

4            A.   I think that was all that was up there.

5            Q.   Well, other than saying Ingle has always

6    been after me and using the F word one time, was not

7    answering your questions, was he in any other way,

8    shape, or form disruptive or uncontrollable or anything

9    of that nature?

10           A.   Just not being going to be cooperative.

11           Q.   Is there an unwritten rule that y'all have

12   up there where somebody becomes uncooperative you throw

13   them in the drunk tank?

14           MR. WILLFORD:    Objection.  Asked and

15       answered.

16           THE COURT:    Overruled.  Go ahead and

17       answer the question.

18       A.   We didn't throw him in there.  We escorted

19   him in there; opened the door up gently and walked him

20   right in, sir.

21           Q.   Let me use another term.  You placed him in

22   the drunk tank.

23           A.   Yes, sir.

24           Q.   Is that an unwritten rule of someone that

25   refuses to answer your questions that you place them in

1    the drunk tank?

2         A.   About 2:00 or 3:00 o'clock in the morning if

3    they're uncooperative, usually an hour or two in there

4    they get a little more cooperative, yes, sir.

5         Q.   Did he become more cooperative?

6         A.   After I left up there, after the hour I was

7    there, whatever time frame I was up there, I didn't come

8    back until the time I got off that morning, 7:00 o'clock

9    back up there.

10        Q.   What is it about the drunk tank that makes

11   someone more cooperative?

12        A.   It gives them time to cool off in their own

13   mind and what have you, they just want to do the right

14   thing and do all the paperwork, and I always give them

15   bond and set it to get back out.

16        Q.   Was there any other action -- anything done

17   while he was in the drunk tank, was he washed down or

18   anything done to him?

19        A.   Not while I was there, not that I know of

20   anyway.

21        Q.   He was in there by himself?

22        A.   Yes, sir.

23        Q.   How big is the drunk tank?

24        A.   Ten by ten, eight by eight, something like

25   that.

1      Q.   Is there a bathroom in there?

2      A.   No, sir, not what you call an actual

3  bathroom.   There is a hole in the floor.

4           MR. PIAZZA:     I don't think I have

5      anything else.

6           MR. WILLFORD:   I have no follow-up.

7           THE COURT:     Next witness.

8           MR. WILLFORD:   Donald Shugart.

9           THE COURT:     Mr. Shugart, have you been

10      put under oath?

11           MR. SHUGART:    Earlier today I was.

12           THE COURT:     I mean as it relates to this

13      proceeding? — — — —

14           MR. SHUGART:    No, sir.

15                     DONALD FOSTER SHUGART

16      called on behalf of the Hiring Authority, having

17  been duly sworn by the Judge, was examined and testified

18  as follows:

19                     DIRECT EXAMINATION

20  BY MR. WILLFORD:

21      Q.   Would you please state your name for the

22  record?

23      A.   Donald Foster Shugart.

24      Q.   How are you employed, sir?

25      A.   Walker County Sheriff's Department,

1    dispatcher.

2         Q.   Would that include operating the 911 system?

3         A.   I take calls from 911, yes, sir.

4         Q.   On February 16, 2004 were you also employed

5    in that position?

6         A.   Yes, sir.

7         Q.   And did you have opportunity that evening to

8    take a 911 call from Taz Burch?

9         A.   Yes, sir.

10        Q.   What I would like -- strike that.

11             Was there a tape made of that 911 call?

12        A.   Yes, sir.

13        Q.   Was a copy of that 911 tape provided to the

14   Walker County personnel Board?

15        A.   Yes, sir, as far as I know.

16             MR. WILLFORD:   At this point in time I'm

17        going to play the tape.

18             MR. PIAZZA:    Before he plays the tape, we

19        had, I think, and I believe we had -- correct me if

20        I'm wrong, we had made a request that if they were

21        going to bring this tape in that we would also have

22        the tape of the communication between Deputy Ingle

23        from the time he left the Barron residence until

24        the time he got to the jail, and is that also on

25        the tape?

1    MR. WILLFORD:    No.  We just have the 911

2    call.

