FILED

2008 Jul-28  PM 05:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

**Exhibit B**
**Transcript of Walker County Civil Service Board**
**Hearing dated 7/12/04**
**(Part I)**

1   CIVIL SERVICE BOARD

2   OF WALKER COUNTY

3   GRIEVANCE HEARING

4   JULY 12, 2004

5   REGARDING TAZ DAY BURCH

6   A.K.A. TOMMY BARRON

7

8   HEARING BEFORE

9   CHARLES STEPHENS, SR.

10

11   APPEARANCES

12   REPRESENTING THE HIRING AUTHORITY:

13      HANK WILEY

14      GARY WILLFORD

15   REPRESENTING THE GRIEVANT:

16      ANTHONY J. PIAZZA

17   BOARD MEMBERS:

18      ANDREW ARCHIE, Chairman

19      DAVID KELLY

20      RUFUS REED

21      MORRIS STUDDARD, JR.

22      DOYLE CUMMINGS

23

24      SHARON TUCKER, CLERK

25



```
1    REPORTED BY:   Rhonda G. Woods

2              Certificate No. AL-CSR-228

3

4                   I N D E X

5                                              PAGE

6    WITNESSES:

7          DERANE INGLE

8              Direct by Mr. Piazza        5, 57

9              Cross by Mr. Willford            56

10         STEVEN ALLEN THOMAS

11             Direct by Mr. Piazza            72

12             Cross by Mr. Willford           75

13

14         CERTIFICATE                         76

15

16

17

18

19

20

21

22

23

24

25
```

THE COURT: The Civil Service Board is convened for the purpose of hearing the complaint of Taz D. Burch that was filed and submitted to the Walker County Civil Service Board by written complaint on March 12, 2004.

Mr. Burch is present and represented by Mr. Anthony Piazza. And the hiring authority, Honorable John Mark Tirey is here represented by the Honorable Hank Wiley and Gary Willford.

We'll go ahead and proceed. I notice we have a number of witnesses in the courtroom. Have the parties been able to check the subpoena list to be sure that all persons are present that's been subpoenaed?

MR. PIAZZA: Do you mind if I take roll?

THE COURT: Be happy for you to.

(Mr. Piazza calling roll.)

MR. WILLFORD: We're satisfied.

THE COURT: We'll go ahead and proceed. Mr. Piazza, for your information and benefit, we will handle this on somewhat an informal basis. The Civil Service Board is sitting there. They'll hear the case. They'll make a determination based on the facts presented here tonight.

We will proceed, allowing you to -- we don't have plaintiffs and defendants by designation in our

1    process but you would actually be taking the place as a

2    plaintiff since your client has filed the complaint.

3    And then the Sheriff and his representative will

4    respond.  You'll have an opportunity to cross-examine

5    witnesses and really handle it just like a regular case

6    in court, which will be the procedure that you're

7    familiar with.

8              With that let's go ahead and everybody

9    that's here that anticipates serving as a witness, let

10   me put you under oath at one time.  If you'll stand and

11   raise your right hand.

12             (Witnesses sworn by the Judge.)

13             THE COURT:   Does anybody want the Rule?

14             MR. PIAZZA:  Yes, I would.  And I would also

15   like to ask if Derane Ingle is here, is he present?

16             MR. WILLFORD:   He's present.

17             THE COURT:   All right.  Who is going to be

18   your first witness?

19             MR. PIAZZA:  Derane Ingle.

20             MR. WILLFORD:  As the complainant has

21   invoked the Rule, I believe his witnesses need to step

22   out.

23             THE COURT:   We're going to get rid of all

24   of them except Mr. Ingle.  Where is Mr. Ingle?

25             MR. WILLFORD:  Mr. Ingle is here.

1    THE COURT:    Everyone other than Mr. Ingle,

2    if you will, just wait outside and we will call you as

3    we need you.

4    Mr. Ingle, just for proper identification,

5    if you will, identify yourself, please.

