FILED

2008 Jul-28 PM 05:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

**Exhibit B**
**Transcript of Walker County Civil Service Board**
**Hearing dated 7/12/04**
**(Part II)**

1  with him. He's hurt his hand." So I said, "Well, stand
2  up, Tommy, and I'll put the handcuffs in front of you."
3  So I got him up and put the handcuffs in front of him,
4  and I asked Ms. Pat to -- if she would go get him some
5  clothes, go get him some pants. So she goes to the
6  bedroom and she's gone for a little bit, and I asked
7  her, I said -- I heard a phone -- I heard the phone
8  dialing, and I asked her, I said, "Will you bring his
9  pants on where we could go?" So she come back in there
10 and she said -- she was talking to his brother Gene, and
11 she said, "Well, Gene, you know how he is. I know he
12 ought not to fight with them, but you can't tell him
13 nothing." I helped her put his pants on, and then I
14 asked her would she go get him some shoes, and she went
15 back and got him some shoes.

16      Q. Did you tell her to hang up the phone? Did
17 you tell her to put down the phone?

18      A. I don't remember that part. I may have told
19 her that she needed to come help me put his clothes on.
20 I may have told her that, but she grabbed one side and I
21 grabbed the other side and we helped him put his pants
22 on. He was sitting in his recliner.

23      Q. Was it after he had his pants on you put the
24 handcuffs on him?

25      A. No, sir.

1      Q.  Before?

2      A.  Yes, sir.

3      Q.  And then I told him we would go, and he

4 stood up and he started walking to the door and then he

5 wouldn't go out the door.  I said, "Tommy, come on,

6 let's go now."  I had him by his left arm and I was

7 trying to get him out the door.  When he started down

8 his steps, he sat on his door steps.  And I told him, I

9 said, "Tommy, get up now.  Come on, let's go."  And I

10 had him by his arm all the way to the car to get him to

11 the car because he didn't want to walk to the car.

12      Q.  All right.  Now, you got him charged -- I

13 understand he's been charged with two violations; one is

14 public intoxication?

15      A.  Yes, sir -- no, sir.

16      Q.  Disorderly conduct and resisting arrest?

17      A.  Yes, sir.

18      Q.  And it's your statement and testimony that

19 both of these occurred within the confines of his home?

20      A.  Yes, sir.

21      Q.  And it's also your testimony that his wife

22 never told you to leave?

23      A.  No, sir.  I don't recall that, no, sir.  She

24 was actually pleasant.  She tried -- she told Tommy, she

25 said, "Tommy, don't fight with him."  But I don't ever

1    recall her being ugly at all.

2         Q.   So how far is his residence from -- did you

3    take him to Jasper or did you take him to --

4         A.   Walker County.

5         Q.   You took him to Walker County jail?

6         A.   Yes, sir.

7         Q.   Here in town?

8         A.   Yes, sir.

9         Q.   And how far is his residence from here?

10        A.   From here to his driveway Is 16.1 miles.

11        Q.   16.1 miles?

12        A.   Yes, sir.

13        Q.   That's pretty accurate.  How would you know

14   that it's 16.1 miles as opposed to 16.5 or 15.9 miles?

15        A.   I took the mileage down.

16        Q.   Okay.  Are you required to do that?

17        A.   I took the mileage today.

18        Q.   You took it today?

19        A.   Yes, sir.

20        Q.   Why did you take it today?

21        A.   At the request of the attorney.

22        Q.   Now, once you left his property, his

23   premises -- let me ask you this:  What route did you

24   take?

25        A.   When I left Tommy's house?

```
 1          Q.   Yes, sir.

 2          A.   We come back out of his house on to

 3   Leonard's Chapel Road.

 4          Q.   What road?

 5          A.   The road he lives on is Leonard's Chapel

 6   Road.

 7          Q.   Leonard's Chapel?

 8          A.   Yes, sir.

 9          Q.   We came to Prospect Road and then went to

10   Cheatham Road.  Traveled Cheatham Road to Ripley Road.

11          Q.   Ripley?

12          A.   Ripley, R-i-p-l-e-y.  And to Highway 118,

13   took the Corridor, and then here.

14          Q.   Highway 118?

15          A.   Yes, sir.  That's the old 78 there until you

16   get on the Corridor, and it turns back to 78.

17          Q.   All right.  Now, was this the same route

18   that you had traveled while in route to Mr. Burch's

19   residence?

20          A.   I don't recall that.  I wouldn't know that.

21          Q.   Where were you when you first got the

22   dispatch?

23          A.   I don't have a dispatch sheet where I would

24   -- I don't know.  I usually either work -- if there's

25   two of us, I'll work west and south or west and north.
```

1    And then mainly most of the time I work west side of the

2    county, and that would have been on the west side of the

3    county.

4        Q.   But you weren't here in Jasper?

5        A.   I don't recall.

6        Q.   You don't recall?

7        A.   No, sir.

8        Q.   Now, is this route that you just described

9    for us, is that route a typical route that you would

10   take from his residence?  It doesn't appear to be a

11   straight shot.

12       A.   It would be the closest route.

13       Q.   This would be the closest?

14       A.   That I would think of, yes, sir.

15       Q.   And most expeditious route?

16       A.   I would think so.

17       Q.   What time did you leave the residence?  Did

18   you make a call in?

19       A.   Yes.  I went -- 15-C, 10-84 to the county

20   jail at 2:06.

