FILED

2008 Jul-28  PM 05:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

**Exhibit E**
**Transcript of Walker County Civil Service Board**
**Hearing dated 10/26/04**
**(Part III)**

1  million dollars to even get it fixed in a straight

2  position. I decided that I didn't want to walk around

3  with it like that. He couldn't fix it unless he fixed

4  it straight. I said this is causing me so much pain

5  that I left it up to him to make a decision, and he said

6  the best decision he could come up with -- he don't like

7  taking parts off of people. He explained that very,

8  very well to me. He does not like having to take toes

9  or fingers or whatever off of nobody. If he can save

10 them, that's what he's there for. He said the best

11 thing was to remove it or I would have more trouble and

12 more trouble out of it.

13      Q. Do you have any use of your small finger and

14 the next to the last finger there?

15      A. I got a little use in this one here and a

16 little bit in those.

17      Q. Now, prior to this incident --

18      A. I got to where I can move this one some.

19 You see, it needs another surgery.

20      Q. Prior to this incident, did you have full

21 use of all four fingers?

22      A. I had some. I didn't have all the good use

23 of them. I'm just glad he didn't break my good hand.

24      Q. You didn't have all -- you didn't have full

25 use of all four fingers on that hand?

1        A.   I had all four fingers in contact, you know,

2  they were there.

3        Q.   You've been injured before on that arm is

4  what you're testifying to?

5        A.   Yes.  I got cut right there (indicating).

6        Q.   All right.  And as a result of that cut you

7  lost some use of those fingers; is that correct?

8        A.   Right.

9        Q.   But you could still use them, they were

10  still functional?

11        A.   I could pick up a little.  I could pick up

12  maybe about five -- maybe four or five pounds with my

13  little finger.

14        Q.   Let me ask you this:  Did Mr. Ingle -- was

15  he aware that you had limited use of your right arm and

16  your right hand?

17        A.   I don't know what he knew.  He never asked

18  me nothing.  He didn't know my condition, and like I

19  said, all he knew, he knew something was the matter with

20  my right arm.

21        Q.   When you left the jail that day, were you

22  given anything or told what you were being charged with?

23        A.   Yes.  I was being charged with disorderly

24  conduct in bed asleep and resisting arrest.

25        Q.   Resisting arrest and disorderly conduct, all

1  right.

2          A.   While I'm at home asleep.

3          Q.   My next question is when you moved from

4  Carbon Hill -- now, you heard Ms. Haley testify that

5  most of those charges over there were dismissed.  Now,

6  she said that there was an agreement reached between the

7  prosecutor, yourself, and another party; what was that

8  agreement?

9          A.   Steven Thomas told me --

10         Q.   That was the judge?

11         A.   Right.

12         Q.   So what was the agreement?

13         A.   If I moved -- I got tired of going to jail.

14  Been taking me to jail all the time, going to jail.   I

15  got tired of going to jail, and I realized -- I wanted

16  to stay where I was at, and that Judge said -- I can't

17  beat the police.

18         Q.   What was the agreement?

19         A.   For me to move and he would drop all the

20  charges.

21         Q.   Now, how long had you lived in that house?

22         A.   Sixteen years.

23         Q.   How many acres did you have?

24         A.   I lived there four years --

25         Q.   How many acres did you have?

```
 1            A.  I just had two lots.

 2            Q.  Two lots.  Did you have a garden?

 3            A.  I tried to have one.  A friend helped me.

 4    He passed away, and I can't do it.

 5            Q.  So you had to put your house on the market

 6    and sell it?

 7            A.  Not really.  It was mine and it was paid

 8    for, but I sold it.  I didn't have to put it on the

 9    market.

10            Q.  You sold it?

11            A.  I sold it to some people about a block away

12    that needed it.  They were hunting a place for a

13    trailer, their daughter was, and so I sold it to her.

14            Q.  Okay.  Did you get a good market price for

15    it?

16            A.  Pretty decent price.

17            Q.  Did you get the market value for it?

18            A.  Yes.

19            Q.  Did you want to move or did you feel like

20    you had to move?

21            A.  No.  I had a wonderful place.  Why would I

22    want to move from a pretty place to an ugly place I'm at

23    now.

24            Q.  So you live in a trailer now?

25            A.  In a cheap trailer.
```

1          MR. PIAZZA:  I think that's all the

2     questions I have for the time being.

3          THE COURT:  Do y'all want to continue on

4     with cross right now?  Does anybody need to take a

5     break?

6          (Short break.)

7                    CROSS-EXAMINATION

8     BY MR. WILLFORD:

9          Q.  Good evening, Mr. Burch.  You had testified

10    in your direct that you had been drinking, and I'm going

11    to talk about -- I guess this happened -- it was

12    actually the morning of the 16th, correct?

13         A.  Correct.

14         Q.  Early in the morning of the 16th?

15         A.  I didn't get home to about 9:30 or 10:00.

16         Q.  That would have been on the 15th, correct?

17         A.  Right.

18         Q.  And you testified that you drank, you said,

19    about four beers, correct?

20         A.  (Witness nods head.)

21         Q.  When did you start drinking those beers?

22         A.  As soon as I got home.

23         Q.  So that would have been about 9:30 --

24         A.  Something like that.

25         Q.  -- that about right?  And when would you

1   have finished the last one?

2           A.   Somewhere about 12:30, I guess.

3           Q.   Okay.  So between 9:30 and 12:30 you drank

4   four beers?

5           A.   That's all I had in the refrigerator.

6           Q.   That's all you had in the refrigerator.  Did

7   you drink anything besides beer that night?

8           A.   Other than meat I eat and I had drank some

9   milk.

10          Q.   Let me ask that question a better way.  Did

11  you drink anything else alcoholic besides beer?

12          A.   No.

13          Q.   So four beers.  Were you on any kind of

14  medication at that time?

15          A.   Sure.

16          Q.   What kind of medication were you on?

17          A.   Some pain pills.

18          Q.   Do you know what kind of pain pills they

19  were?