3        THE WITNESS:    We don't have anything that

4    records the messages from dispatch to the inside of

5    the car.

6        MR. PIAZZA:    There is nothing between --

7    there is no communication?

8        THE WITNESS:    It tapes -- no, sir, phone

9    calls that comes in and goes out.

10       MR. PIAZZA:    Okay.

11       (Tape being played.)

12    Q.  Mr. Shugart, is that a true and accurate

13 depiction of a 911 call you handled on February 16,

14 2004?

15    A.  Yes, sir.

16    Q.  And did Mr. Burch not say on that tape it

17 was his wife who broke his thumb?

18    A.  Yes, sir.

19       MR. WILLFORD:    That's all the questions I

20    have.  Thank you.

21       THE COURT:    Cross?

22       MR. PIAZZA:    I don't think I have any

23    questions.

24       THE COURT:    May he be excused?

25       MR. WILLFORD:    Yes, sir, he can.

1            (Witness excused.)

2            MR. WILLFORD:    At this point we call

3    Sheriff Tirey.

4            SHERIFF JOHN MARK TIREY

5        called on behalf of the Hiring Authority, having

6    been duly sworn by the Judge, was examined and testified

7    as follows:

8            DIRECT EXAMINATION

9    BY MR. WILLFORD:

10           Q.    Please state your name for the record.

11           A.    I'm Sheriff John Mark Tirey.

12           Q.    Sir, are you the sheriff of Walker County,

13    Alabama?

14           A.    Yes, sir, I am.

15           Q.    On February 16, 2004 were you the sheriff of

16    Walker County, Alabama?

17           A.    Yes, sir, I was.

18           Q.    Are you familiar with Deputy Derane Ingle?

19           A.    Yes, sir.

20           Q.    Is he one of your deputies?

21           A.    Yes, sir, he is.

22           Q.    Was he deputy on February 16, 2004?

23           A.    Yes, sir, he was.

24           Q.    Other than this matter that we're here on

25    tonight, have you had any complaints about Deputy Ingle?

1      A.  No, sir, none to my knowledge.

2      Q.  And you've been in here on the previous

3  occasions that this Board has met and listened to the

4  testimony; is that correct?

5      A.  Yes, sir, I have.

6      Q.  Do you recall some testimony about pictures

7  being taken of Freeze Plus P marks on the ground?

8      A.  Yes, sir.

9      Q.  Are you certified as a Freeze Plus P -- a

10  person who can use Freeze Plus P?

11      A.  Yes, sir, I am.

12      Q.  Are you familiar with the characteristics of

13  Freeze Plus P?

14      A.  Yes, sir, I am.

15      Q.  Does Freeze Plus P leave marks on the ground

16  when it's sprayed?

17      A.  No, sir, they do not.  Let me clarify that.

18  Not visible to the naked eye.

19      Q.  Are you familiar with criminal proceedings

20  that involved Mr. Burch earlier today?

21      A.  Yes, sir, district court here in the

22  courthouse, yes, sir.

23      Q.  And did that criminal proceeding involve the

24  same matter that we're here on tonight?

25      A.  Yes, sir, it did.

1      Q.   What was the result of that criminal

2   proceeding?

3      A.   Mr. Burch was convicted of resisting arrest

4   here in district court today.

5      Q.   And we just said you've sat here -- this is

6   the fourth night that we've had this hearing and

7   listened to the testimony, correct?

8      A.   Yes, sir.

9      Q.   I would like to give you an opportunity as

10  the Hiring Authority to tell the Board what it is that

11  you would like them to do in this case.

12     A.   I reviewed some of this material.  I was not

13  available initially early on.  I think maybe Tommy's

14  brother Gene who I worked with many years had tried to

15  contact me.  The first thing I knew of any incident of

16  this I got a letter from him.  I immediately began a

17  review in the Sheriff's office.  I basically heard the

18  same information that this Board has as far as

19  information from my employees.  I spoke with Deputy

20  Ingle on several occasions about it, the jail personnel

21  staff.  I even reviewed the 911 tape prior to the Board

22  subpoenaing of the tape and listened to that.