6    MR. INGLE:    Derane Ingle.

7    THE COURT:    Mr. Piazza.

8    <u>DERANE INGLE</u>

9    called on behalf of the grievant, having been

10   duly sworn, was examined and testified as follows:

11   <u>DIRECT EXAMINATION</u>

12   BY MR. PIAZZA:

13   Q.   And you're currently employed by Walker

14   County?

15   A.   Yes, sir.

16   Q.   As deputy sheriff.

17   A.   Yes, sir.

18   Q.   And how long have you been employed?

19   A.   With Walker County Sheriff's Office since

20   October of last year.

21   Q.   2003?

22   A.   Yes, sir.

23   Q.   And who is your immediate supervisor?

24   A.   Carey Scruggs.

25   Q.   Can you spell that, please?

```
 1          A.   C-a-r-e-y, Scruggs, S-c-r-u-g-g-s.

 2          Q.   What is his or her title?

 3          A.   His title is chief deputy.

 4          Q.   Chief deputy?

 5          A.   Yes, sir.

 6          Q.   And who does he answer to?

 7          A.   Sheriff John Mark Tirey.

 8          Q.   Tirey?

 9          A.   Yes, sir.

10          Q.   When did you first apply to Walker County to

11   be a deputy sheriff?

12          A.   I don't remember the date.  I done the test

13   and the paper but I don't know what day it was.

14          BOARD MEMBER REED:  Charlie, we ask if he

15   would speak up just a little bit.  I can't hear.

16          THE COURT:   Derane, if you will speak up

17   because this body over here is going to be making the

18   final decision, so they need to hear what you're saying.

19          Q.   Who did you interview with when you

20   originally applied, do you recall?

21          A.   Sheriff Tirey and Carey Scruggs.

22          Q.   Tirey and Scruggs?

23          A.   Yes, sir.

24          Q.   Do you recall when that was?

25          A.   I done my PT and my run and everything
```

1    about, I guess, two or three weeks before they hired me,

2    before I started.

3          Q.  So you had to meet certain physical

4    qualifications?

5          A.  Yes, sir.

6          Q.  And did you meet those physical

7    qualifications?

8          A.  Yes, sir.

9          Q.  I assume there was a physical fitness test?

10         A.  Yes, sir.

11         Q.  What else was there?

12         A.  Agility course.

13         Q.  Agility?

14         A.  Yes, sir.

15         Q.  Anything else?

16         A.  None that I can think of.

17         Q.  Was there a written application that you

18    filled out?

19         A.  Yes, sir.

20         Q.  Was there any type of a written exam or an

21    electronic exam?

22         A.  Yes, written.

23         Q.  Written exam?

24         A.  Yes, sir.

25         Q.  Did you complete that?

1          A.   Yes, sir.

2          Q.   Do you recall the score you made on that?

3          A.   I don't believe they give a score, just fail

4     or pass.

5          Q.   So you passed that?

6          A.   Yes, sir.

7          Q.   Did you have to -- were you required to

8     submit any documents other than your written

9     application?

10         A.   On my certificates I have, my

11    certifications.

12         Q.   Certifications?

13         A.   Yes, sir.

14         Q.   We'll get into those.  And did you, in fact,

15    submit those certifications?

16         A.   Yes, sir.

17         Q.   Do you recall on the written application if

18    there was a question concerning a background check?

19         A.   Was there a question about a background

20    check?

21              MR. WILLFORD:   Let me interject here for

22         just a minute.  This is starting to sound like a

23         deposition, and I know we're wide open here, but I

24         believe the allegations that are against the deputy

25         are whether or not he engaged in any kind of

1    excessive force against the complainant, and I fail

2    to understand the relevancy of all these

3    deposition-like questions about the application,

4    and we'll stipulate for the record that he was

5    hired as a deputy sheriff at the time of the

6    incident.

7         MR. PIAZZA:  I think the question before the

8    Board, and forgive me if I'm incorrect, but I think

9    the question before the Board is whether this

10   gentleman deserves to maintain his job or to keep

11   his employment with the county.  I think that's the

12   central issue.  There has been an allegation by my

13   client that there was excessive abuse and treatment

14   of him as a prisoner; however, that doesn't exclude

15   any other reasons that the Board may find that he

16   could be excused as an employee, and my questioning

17   concerns that other aspect.

18        THE COURT:  Mr. Piazza, I can understand

19   your --

20        MR. PIAZZA:  In fact, I'm trying to lay a

21   background for that.

22        THE COURT:  Let me help you a little bit,

23   and this is Charlie Stephens, the attorney for the

24   Board.  Mr. Ingle would have made application to

25   this body, the Civil Service Board, for employment.

1　　　　All the employees are hired through the Civil

2　　Service Board. He would have make his application

3　　to this Board. He would have taken the exam that

4　　he's referred to, which was given by this Board,

5　　graded by this Board, and the qualifications for

6　　this position has been checked by the Civil Service

7　　Board, so he was qualified for employment. I think

8　　the Board could find that as a matter of judicial

9　　notice, for lack of a better term.