21       Q.   You arrived at 2:06?

22       A.   No, sir.  I went in route to the county

23   jail --

24       Q.   At 2:06?

25       A.   Either I was pulling out of his driveway or

1    I had left his house at that -- by that time, when I
2    called it in.
3             Q.   And who did you call?
4             A.   The dispatch.
5             Q.   And did you call while you were still inside
6    their home?
7             A.   No, sir.
8             Q.   Did you have any communications with the
9    dispatcher while you were inside their home?
10            A.   Do I have communication?
11            Q.   Did you have any communication with the
12   dispatcher?
13            A.   I don't know.  Usually they do a check on us
14   after so many minutes when we're out on a call, but I
15   don't know.  It's not on here, so I wouldn't know.  I
16   don't remember that.
17            Q.   So at the time that you were making this
18   arrest, would you not have called to let that fact be
19   known?
20            A.   Usually --
21            Q.   Is that normal procedure?
22            A.   Normally after we get in the car you let
23   them know.
24            Q.   But you don't call from the spot, from the
25   scene, that you made an arrest?

```
 1          A.   Not always, no, sir.  I mean there's been
 2   times that we have, you know.  You may have to wait on a
 3   wrecker or --
 4          Q.   Did you have to wait on a wrecker?
 5          A.   No, sir.
 6          Q.   So you just waited until you got back in
 7   your car to make the call?
 8          A.   Well, according to the log sheet, the way I
 9   -- when I called it in, I said 10-84 to the county jail,
10   and that was at 2:06.
11          Q.   What time did you arrive at the county jail?
12          A.   2:21.
13          Q.   Is that documented in the record?
14          A.   Yes, sir.
15          Q.   And did you make any stops along the way?
16          A.   No, sir.
17          Q.   And what kind of condition was Mr. Burch in
18   when you put him in your patrol car?
19          A.   As far as intoxicated wise?
20          Q.   Physical condition.  You've already
21   testified that he appeared to have been intoxicated.
22   You've already testified that he had a bandage on his
23   wrist.  Was that on his wrist or hand?
24          A.   Best I remember it come up to right along in
25   here somewhere (indicating).  I don't really recall.  I
```

1    mean, I don't know for sure.

2         Q.   Other than those two facts --

3         A.   I don't know as far as physical condition

4    other than him being intoxicated, he would appear to be

5    about, I would think, about the same as he would be now

6    except for he had a brace on his right hand.

7         Q.   The brace was on the right hand.  And you

8    testified that you didn't make any stops?

9         A.   No, sir, that is correct.

10        Q.   Did you make any sudden stops?

11        A.   No, sir.

12        Q.   Did you make any jerking stops?

13        A.   No, sir.

14        Q.   Did you make any intentional sudden stops of

15   the vehicle so that Mr. Burch would hit his head against

16   the glass petition?

17        A.   No, sir.

18        Q.   You didn't do any of that?

19        A.   No, sir.

20        Q.   Had you ever done that before in the past?

21        A.   No, sir.

22        Q.   To any person you had in your car?

23        A.   No, sir.

24        Q.   Did you stop and get out of the car at any

25   time?

1       A.  Only at the county jail.

2       Q.  But nowhere in between?

3       A.  No, sir.  It took me about 15 minutes, if I

4 ain't mistaken, to get from his house to the county

5 jail.

6       Q.  And tell me what kind of condition Mr. Burch

7 was in after he got out of your car to go into the

8 county jail?

9       A.  Best of my knowledge he was in the condition

10 he was when he got in the car.

11       Q.  Did he have any bruises on him?

12       A.  I didn't see no bruises on him.  I didn't

13 look for them, though.

14       Q.  Who was at the jail when you arrived?

15       A.  Charlie Skalnik.

16       Q.  Can you spell that?

17       A.  No.  I want to say -- I'm not sure.  It's

18 S-c, but I don't know how -- S-c-a-l-n-i-k, but I'm not

19 for sure about that spelling.

20       Q.  Skalnik?

21       A.  Yes, sir.

22       Q.  And someone else?

23       A.  Chris Kendrick.  They come out and met me in

24 the sally port.

25       Q.  Met you where?

1   A.   In the sally port.

2   Q.   Now, what is their position?

3   A.   Kendrick is a sergeant in the jail.

4   Q.   Okay.

5   A.   And Charlie is a jailer.

6   Q.   Did he still have his handcuffs on?

7   A.   At that time, yes, sir.

8   Q.   Was he verbal, was he saying anything?

9   A.   He didn't want to get out of the car.  He
10  was still mad at me at that time.

11  Q.   Well, what did he say specifically that you
12  recall?

13  A.   I don't recall what he said.  On the way to
14  the jail he was threatening me with his family and his
15  son.  He accused me of being on drugs and being arrested
16  for drugs.  He told me he was going to kill me.  He told
17  me that his brother was a deputy sheriff up here and he
18  would cost me my job, that I would be in the newspaper
19  and on TV, that I would regret coming to his house.  It
20  was just numerous threats that he made on the way.

21  Q.   And all this was going on during the trip?

22  A.   Yes, sir.  He was beating his head on the
23  cage in the car.

24  Q.   Oh, he was beating his head?

25  A.   Yes, sir.

1          THE COURT:    Mr. Burch, you just need to

2    sit down and wait.  You will have your turn.

3          Q.  Was he bleeding anywhere after he got out

4    of the car?