20          A.   Darvocet 500 milligrams.

21          Q.   And had you taken any of those Darvocets

22  that day?

23          A.   When I got home I took one.

24          Q.   You took one at 9:30; is that correct?

25          A.   Yes.

1        Q.  And then you started drinking your beer at

2  9:30, correct?

3        A.  I was hurting.

4        Q.  How many of those Darvocets did you take?

5        A.  One.

6        Q.  One Darvocet.  Between 9:30 and the time

7  Deputy Ingle got there, did you take any more of those

8  Darvocets?

9        A.  No.

10       Q.  Did you take any other kind of pain

11  medication?

12       A.  No.

13       Q.  Did you take any other kind of medication,

14  period, between 9:30 and when Deputy Ingle got there?

15       A.  No, sir.

16       Q.  Had you taken any other kind of medication

17  that day --

18       A.  Yes.

19       Q.  -- before 9:30?

20       A.  Yes.

21       Q.  What had you taken?

22       A.  I had taken two different kinds of heart

23  medication, Altace -- anyway, I brought all my medicines

24  with me in case I couldn't pronounce the word.

25       Q.  Okay.  But that was for your heart, correct?

        A.    Yeah.  I had my daily script, I got to go
get my heart medicine, blood pressure medicine.  I have
to take one cramp pill and --
        Q.    One what kind of pill?  I'm sorry, I didn't
hear that.
        A.    Cramp.
        Q.    Cramp pill, okay.
        A.    That time I thought I had --
              (Short interruption.)
        Q.    Now, while we were changing the tape you
pulled an Albuterol inhaler out of your pocket?
        A.    Yes.
        Q.    And you were taking the Albuterol on the
15th of February?
        A.    That's all the medicine I had.
        Q.    Okay.  And you had taken some of that
Albuterol that day?
        A.    I have to take two aspirin too everyday,
baby aspirin.
        Q.    Do you recall reading the label on that
Darvocet that you took?
        A.    Yes.
        Q.    Did it say anything about drinking alcohol
with that medication?
        A.    It said it would enhance the effects of it.

1       Q.  And you drank a beer anyway?

2       A.  I drank beer and took one of them.

3       Q.  Did it enhance the effects?

4       A.  Pain was still hurting.

5       Q.  Did you take any other kind of drugs?

6       A.  No, sir.

7       Q.  Anything that would be illegal?

8       A.  No, sir.  The doctor said take one if you

9 want to.

10       MR. PIAZZA:  Taz, just answer his

11 questions.

12       Q.  Now, I think you testified that you got into

13 a little argument with your wife, is that correct, after

14 you got home?

15       A.  Nicky nack.

16       Q.  Nicky nack.

17       A.  Nicky nack.

18       Q.  Do you remember I think you testified it

19 was about her wanting to go to bed and you not wanting

20 her to go to bed?

21       A.  Yes.  I wanted her to stay up with me.  She

22 wanted to go to bed.  I decided -- I don't know why, I

23 have a bad habit of calling 911 when I lived where I

24 did.  Lived for 15 years over there trying to get that

25 farm moved.  I went to jail over one of them phone calls

```
 1    trying to get the farm moved, but I just had grown a bad

 2    habit of dialing 911. And they told me at mental health

 3    that I had bipolar disorder. It would cause me to do

 4    stuff like that. Silly stuff. Never really hurt

 5    nobody.

 6         Q.  Was that the only thing that you were

 7    arguing about was her staying up?

 8         A.  Yes. I wanted her to stay up with me and

 9    she won't.

10         Q.  And so you called 911 because of that?

11         A.  Yeah. I said, "Well, I'm going to bed." I

12    hung the phone up and she got on the other phone, was

13    talking, said, "We don't need nobody out here. We're

14    not fighting. He is going to bed."

15         Q.  All right. Do you recall telling the

16    dispatcher you wanted her out of your house?

17         A.  Yes, sir.

18         Q.  Why did you want her out of the house if you

19    wanted her to stay up with you?

20         A.  I reckon I stayed up farting around and

21    stupid.

22         Q.  Okay.

23         A.  Just stupid, something stupid. It was no

24    meaning to it at all.

25         Q.  Do you recall telling her or telling the
```

1    dispatcher that you were going to hit your wife if they

2    didn't come get her out?

3              A.    I wouldn't hit her for a million dollars.

4              Q.    That wasn't my question.  Did you tell the

5    dispatcher that you were going to hit her if they didn't

6    come get her out of your house?

7              A.    No, I never told the dispatcher I was going

8    to hit her.

9              Q.    You never told the dispatcher that?

10             A.    No.

11             Q.    You never told the dispatcher that?

12             A.    I didn't tell them that I was going to hit

13   her.

14             Q.    I'm not talking about her.  Did you tell the

15   dispatcher that you were going to hit your wife?

16             A.    I never hit her and I never will.

17             Q.    You're not answering my question.

18             A.    I didn't tell the dispatcher I was going to

19   hit her.

20             Q.    Okay.  That's the answer.

21             A.    It never crossed my mind.

22             Q.    You said just a minute ago that you had been

23   diagnosed as being bipolar?

24             A.    Yes, and schizophrenia.

25             Q.    Do you take any kind of medication for that?

         A.   Yes, I was taking it.

         Q.   Were you taking it that night?

         A.   Look that stuff made me so goofy, I just
laid off of it because I can't walk around on -- I got
to be at myself.

         Q.   Listen to my question.  Did you take any of
that medication for your bipolar disorder that night,
February 15?

         A.   No.

         Q.   How long had you been off of it on February
15?

         A.   Pretty good while.

         Q.   Months?

         A.   Everything they give me didn't have my name
on the label or how --

              MR. PIAZZA:  Just answer his question.

         A.   It came in boxes --

              MR. PIAZZA:  Taz, just answer his question.