23          Basically, if Tommy hadn't picked up the

24  phone and called 911 that night and wanted his wife

25  removed and called for law enforcement to be there, we

1  certainly wouldn't have been there.  We would have been

2  on about our other business of trying to enforce the law

3  in Walker County.

4          After careful review of it and in light of

5  the tape and all that I reviewed on it, I did not find

6  anything overwhelming that I needed to take any action

7  against Deputy Ingle because they denied that he said it

8  happened, but all the employees in the jail also deny

9  that, you know, he came in skinned up and beat, had grid

10  marks on his face or anything.

11          MR. WILLFORD:    I have no further

12  questions.

13                  CROSS-EXAMINATION

14  BY MR. PIAZZA:

15          Q.  Sheriff Tirey, how long were you -- how long

16  have you been the sheriff prior to Deputy Ingle coming

17  to work for you?

18          A.  I'm on my third term.  I've been in the

19  Sheriff's Office 24 years.  I don't recall his hire date

20  right off.  I don't know.  Been some time, I'm sure, at

21  least two and a half terms.

22          Q.  Was it within a six-month period prior to

23  February 16, 2004, had he been hired within the

24  six-month period -- what I'm asking is if he was on

25  probation at the time of this occurrence, February 16?

1    A.   Not that I recall.

2         MR. PIAZZA:    I got his personnel file.

3    We can check the date that he was hired unless he

4    can tell us real quick.

5         DEPUTY DERANE INGLE:   October 6, 2003.

6    Q.   So that would have been within the six

7    month probation period; is that correct?

8    A.   I apologize.   What's the date this incident

9    occurred?

10   Q.   February 16, 2004.

11   A.   Yes, sir, that would certainly have been

12   within six months.

13   Q.   When you got the complaint from Mr. Burch,

14   you said you reviewed the action, you reviewed -- you

15   talked to Mr. Ingle, you talked to some people at the

16   jail.   What else did your review entail?

17   A.   I went to 911 and listened to the tape.   I

18   spoke with Mr. Shugart -- everybody that has testified

19   here, I spoke with them about it, that had any

20   connection, maybe not -- and I don't recall each and

21   every one of them, but I spoke to each and every one of

22   them.

23   Q.   The witnesses we've had here?

24   A.   Basically, yes, sir.   They're all my

25   employees, yes, sir.

1    Q.  Did you review the applicant -- his

2  employment application and his records with Carbon Hill?

3    A.  During that time or prior to hiring him?

4    Q.  Well, at the time that this grievance came

5  to your attention.

6    A.  Not that I recall, no, sir.

7    Q.  Have you had an opportunity since then to go

8  back and review his personnel records from Carbon Hill

9  since this grievance has come up?

10    A.  No, sir.

11    Q.  Were you aware that when you hired him

12  that -- I'm assuming that you're the Hiring Authority,

13  that you actually made the decision to hire Deputy

14  Ingle?

15    A.  Yes, sir, that's correct.

16    Q.  Were you aware that he had been off of work

17  for some time in Carbon Hill --

18    A.  Yes, sir.

19    Q.  -- before terminating that position?

20    A.  Well, I don't think they terminated him.  I

21  think he quit.  But, yes, sir.  He had some health

22  issues, I think.

23    Q.  Were you aware that the personnel board from

24  Carbon Hill or the Civil Service Board was considering

25  whether or not to keep him on as an employee at the time

1    he submitted his resignation?

2         A.   No, sir, never heard that.

3         Q.   Now, you're familiar with -- I'm going to

4    refer to it as Freeze Plus.  I'm not going to add the P.

5    You're familiar with the use, criteria for use of Freeze

6    Plus; is that correct?

7         A.   Yes, sir.

8         Q.   And you're certified in use of it yourself,

9    I'm assuming?

10        A.   Yes, sir.

11        Q.   Is there a control log maintained for your

12   inventory of Freeze Plus there at the jail or at the

13   Sheriff's office?

14        A.   Well, I don't know if you call it control.

15   Our chief deputy maintains a stock of it and folks bring

16   in their empty can when they're ready to replenish it

17   with a new one.