10　　　　They have certainly certified his

11　　qualifications and submitted his name to the

12　　Sheriff as an eligible employee for that position

13　　after having been tested and examined. So if that

14　　helps you any, I don't know if it does or not, I

15　　was assuming you were going through for the

16　　qualification aspect of it, but he is qualified. I

17　　think the Board will take judicial notice of that.

18　　　　MR. PIAZZA: Well, my only other question in

19　　that particular vein would be was there a question

20　　concerning his criminal background?

21　　　　THE COURT: Okay. You can ask him if he

22　　knows. Go ahead.

23　　　　Q. Was there such a question on your

24　　application to the county concerning any criminal record

25　　or background that you may have had?

```
 1        A.   It asked you if you had been arrested

 2   before.

 3        Q.   Have you ever been arrested?

 4        A.   No.

 5        Q.   You've never been arrested?

 6        A.   No, sir.

 7        Q.   You've never been convicted of a crime?

 8        A.   Never had a speeding ticket.

 9        Q.   Never had a speeding ticket.  I'm assuming

10   you responded negatively to that particular question; is

11   that correct?

12        A.   (Witness nods head.)

13        Q.   Now, having gotten that out of the way, how

14   long have you known the complainant, Taz Burch?

15        A.   I've known Tommy for probably 10 or 12

16   years, something like that.

17        Q.   And when did you make his acquaintance?

18        A.   It would have been after I worked at Carbon

19   Hill, the City of Carbon Hill.

20        Q.   And forgive me if I lead a little bit.  Were

21   you the chief of police at Carbon Hill?

22        A.   Yes, sir, for a period of time.

23        Q.   Okay.

24        A.   But when I first begun to know him I wasn't

25   the chief of police.  I started out as a dispatcher.
```

```
 1          Q.   Dispatcher?

 2          A.   Yes.

 3          Q.   When did you go to work for Carbon Hill?

 4          A.   I believe I started dispatching with them in

 5    '93, and I worked for them for a while and I quit and I

 6    went back.   I was a part-time patrolman and then I went

 7    full-time patrolman and then I went to assistant chief.

 8    I was assistant chief job for several, several years and

 9    then I was chief of police for almost two years, I

10    guess.   Close to two years.

11          Q.   Was that the last two years prior to your

12    being employed by the county?

13          A.   I worked about a year in Oakman.

14          Q.   Oakman?

15          A.   Yes, sir, City of Oakman.

16          Q.   What was your position there?

17          A.   I was patrolman.

18          Q.   Why did you leave the City of Oakman?

19          A.   I took a job with the Sheriff's Office.

20          Q.   Why did you leave the chief of police

21    position at Carbon Hill?

22          A.   I got sick and the working conditions.

23          Q.   Excuse me?

24          A.   I was sick.   I got sick and the working

25    conditions.
```

```
1          Q.   The working conditions?

2          A.   Uh-huh.

3          Q.   What -- can you be more descriptive, please?

4          A.   As far as the working conditions?

5          Q.   And also your illness.

6          A.   Stress bothered me and the mayor tried to

7    get me to do some things that wasn't right and I let it

8    make me sick.

9          Q.   The mayor, who was that at the time?

10         A.   James Richardson.

11         Q.   What was he trying to get you to do?

12              MR. WILLFORD:   Again, I don't see the

13         relevance of this.

14              THE COURT:   Unless it's going to help us

15         someway, Mr. Piazza, we -- how is that going to

16         help us?

17              MR. PIAZZA:  Well, Mr. Stephens, what I'm

18         trying to determine, and I may have to go another

19         way with this --

20              THE COURT:   Yes.  I'm going to sustain his

21         objection as to that.

22         Q.   So, during the time that you've known Mr.

23    Burch, how many times have you arrested him if you

24    recall?

25         A.   At Carbon Hill or altogether?
```

1        Q.  Let's start with Carbon Hill.

2        A.  Three times.  One of them would have

3  probably been on a warrant.

4        Q.  And the other two?

5        A.  Public intoxication, unlawful possession of

6  prohibited beverage, and then another unlawful

7  possession of prohibited beverage.

8        Q.  That's three occasions in Carbon Hill.  Any

9  other times that you've arrested Mr. Burch?

10       A.  The only two I have a recollection of at

11  this time.

12       Q.  What about when you were at Oakman?

13       A.  No, sir.

14       Q.  You didn't arrest him while you were there?

15       A.  No, sir.

16       Q.  Now, in your dealings with Mr. Burch, tell

17  me what you know about Mr. Burch, about his physical

18  condition.