5          A.  I don't recall.

6          Q.  Did he require any medical treatment?

7          A.  I don't know.  I take him into the jail, and

8    if I don't have my arrest report done, they take

9    possession of him.

10          Q.  When did you do your arrest report?

11          A.  In the jail.

12          Q.  Immediately thereafter?

13          A.  Yes, sir.  I was in the jail for -- I got at

14    the jail at 2:21:42 and I left the jail.  I was back in

15    my car on the road at 3:05.  So I was in the jail for

16    about 39 minutes.

17          Q.  That's where you made your arrest report?

18          A.  Yes.  If I have to wait on a wrecker, I try

19    to do it on the road, but in cases of this nature I make

20    it in the jail.

21          Q.  So you left Mr. Burch in the possession of

22    Charlie Skalnik and Chris Kendrick?

23          A.  Yes, sir.

24          Q.  Are either one of those gentlemen here

25    tonight?

1        A.   Yes; sir.  And there's a Ms. Chapman.  I

2   don't know her first name.  She's also here.

3        Q.   What was her position?

4        A.   She's a jailer.

5        Q.   She's a jailer?

6        A.   Yes, sir.

7        Q.   And are these people here on your behalf?

8        A.   They're subpoenaed, yes.

9        Q.   Who subpoenaed them?

10       A.   Civil Service Board.

11       Q.   Now, after you left the jail at 3:05, did

12  you have any other contact with the jail regarding Mr.

13  Burch?

14       A.   Did I go back in the jail?

15       Q.   Did you have any other contact either

16  physically going back to the jail or telephonically,

17  radio, any type of contact whatsoever?

18       A.   None that I would know of.  I left the

19  jail -- like I said, I was back on the road at 3:05, so

20  I wouldn't have went back to the jail unless I made

21  another arrest.

22       Q.   Okay.  Do you recall making any calls back

23  to the jail?

24       A.   No, sir.

25       Q.   So do you have any knowledge of anything

1    that transpired after you deposited Mr. Burch at the

2    jail?

3            A.   He was uncooperative with the folks in the

4    jail.   I was doing my arrest report and --

5            Q.   Before we go into that, you're talking about

6    the window of time between 2:21 and 3:05, you said you

7    were doing your arrest report.

8            A.   Yes, sir.   That would have been the time,

9    yes, sir.   While I was in the jail doing my arrest

10   report, you could hear them ask him questions, and he

11   wouldn't -- I think one of the questions was what's your

12   Social Security number, and I think he told them one.

13   He wouldn't give information to them.   When they did

14   have him in a cell, before I left you could hear a

15   thump, which he was hitting the door and the door --

16           Q.   Now, did you actually see this going on or

17   is this speculation?

18           A.   No.   It was in the cell where he was at that

19   they -- there wasn't no one else in there.   I did see

20   him hit his head on the wall in the jail.   He was

21   hitting his head on the wall.   But that would have been

22   the end of my contact with him once the jail takes

23   possession of him.

24           Q.   Was this unusual conduct on his part?

25           A.   From the last time I put him in jail, yes,

1    sir.

2         Q. And from the previous three times that you

3    put him in jail, he's never conducted himself like this

4    in the past?

5         A. None I recall of any time -- he's been put

6    in jail he's either had some type of medical necessity,

7    and I think one time he said he had a heart attack in

8    jail at Carbon Hill, but I -- he never -- not acted like

9    this, no, sir.

10        Q. Do you know whether or not -- did you check

11    to see if he had injured himself?

12        A. No, sir.

13        Q. Did you do anything to restrain him so he

14    wouldn't injure himself?

15        A. In the car?

16        Q. In the jail.

17        A. I don't do that. I don't handle them in the

18    jail. When I put him in the back seat of the car, I

19    seat belted him in but that's as far as I -- of course,

20    he didn't have it on when he got to the jail.

21        Q. So his hands were handcuffed behind him?

22        A. No, sir, his hands were up front.

23        Q. And you did put his seat belt on?

24        A. Yes, sir, when we left his residence.

25        Q. And it wasn't on when you arrived?

1        A.   No, sir.

2        Q.   Do you know whether or not he required any

3   medical treatment that night?

4        A.   I don't know of any.

5        Q.   When you were -- when you arrested him on

6   the three previous occasions, has there -- in each of

7   those occasions has there ever been an incident where he

8   was injured during the arrest?

9        A.   When I arrested him?

10       Q.   Yes, sir.

11       A.   None that I know of, no.

12       Q.   Is this the first claim he's ever filed

13  against --

14       A.   Against me?

15       Q.   Against you?

16       A.   As far as I know.  I don't recall any more.

17       Q.   Is this the first dispute that you've ever

18  had with him?

19       A.   As far as argument wise?

20       Q.   Any type of dispute whatsoever.  Any type of

21  conflict or issues between you and this gentleman.

22       A.   When I was chief of police he complained

23  about my in-laws having chickens and ducks and said they

24  kept him up during the night and wanted me to do

25  something with it.  There wasn't an ordinance to do

1    anything with.  That would be the only thing I can think

2    of.

3           Q.  This was while you were chief at Carbon

4    Hill?

5           A.  Yes, sir.  It should have been during that

6    time.

7           Q.  I take it their property, your in-laws'

8    property, was located adjacent to his?

9           A.  They was adjoining to Mr. Barron's, yes.

10           Q.  How close were these stock animals to his

11    home?