         A.   Give me so much of it I just throwed it
away.

         Q.   How long had you been off of it on February
15?

         A.   I couldn't tell you that.  I can't remember
days.

         Q.   Was it months, was it a period of months?

1    A.   Probably a month.

2    Q.   A month?

3    A.   Something like that.

4    Q.   Did you tell your doctor you were getting

5    off the medication?

6    A.   No.   I hadn't got in touch -- I went down

7    and got in touch with him.   He was supposed to write my

8    lawyer a letter explaining my condition that I didn't

9    know I had.   He said he would.   I don't know if he sent

10   it to him.

11   Q.   What's that doctor's name?

12   A.   David Dixon.

13   Q.   Dennison?

14   A.   David Dixon.

15   Q.   So you're not on any kind of medication for

16   your bipolar disorder now?

17   A.   Correct.   I'm on medicine for it.

18   Q.   You are now?

19   A.   Yes.

20   Q.   Today?

21   A.   That's right.   I got -- I didn't even have a

22   doctor to go to besides the Oakman Clinic and mental

23   health, but I got on this H.M.O.   I got Dr. Tai, is my

24   family doctor.   Since this happened I have been seeing

25   Dr. Miller over here.   He's an orthopaedic specialist.

```
1          Q.   Okay.  But you now today are taking
2   medication for your bipolar disorder; is that correct?
3          A.   Right.  You say I take it -- I take three
4   Xanax tens a day.
5          Q.   Do you take anything else?
6          A.   Three pain pills a day, Lortab 50.
7          Q.   Have you taken those pills today?
8          A.   I took one when I get up and one of my cramp
9   pills and my heart medication, and I took one of Xanax
10  and the cramp pill at around 12:00.
11         Q.   And have you had anything to drink alcoholic
12  today?
13         A.   Coming down here, no.
14         Q.   Just want to make sure we weren't
15  exacerbating any effects.
16              Have you ever been voluntarily committed to
17  a mental institution?
18         A.   Not that I recall.  I did check myself into
19  Pierson Hall.
20         Q.   When was that?
21         A.   Stayed 33 days.
22         Q.   When?
23         A.   I can't remember the date of that.  Let's
24  see.  Somewhere in '97 -- '96 to '97, somewhere in
25  there.  Social Security office sent me there.
```

```
 1              Q.   Okay.   I want to make sure I understand the
 2    sequence as far as the call to 911 is concerned, that
 3    morning of the 16th.   You said you got into a little bit
 4    of a -- I think you phrased it as a nick nack with your
 5    wife about her not wanting to stay up with you, right?
 6              A.   No screaming, no fussing, no hollering, no
 7    fighting, just talking like you're talking to me.
 8              Q.   So you called 911, correct?
 9              A.   It was a bad habit I have.
10              Q.   And you told them that you wanted her out of
11    your house, correct?
12              A.   Well, I told her that but, you know, she
13    said something and I said, "Well, I don't blame you.
14    You're my wife."   She spent the night with me, and she
15    plainly told him we didn't need --
16              Q.   We're not to that point yet, Mr. Burch,
17    we're not to that point yet.   I'll get to it in a
18    minute.
19              A.   She's still with me.   I ain't never hit
20    her.
21              Q.   And you went to bed right after that
22    conversation with 911, correct?
23              A.   She was on the phone with them trying to
24    tell them we didn't need no officer out here and
25    everything was fine.
```

```
 1          Q.   Why did you go to bed after that?

 2          A.   Because I was sleepy.

 3          Q.   Your were tired?

 4          A.   It was 3:00 o'clock in the morning, about

 5     2:30.

 6          Q.   So you went to sleep, correct?

 7          A.   Yes.  I was tired.

 8          Q.   And what was the next awareness that you

 9     had?  What was the next thing that you knew about?

10          A.   That man right there, Derane Ingle, cussing

11     in my living room, screaming and cussing and hollering

12     at my wife, hollering at me to get out of bed, you come

13     in this living room.

14          Q.   Did he come into your bedroom?

15          A.   He didn't come down to the bedroom.  He just

16     kept staying in the living room.

17          Q.   So when you say in your complaint that he

18     woke you, you mean by his voice; is that correct?

19          A.   Bad loud voice, bang and hollering.  It

20     scared my wife, and I didn't know what in the world was

21     breaking lose in there, but he was hollering.

22          Q.   What specifically did he say?

23          A.   Well, to me at that time the only words he

24     said to me when I said --

25          Q.   I'm not asking what he told you.  You said
```

1    that you woke up when you heard him out in your living

2    room.  What did you hear him say?

3         A.  I didn't hear what he said after that.

4    You'll have to ask my wife because she met him outside.

5         Q.  Okay.  So then at that point you got up and

6    went out in the living room to see what was going on,

7    correct?

8         A.  He followed her in the house.  She thought

9    he was going to leave and he barged right in behind her,

10   didn't ask could he come in.  He just barged on in

11   behind her.

12        Q.  But you didn't see that, did you?

13        A.  She did.

14        Q.  I'm asking you what you saw.  You didn't see

15   that.

16        A.  I didn't see it.  He was the first face I

17   seen when I come out of my bedroom, standing up, jumping

18   up and down in my bedroom raising all kind of --

19        Q.  Follow my question, Mr. Burch.  You heard

20   the noise out in the living room.  Then you got up to go

21   see what was going on, correct?

22        A.  Right.

23        Q.  When you got out into the living room, what

24   did you see?

25        A.  I seen him standing in the middle of my

living room, and he said, "Your ass is going to jail."
And he reached behind Patsy and sprayed me with that
stuff. Didn't tell me why I was going to jail, and I
didn't know until John Mark got back to work.

Q. How did you come out of the bedroom?

A. Well, I come out of my bedroom and walked up
the hallway. It's got a hallway in the trailer in there
to the living room.