18        Q.   Okay.  Do you recall whether or not Deputy

19   Ingle brought in an empty can, would you have any

20   recollection of that whatsoever?

21        A.   No, sir, I would not.

22        Q.   Would there be a record of that?

23        A.   I don't believe so.  Not that I'm aware of,

24   unless the chief started keeping those, and I don't

25   think they ever have.

1        Q.  And you don't think there's ever been a

2  record of that?

3        A.  Not that I'm aware of.

4        Q.  They just turn in an empty can and get

5  another one?

6        A.  Yes, sir.

7        Q.  And they're only allowed one each time; is

8  that correct?

9        A.  Correct.

10        Q.  Now, as far as the use of Freeze Plus,

11  you're aware that it's a crime to improperly use Freeze

12  Plus when there is no justification?

13        A.  Well, I understand what you're saying.  I'm

14  not representing that I agree that it's a crime, but I

15  certainly know it's an infringement on a person's right,

16  their civil rights, yes, sir.

17        Q.  Well, in the course that you took, don't

18  they tell you that it's a criminal offense to use Freeze

19  Plus when it isn't necessary?

20        A.  Yes, sir, I would agree with that in

21  general, yes, sir.

22        Q.  Now, and you heard the testimony that we had

23  in the last four or five months here, you heard the

24  testimony from Mr. Ingle and you heard the testimony

25  from Mr. Burch and his wife to the effect that he was

1    not combative once Mr. Ingle was inside of their home

2    and that Deputy Ingle unilaterally and voluntarily

3    initiated this whole thing by taking out the Freeze Plus

4    and spraying Mr. Barron.  You heard that testimony; is

5    that correct?

6                MR. WILLFORD:    I'm going to object to that

7        because I don't think that's -- and considering

8        that he included Derane in that litany of facts as

9        testifying to that, and I don't think that's

10       correct.

11               MR. PIAZZA:    I didn't include him to

12       testifying.  I said Mr. Burch and his wife, that's

13       their testimony.

14               THE COURT:    I didn't understand the

15       question to come out of that.

16               MR. PIAZZA:    Well, my question is --

17               THE COURT:    Restate your question.

18       Q.  You're familiar with the testimony that

19   we've had concerning the incident that happened in Mr.

20   Burch's home on the morning of February 16, you've heard

21   the testimony?

22       A.  Somewhat.

23       Q.  I know that you work there, but you've heard

24   the testimony?

25       A.  Yes, sir.

1     Q.  Now, with the testimony that you've heard,
2  would it still be your recommendation to the Board that
3  they -- that they not take any action with regard to
4  Deputy Ingle in that situation where Mr. Burch was --
5  and this is the testimony of record, I believe, that Mr.
6  Burch was in his home, that he came -- he was awoken up
7  from a sleep, and it certainly is controverted by Deputy
8  Ingle, I give you that, but the facts are not
9  controverted that he was in his own home and that he was
10  in his underwear.  Now, he did not have a weapon and
11  that he even had a bandage on his left hand; would you
12  agree that those facts are not controverted having heard
13  the testimony?
14     A.  I don't know how to answer that to tell you
15  the truth.  I mean, I don't know what you're --
16     Q.  I'm just asking you would you agree that
17  that's been the testimony that we've heard, that Mr.
18  Burch was in his own home, that he was half naked, that
19  he had a bandage on his hand, that he didn't have a
20  weapon?
21         THE COURT:    That's infringing on the
22     Civil Service Board's --
23         MR. PIAZZA:    I'm trying to understand the
24     basis of his recommendations, and I'll just ask
25     him that.

1    Q.  What is the basis of your recommendation to

2  the Board having heard the facts as you've heard them?

3    A.  I've basically heard the same facts that the

4  Board has heard as far as I asked them what happened.  I

5  spoke with Deputy Ingle.  I spoke with the folks that

6  were on the shift in the jail.  I listened to the tape.