19       A.  About every time I've ever had any dealings

20  with him it was either because him complaining about

21  something that --

22       Q.  I'm not asking you that.  I'm asking you

23  what your knowledge is about his physical condition.

24  This is a man that you've known for 10 or 12 years.

25       A.  I don't understand.  I don't understand what

```
 1    you want me to tell you.
 2            Q.   Do you understand him to be a normal,
 3    healthy, walking, individual or do you know him to have
 4    physical health problem?
 5            A.   I know he has some problems with one arm.
 6            Q.   What -- how would you describe that problem?
 7            A.   He's got a big scar on it.
 8            Q.   Is that it?  Do you know if he can use that
 9    arm?
10            A.   I mean, my extent of knowing him -- well,
11    somewhat personal but not an extent of knowing what his
12    physical capabilities would be, no, sir.
13            Q.   Do you know if he has use of that arm?
14            A.   I've seen him use the arm if that's what
15    you're asking me.
16            Q.   When did you notice he had a scar on that
17    arm?
18            A.   I guess the first time I ever seen him.  I
19    mean, it's obvious.  You can see it.
20            Q.   Is it his right or left arm?
21            A.   It would be his right arm.
22            Q.   Does he have any other physical impairments?
23            A.   I don't know.
24            Q.   Do you know whether or not -- do you know or
25    can testify as to his mental condition?
```

```
 1          A.   No, sir.

 2          Q.   Have you ever known him to have a mental

 3   condition?

 4          A.   No, sir, I mean I --

 5          Q.   When I say "mental condition," I'm referring

 6   to a mental disease or illness.

 7          A.   I don't know.  I don't know whether he does

 8   or not, no, sir.

 9          Q.   Have you ever known him to take medication?

10          A.   Other than what he's told me?

11          Q.   What has he told you about his medication?

12          A.   He called me up to his house one day, was at

13   Carbon Hill, he told me that he was on a lot of

14   medication.  Of course, I don't remember the reason he

15   called for us to come up there.  We used to sit and

16   talk.  There was times he would call.  He would have a

17   problem and we would go up there and then Tommy would

18   talk.  Because I played music and he played music, he

19   wanted us to get together and play music.  That would be

20   the most part about knowing anything about his medical

21   history.  I'm no doctor so I can't testify to what he's

22   on or what his capabilities are.

23          Q.   Well, I mean did he -- does he appear to

24   be -- let me rephrase that question.

25               Have you ever known him not to conduct
```

1  himself in a normal fashion?

2       A.  As in intoxicated wise?  What does that

3  mean?

4       Q.  If intoxication would be the way that you

5  would describe it, then describe it.  Have you ever seen

6  him intoxicated?

7       A.  Yes, sir.

8       Q.  Have you ever seen him acting abnormally

9  without being intoxicated?

10       A.  I wouldn't say that.  I wouldn't know -- him

11  act abnormal without being intoxicated, no.  There's

12  been times that I've been to his house and he's been

13  intoxicated but he's not act as bad as he had at other

14  times.  When I -- from the time I put him in jail, when

15  I first had an encounter with him is nothing the way

16  that he acted, you know, when I put him in jail the last

17  time.  Very irate.  Not as if it was when I had -- maybe

18  had first dealings with him.

19       Q.  You were the chief of police in Carbon

20  Hill.  You arrested him three times; is that correct?

21       A.  When I was chief of police, I don't believe

22  I ever arrested him.

23       Q.  Was this while you were a patrolman --

24       A.  I arrested him for a --

25       Q.  -- or assistant chief?

1    A.  Once I was a patrolman, I might have been

2   part -- I was patrolman at that time.  I arrested him on

3   a -- I believe that would have been a warrant.  A

4   warrant was signed on him because he kept calling the

5   dispatcher and cussing them at Carbon Hill, so the

6   magistrate issued a warrant on him and he was arrested

7   for that.  The other two times would have been the time

8   that I was assistant chief.

9    Q.  What were those two times for?

10   A.  Public intoxication and unlawful possession

11  and then, again, for unlawful possession.

12   Q.  And at any time did you have an occasion to

13  incarcerate him in the facility there at Carbon Hill?

14   A.  All of those would have been Carbon Hill.

15   Q.  At any time did you search his person to see

16  if he had medications or drugs, any type of --

17   A.  Put somebody in jail, yes.

18   Q.  And did you ever determine that he did have

19  medications on his person?