12           A.  I don't know where the property line would

13    have been, but I -- I really don't know what the -- it

14    wasn't like a mile away but it wasn't like right up next

15    to his house.  I don't really know how to --

16           Q.  Was it within the city limits of Carbon

17    Hill?

18           A.  Yes.

19           Q.  Did he ever attempt to file reports or

20    complaints?

21           A.  About the chickens and stuff?

22           Q.  About --

23           A.  He never --

24           Q.  With your in-laws?

25           A.  He never -- I don't think he ever tried to

1    get me to do a report. I don't know if --

2        Q. Did he ever ask you to do a report?

3        A. No, sir. If he had of, I would have done

4    it.

5        Q. So as far as you know there's no written

6    complaint or an incident report that you're aware of?

7        A. I don't know about that. There may be, and

8    I'm sure there are because I think they had him arrested

9    while I was either gone or off.

10       Q. Who are your in-laws over there?

11       A. Sam and Sandra Nelson.

12       Q. Sam and Sandra Nelson?

13       A. Yes.

14       Q. And did they own a house?

15       A. Yes, sir, a house.

16       Q. A house and lot or did they have acreage to

17    go with that?

18       A. No. It's a couple of -- I don't know how

19    many lots they've got, but it's in lots. It's not

20    acreage.

21       Q. Did they have livestock as part of that --

22       A. They had -- at one time they had a horse up

23    there, some horses, and they had some chickens and ducks

24    and turkey, and I don't know what all they had up there.

25       Q. What about Mr. Burch at that time prior to

1  where you made the arrest the other night, where did

2  he -- did he have a house and lot or did he have

3  acreage?

4      A.  There's a trailer.  The driveway is

5  probably -- it's probably -- I really don't know how far

6  off the road he lives.  It's probably within two-tenths

7  of a mile, I guess.  I'm just guessing.  I don't know

8  for sure.

9      Q.  Was this more of a complaint about noise, is

10 that what he was complaining about, or was it a nuisance

11 complaint?

12     A.  At his house?

13     Q.  Yes.

14     A.  Where he lives at now?

15     Q.  In Carbon Hill with your in-laws.

16     A.  He was complaining about the chickens.  I

17 asked the mayor at that time and the magistrate did they

18 have an ordinance.  They didn't know of no ordinance.

19     Q.  So you -- the mayor and the magistrate and

20 you, none of y'all knew of any type of ordinance, a

21 nuisance ordinance or a noise ordinance or anything like

22 that?

23     A.  Not a nuisance as far as livestock, no,

24 sir.  They had a nuisance ordinance like a noise, like a

25 car radio or something like that, but without reading it

1    I couldn't tell you what was in it. I don't remember
2    one about the livestock. They didn't know of one about
3    livestock. If we ever got a thing like that, we would
4    ask the city clerk and the magistrate. You know, she
5    would be the one that would find it and give it to us
6    and tell us what it was.
7         Q. What about the presence of the livestock
8    within the city limits?
9         A. I don't know that there is an ordinance
10   against it.
11        Q. Nothing within your knowledge as chief of
12   police?
13        A. No, sir.
14        Q. Is that the only conflict that you can
15   recall between Mr. Burch and yourself or your in-laws?
16        A. Actually, me and him didn't have a conflict
17   over it. I mean, that was more of a conflict with my
18   in-laws. I can no more control my in-laws than you
19   would yours, you know, and I think they -- like I said,
20   I think they had him arrested.
21        Q. Do you know what the charge was?
22        A. There was two more on here, and I don't
23   know -- would have been during the time I was off. One
24   of them was June of '02, and it was for harassment
25   communications. There was also one for July 10. That

1  was disorderly conduct.

2      Q.   '02?

3      A.   Yes, sir.

4      Q.   And didn't you say this was made -- these

5  were made during the time that you were off?

6      A.   Yes, sir.

7      Q.   When you were off sick?

8      A.   Yes, sir.

9      Q.   How long were you off sick?

10     A.   About three months.

11     Q.   Where were you at the time?

12         MR. WILLFORD:   Let me renew my relevancy

13     objection.

14         THE COURT:   Yeah, the hour is going to be

15     late before we get through.  If you can keep it a

16     little bit more germane to what we're doing, it

17     sure would be helpful.

18     Q.   While you were at the -- I'm going back to

19  the evening of the 16th.  While you were at the Walker

20  County jail with Mr. Burch, was there any physical

21  contact between you and he?

22     A.   In the jail, no, sir.

23     Q.   Any type of confrontation, any type of

24  fighting?

25     A.   The only physical thing that would have been

1    between me and Tommy would have been when I arrested

2    him. As far as physical mistreatment or anything like

3    that, there was none. After I give him to the jail

4    personnel, they take possession of them then. I don't

5    have to deal with them.

6         Q. So you didn't take him and wrestle him to

7    the concrete floor and throw water on him or anything

8    like that?

9         A. No, sir, I did not.

10        Q. He didn't give you any reason to?

11        A. I wouldn't have done that. Even if he had

12   of, I wouldn't have thrown water on him. But, no, I did

13   not have no -- after he was given to the jail, they

14   handled him.

15        MR. PIAZZA: I think that's all the

16   testimony I have.

17        THE COURT: Cross.

18        MR. WILLFORD: I would just like to cover

19   one area just briefly that I'm not sure it got on

20   the record and I want to make sure that the Board

21   observed the motions that you made.