Q. Did you run?

A. No.

Q. Where were your hands?

A. When I came in there my hand was just like
this (indicating), and I was standing there in my
underwear.

Q. You walk like this?

A. I had my hands just like this (indicating).

Q. When you were walking up towards him you had
your hands like this?

A. I was walking down the hallway like this
(indicating), and I put my hands like this thinking, oh,
me, you know.

Q. All right. I think you testified that you
had a bandage on your right hand, correct?

A. I had it on that Sunday the 15th.

Q. For the thumb?

1     A.  I had a fracture here.  I was trying to

2  tighten up a pipe on the water heater.  It was leaking,

3  and the wrench slipped, and I hurt -- fractured my thumb

4  trying to push on it with both hands.  I ain't got a

5  whole bunch of use with this hand.

6     Q.  Did it actually break the bone?

7     A.  It shows on the x-ray right here or right

8  here one, one knuckle is barely fractured, and I kind of

9  figure you're going to use this saying my hand was

10  already hurt.

11     Q.  Let me show you if I can -- do you recognize

12  this?

13     A.  Yeah, I reckon I do.

14     Q.  What is that?

15     A.  That's the complaint.

16     Q.  That's the complaint you filed that started

17  this grievance here today, correct?

18     A.  That's correct.

19     Q.  Did you prepare this yourself?

20     A.  No, I didn't.

21     Q.  Is that your signature there on the second

22  page?

23     A.  That's correct.

24     Q.  Taz D. Burch.  Who prepared this for you?

25     A.  Bank of Carbon Hill.

```
1          Q.   The Bank of Carbon Hill wrote this?

2          A.   (Witness nods head.)

3          Q.   Who at the Bank of Carbon Hill wrote this?

4          A.   A Notary Public.

5          Q.   Did she notarize it, the Notary Public at

6     the Bank of Carbon Hill?

7          A.   She should have.

8          Q.   Okay.  You're saying -- there's supposed to

9     be a notary mark on here, correct?

10         A.   Yes.

11         Q.   What I'm asking you is who wrote this, not

12    who notarized it, but who wrote this?

13         A.   All I can tell you the banker's secretary.

14         Q.   How did the banker's secretary know what to

15    say in here?

16         A.   Because I already had it jibbered down on

17    paperwork for her to go over.

18         Q.   Okay.  So you wrote it down, you handwrote

19    it?

20         A.   Correct.

21         Q.   And she typed it into that?

22         A.   Yes.

23         Q.   Is that right?

24         A.   Correct.

25         Q.   Okay.  And did she put down then in here
```

1  everything that you said in your handwritten notes?

2          A.    I don't know if he's got that -- that may be

3  a copy.  I don't remember, but I think she pretty -- I'm

4  pretty well sure she notarized it and didn't charge me

5  for doing it, but she said she wouldn't do it again

6  because she must be some kind of kin folks with him and

7  has to work at the bank and the bank gets paid to do

8  that.

9          Q.    Did she put down everything in this

10 document, this complaint, that you told her to put in

11 there?

12         A.    I think she kind of mixed one thing just a

13 little.

14         Q.    So she put everything in there that you had

15 in your handwritten notes, correct?

16         A.    All except pushed me down in the jail and

17 throwing cold water on me.

18         Q.    Okay.  And the date on this is March 12,

19 2004, right?  That's when you had this prepared.

20         A.    Yes.  It took me a little while to get --

21         Q.    Okay.

22         A.    -- the paperwork going.

23         Q.    That's fine.

24         A.    And get me a good lawyer.

25         Q.    And you reviewed it before you signed it,

1  correct?

2         A.   Correct.

3         Q.   Signed it in front of a Notary and

4  everything on here is true and correct?

5         A.   A Notary Public.

6         Q.   And you understood that when you signed it

7  that everything on here was true and correct; is that

8  right?

9         A.   She put her name, but it came from the Bank

10 of Carbon Hill and I think her name was Sheila.  Patsy

11 can tell you who it is.

12        Q.   Let me leave that and let me ask you, does

13 it say anything in there about Deputy Ingle spraying you

14 with pepper spray?

15        A.   Yes.  I forgot to put that in here.  That

16 was one thing I forgot to put in here.

17        Q.   Does it say anything in there about him

18 punching you in the ribs as he was trying to take you

19 out of the car?

20        A.   I know I forgot to put him spraying all that

21 stuff on me.  I meant to.  Forgot to put that in there.

22 Like I said, I've got a sixth-grade education.  I done

23 the best I could, and it might not be in here, but Patsy

24 seen it.  It's all over the ground.  It's all over me.

25 He sprayed me with it.  He admitted spraying me with it.

1    That's good enough for me, but he ain't even admitted

2    spraying me with it.

3        Q.   But your testimony is -- Mr. Burch, your

4    testimony is that he sprayed you basically from the

5    living room all the way out to the car and sprayed you

6    again and sprayed you in the jail?

7        A.   Sprayed me in the police car, sprayed me

8    some more, sprayed -- I thought when is he going to run

9    out of spray.

10       Q.   And as much as he sprayed you --

11       A.   That stuff hurt.

12       Q.   That wasn't something that stuck out in your

13   mind to put in your complaint?

14       A.   Well, I've got a sixth-grade education and

15   I'm prone to make a little bitty mistake like that.

16       Q.   Okay.

17       A.   It was brought to my attention by my

18   brother, you didn't put that in there.  Well, he was on

19   probation when they hired him and this happened before

20   his probation was up, and done had this so we just

21   tookwhat I could get gathered up.  I have a sixth-grade

22   education, not no high school education.

23       Q.   Does that affect your ability to feel pain?

24       A.   That affects my ability to write and put

25   down stuff on paper.

1    Q.  Does that affect your memory?

2    A.  No.  I've got a good memory.

3        MR. PIAZZA:  I'm going to have to object to

4    this.  He's arguing with the witness.

5        THE COURT:  He's just cross-examining him.

6    Let's go ahead.

7    Q.  When you came out of the bedroom and saw

8    Deputy Ingle in your living room, did you tell him he

9    wasn't wanted in your house?