7  I mean I spoke with everybody I could.

8    Plus I have one more advantage that probably

9  nobody else in this room does other than his brother and

10 his wife.  I've known Tommy for many, many years.  I do

11 know he has some problems and he gets mixed up and I

12 don't know what the correct or diplomatic way to put it,

13 but like his wife stated he kind of goes and comes, and

14 you know I understand that.  I have no doubt from the

15 tape that -- you know, I don't really know if he was on

16 too much medication, not enough medication or mixing

17 alcohol or what, but I mean I kind of understood that,

18 but I've known Tommy.

19    I went to school with him.  I've known him

20 personally for many, many years, and he and I have

21 gotten along fine.  I think in considering all the

22 facts, you know, I mean, from the tape that he called in

23 the 911 and this thing with his wife, I don't think his

24 wife probably did a thing to him.  I think he got mixed

25 up, but I had to take all that into consideration and I

1  feel it's very possible, and I've never indicated to him
2  anything different but I don't know that he's not mixed
3  up on some of the other.  I don't know.
4        Q.  Well, in all the time -- in all the length
5  of time that you've known him, have you ever known him
6  to be a violent person?
7        A.  I don't think physically there's probably
8  been any violent to him.  I think he would indicate to
9  folks that he might have been; the old saying, his bark
10  would be a lot worse than his bite.
11        Q.  And you know that Deputy Ingle has known him
12  for a long time also?
13        A.  I'm sure he's had some dealings with him,
14  yes.
15        Q.  And that he would probably know that as
16  well?
17        A.  I can't say to what he would know.  I don't
18  know.
19        Q.  Now, would you say that there would have to
20  be an underlying basis, criminal basis, for the use of
21  Freeze Plus, some kind of underlying criminal activity?
22        A.  Basically, yes.  I mean, and I probably feel
23  like I need to qualify that.  It could initially be
24  through just a routine interrogation stop, asking
25  somebody questions and it could turn instantly into

1   something bad. We have a use of force of continuing

2   that we utilize in that and go from verbal commands all

3   the way to lethal force. So, yes, sir, we're trained in

4   that. I understand how that works.

5         Q. So, and I know that you can't testify for

6   Deputy Ingle, but as a professional law enforcement

7   officer and with knowledge on the use of this Freeze

8   Plus, there would have to be an underlying criminal

9   offense in order to justify the use of that, regardless

10  of what that offense was. If there was an offense, then

11  the officer would be justified in using it; is that

12  correct?

13        A. I suppose that's true but I -- that's a

14  unique situation. I mean that's hard to answer yes or

15  no, but I'll answer it that -- that's the basic

16  premises. There should be some violation or something

17  has gone wrong.

18        Q. And with that, in order for there to be a

19  valid arrest, there also must be a valid justification

20  for that arrest so that if an arrest is made and there's

21  no criminal violation underlying or forming the basis of

22  that arrest, then the arrest itself is an illegal

23  arrest; would you agree with that?

24        MR. WILLFORD:   Objection. Calls for a

25       legal conclusion.

1        MR. PIAZZA:    He's an expert.  He's a law

2   enforcement expert.

3        MR. WILLFORD:  He's not a lawyer.

4  -      THE COURT:    I'll let him answer if he

5   knows.

6     A.  You know, I would like to answer, but they

7  pay these judges an awful lot of money every year to

8  decipher and to figure that out and they don't pay me

9  that much, so I --

10     Q.  This is not about salaries but it is about

11  our laws and regulations and what we all live by.  And

12  as a law enforcement officer, I'm assuming that you're

13  an expert in this area, just like that Judge, because

14  these are the laws that you have to administer everyday;

15  would you agree to that?

16     A.  That I administer laws everyday, yes, sir.

17     Q.  So in order for there to be a valid

18  resisting arrest charge, there must be a valid

19  underlying criminal offense.

20        MR. WILLFORD:  Same objection.

21        THE COURT:    Overruled.

22     A.  Well, in my opinion before resisting arrest

23  there would be another charge that started the process

24  for the arrest to begin before there was a resist, yes,

25  sir, I would agree with the general premise of that,

1    yes, sir.