20   A.  I don't recall that.

21   Q.  Did he ever request medications from you

22  while he was incarcerated in Carbon Hill?

23   A.  He wouldn't have requested them from me,

24  because I wouldn't have been the one.  After I take him

25  to jail, I don't handle him no more.  It would be the

1    dispatcher or the jailer.

2         Q.   So it's your testimony that you wouldn't

3    have any knowledge of his medications?

4         A.   He didn't ask me for no medications.   I

5    mean, I would have no reason for him to ask me because I

6    don't work in the jail.

7         Q.   In your discussions with people who work at

8    the jail, do you have any knowledge from your

9    discussions with him that he required medications?

10        A.   No, sir.

11        Q.   Or that he required physical or bodily or

12   mental treatment?

13        A.   On the booking sheet --

14        Q.   Can I ask what you're looking for?

15        A.   His booking sheet where he's made calls from

16   911, it was either transferred over to the Sheriff's

17   Office or whether he called the Sheriff's Office about

18   something.   You want me to tell you what they were?

19        Q.   Right now I would like to know about any

20   treatment that he received.

21        A.   On the booking sheet it says medical needs

22   and it says physician, Dr. Camp.   It don't say nothing

23   about his medicines.   It says problems or concerns, he's

24   had a heart attack, a collapse lung, and he has

25   breathing problems.

1        Q.   Heart attack, collapse lung, and breathing

2   problems?

3        A.   Yes.

4        Q.   What's the date of that?

5        A.   It doesn't have a date on here.

6        Q.   Which arrest was that, does it say?

7        A.   No, sir.  No.  It's just a booking sheet is

8   all it is.

9        Q.   Can I see that?

10       A.   (Witness complies.)

11            MR. PIAZZA:  Is it possible that we could

12       have these documents entered into the record

13       here, documents that he's brought to court?

14            THE COURT:   That he's been referring to?

15            MR. PIAZZA:  Yes.

16            THE COURT:   Any objection?  He's been

17       referring to them.

18            MR. WILLFORD:  No.

19       Q.   You said you arrested him three times while

20   you were at Carbon Hill.  Have you arrested him other

21   times other than the time that we're here on this

22   evening?

23       A.   No, sir, none that I recall.

24       Q.   So you've only arrested this gentleman four

25   times?

1       A.   Seems like when he was arrested on one of

2   these times here he had some marijuana on him, but it's

3   not on his --

4       Q.   I didn't ask you that.  Well, I mean, that

5   you didn't make the arrest --

6       A.   On the marijuana?

7       Q.   -- is what you're saying?

8       A.   Nuh-uh.

9       Q.   So you did make --

10      A.   But it's not on the booking sheet so --

11          THE DEFENDANT:  I've never smoked pot and

12  never had none on me.

13      Q.   So it's your testimony then, without it

14  being documented with these records, that you've

15  arrested this man for -- what was the charge

16  specifically regarding the marijuana?

17      A.   It's not on this booking sheet.  The only

18  way I would know is if I subpoenaed Carbon Hill's

19  records and seen if it was in his file somewhere.  I

20  couldn't tell you -- I don't -- I just have to -- we

21  would have to subpoena the records.

22      Q.   Are you just recalling this from memory?

23      A.   No, because it's not on here and I don't

24  really -- we'd have to subpoena the records to be able

25  to know.

1      Q.  So it's your testimony that there's never

2  been an arrest for marijuana?  From your recollection

3  only that you recall without going to the records.

4      A.  There should have been one on here

5  because --

6           THE COURT:  His question to you is do you

7       have any independent recollection of arresting him

8       for possession of marijuana, whether it's on these

9       records or not.  Do you have any independent

10      recollection of having arrested him for marijuana?

11           THE WITNESS:  Do I remember doing it?

12           THE COURT:  Yes.

13      A.  When I put him in jail when I charged him

14  with a P.I., he was actually driving a vehicle.  I mean

15  I remember that.  I remember that.  But I charged him

16  with P.I. because -- to keep him from losing his

17  license.  It was unlawful possession of prohibited

18  beverage, and they should have been, if I ain't

19  mistaken, but to verify, I would have to subpoena the

20  records at Carbon Hill to verify that to be the facts.

21  No, I don't know for a fact.  I couldn't tell you that

22  for a fact without subpoenaing the records.

23      Q.  So you don't have any independent

24  recollection you can tell this Court about marijuana

25  possession that he was ever charged with --

1        A.   I would have to subpoena the record.

2        Q.   -- or ever found on his person?

3        A.   I would have to subpoena records before I

4   could tell you that for sure.