22                    CROSS-EXAMINATION

23   BY MR. WILLFORD:

24        Q. When or immediately prior to the time that

25   you applied the spray to Mr. Burch, I think you

```
 1    testified that he had said that he was going to whop

 2    your a-s-s a couple of times, and then I saw you make a

 3    motion like this (indicating).  Did Mr. Burch touch you

 4    prior to you applying the spray?

 5         A.  Yes, sir.  He touched my chest.  That's when

 6    he told me that he was going to -- he had done told me

 7    he was going whop my a-s-s and he told me that I was

 8    unwanted in his house.

 9         Q.  How close was he to you?

10         A.  At that time?

11         Q.  Yes, sir.

12         A.  We was close.  He walked up to me and I

13    asked him to step back and he wouldn't step back.  When

14    I grabbed him by the arm, he jerked away.  He had his

15    arm drawn back and I sprayed him.  Spraying him was for

16    my safety and his to keep me from getting hurt or keep

17    him from getting hurt, and that's why he was sprayed.

18              MR. WILLFORD:  No more questions.

19              MR. PIAZZA:   Well, let me ask you this.

20                 REDIRECT EXAMINATION

21    BY MR. PIAZZA:

22         Q.  After you sprayed him, you say he was pretty

23    blinded by the whole incident.  Did you still feel he

24    was a threat -- was he fighting you at the time?

25         A.  When I grabbed him back by the arm, he was
```

1    still trying to pull away from me after I sprayed him.

2        Q.  So you sprayed him and you grabbed him by

3    the arm?

4        A.  No, sir.  When I grabbed him by the arm the

5    first time and told him he was under arrest, he jerked

6    away from me.

7        Q.  Which arm did you grab?

8        A.  This arm (indicating), his elbow.

9        Q.  The left arm?

10       A.  Yes, sir.  Right in here (indicating).

11       Q.  That's his good arm as far as you know?

12       A.  As far as I know.

13       Q.  Your own testimony?

14       A.  As far as I know.

15       Q.  Proceed.

16       A.  So when he pulled away from me and he had

17   his hand back and I sprayed him and then I reached and

18   grabbed him by his arm again and he was still trying to

19   pull from me and I pulled him.

20       Q.  Did he land on the floor?

21       A.  He never did go completely to the floor.

22   His feet was on the ground, his hands was out in front

23   of him and then his butt was in the air.

24       Q.  Okay.  So he was -- he had all fours on the

25   floor?

1       A.  Yes, sir.  He was on the ground and his

2  behind was up in the air, yes, sir.

3       Q.  Plus he couldn't see?

4       A.  I wouldn't think so at that time.

5       Q.  At that point, when he was in that position

6  on the floor, you felt that he was a threat to you such

7  that you needed to arrest him at that point?

8       A.  I had done told him he was under arrest

9  before all that happened.

10       Q.  You told him he was under arrest before

11  you --

12       A.  That's when he first pulled away from me.  I

13  told him he was under arrest.  That's what led to him

14  being sprayed, and then when I reached and grabbed him

15  by the arm again and pulled him, he was on all fours.

16  And I went to handcuff him, and that's when Ms. Barron

17  told me to please be careful he had hurt his hand.  So I

18  told him, I said, "Tommy, stand up," and I put the

19  handcuffs in front of him and that's what I did.

20       Q.  Now, prior to your telling him he was under

21  arrest, had he touched you at all?

22       A.  Before that?

23       Q.  Before you told him he was under arrest.

24       A.  That's when he told me he was going to --

25  yes, sir.  That's when he told me he was going to whop

1    my --

2         Q.   Let me ask you again.  Prior to your telling
3    him he was under arrest, had he touched you?

4         A.   When he told me like that, he told me he was
5    going to whop my a-s-s --

6              MR. WILLFORD:   For the record, the witness
7    is tapping his chest again.

8         A.   He told me that's what he was going to do,
9    and I told him he was under arrest for disorderly
10   conduct.

11             MR. PIAZZA:  I don't think I have any other
12        questions.

13             THE WITNESS:  Did you want me to tell you
14        some of these --

15             THE COURT:   No.  He doesn't want you to
16        tell him anything else.

17             MR. PIAZZA:  I would like to count the
18        number of pages that we've got here.

19             THE COURT:   We're going to take a break in
20        a minute and we can copy those while we --

21             MR. PIAZZA:  Can we do this:  Why don't we
22        have him, since he can identify each one, can we
23        have him put that in the record?

24             THE COURT:   Sure.

25             MR. WILEY:   Is that necessary?  We've got

1    an official court reporter here that's licensed by

2    the State of Alabama. She's given documents all

3    the time.

4        THE COURT: Well, he wants to identify

5    them, though. I mean that would be the proper

6    thing to do would be to identify them.

7        MR. PIAZZA: You want me to go ahead?

8        THE COURT: Yes.

9                    FURTHER EXAMINATION

10   BY MR. PIAZZA:

11       Q. Just briefly identify each record that you

12   have there.

13       A. These are where he's called in a prowler.

14   This is one where some female was screaming.

15       Q. Do you have a date on these?

16       A. Yes, sir.

17       Q. Read the date into the record.

18       A. Yes, sir. It would be at the top. January

19   17 of 2003, prowler report, prowler complaint.

20       Q. Does that have any other identifying number

21   on it?