10   A.  I didn't say that.  I said, "My past has

11   come to haunt me."

12   Q.  Did you ask him to leave?

13   A.  I didn't have time to.  He told me to sit

14   down and reached around there and sprayed me with that

15   stuff, and I couldn't see nothing, turn me around and

16   started throwing me every which way.

17   Q.  So it's -- make sure I understand.  The only

18   thing that you said was, "Oh, Lord, my past is coming

19   back to haunt me."  You didn't say anything else?

20   A.  He admitted spraying me with it.  It might

21   not be in here, but he had done admitted spraying me

22   with it.  I might have forgot to put it in there.

23   Q.  Mr. Burch, we're moving beyond that.  I'm

24   just wanting to make sure that I understand what it was

25   that you said when you came of the bedroom.  The only

1  thing that you said before you got sprayed was, "My,

2  God, my past is coming back to haunt me."

3      A.  "My past is coming back to haunt me."  After

4  I moved away from him.

5      Q.  Just like that.  Did you raise your hands?

6      A.  I put it over my eyes like that, and I said,

7  "Oh, me."  I was in my underwear and that's all I had

8  on.

9      Q.  Was your hands still over your eyes when you

10  got sprayed?

11     A.  No.  He hit me right square in the eyes with

12  it because I wasn't expecting it.  My eyes was opened

13  that big when he hit me, but I couldn't see.

14     Q.  Did you threatened to whop his ass?

15     A.  He said I pushed him.

16     Q.  I'm not asking you what he said.

17     A.  I can't push him between my wife and him.

18  I'm not about to push my wife.

19     Q.  Mr. Burch, answer my question.

20         THE COURT:  Mr. Burch, listen, he asked a

21  simple question --

22     A.  I didn't push him.  I didn't threaten him.

23         THE COURT:  Answer his questions like that

24  and we'll get through this a lot quicker.  Listen to him

25  and answer his questions.

1    Q.   Did you threaten to whop his ass?

2    A.   I ain't able to whop his ass and I didn't

3    threaten to whop his ass.

4    Q.   Did you tell him you were going to knock the

5    hell out of him?

6    A.   No.   That's his -- his say so on that.

7    Q.   Did you have a watch on that night?

8    A.   Yes.   They broke it and tore it off.

9    Q.   Which hand?

10    A.   Broke the band, a $20 band.

11    Q.   Who is "they"?

12    A.   Him and that jailer right there, that was at

13    the front window when we got down there.

14    Q.   So you went to bed that night in your

15    underwear and your watch; is that correct?

16    A.   Right.

17    Q.   So when you got up, you didn't put anything

18    on, correct?

19    A.   I walked in the living room with my

20    underwear and watch on.

21    Q.   Did you happen to look at your watch as you

22    were coming down the hall?

23    A.   I seen him and I stalled.

24    Q.   So you didn't look at your watch, right?

25    A.   I didn't look at my watch.

1    Q.  Did you look at any clock in the living

2  room?

3    A.  I looked at him and then I said, "Oh, my

4  past has come back to haunt me," and hit me in the face

5  with that and -- after you get sprayed in the face with

6  that, you're not going to see no clock, no watch.

7    Q.  Before you got sprayed, did you look at a

8  clock?

9    A.  Nun-uh.  I done been asleep when he got in

10  there hollering and screaming.

11    Q.  Sir, it's a simple question.  Did you look

12  at a clock before you got sprayed?

13    A.  I didn't look at a clock before he sprayed

14  me.

15    MR. PIAZZA:  He's answered the question.

16    He's asked it about three or four times.  He's

17    answered it.

18    THE COURT:  He qualifies it every time.

19    It's kind of hard to follow what he's saying.

20    A.  I didn't look at the clock.

21    Q.  At some point in time Deputy Ingle placed

22  you in handcuffs, correct?

23    A.  (Witness nods head.)

24    THE COURT:  Now you're doing better, but

25  say it where this lady can write it down.  That nod

1  would be yes.

2             THE WITNESS:  Okay.

3             THE COURT:   Well, answer his questions.

4        Q.  Were you placed in handcuffs?

5        A.  Yes.

6        Q.  And it was your testimony that he handcuffed

7   you behind your back; is that correct?

8        A.  That is correct.

9        Q.  When he placed the handcuffs on you, were

10  you standing up or were you on the floor?

11       A.  I was standing up.

12       Q.  Did you cooperate with him?

13       A.  Yes.

14       Q.  And then he took you outside the trailer,

15  correct?

16       A.  Throwed me.

17       Q.  And put you in the car?

18       A.  Not yet.  He throwed me back in the house.

19       Q.  That's when you got a coat; is that right?

20       A.  Patsy got a pair of pants on me and she

21  throwed a t-shirt on me.

22       Q.  Back outside the trailer.

23       A.  Throwed me back out again, pushing me down

24  all the way to the car.  About 35 feet of pushing me

25  down, told me to get in the car.  I couldn't see how to

1  get in no car.

2      Q.  And while he's pushing you, he's still

3  continuing to spray you with the spray?

4      A.  Correct.  It's all over the driveway.

5      Q.  And he put you in the car at that point?

6      A.  Got me in the car.

7      Q.  Did you cooperate with him getting you in

8  the car?

9      A.  I couldn't help but cooperate with him

10  getting me in the car.

11      Q.  Do you remember him putting his hand on your

12  head helping your head get inside the car?

13      A.  All I remember is him just shoving me in

14  there.

15      Q.  Did you hit your head on anything when you

16  were going in there?

17      A.  I ain't for sure if I hit my head on

18  anything going in there.  I get slung around like a rag

19  doll.

20      Q.  And you testified that he did not put a

21  seat belt on you; is that right?

22      A.  He did not put a seat belt on me so help me

23  God.

24      Q.  And as he's taking you back towards the

25  jail, you said he kept slamming on the brakes and making

1  you hit that screen?