2           Q.   And you know, having knowledge of the

3    Judge's ruling today, that the Judge threw out that

4    underlying charge, he dismissed it against Mr. Burch.

5           A.   Disorderly conduct?

6           Q.   Yes, sir.   He dismissed the disorderly

7    conduct charge.

8           A.   Yes, sir.

9           Q.   That's like saying it didn't happen, based

10   on the testimony that he heard today.

11          A.   I don't know.   You would have to ask him.

12          Q.   All I'm saying is you know that he was

13   acquitted of that charge?

14          A.   Disorderly conduct, yes, sir, he was

15   acquitted.

16          MR. PIAZZA:    Sheriff, I don't think I

17   have any further questions at this time.

18          MR. WILLFORD:   Nothing further.   The

19   Hiring Authority rests.

20          MR. PIAZZA:    For rebuttal I would like to

21   call Ms. Patsy Barron to the witness stand.

22          THE COURT:    We're going to limit this to

23   rebuttal, so --

24          You testified earlier in this case.   Just

25   consider yourself to be continued to be under oath.

<u>REBUTTAL</u>

<u>PATRICIA WILKERSON BARRON</u>

recalled on behalf of the grievant, having been previously duly sworn, was examined and testified further as follows:

<u>DIRECT EXAMINATION</u>

<u>BY MR. PIAZZA:</u>

Q. Ms. Barron, you've heard the testimony and you've heard the tape. In fact, you were present when your husband made the 911 call.

A. Yes.

Q. And you were present when you heard him say to Officer Shugart that it was you that broke his thumb?

A. No, I didn't hear that.

Q. You didn't hear that?

A. No.

Q. Did you hear it on the tape a minute ago?

A. Not really.

Q. Would you like for me to play it for you?

A. No. I don't want to hear that again, please.

Q. Well, I'll just ask you: Did your husband break your thumb?

A. Did I break -- no.

Q. Excuse me. Did you break his thumb?

1    A.   No, I didn't break his thumb, no.   I didn't
2    break anything.
3        Q.   Okay.   So you did not break his thumb?
4        A.   No.
5        Q.   How did he break his thumb?
6        A.   That had happened the week before, like this
7    was on Sunday, he got up Sunday morning and he said my
8    thumb is throbbing and still hurting.   And I said,
9    "Well, I'll just take you to the emergency room and
10   we'll get it x-rayed and see if it's broken."   And I'm
11   not absolutely sure how it happened.   But we did go to
12   the hospital, and he did have a little fracture and they
13   did put something on it.
14       MR. PIAZZA:      I have nothing further for
15   her.
16               CROSS-EXAMINATION
17   BY MR. WILLFORD:
18       Q.   So if he said on the tape to the 911
19   dispatcher that you broke his thumb, he was lying; is
20   that right?
21       A.   I guess so.
22       MR. WILLFORD:      That's all I have.
23       THE COURT:      You can come down.
24       MR. PIAZZA:      I would like to ask Mr.
25   Burch to return to the witness stand as a

1    rebuttal.

2            THE COURT:        You're still under oath.

3                    TAZ DAY BURCH

4        the grievant, recalled on his own behalf, having

5    been previously duly sworn by the Judge, was examined

6    and testified further as follows:

7                    DIRECT EXAMINATION

8    BY MR. PIAZZA:

9        Q.    Taz, how did you break your -- was your

10    thumb broken?

11        A.    Fractured.

12        Q.    How did you fracture your thumb?

13        A.    Well, I nearly fell trying to catch myself

14    on the kitchen sink, like that (indicating), and it

15    fractured this joint here.  And I done it like on Friday

16    or Saturday before this other mess happened, and it got

17    to hurting me so I got Patty to take me to Winfield, and

18    I have copies of it.

19        Q.    Why did you tell the 911 dispatcher that she

20    broke your thumb?

21        A.    I couldn't tell you how that got on there

22    but she didn't break my thumb.