5        Q.   During the three arrests that we talked

6   about, has he ever been noncooperative with you as the

7   arresting officer?

8        A.   I don't believe so.

9        Q.   So he's always cooperated with you when

10  you've arrested him?

11       A.   The best of my knowledge on those, yes, sir.

12       Q.   Has he been -- do you know of any -- do you

13  have any knowledge of him being uncooperative with any

14  other police officers or law enforcement officials while

15  he was in their custody?

16       A.   In custody, no.

17       Q.   After an arrest, or after an arrest?

18       A.   Not during, no, not arrest.  He wasn't

19  arrested on that one.

20       Q.   Would you characterize Mr. Burch as a fairly

21  peaceful individual that likes to drink and he gets

22  caught being drunk occasionally?

23       A.   I don't know how you would characterize it.

24  Normally it would be his neighbors that would complain

25  on him if there was a complaint.  Those two times I

1    arrested him would have been -- would have had to have

2    been not at residence for him to be charged with those

3    charges.

4         Q.  Well, getting back to these charges, were

5    these for infractions or violations that were committed

6    in your presence?  I know that you said one was by

7    virtue of a warrant, but wasn't the other two committed

8    in your presence?

9         A.  For me to make the case, yes, sir, they had

10   to have been.

11        Q.  And how did it come upon you to be at the

12   time and place where this man was at the time of the

13   violation?

14        A.  I don't know that.  It would have been while

15   I would have been patrolling I'm sure.

16        Q.  Do you have any recollection of how the

17   public intoxication charge came about?

18        A.  No, sir.  All I have is a booking sheet.  I

19   don't have his arrest report on that.

20        Q.  Did you make an arrest report?

21        A.  Yes, sir.  If he's been booked in jail,

22   there would be one, yes, sir.

23        Q.  What about the possession charge?

24        A.  Alcohol, yes, sir.  There would have been an

25   arrest report on any charge that he had been --

1          Q.   How did you come to be in the particular

2      place where this -- was this made at the same time the

3      two charges -- was this for one arrest or two separate

4      occasions?

5          A.   Yes, sir, two of them was right there what

6      you've got down and then he has another unlawful

7      possession of beer.

8          Q.   So there is a third one of unlawful

9      possession?

10         A.   On one arrest he was charged with P.I., yes,

11     sir, and then he was charged with beer on the next --

12     another one.

13         Q.   And how did you come to be in the location

14     where Mr. Burch was, or as you know him, Mr. Barron, how

15     did you come to be in that location at the particular

16     time that these violations were going on?

17         A.   I wouldn't know how to answer.  I mean other

18     than patrolling, I couldn't tell you.  I don't have the

19     arrest reports.  I mean, I don't know -- I don't know

20     how to answer other than what I -- I don't know anything

21     else to tell you.  I would have to look at the arrest

22     report to see why or where I arrested him.  I wouldn't

23     remember where it could have been.

24         Q.   So you don't recall any circumstances

25     surrounding these arrests?

A.   No.

Q.   Regarding the arrest that we're here on this
evening, which occurred, correct me if I'm wrong,
February 16.

A.   Yes, sir.

Q.   Is that correct?

A.   Yes, sir.

Q.   What evening -- what day of the week was
that?

A.   Monday, I believe.

Q.   Tell me what you recall about that
particular arrest.

A.   Do you want me to start from the beginning?

Q.   Yes, sir.

A.   I was dispatched out.  Dispatch give me the
call that Mr. Barron called.

Q.   What time was that?  Excuse me for
interrupting.  I may interrupt you because I want -- I
would like to know --

A.   I don't know.  It come through 911, so I
don't know what time it would have been.  Mr. Barron
has --

THE COURT:   Let me help the record here.
We're referring to the complainant as Mr. Burch and
then you're referring to him as Mr. Barron.  Is Taz

1          Burch and Tommy -- or Taz Burch and Tommy Burton

2          (sic) one and the same person?

3                    MR. PIAZZA:  Barron.

4                    THE COURT:  Tommy Barron.

5                    MR. PIAZZA:  He's formerly known as Tommy

6          Barron.  He went through a formal change of name

7          process.

8                    THE DEFENDANT:  I changed my name February

9          the 6th.

10                   THE COURT:  I just wanted to clear that up

11         for the record because it could be confusing later

12         on.

13                   MR. PIAZZA:  I was going to clear that up

14         with him.