22       A. When he got there, Mr. Barron had a gun, and

23   I told him to put it up. March 23 of 2003, female was

24   supposedly in his yard yelling at him. He said she had

25   a 10-79 or a 10-56, which is either dope or drunk.

1          January 25 of 2003, he called wanting an

2   ambulance.  RPS requested deputy to go out there because

3   he mentioned he had guns.

4          August 25 of 2003, he reported a stolen

5   gun.  October 7 of 2003, he called 911 and told them he

6   had an Uzi and he was going to start killing people with

7   it.  October 14, 2003, there was a domestic disturbance

8   at his house.  February 16, 2004, another domestic call

9   at his house.  This is the activity sheet where I went

10  to his residence.

11         Q.  What night was this?  Was that February 16,

12  2004?

13         A.  Yes, February 16.

14         Q.  Let me look at this one before you go any

15  further.  There are two, and I'm going to ask you to

16  interpret this, okay.  There are two -- there are two

17  items here that are -- the times of which are 1:44 a.m.

18  and 1:51 a.m.  Do those reflect calls that you made into

19  your dispatcher?

20         A.  When you go 10-84, that's when they give you

21  a call and you tell them you're in route, 10-84, and

22  that's when they -- and 10-23 is when I arrive, and

23  10-15C is when I was leaving his yard.

24         Q.  Okay.  All right.

25         A.  That's also indicating on here that Mr.

1    Barron was beating his head on the cage.

2         Q.   That was at 02:16 a.m., is that correct?

3    That's 10 minutes after you left his home.

4         A.   Yes.

5         Q.   You called and reported --

6         A.   2:16, yes, sir.

7         Q.   2:16, ten minutes after you left his home?

8         A.   I keyed the radio up where the dispatcher

9    could hear him.

10        Q.   You called and reported that he was beating

11   his head on --

12        A.   I called in and -- yeah, keyed the radio

13   where the dispatcher could hear what was going on in the

14   car.

15             This is general information here

16   (indicating).  His booking sheet.  This is just a copy

17   of where he was arrested back in '98.  The other one in

18   '98.  This is one -- I don't know which one this one

19   was.  I believe this is one where a trooper got him for

20   DUI in April of last year.  This is booking

21   information.  That's a list of calls to the residence

22   where he lives at.  My subpoena.  And a copy where

23   his -- I guess where his court case was adjudicated up

24   here.

25        Q.   What's the date on that one?

1    A.   On the adjudication?

2    Q.   Yes.  And which case was it?

3    A.   May 1, 1995.  It was carrying a concealed

4  weapon.  Looks like Officer Batemon.  I don't know if

5  that's -- and then a public intoxication of -- the same

6  date by Officer Batemon, and then I have a copy of his

7  booking sheet from Carbon Hill.

8    Q.   You're going through a lot of pages.

9    A.   That's his booking sheet and records.  This

10  right here is his booking -- where he was booked in

11  Carbon Hill, the front and back his booking card.  His

12  arrest report.  My letter from the Civil Service, and

13  a driver's history on him.

14    Q.   Okay.  I'm just getting back to the scene

15  inside Mr. Burch's home.  Once Mr. Burch was on the

16  floor on all fours, did you feel at that point in time

17  that you had pretty much alleviated any threat that Mr.

18  Burch would cause you?

19    A.   Well, that's when I put him in handcuffs.

20    Q.   I didn't ask you that.

21    A.   I didn't --

22    Q.   What I asked you was did you feel like in

23  your own mind you had alleviated any threat that Mr.

24  Burch would have caused you or threatened, any threat to

25  your person?

1   A. Yes, sir, I would say so.  I put his hands

2 in front of him because of his benefit to where she said

3 he had hurt his hand or arm or hand.  And on the way to

4 the jail, I wished I had put his hands behind him

5 because a couple of times he hit the cage really hard.

6   Q. But did you feel like at that point in time

7 when he was on the floor you had alleviated any threat

8 to your person?

9   A. Yes, sir.

10   Q. Could you have made the decision at that

11 time not to take him in?

12   A. No, sir, because I had done arrested him.  I

13 done told him he was under arrest.

14   Q. Did you read him his rights?

15   A. No, sir.

16   Q. Did you allow him to make a phone call?

17   A. I don't -- once they're in the jail, I don't

18 handle that.

19   Q. Did you feel it necessary to take him to

20 jail after you told him he was under arrest?

21   A. Yes, sir.

22   Q. Even though you had not called in the

23 arrest yet to the dispatcher, could you have said --

24   A. I had done told him he was under arrest.  I

25 don't know.  I don't think you can unarrest him.

1    Q.  In your own mind you still -- you were

2    obligated to take him in?

3         A.  From my knowledge, yes.

4         Q.  After the threat was removed?

5         A.  From my knowledge, yes.

6         Q.  From your person?

7         A.  Yes.

8         Q.  And was there any other threats made to you

9    after he left other than what you testified to in the

10   patrol car?

11        A.  Uh --

12        Q.  Any threats other than while he was behind

13   the glass petition in the patrol car?

14        A.  Yes, sir.

15        Q.  Any other threats?

16        A.  No, he told me that during their trip down

17   there he did tell me he would give us hell, that he was

18   -- and I told him, I said, "Tommy, that's crazy."  Well,

19   he hit the cage again and accused me of calling him

20   crazy.  I said, "Tommy, I ain't calling you crazy.  I'm

21   saying your comment is crazy."