2      A.  Yes.

3      Q.  What part of your body hit the screen?

4      A.  Several parts.  Head.

5      Q.  Did your face?

6      A.  (Witness nods head.)

7      Q.  Your forehead?

8      A.  Yes.

9      Q.  Did you suffer any injuries as a result of

10 that?

11     A.  I had some bruises and knots.

12     Q.  All right.  I refer you back to your

13 pictures that you took and testified to, the day after

14 you were released from jail.  I've got two pictures of

15 you here, and both of them show your face pretty good.

16 Show me on there where your bruises are from hitting

17 that screen.

18     A.  Well, they're mostly in my hairline on top

19 of my head.  See, I was like that (indicating).  I got

20 it this way and I got it that way.  In my hairline there

21 were knots and bruises but you would have to, you know,

22 sit down and look through my hair to see it.

23     Q.  Now, you just testified, though, a minute

24 ago that your face hit the screen too.

25     A.  My face hit the screen too.

1        Q.  But there's no marks on the pictures are

2  there?

3        A.  Take a good close look right there and right

4  above my eyebrow.  And my brain was not etched up in

5  a -- looks like attention.  My face is just as plain and

6  relaxed as can be.  Can you not see the red on my face

7  right there?  And under that eye right there and under

8  this eye (indicating)?

9        Q.  I tell you what, we'll let the Board decide.

10  Do you remember telling Deputy Ingle while you were in

11  the car that you were going to get out of this?

12        A.  No, never said a word in the car to him at

13  all.

14        Q.  Never said a word while you were in the car?

15        A.  Two words.

16        Q.  What were those two words?

17        A.  Or maybe three.  I said, "You couldn't hurt

18  a fly."  Every time he tried to hurt me, he'd laugh,

19  "Ha, ha, did that hurt?"  And about two times, I tell

20  him, "You couldn't hurt a fly."  I've been hurt bad.

21  I've been through a bunch of pain and stuff, but I

22  wasn't about to tell him that he had hurt me, if he had

23  killed me.

24        Q.  Did you yell at him?

25        A.  He had it in his mind to kill me anyhow.

1    Q.  Did you yell at him?

2    A.  No, never did raise my voice.

3    Q.  Now, you were charged that night with

4 disorderly conduct and resisting arrest, correct?

5    A.  At home asleep in my bed charged with

6 disorderly conduct.

7    Q.  And resisting arrest.

8    A.  Yes.

9    Q.  You haven't gone to trial on those charges

10 yet, have you?

11   A.  Trying to get this mess dealt with, and

12 that's all I can tell you.

13   Q.  It's been continued several times; is that

14 correct?

15   A.  Uh-huh.

16   Q.  I need you to answer out loud so the court

17 reporter can take it down.

18        All right.  I think you also testified

19 earlier that you heard someone call and ask Deputy Ingle

20 what was taking him so long; is that right?

21   A.  On the radio when he was trying to drag me

22 out of the back of the car.

23   Q.  Was it a male or a female calling?

24   A.  It was a woman.

25   Q.  It was a woman.

1       A.  I was a dispatcher for three years.  I know

2  something about dispatching, or two and a half years.

3  He had to call back in right then.  They wanted to know

4  how long -- how come it was taking him so long to get to

5  the jail house.  He said he run into traffic.  There was

6  no traffic on that back road.  He was going to make it

7  look like I escaped and then pop a cap in me.

8       Q.  He didn't shoot you, though, did he?

9       A.  He would have if he got me out of the car

10  and I done my handcuffs, he shot me.  I knew this

11  because he had a buddy he practiced with.  Dan Tucker

12  shot a man -- one of his buddies, Dan Tucker, shot and

13  killed, and didn't ask him.  His own buddy.  They had a

14  kung fu shop together, was working together and he shot

15  and killed, a mental case.

16       Q.  When you got to the jail, did you tell

17  anybody at the jail that Deputy Ingle had abused you?

18       A.  Oh, yes.

19       Q.  Who did you tell?

20       A.  When I got the opportunity.

21       Q.  Who did you tell?

22       A.  I told the nurse.  I told Lonny I wanted to

23  know what I was in there for, couldn't figure out what I

24  was in there for, until John Mark got back on Tuesday

25  the 16th.  And he said, you look rough, so he got the

1   nurse.

2          Q.  So you told the Sheriff; is that right?

3          A.  I didn't -- I didn't get in contact with

4   John Mark.  My brother left a message with John Mark's

5   secretary for John Mark to call my brother back.  He

6   wanted me checked on to see if I was beat up before they

7   let me out of jail.

8          Q.  Let me see if I can maybe help just a little

9   bit.  What I'm looking to see is when you got to the

10   jail on the morning of the 16th, you testified that you

11   told the nurse.

12          A.  I didn't get to see the nurse till the next

13   morning when Lonny Devito came on.

14          Q.  Okay.  But that still would have been the

15   16th, correct?

16          A.  Yes, that would have been the 16th.

17          Q.  Because all this happened on the morning of

18   the 16th, the early morning hours, right?

19          A.  True.  The nurse got to come see me around

20   9:00 o'clock I guess.  I couldn't see the watch.  When

21   Lonny come on checking prisoners, he opened my door and

22   he thought I was dead because I was balled up in a ball.

23          Q.  Did you tell Mr. Devito about what had

24   happened with Deputy Ingle?

25          A.  Yes.

1      Q.   What did you tell him happened?

2      A.   I told him the same thing I've been telling

3  all of y'all; he come to check out a call and come

4  hollering and screaming in my house.  He was not

5  invited.

6      Q.   Let's not go back through it.  You told Mr.

7  Devito everything that you had testified to tonight?

8      A.   My wife asked him to leave three or four

9  times.

10     Q.   Mr. Burch, I'm just asking you what you told

11 Mr. Devito, and I think you said that you told him

12 everything you testified to here, right?

13     A.   You need to see the nurse.  He went and got

14 the nurse.