23        Q.    But you heard your --

24        A.    I heard it on that tape, but like I said,

25    she didn't break my thumb.  I hurt my thumb.

1    Q.  Did you hear yourself on the tape?

2    A.  I went to -- yes.

3    Q.  Was that your voice?

4    A.  Yes.

5    Q.  Do you recall saying that?

6    A.  I didn't do good in school.  I stayed two or

7    three years in the same class.  I had problems.  I

8    didn't even know they drew a check on me.  I had to quit

9    and go to work when I was 16.  I had problems all the

10   time, but I used to go play with him and stuff but --

11   Q.  It's just something that you said that you

12   regret saying?

13   A.  Yes.  I said two things in there that I --

14   I don't know.  I can't even remember saying them.

15   Q.  Was it one that said you were going to beat

16   her up?

17   A.  No, I wouldn't hurt her.

18   Q.  Have you ever laid a hand on her?

19   A.  Never have and never will.

20   Q.  And the other thing was that --

21   A.  Probably just running my mouth.  That's all.

22   I don't remember what all I said.

23         MR. PIAZZA:    That's all I have.

24

25

<u>CROSS-EXAMINATION</u>

<u>BY MR. WILLFORD</u>:

Q.  Mr. Burch, didn't you tell this panel when you testified before that you broke your thumb on a water heater?

A.  Well, hot water heater went out.  The fuse blowed to it, but it didn't happen -- I thought that might be what had happened, but I've got a step up about this high, had on the little kitchen floor where I had to have overlaid and you would stumble if you ain't careful.

Q.  So now it's your testimony that you fell, and that's how you broke it?

A.  Well, I was having hot water heater troubles.  The hot element went out on it and couldn't seem to do nothing to fix it and I might have banged it in there, but I did stumble over the kitchen and my thumb went like that pretty hard, but this happened like a Friday, back up on the 16th.  It happened like a Friday and I got Patsy to take me to Winfield on the 15th, that Sunday, and he put a little splint on it and gauze, wrapped where I could take it off and on.

Q.  Well, I'm not asking you about what they did to fix it.  I'm just confused here.  I'm trying to figure out did you break it on a water heater or did you

1    break it when you fell?

2         A.  Well, like I say, I was having hot water

3    heater troubles, and I -- where that element goes at,

4    the hot water heater element that goes in there, and I'm

5    trying to get -- I had a chance to go one side or the

6    other.  I was afraid to mess with it.  I called my

7    brother and told him about it, and he said, "Well, don't

8    mess with it."

9         Q.  Mr. Burch, do you understand my question?

10        A.  When I came back into the living room, I was

11   going to the kitchen to get me a -- I can't remember

12   what I was going in the kitchen for, but my toe got hung

13   on that step up about that high and then I fell, so I

14   tried to catch myself and I don't --

15        Q.  Stop.

16             (Short interruption.)

17             THE COURT:     Mr. Burch, just listen to

18   his question and just answer the best you can.

19        A.  All right.

20        Q.  I think I understand it now.  You did break

21   it when you fell; is that right?

22        A.  I don't know if I hurt it trying to mess

23   around with the hot water heater.  I ain't for sure if

24   it was there or I tripped and fell and tried to catch

25   myself.  I hurt my thumb.  Patsy did not hurt my thumb.

1     Q.   Okay.

2     A.   That's on that tape.  I don't know how it

3   got on there.

4     Q.   Well, did you say it or didn't you?

5     A.   If I did, I don't know what I said, because

6   like I said, I took my medicine, go to sleep, and I know

7   I didn't have but beers left in the frig because it was

8   Sunday.  You don't get no more till Monday till the

9   store -- but I had four beers in the refrigerator for

10  Sunday, and I took my medicine.  I drank them four

11  beers, and I left Gene's house about 10:00 o'clock.  I

12  got home and drank them four beers and took my medicine,

13  and it hit me and I wasn't completely right upstairs

14  when I did make the phone call to 911, but my wife has

15  never hit me and she didn't break my finger. Between the

16  hot water heater and me tripping and falling -- I nearly

17  fell.  I tried to catch myself.  I hurt my own thumb,

18  but wasn't nothing matter with my middle finger here.  I

19  mean, there wasn't nothing wrong with

20  it.