15              Q.  What shift were you working on the evening

16    of February 16?

17              A.  Midnight.

18              Q.  Midnight?

19              A.  12:00 to 8:00.

20              Q.  And what time after you got your -- after

21    you got notified of the dispatcher's 911 call, what time

22    did you arrive at Mr. Burch's residence?

23              A.  I got at his house at 1:51 a.m.

24              Q.  Was that on the 17th?

25              A.  The 16th.

```
 1            Q.   That would have been the 16th?

 2            A.   Yes, sir.

 3            Q.   And what information did you have as a

 4    result of the dispatchers notifying you of the call,

 5    what information did you have prior to your going to

 6    their residence?

 7            A.   Dispatch give it to me that he had a

 8    combative wife, unwanted guest, and he wanted her

 9    removed.

10            Q.   Combative wife, unwanted guest?

11            A.   Yes, sir.

12            Q.   And Mr. Burch was the one that made the

13    call?

14            A.   Yes, sir, from what dispatch --

15            Q.   Did it say what time the call came in?

16            A.   No, sir.  I don't have that, no, sir.

17            Q.   And when you arrived at the residence, what

18    did you find?

19            A.   When I pulled up Ms. -- I know her as Ms.

20    Wilkerson so I may refer to her as Ms. Wilkerson -- but

21    Ms. Barron came outside and told me everything was

22    okay.  I asked her what was going on, and she told me

23    that Tommy had been drinking all day and he was drunk

24    and he had got mad.  So I said, "Well, let me talk to

25    him."  She said, "Well, he's in the bed."  I said,
```

1    "Well, I need to talk to him because he made the call

2    and make sure everything is all right."  Well, we

3    stepped in the door.  There was food in the floor, and I

4    asked her what had happened.  She said he got mad and

5    threw his food in the floor and started cussing her.

6    So, Tommy come from the -- well, he first said, "What in

7    the h-e-l-l is going on?"  And Ms. Barron was talking --

8         Q.  Let me interrupt you for a second and back

9    up here.  So after she told you everything was okay, did

10    she ask you in?

11         A.  I don't recall.  I don't know.  I told her I

12    needed to speak to him, so she went back up in front of

13    me.

14         Q.  What kind of condition was Ms. Barron in?

15         A.  Actually she was kind of pleasant, I mean,

16    she wasn't ugly.  She -- I don't recall her saying

17    anything out of the way.

18         Q.  Did she say Tommy, or Taz, was in the

19    bedroom asleep?

20         A.  She said he had laid down, and I told her

21    that I needed to speak to him because he was the one

22    that made the call and let me speak to him and make sure

23    everything was all right and I would be gone.

24         He asked, "What in the h-e-l-l was going

25    on?"

1        Q.  Before you go any further, did -- how was it

2  that Taz came out of the bedroom?  I'm assuming he came

3  out of the bedroom or did you go into the bedroom?

4        A.  No, sir.  I never left the living room.  I

5  was in the living room.

6        Q.  You were in the living room?

7        A.  Yes, sir.

8        Q.  And Ms. Burch, or Ms. Barron, was in the

9  living room?

10       A.  (Witness nods head.)

11       Q.  How did Mr. Burch --

12       MR. WILLFORD:  You're going to need to

13     answer verbally.  You shook your head up and down

14     for the last question.  We're getting this all on

15     tape so if you would give us answers.

16       A.  I'm sorry.

17       Q.  Did you call for Mr. Burch to come out of

18  the bedroom?

19       A.  No, sir.

20       Q.  Or did Ms. Barron do that?

21       A.  While she was telling me what happened with

22  the food in the floor, that's when Tommy asked, "What in

23  the h-e-l-l is going on?"  Well, I was talking to her

24  and he asked it again, and that's when he come through

25  the hallway.

1      Q.   So there was a hallway separating -- the

2   living room, I take it, is where you were?

3          A.   The best I remember when you go in, that's

4   the living room, and I believe the kitchen was on the

5   right and the hallway would have been to your left.

6          Q.   And how far away was Tommy from you when you

7   first saw him?

8          A.   I don't really know.  The trailer it ain't

9   -- I don't think it's a real wide trailer, so it

10  wouldn't have been a large space, but I don't -- I

11  wouldn't know how many feet.

12         Q.   Did you have any type of weapon drawn --

13         A.   No, sir.

14         Q.   -- or anything of that nature?

15         A.   No, sir.

16         Q.   Did she ever ask you to leave?

17         A.   No, sir.

18         Q.   At any time?

19         A.   No, sir.

20         Q.   Did you make the statement -- did you scream

21  at Taz to get up out of bed and get in here into the

22  living room?