22        Q.  Do you know if he had any medication with

23   him --

24        A.  No, sir, I don't.

25        Q.  -- before you he left his home?

1      A.  No, sir, I don't.  Unless he had it in his

2  pants pocket, I wouldn't.

3      Q.  Did you think to ask Ms. Barron if he needed

4  his medication?

5      A.  No, I didn't.

6      Q.  Did you think to ask her if he was on his

7  medication?

8      A.  No, sir, I didn't.

9      Q.  Or if he had been taking his medication?

10     A.  No, sir.  All she told me was that he had

11 been drinking all day and he was drunk and that's -- no,

12 sir, I didn't ask her that, no, sir.

13     Q.  And from what it appeared to you, he had a

14 bandage or a brace on his left arm or his left wrist?

15     A.  No, sir.

16     Q.  His injured wrist, on his right one?

17     A.  He had a -- I thought it was some type of

18 brace.  It appeared to have some type of ace bandage

19 wrapped around it or something.

20          MR. PIAZZA:  That's all I have.

21          THE COURT:  For clarification there's been

22 a lady been referred to by different names; is that one

23 and the same person?  The lady that was at the scene.

24          MR. PIAZZA:  Ms. Barron, yes, sir.

25          THE WITNESS:  I've always known her as Ms.

1  Wilkerson.

2         THE COURT:  All right.  So Ms. Wilkerson --

3         MR. WILLFORD:  And I think you referred to

4  her as Pat at one point.

5         THE WITNESS:  Yes, her name is Pat

6  Wilkerson.

7         THE COURT:  And Pat and then Ms. Barron.

8  That's all the same person?

9         MR. PIAZZA:  Yes.  As far as I know, until

10  I'm told differently.

11         THE COURT:  All right.  That's the way I

12  kind of interpreted it.  I wanted to be sure because we

13  had those three names.

14         Anything else for this witness?

15         MR. WILLFORD:  No, sir.

16         MR. STEPHENS:  We've been going an hour and

17  a half.  Does the Board want to take a stretch break or

18  do you want to continue on?

19         (Short recess.)

20         THE COURT:  We're back on the record after a

21  short recess.  It appears to the Board and to counsel

22  that we're not going to be able to conclude tonight, and

23  since we can't conclude tonight, it might be best to

24  look at a time when we can come back.  We discussed this

25  shortly with the Board.  Next week is not going to be --

1    any day next week is not going to be available.  The

2    26th, which is Monday week, two weeks from today, is not

3    going to be a good day.  The 27th or the 28th of July

4    will be good days.  The 3rd and the 4th of August are

5    going to be good days.  We talked about starting like at

6    4:30 in the afternoon and concluding at some reasonable

7    hour.  Do your calendars look like those dates would be

8    okay?

9              MR. WILLFORD:   The 27th, the 28th, the 3rd,

10   and the 4th are all good for me.

11             THE COURT:  Hank, how about you as far as

12   you can tell?

13             MR. WILEY:   I'm looking.  The 27th, believe

14   it or not, I'm going to be in Montgomery in

15   depositions.  Maybe I can get Gary to take my deposition

16   in Montgomery and he can stay down there.  The 28th will

17   be okay.  The 3rd and 4th will be okay.

18             THE COURT:  Mr. Piazza, what about you?

19             MR. PIAZZA:  As far as the 27th and the

20   28th, which is a Tuesday and Wednesday, I may be called

21   back to military duty.  I've been doing a lot for the

22   last two months so they've been -- usually they'll call

23   me and I'll go in for three days a week, but I do my

24   duty in Birmingham but it's usually in the middle of the

25   week, so the 27th and the 28th is questionable right

1  now.

2  THE COURT: What about the 3rd and 4th? The

3  same thing with that?

4  MR. PIAZZA: The 3rd and 4th would be the

5  same thing with that. It's just too far in advance to

6  know.

7  THE COURT: When will you know about the

8  27th and the 28th?

9  MR. PIAZZA: Usually the week before. I

10  should know by the end of this week. If not I could do

11  one of the days -- the end of next week.

12  THE COURT: Okay. Hank, you're going to be

13  -- the 27th you're going to be in Montgomery?

14  MR. WILEY: The 27th I've got some court --

15  I've got a court-ordered deposition.

16  THE COURT: Why don't we look at the 28th,

17  the 3rd and the 4th. And, Mr. Piazza, we'll just go

18  ahead and schedule it one of those days. I wouldn't

19  mind going ahead and just settling on the 28th, which is

20  a Wednesday. Not good Wednesday? What about the 3rd or

21  4th? Let's look at the 3rd. Is that convenient with

22  the Board? That's Tuesday, August 3. If that's good

23  with everybody, we'll just go ahead and schedule that

24  date. We're going to start about 4:30 in the afternoon.

25  That's the earliest that Rhonda would be available, our

court reporter, and that's the earliest we would know

for sure that we would have this courtroom.

One thing, I wish I had thought of it but I

didn't, Mr. Wiley -- Mr. Wiley suggested -- we've got a

lawyer out here that has been subpoenaed. It would be

good if we could go ahead and get his testimony. It

should be brief. Do you think he will be a short

witness, Judge Thomas?

MR. PIAZZA: It's our witness.

MR. WILEY: He's the judge from -- he's the

municipal judge of the City of Carbon Hill.

THE COURT: It sure would be a good

accommodation to him if we could get him --

MR. WILEY: I can't imagine what he would

have to say.

MR. PIAZZA: Yes, sir, that's fine with me.