15     Q.   And then you told the nurse, right?

16     A.   I didn't have to tell the nurse.  She looked

17 at me --

18          THE COURT:  Mr. Burch, look, you run these

19      answers way out real long and they're not really

20      responsive.  Listen to his question and try to

21      answer the best you can.

22     A.   I try to answer the best I can.

23     Q.   Did you tell Nurse Gold what Deputy Ingle

24 supposedly did to you?

25     A.   That's correct.

1    Q.  So we've got Nurse Gold and we've got Mr.

2   Devito.  Did you tell anybody else on the morning of the

3   16th what you claim Deputy Ingle did to you?

4        A.  I decided to keep my mouth shut, and she

5   decided I needed to see the doctor.  She let me go see

6   the doctor and they put me back in there until I got

7   bonded out.

8        Q.  Okay.  How long does it take you to get from

9   your house to the jail when you drive it?

10       A.  Probably around -- having to go a little cut

11  off to get to -- what do you call it?

12       Q.  Just how long?

13       A.  Fourteen minutes.

14       Q.  Fourteen minutes.  Now, you testified at

15  length that you had a little bit of a history with

16  Deputy Ingle.

17       A.  A whole bunch.

18       Q.  I want to ask you, have you ever had any

19  kind of a history like that with Charlie Skalnik?

20       A.  I don't know no Charlie Skalnik.

21       Q.  What about Ms. Chapman that works at the

22  jail, ever had any problems like that with her?

23       A.  I don't know Ms. Chapman.

24       Q.  What about Joey Darty, did you have any

25  problems like that --

1        A.   That nurse?

2        Q.   You don't recognize the name?

3        A.   The first time I ever met him I was naked.

4        Q.   Nurse Gold, have you had any kind of history

5 with her, negative history?

6        A.   Never seen her before in my life until then.

7        Q.   Donald Shuggart, ever had any kind of

8 negative history with him?

9        A.   Unless he was one -- that jailer having fun

10 with me.

11       Q.   I'm not asking you about that night.  I'm

12 talking about any time before that.

13       A.   I don't know that man's name.

14       Q.   All right.  I'm curious about something that

15 you testified to earlier when you said that the

16 Sheriff's Department knew that they shouldn't have sent

17 Deputy Ingle to your house.

18       A.  Correct.

19       Q.   How should they have known that?

20       A.   He should have told them I had problems in

21 the past with him, and if there was another officer on,

22 he should have sent another officer.

23       Q.   You're confusing me with your pronouns here.

24 Which he are you talking about?

25       A.   He done had in his head he was going to do

1  what he was going to do, because my brother Gene told me

2  that. He said, "Your buddy got a job with the county.

3  He get a chance, Taz, he's going to beat you up, going

4  to hurt you." He was right.

5        Q. Mr. Burch, how would the Sheriff's

6  Department know about your history with Mr. Ingle?

7        A. John Mark didn't put him up to doing this.

8  John Mark didn't even know what he was doing. He was

9  out doing what he wanted to do or what he was suppose to

10  do, but he took it on his own to do this, and he should

11  not have done that. I'm sure John Mark -- I've been to

12  school with John Mark. John Mark is a good man. John

13  Mark did not put him up to do it, and if there's another

14  deputy on sheriff, he knows we had problems in the past.

15  He should have sent another deputy out there.

16        Q. So just make sure I understand correctly.

17  What you meant by that was Deputy Ingle should have told

18  the Sheriff's Department about his previous dealings

19  with you; is that right?

20        A. That's correct. He should have sent

21  somebody else out there, not him, and we wouldn't be

22  here today.

23        Q. Mr. Burch, how many times have you been

24  convicted of a crime?

25        A. What kind of crimes are you talking about?

1    Q.   Any crime.   Let's exclude traffic tickets.

2    A.   One public intoxication, one U.P.P.B., but

3  it wasn't mine.   The man that was driving the truck, it

4  belonged to him.

5    Q.   What's a U.P.P.B.?

6    A.   U.P.P.B. is unlawful possession of beer.   He

7  had two cans of beer in his truck.   They took both of us

8  to jail because it was his beer, not mine.   They jerked

9  me out of that vehicle I don't know how many times and

10  took me to jail.

11    Q.   I'm not asking you about the specifics

12  yet.   We've got one public intox.   We've got an unlawful

13  possession of a prohibited beverage.   You have to

14  forgive me, I'm not from a dry county.

15    A.   And on another arrest put me in there --

16  come and get me, come and get me, come and get me, come

17  and get me.   I called trying to get the farm moved.   I'm

18  going to jail because it was his wife.   His mother and

19  daddy got on my property.   They couldn't get the farm

20  moved, but the Judge requested I move.   I've been there

21  a lot longer than they have, and I had to move out of

22  town.

23    Q.   Have you ever been convicted of carrying a

24  concealed weapon?

25    A.   (Witness shakes head.)

Q. I need you to answer out loud, sir.

A. Never been convicted of carrying a concealed weapon.

Q. On April the 18th of 1995 you were not convicted of carrying a concealed weapon?

A. I never was charged with it, but that's the way I'm supposed to carry it, concealed. I ain't suppose to have it on my side. I'm supposed to carry it concealed.

THE COURT: Let's take just a short break.

(Short recess.)

Q. I've got one more area, Mr. Burch, and then I'll stop for the night. When you got to the jail -- let me back up.

You've been booked into the Walker County jail before, correct?

A. Correct.

Q. And you know the procedures for booking folks into the jail, correct?

A. Correct.

Q. Did you go through that procedure on the morning of February 16?

A. Nope.

Q. You don't recall anybody asking you any questions about your Social Security number for example?

1    A.   I didn't have an ID on me.

2    Q.   Did anybody ask you what your Social

3    Security number was?

4    A.   No.

5    Q.   Did anybody ask you about your medical

6    condition?