21     Q.   That's not what I'm asking about right now.

22  Do you remember telling this panel before that you

23  didn't threaten your wife that night?

24     A.   Like I say, I took my medicine first and

25  then I drank those four beers on top of it.  You could

1  tell I wasn't -- when I got hurt in '91, I had a speech

2  problem because I nearly bled to death and they said I

3  had a little brain damage to go with it.  I bled to

4  death, I went through a bunch of -- I don't know what

5  all I went through, but they said I could have slight

6  brain damage and some slur speech and stuff.

7       Q.  Does that affect your memory?

8       A.  It has affect.  I can remember some things

9  and some things I can't remember.

10      Q.  Do you ever remember things that never

11 happened?

12      A.  I can remember everything that happened.  I

13 can pretty well go back all the way, you know, about 90

14 percent on everything since -- I do have these memory

15 lapse sorts of like -- like I can't remember right now

16 but will come to me after while sometimes.

17      Q.  Do you remember also telling this panel that

18 you didn't take your medication that night?

19      A.  I don't know if I told them I took my

20 medication, but I took my medication.

21      Q.  It's your recollection now that you took

22 your medication?

23      A.  Medication.

24      Q.  Along with the beer that you drank that

25 night?

1      A.   Because my nerves was messed up all over

2  this business here, and I figured it would help me

3  sleep.

4      Q.   But this business here hadn't happened yet.

5      A.   I mean from the Carbon Hill business, all

6  the trouble of getting run out of town.

7      Q.   Did you drink beer that night?

8      A.   I drank four.  That was all that was in the

9  refrigerator.

10     Q.   You drank four beers?

11     A.   Yes.

12     Q.   You took your medication?

13     A.   I did.

14     Q.   That night?

15     A.   And it started affecting me, and I actually

16  shouldn't have called 911 at all.

17          MR. WILLFORD:   Okay.  I have no further

18  questions.

19                REDIRECT EXAMINATION

20  BY MR. PIAZZA:

21     Q.   Your recollection is pretty clear about what

22  happened to you that night?

23     A.   I can remember everything that was happening

24  to me that night.  I mean, I couldn't see it but I could

25  remember it.

1    Q.   And you didn't threaten your wife that
2   night?
3    A.   She asked me if someone was on the phone.  I
4   wouldn't hurt her for nothing in the world.
5    Q.   Prior to your getting on the phone, you
6   didn't threaten her?
7    A.   Well, just goofing off.  Well, what do you
8   call it --
9    Q.   Did you threaten her or did you threaten to
10  hurt her or harm her or anything like that, Taz, do you
11  recall?
12   A.   I just wanted her to stay up with me a
13  little bit longer and she wanted to go to bed.  I said,
14  "You going, I'm going too."  And I took my medicine and
15  I drank about four beers.
16   Q.   Do you regret making that 911 call?
17   A.   Yes.  I should have not ever called.  I
18  wasn't in my right mind calling.  I didn't need them.  I
19  didn't need an officer.  We wasn't fussing at each
20  other.  I just said, if she's going to bed, I'm going to
21  bed too.  I took my medicine with beer, and beer and
22  medicine and went to bed.  I don't know why I called 911
23  but I did, because I had -- I been having problems for a
24  long time.
25            MR. PIAZZA:    That's all.

C E R T I F I C A T E

STATE OF ALABAMA        )

WALKER COUNTY           )

    I hereby certify that the above and foregoing proceeding was taken down by me by stenographic means, and that the questions and answers therein were produced in transcript form by computer aid, and that the foregoing represents a true and correct transcript of the proceedings occurring on said date.

    I further certify that I am not of counsel, nor related to any of the parties to this action; nor am I in anywise interested in the result of said cause.

RHONDA G. WOODS

Notary Public, State of Alabama at Large

My commission expires December 21, 2008.