23         A.   No, sir.

24         Q.   After you heard Taz say, "What the hell is

25  going on in here," what did you do or say?

A.   Well, Ms. Barron was still talking so I
never acknowledged the first one.  He said it again and
that's when he came through the hallway and he came into
the living room.

Q.   Okay.

A.   You want me to continue?

Q.   Yes.

A.   Then he asked me what the h-e-l-l am I doing
in his house, that I needed to leave his house, this is
his d-a-m house and I had no business being there.

Q.   Did you ask him about the 911 call?

A.   Yes, sir, I tried to, and Tommy told me if I
didn't leave he was going to knock the h-e-l-l out of me
and he was going to whop my a-s-s.

Q.   So it's your testimony that he threatened
you?

A.   Yes, sir.

Q.   And as a result of that threat you pulled --
what is it, mace that you have or pepper spray?

A.   As a result of his threat?

Q.   Yes.

A.   No, sir.

Q.   Tell me what happened next.

A.   I asked Tommy to sit down and let's talk
about the call he made, and he would not talk.  He

1   didn't want to talk to me.  He wanted me to leave his
2   house.
3           Q.   Did he say everything was okay?
4           A.   No, sir.  He didn't tell me nothing about
5   the call.
6           Q.   Did it appear to you that everything was
7   okay?
8           A.   Other than him being irate, I didn't see any
9   marks on Ms. Wilkerson.
10          Q.   Did he appear intoxicated?
11          A.   Very.  I asked him several times, let's talk
12  about -- you know, make sure everything was -- he was
13  very irate.  He wouldn't -- he told me again that he was
14  going to whop my a-s-s.  And he pointed his finger at me
15  and he told me, "I'll whop your a-s-s if you don't
16  leave."  So I reached for Tommy's left arm and I grabbed
17  him by his arm and told him he was under arrest for
18  disorderly conduct.  He snatched it away from me and had
19  his arm back, and that's when I sprayed him and then I
20  grabbed his arm.
21          Q.   After you sprayed him, did he hit the floor?
22          A.   No, sir.
23          Q.   Where did you spray him?
24          A.   In the face.
25          Q.   Was he able to see after that?

```
1          A.   I wouldn't think so, no, sir.

2          Q.   When he hit -- let me ask you this:  What

3    kind of clothing did he have on when he came out of the

4    bedroom?

5          A.   I believe he had some -- a pair of underwear

6    and a t-shirt, if I ain't mistaken, I believe that's

7    what he had on.

8          Q.   Was he wearing shoes?

9          A.   No.   I think he had -- I'm not a hundred

10   percent sure but it seemed like he might have had some

11   socks on but I wouldn't say hundred percent about that.

12         Q.   Did he have any kind of weapon in his hand?

13         A.   No, sir.

14         Q.   At the time of the -- of your statement that

15   me made threats to you to whip your ass, did he have a

16   weapon?

17         A.   No, sir.

18         Q.   Did he have anything in his hand?

19         A.   He had nothing in his hand, no, sir.

20         Q.   Did you know at that time he only had use of

21   one arm?

22         A.   No, sir.  I mean, other than what ability he

23   has now, no, sir, I mean --

24         Q.   Did you notice anything else different about

25   him?
```

1        A.  He had a brace of some sort on his right

2  hand.

3        Q.  A brace?

4        A.  A brace or --

5        Q.  Can you describe it other than a brace?

6        A.  Just a white brace or it looked like an ace

7  bandage might have been wrapped around the top of it or

8  something.

9        Q.  So it's more of an ace bandage?

10       A.  Well, I don't know.  I didn't take it off

11  and I don't -- it looked to me like a brace made with

12  ace bandages around the back of it or the side of it or

13  something.

14       Q.  Did you ask him about it?

15       A.  No, sir.

16       Q.  So, you sprayed him and he's on the floor.

17  What happened next?

18       A.  No, sir, when I sprayed him, he didn't go to

19  the floor.  When I sprayed him, I grabbed him back by

20  his left arm and then I tried to pull him down in the

21  floor and -- you want me to show you how he went?  He

22  was up on his feet and his hands was down like this and

23  his butt was in the air, and I couldn't get him to give

24  me his hand to handcuff it.  Well, I put one handcuff on

25  him and Ms. Wilkerson said, she said, "Please be careful