That's perfectly fine. Let's go ahead and hear his

testimony.

THE COURT: He should be a short witness,

and as an accommodation to him, I think it would be good

to do that.

(Mr. Steven Thomas is brought into the

Courtroom.)

THE COURT: Mr. Thomas, I want the record to

show and I want you to understand we're all tired and

1  we're fixing to go home and thought we'd go ahead as an

2  accommodation to you let you go ahead since you've

3  already burned some time here tonight, get your

4  testimony out of the way and that will excuse you from

5  having to come back.  So with that having been said, Mr.

6  Piazza, he's your witness.

7               STEVEN ALLEN THOMAS

8        having previously been duly sworn, was examined

9  and testified as follows:

10              DIRECT EXAMINATION

11 BY MR. PIAZZA:

12       Q.  Judge, would you please state your full name

13 for the Board?

14       A.  Steven, S-t-e-v-e-n, Allen, A-l-l-e-n,

15 Thomas, T-h-o-m-a-s.

16           BOARD MEMBER STUDDARD:  Should we tell these

17      other folks that if they want to go home instead of

18      just --

19           THE COURT:  That's a good idea.  John Mark,

20      if you'll just tell them that they can be excused

21      and we'll let them know about the -- right now

22      we're looking at August the 3rd at 4:30.  Go ahead.

23       Q.  Judge, where do you preside?

24       A.  Well, I preside at the municipal court of

25 Carbon Hill, Alabama, also Oakman, Alabama, and Arley,

1    Alabama.

2              Q.   Arley?

3              A.   Arley, A-r-l-e-y.

4              Q.   Oh, Arley.  And how long have you been a

5    municipal court judge?

6              A.   Over 20 years in Carbon Hill.

7              Q.   And do you know Mr. -- I'm going to refer

8    to him as Tommy Barron and you may know him as Taz Burch

9    or you may know him as some other name.  Do you know

10   this gentleman sitting to my left?

11             A.   Yes.  I know him as Tommy Barron.

12             Q.   Tommy Barron.  And how did you come to know

13   Mr. Barron?

14             A.   Well, he has appeared as a defendant in the

15   municipal court of Carbon Hill.

16             Q.   Do you recall how many occasions he has

17   appeared before the municipal court there in Carbon

18   Hill?

19             A.   Not definitely but I would say two or three

20   times.

21             Q.   And do you recall how long ago that was?

22             A.   I think the last time was probably within

23   the last 12 months.

24             Q.   Within the last 12 months.  And do you

25   recall the disposition of the -- I know that you hear a

1    lot of cases, but would there be something that would

2    stand out in your mind as to this particular individual,

3    this particular gentleman or his cases?

4         A.   Well, one case he was having a problem with

5    neighbors.  I think some of their names were Nelson, and

6    there was some accusations that had been made, and I

7    think the Nelsons were, or some of the Nelson family,

8    was the prosecuting witness on the case.

9         Q.   Do you know what the charges were?  Was it

10   some type of harassment charge?

11        A.   I think it was.  I think it involved

12   allegations of shooting a gun toward their property.  I

13   don't remember the exact charges.

14        Q.   Do you recall how that case was disposed of?

15        A.   I think there was some type of agreement,

16   and I'm not clear on this, but Mr. Barron had planned on

17   moving away and that part of the disposition was going

18   to be based on the fact that he would move away and

19   would no longer be a neighbor of the Nelsons.

20        Q.   And as a result of that agreement, was the

21   the case against him dismissed or non pros.

22        A.   I think that's what was supposed to have

23   happened and probably did happen.

24        Q.   Were there any other cases -- you mentioned

25   two or three cases.  Were these all three cases -- and

1    just for expediency, were these all three cases

2    involving the Nelson's complaints against Mr. Burch?

3          A.    May have but I don't really recall.

4          Q.    Okay.  Do you have any recollection of the

5    other two cases that would have been before you?

6          A.    I do not.

7          Q.    Excuse me one minute.

8          MR. PIAZZA:  That's all the questions I

9       have, sir.

10         MR. WILLFORD:    Judge, just very briefly.

11                    CROSS-EXAMINATION

12   BY MR. WILLFORD:

13         Q.    Would it be fair to say that the cases that

14   you have presided over that involved Mr. Burch that the

15   court records would accurately reflect what happened in

16   those cases?

17         A.    I'm certain they would.

18         Q.    So if we were to get those and submit those

19   to the Court, that that would be a true and accurate

20   reflection of what happened in those cases?

21         A.    I believe they should.

22         MR. WILLFORD:    That's all the questions I

23      have.

24         THE COURT:  Folks, we'll adjourn and

25      reconvene on the 3rd of August unless there's some

1    conflict with Mr. Piazza's schedule.

2                    C E R T I F I C A T E

3    STATE OF ALABAMA        )

4    WALKER COUNTY           )

5        I hereby certify that the above and foregoing

6    proceeding was taken down by me by stenographic means,

7    and that the questions and answers therein were produced

8    in transcript form by computer aid, and that the

9    foregoing represents a true and correct transcript of

10   the proceedings occurring on said date.

11       I further certify that I am not of counsel, nor

12   related to any of the parties to this action; nor am I

13   in anywise interested in the result of said cause.

14

15   _____

16              RHONDA G. WOODS

17

18   Notary Public, State of Alabama at Large

19   My commission expires December 21, 2008.

20

21

22

23

24

25