7    A.   No.

8    Q.   When you spoke with Nurse Gold, did you

9    complain to her about your middle finger on your right

10   hand?

11   A.   Yes.

12   Q.   Did you complain to her about that?

13   A.   Yes.

14   Q.   Did you complain to her about your thumb on

15   your right hand?

16   A.   Not necessarily.

17   Q.   Not necessarily?

18   A.   I didn't complain about my thumb.

19   Q.   You did not complain about your thumb to

20   Nurse Gold?

21   A.   Right.

22   Q.   I've got one last question for you, Mr.

23   Burch.  Would you object to signing a medical release so

24   the Board can take a look at your previous medical

25   records?

1           MR. PIAZZA: I'm going to object to that

2   because they're not relevant.

3           MR. WILLFORD: Whether he had a previous

4   injury I think is very relevant. They've got his

5   post-injury records.

6           MR. PIAZZA: We've got the pre-injury

7   records too.

8           MR. WILLFORD: We would like to see those.

9           THE COURT: Have the pre-injury records

10   been introduced?

11           MR. WILLFORD: I don't think they have been.

12           MR. PIAZZA: I don't think I have those

13   with me. I'll be happy to share them if I do.

14           MR. WILLFORD: What we're interested in

15   here is -- I mean, he's listed a large number of

16   doctors; we've got Carraway, we've got that

17   questionable x-ray, and I think the records from

18   that visit would be very relevant for the Board to

19   review.

20           THE WITNESS: The records is in there. We

21   got a paper to come with that x-ray. It's in that

22   file.

23           MR. PIAZZA: I stand corrected, I don't --

24           MR. WILLFORD: You don't have those?

25           MR. PIAZZA: I thought I did.

1    Q.   Mr. Burch, do you go to a methadone clinic?

2    A.   I wouldn't go to a methadone clinic ever.

3         MR. WILLFORD:   That's all I have.

4         MR. PIAZZA:  I've got a few follow-up

5    questions and that's it.

6                    REDIRECT EXAMINATION

7    BY MR. PIAZZA:

8    Q.   The people, the names that he mentioned,

9    Skalnik, Chapman, Darty --

10        MR. PIAZZA:  And what was the last one?

11        MR. WILLFORD:   Shuggart.

12        MR. PIAZZA:   How do you spell that?

13        MR. WILLFORD:   S-h-u-g-g-a-r-t.

14   Q.   You've never heard of these people, you

15   don't know them?

16   A.   I never heard of them before in my life.

17   Q.   Your wife told Officer Ingle to leave how

18   many times?

19   A.   Four or five or six times.

20   Q.   Was this after you got up?

21   A.   This was while I was still in bed and she

22   went outside to meet him and told him -- asked him to

23   leave.

24   Q.   So you could hear what was going on from

25   your bedroom?

1        A.  No I couldn't hear what was going on.

2        Q.  She told you she said that?

3        A.  Yes.  She asked him to leave and he didn't

4  ask her could he come in.

5        Q.  I'll get that testimony from her.

6            You never told him you were going to whip

7  his ass or knock the hell out of him when he was in your

8  house?

9        A.  No.

10       Q.  Did you tell Mr. Ingle to leave your home?

11       A.  My wife advised him to leave my house.

12       Q.  After you got up did you tell him to leave?

13       A.  I didn't have time to tell him nothing.

14       MR. PIAZZA:  That's all I have.

15       THE COURT:  Mr. Burch, you can step down.

16                 <u>SONYA GOLD</u>

17  called on behalf of the grievant, having been

18  duly sworn by the Judge, was examined and testified as

19  follows:

20            <u>DIRECT EXAMINATION</u>

21  <u>BY MR. PIAZZA</u>:

22       Q.  Ms. Gold, would you please state where

23  you're employed?

24       A.  Where I'm employed at?

25       Q.  Yes, ma'am.

1       A.   I work at the Walker County Sheriff's
2   Department.

3       Q.   And what position are you employed there?

4       A.   It's a contract labor type.

5       Q.   Okay.

6       A.   I'm not employed for the Sheriff's
7   Department.  I work for Gold Medical Services.

8       Q.   So you are not an employee of the county --

9       A.   No.

10      Q.   -- or the Sheriff's Department?

11      A.   No.

12      Q.   How long have you been in that position?
13  And you work there as an RN or nurse?

14      A.   LPN.  I've been there six years.

15      Q.   And tell me and tell the Board what your
16  responsibilities are in regard to that position.

17      A.   My responsibilities at the jail is to
18  administer medical care.

19      Q.   Could you please speak up a little bit?

20      A.   To administer medical care to the inmates.
21  Basically when inmates enter our facility if they have a
22  problem, I triage the patient.  If they have medications
23  or need to see a doctor, we have a doctor that's on
24  staff 24 hours and he physically comes to the jail twice
25  a week and he sees the inmates that have requested to be

1  seen. We administer the -- I administer the medications

2  twice a day at the jail. I'm physically there 5:30 in

3  the morning until roughly 9:00 or 10:00 in the morning,

4  and this is administering the morning medications and

5  seeing those who request to see a nurse or needs to be

6  seen. Then throughout the day I'm on call, and if the

7  officers have a complaint from an inmate or anything or

8  they need to see a nurse or have a question concerning

9  an inmate, they call me and I respond to their situation

10  as needed.

11           Then I return back to the jail approximately

12  about 4:30 or 5:00 that afternoon and we do an evening

13  pill call administration.

14           Q.  How did you characterize that?

15           A.  We do -- we label it as pill call. We

16  administer their evening medication, and we call it a

17  pill call. And we usually finish up around 8:00 or 8:30

18  and then I will see the inmates that request to be seen

19  and so forth, and then I'm on call throughout the night

20  if they need me.

21           Q.  Okay. Thank you. Let me ask you this:

22  Have you ever met Mr. Taz Burch?

23           A.  I have met Tommy Barron, who is also known

24  as Taz now. I was not familiar with the Taz, the new

25  name.