FILED

2008 Jul-28  PM 05:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

**Exhibit E**
**Transcript of Walker County Civil Service Board**
**Hearing dated 10/26/04**
**(Part IV)**

1       Q. All right. And when did you meet him?

2       A. I have to look at my records here. The

3 first time he --

4       Q. Let me, before you go any further, let me

5 ask you what kind of records do you have with you?

6       A. I just basically have the medical records

7 where he -- when he enters our jail if I spoke with him,

8 if he's on medication and if he brought any medication

9 with him, we list the medications, and if he saw the

10 doctor and was evaluated.

11       Q. Are these records kept by you yourself?

12       A. Yes. We have them at the Walker County

13 jail.

14       Q. Okay. So they're permanent records there?

15       A. Permanent records.

16       Q. What is the title of those records?

17       A. Medical records, medical charts.

18       Q. Do they have a name? If I was going to

19 subpoena those records, what would I --

20       A. Just medical records, just like with any

21 doctor's office.

22       Q. Pardon me.

23       A. Just like with any doctor's office, if you

24 were to subpoena the medical records.

25       Q. And how are they indexed, by name?

1      A.  Right, by their name and their -- I don't

2   know if I'm getting -- they're labeled in filing

3   cabinets by their last name.

4      Q.  By last name?

5      A.  Yes.

6      Q.  And they're kept on all inmates?

7      A.  Right.

8      Q.  Or guest we'll say --

9      A.  Yes.

10     Q.  -- to the Walker County jail.  Does that

11  include if a guest does not need any medical treatment

12  or has no pills, do you still make a record of it?

13     A.  We -- as opposed to me making a chart on

14  every inmate that comes through there, they have an

15  inmate, or a patient, you know, but if they come in,

16  they do a history on them, they ask them a series of

17  questions and then they determine if they need to see me

18  through the series of questions.

19     Q.  Who does the history?

20     A.  The booking officer.

21     Q.  The booking officer?

22     A.  Uh-huh.  They have a standard form.

23     Q.  Is that a matter of practice on every --

24     A.  Everyone.

25     Q.  -- every person --

1      A.  Every person.

2      Q.  -- inmate that comes in?

3      A.  (Witness nods head.)

4      Q.  And when is this booking history made?

5      A.  When they're brought into the jail.

6      Q.  When they're booked?  So that's part of the

7 booking process?

8      A.  Booking process.

9      Q.  What all is included in the booking process?

10      A.  I wouldn't be able to answer.  I'm not an

11 officer.

12      Q.  You just have knowledge concerning the

13 medical aspect of it?

14      A.  Right.

15      Q.  Do you have the record with you that was

16 made on the morning that Mr. Burch or Mr. Barron was

17 brought in?

18      A.  Just briefly looking just then, yes, I

19 have --

20      Q.  Can I see that, please?

21      A.  Here is a medical history for -- this is

22 dated on 4/2/03.

23      Q.  4/2/03?

24      A.  Yes.  I don't know if that's the date you're

25 looking for.

```
 1          Q.   What was the piece of paper that you just --
 2          A.   That's where I spoke with the patient on
 3     4/2/03.
 4          Q.   Now, this is a Tommy Barron.  Are we talking
 5     about April 3, 2003?
 6          A.   Uh-huh.
 7          Q.   Hold on to those for one second.  So this
 8     is -- is that the first time that you met Mr. Barron?
 9          A.   Right.
10          Q.   And was that at the Walker Regional -- I
11     mean was that at the Walker County jail?
12          A.   Right.
13          Q.   Do you have any records for February 16, the
14     morning of February 16?
15          A.   Yes, I do.
16          Q.   Do you have those with you?
17          A.   Yes.  I have a list of his medications and I
18     have an evaluation form where he seen the doctor.
19          Q.   Can I see that, please?
20          A.   Sure.  As opposed to his history booking
21     process, it's probably in his chart.  I don't have that,
22     but I can get access to it.
23          Q.   You didn't bring the chart for the last time
24     he was in jail, which would have been February 16?
25          A.   No.  This is all his chart that I have.
```

1    Q. That's everything on Mr. Barron?

2    A. Yes, that I have.

3    Q. Is that all the records that the Walker

4    County jail would have on Mr. Barron?

5    A. No. We would have log sheets that we put on

6    each individual cell, and we write on those log sheets

7    and those are kept in his permanent record. Their

8    record as opposed to my medical is totally different.

9    Q. Okay. So they have a permanent record and

10   you have a personal record?

11   A. Right.

12   Q. And what you've brought tonight is your

13   personal record?

14   A. Right.

15   Q. Now, and your testimony is that you made

16   this personal record on the morning of February 16?

17   A. Right. I spoke with him at -- approximately

18   I arrive at the jail at 5:30, so it could have been

19   anywhere between 5:30 and 5:45, but I had documented on

20   his log sheet.

21   Q. Okay. When you first came into contact with

22   Mr. -- we'll say Barron for your benefit. That morning

23   what kind of condition did you find him?

24   A. I was -- when I arrived at the jail, I was

25   met by several officers saying we have an inmate that

1  you need to see.

2       Q.  Who were those officers?

3       A.  I do recall one specifically was Sergeant

4  Kendrick, Chris Kendrick and Charlie Skalnik.

5       Q.  Charlie --

6       A.  Skalnik, S-k-a-l-n-i-k.  And they told me

7  that they had -- an inmate had come in in the middle of

8  the night and that he was pretty combative and could be

9  under the influence, and they had said, you know, we're

10  going to take you to him but just stand back and be

11  careful.

12       Q.  So that was at 5:30 when you arrived.  At

13  what time did you make contact with Mr. Barron?

14       A.  Approximately between arrival of 5:30 and no

15  later than 6:00, so within a 30 minute time frame.  The

16  booking cell that he was in was BK5.  There's four other

17  cells above him, and I just routinely check every inmate

18  and speak with them briefly.

19       Q.  What was the number of his cell?

20       A.  BK5.

21       Q.  So, as far as what order you saw him, was

22  he the first or the fifth or the sixth inmate that you

23  saw that morning?

24       A.  Actually I can't recall, you know, if he was

25  the first.  I do recall going to his cell pretty

1  promptly since they, you know, stated that I needed to

2  see him.  I don't know if there was any -- even if

3  anybody was in those other cells at the time.  There

4  could have been.

5         Q.  When you first saw him, what kind of

6  condition did you find him?

7         A.  When they opened the cell, they called for

8  him to come and speak to the nurse, and they said you

9  said you had routine medications and you need to tell

10 her.

11        Q.  Who said this?

12        A.  The officers.  I can't remember which one.

13        Q.  They were telling him this?

14        A.  Right.  And he was lying on his mattress.

15        Q.  So you went to his cell?

16        A.  Right.  And, of course, when I was there by

17 these officers, Officer Kendrick said, "He did have a

18 cast on when he came in but he's torn it off."

19        Q.  Kendrick said that?

20        A.  Right.  He had a previous injury to his hand

21 and he has taken it off.

22        Q.  Kendrick told you he had a previous injury

23 to his hand?

24        A.  Uh-huh, and he had taken it off.  When I,

25 you know, peered into the cell, he was lying there.  I

1    did see something in the floor.  It appeared to be some

2    type of debris.  I can't recall if it was casting

3    material or, you know, because it was not -- the cells

4    are dark, and he was in there.

5        Q.  Now, did he have any clothing on?

6        A.  Yes, a uniform.

7        Q.  He had the orange jail uniform?

8        A.  Right.

9        Q.  Was he asleep?

10       A.  He appeared to be asleep, and at first it

11   appeared that he didn't want to speak to me, just --

12       Q.  Why do you say that?

13       A.  He didn't -- they asked him to come talk

14   with me and he was --

15       Q.  Now, when you say "they," are you talking

16   about Kendrick and Skalnik?

17       A.  Yes.

18       Q.  Where were they located, where were they all

19   this time?

20       A.  There were several officers because they had

21   stated that he had been very argumentative and

22   combative.

23       Q.  I didn't ask you that.  I asked you where

24   they were.

25       A.  Right.  They were standing in front of me

1     holding the door and I was behind them.

2         Q. All right. But before they brought you to

3     his cell they told you to be careful?

4         A. Right.

5         Q. Now, did he appear to be combative or

6     aggressive or, you know, presenting any type of

7     aggressive behavior or combative while in your presence?

8         A. It did escalate after he came to the door

9     because I was not allowed to go into the cell.

10         Q. Now, you said it did not escalate.

11         A. It begin to escalate. After he got up and

12     came over and he was, you know, speaking about his

13     medications.

14         Q. Okay. Tell me what he said about his

15     medications.

16         A. He stated he was on numerous medications and

17     I questioned him what they were. He didn't know the

18     names of them. I asked him who his primary doctor was

19     and --

20         Q. Did he tell you his primary doctor?

21         A. Dr. Keating, I believe. I can't recall. I

22     want to say Dr. Keating.

23         Q. Did you already have his history? You had

24     his history in front of you, right?

25         A. Oh, no. I had -- no, not at that time.

1          Q.   When did you first see his history?

2          A.   When he came to the doctor and saw the

3     doctor.

4          Q.   Okay.  What's the purpose of making a

5     history when the inmate arrives if they don't give it to

6     the nurse and the nurse not have it when the nurse sees

7     the inmate?

8          A.   How can I best describe that to you.  We had

9     an inmate who I needed to speak with, and he could give

10    me the medical history to me.  I would question him

11    and --

12         Q.   But you don't have the medical history with

13    you when you visit the inmate?

14         A.   The questions are:  Are you conscious, are

15    you unconscious.  I can evaluate that as a nursing

16    professional.

17         Q.   Is that all the history is comprised of; are

18    you conscious or are you unconscious?

19         A.   Is the inmate conscious or unconscious or

20    does he have any medications with him.

21         Q.   So the history is written without the input

22    of the inmate?

23         A.   It's a standard medical screen that we have,

24    that most jails have, that we have developed.

25         Q.   So if the history is written prior to the

1    time that you made contact with the inmate and you don't

2    have the benefit of that history and the inmate is

3    unconscious by the time you get there, what do you do?

4         A.   It's basically that if they are unconscious

5    when they arrive there, when I get there and they are

6    conscious, then that history prior is useless to me.

7    That's why I ask my questions and find out, you know,

8    what medical --

9              (Short interruption.)

10        Q.   If the inmate is conscious and he's talking

11   to you, able to communicate, do you verify the

12   information on the history?

13        A.   Oh, yes.  I can look back to their standard

14   questions.  This is their standard questioning of the

15   jail.

16        Q.   But a non-medical person, from your

17   testimony, takes the history upon entry into the jail?

18        A.   Right.

19        Q.   A non-medical person?

20        A.   A booking officer.

21        Q.   Right.  A booking officer.  Do you have a

22   copy of the history?

23        A.   Sure.

24        Q.   You do?

25        A.   Yeah.  It's standard questions that the

1    inmate --

2          Q.   Is that his history?  Mr. Burch's history?

3          A.   It's 04/02.

4          Q.   4/2/03, okay.  But you don't have the one

5    for --

6          A.   Say yes or no type questions.

7          Q.   You don't have the one for February 16?

8          A.   It's in his chart.

9          Q.   Is there any particular reason you don't

10   have that one?

11         A.   No.

12         Q.   Is there any particular reason you brought

13   the history from April 3, 2003?

14         A.   If I have the medical history, I would place

15   them in the charts, but if I don't, if they're stapled

16   to their booking and it's placed in their main charts at

17   the jail.  If they don't have any medical problems, they

18   are not given to me if they don't have any medical

19   problems, but I usually get a copy of all of them.

20         Q.   Okay.  You can't testify what was written on

21   that history?

22         A.   I wouldn't testify on what was written on

23   that history.  I did my own history.  I did my own

24   questioning and evaluation.  I would not base my

25   knowledge and treatment of choice on anybody else's

1    opinion or yes or no question anyway.

2          Q.   Did you have an opportunity to review the

3    medical history that was taken on the morning of

4    February 16 before arriving here tonight?

5          A.   No.

6          Q.   Why not?  Why did you bring your personal

7    chart and not review the history that was written?

8          A.   I can only bring what I implemented and what

9    I have done.

10         Q.   Okay.

11         A.   I felt no need to look into his chart and

12   see what his charts are.

13         Q.   Did you verify that there was even a history

14   done?

15         A.   No.

16         Q.   So you really can't testify that there was a

17   history done on Mr. Burch the morning that he entered

18   the jail?

19         A.   No.

20              MR. WILLFORD:  Other than the one she took?

21         A.   Right.

22         Q.   Other than this document here?

23         A.   Right.

24         Q.   Now, you said the -- something began to

25   escalate.  Can you elaborate on that for the Board,

1    please?

2         A.   He kept repeating that he needed his routine

3    medication and he had to have them and just basically

4    raising of the voice.

5         Q.   Did he ever become combative or violent with

6    you?   Did he ever threaten you?

7         A.   I never allowed that to happen.

8         Q.   But did it happen?

9         A.   No.

10        Q.   Did you even feel -- did you feel threatened

11   in his presence?

12        A.   No.   I had several officers with me.

13        Q.   Was he -- did he appear to be upset because

14   he didn't have his medication?

15        A.   Right.

16        Q.   Would you characterize it as his being more

17   upset than combative?

18        A.   Really argumentative.

19        Q.   Now, how long did you spend with Mr. Barron?

20        A.   Roughly 10, 15 minutes, briefly.

21        Q.   I've got your record here and you made this

22   record while you were speaking with him?

23        A.   No.

24        Q.   When did you make this record?

25        A.   That's the doctor's.

```
1        Q.   This is the doctor's record?

2        A.   Right.

3        Q.   And this was made sometime later I take it?

4        A.   Right.  He did see the doctor that

5   afternoon.

6        Q.   What time?

7        A.   Approximately 5:00 or 5:30 maybe.  I'm

8   estimating, though.  I really can't be sure of the time

9   of the arrival of the doctor that night.

10       Q.   Do you know who it was?

11       A.   His records -- yes.  Dr. Vance.

12       Q.   Dr. Vance, Clifford Vance?

13       A.   Princeton ER.  The best records for the time

14  of the arrival of the doctor would be our central

15  control officer who allowed the officer in the jail.

16  They document the time.

17       Q.   The central patrol officer?

18       A.   Central control.

19       Q.   Oh, central control officer?

20       A.   Right.

21       Q.   He controls who gets in and out of the

22  jail?

23       A.   In and out.  Documents the time of arrival

24  and times that they leave.

25       Q.   So these are actually his records that he
```

1   made?

2          A.   Right.

3          Q.   You had nothing to do with taking the

4   information down on these records here?

5          A.   Well, I did speak with Mr. Barron.   That

6   morning he complained he was in pain, and he complained

7   about the thumb hurting, and so I had documented on that

8   sheet that he needed to see the doctor related to the

9   thumb.

10         Q.   Thumb?

11         A.   Pain.

12         Q.   Any other complaints other than thumb and

13  the lack of medication?

14         A.   Just stated that he needed his routine

15  medicines and that he had injured his thumb.

16         Q.   And where did you make those notations?

17         A.   It would be on the log sheet.

18         Q.   On his log sheet?

19         A.   Right.

20         Q.   So we have a third medical record for the

21  jail?

22         A.   No.   Actually if you read at the top there,

23  patient complains he has thumb pain.

24         Q.   So this is the note that you made?

25         A.   That's when his medications arrived.   His, I

1    believe, brother, I think, brought his routine

2    medication to him.  And then shortly he saw the doctor,

3    so I think the time should be on there.

4            Q.  Actually the time is 4:45.

5            A.  So he saw the doctor shortly after that.

6            Q.  Is this your signature here?  Do you want to

7    take a look at that?

8            A.  Yes, where it says nurse.

9            Q.  What is your first name?

10           A.  Sonya.

11           Q.  Is that your signature?

12           A.  Yeah.

13           Q.  How do you get Gold out of that?  It's about

14   as bad as my signature.

15           A.  Sorry.  I'm on call for the jail.

16               (Short interruption.)

17           Q.  So this record is the one that you made at

18   4:45 p.m., right?

19           A.  Right.

20           Q.  Do you have a record that you made at 5:30

21   a.m.?

22           A.  No, not with me, I do not.

23           Q.  Why not?

24           A.  The doctor --

25           Q.  Why didn't you bring that record?

1          A.   If I document anything, I would document on

2     his log sheet.

3          Q.   On the log sheet?

4          A.   Right.

5          Q.   Why didn't you bring the log sheet in?

6          A.   It's in his permanent record.

7          Q.   It's part of the permanent report?

8          A.   Right, like the officers' documents.

9          Q.   So we've got the log sheet, which is a

10    permanent record.  We have the history.  That's another

11    permanent record, right?

12         A.   Right.

13         Q.   History.  We've got your notes.  Why wasn't

14    this documented on the log sheet?

15         A.   Because the brother gave me the medication

16    and I went and documented on his chart by his

17    medications that I had listed.

18         Q.   We've got the nurse's notes and we've got

19    the physician notes from the time that Dr. Clifford --

20    what's his name?

21         A.   Vance.

22         Q.   So we have four separate medical records

23    that are made.  Is this on a normal basis?

24         A.   Four separate documentations.

25         Q.   Four separate documents, medical documents,

1    that are made when an inmate enters the jail, is that

2    correct, on a normal basis?

3        A.  No.  I mean, not on a normal basis.  I

4    couldn't say, I mean, basically when I evaluate a

5    patient I'll document on the notes right there, pen and

6    paper there, available, and we'll document on the log

7    sheet what I'm observing or seeing or speaking with

8    them.  I would not take, you know, the time to go pull

9    their chart and document in their medical chart at that

10   particular time.  I may make a quick note at the door.

11        Q.  Do you recall what you logged and what you

12   placed on his log sheet for that morning?

13        A.  I don't recall, no, what I had documented.

14   Probably -- I can't recall.  I would have to just see

15   it.

16        Q.  You don't recall?

17        A.  Right.  I had already scheduled for that

18   resident to follow up with a primary doctor since we

19   were unable to find out the medications or we were

20   unable to find out the list of medications or the

21   primary doctor, or any information I could go on, so I

22   knew that in less than eight hours a doctor would be

23   available and we could get him some care, that he could

24   write some scripts and get the medication.

25        Q.  So when you first saw him that morning, he

1   didn't tell you what medications he needed?

2        A.   It wasn't -- just high blood pressure pills

3   and statements like that, didn't know the names of them,

4   because our primary doctor is Dr. Keating, and I

5   referred to him as Mark Keating then slurred speech

6   Martha Keating, and we don't have a Martha Keating.

7        Q.   Now let me ask you this:  At the time you

8   interviewed him that morning, he told you that he was on

9   some medications that he didn't have; is that correct?

10       A.   Uh-huh.

11       Q.   Did he ask you to call his wife or his

12  brother to get medications over there for him, do you

13  recall him asking you that?

14       A.   I don't recall him asking me for, you know,

15  any type of, you know, information.  I'll try to, you

16  know, get any information I can to go on to get the

17  routine medication.

18       Q.   Did he tell you that he needed those

19  medications right away?

20       A.   He just stated that he was on routine

21  medications, not that they were warning medications,

22  that he just basically had routine medicines.

23       Q.   Did he tell you that he had had a heart

24  attack and he was on heart medication, blood pressure

25  medication, any of those?

1         A.   I don't recall.

2         Q.   But he did tell you, though, that he was on

3  some medication?

4         A.   Right.

5         Q.   Did you call his wife to ask her what kind

6  of medication is your husband taking because he doesn't

7  know the names, did you do that?

8         A.   No.

9         MR. WILLFORD:  Charlie, I'm going to -- what

10      does this got to do with Deputy Ingle?

11        THE COURT:   I'm not sure.

12        MR. PIAZZA:   I'm --

13        THE COURT:   He is just trying to inquire

14      about what record they have and how they

15      interrelate, I think.

16        MR. WILLFORD:  It doesn't seem to have

17      anything to do with what Deputy Ingle did or did

18      not do or whether he should be terminated.

19        MR. PIAZZA:  I'm going to get to that.

20         Q.   Did you ask his wife about -- you didn't

21  call his wife about --

22         A.   No.

23         Q.   Did he tell you that his middle finger on

24  his right hand had been broken or injured?

25         A.   He said his thumb -- the thumb was hurt on

1   his hand.

2       Q.  He said the thumb.  Is that the only finger

3   me mentioned?

4       A.  It's the only finger that I looked at and

5   documented.

6       Q.  Okay.  Did he relate to you or -- relate to

7   you his experience on being arrested and brought over to

8   the jail by Deputy Ingle?

9       A.  No.  There was no, you know, discussion of

10  how the injury occurred.

11      Q.  There was no discussion of how the injury

12  occurred?

13      A.  Right.

14      Q.  Did you ask him how the thumb injury

15  occurred?

16      A.  No, he didn't tell me how it occurred.

17      Q.  He just told you he had a thumb injury?

18      A.  He said his thumb was sore.

19      Q.  Pardon me?

20      A.  He said his thumb was hurting, his thumb was

21  sore.

22      Q.  Did you notice any bruises or marks on Mr.

23  Barron?

24      A.  No, none that I know of.  I mean, he's

25  inside a cell.  I'm two or three people from him.

Q.   Okay.   You didn't physically examine his hand?

A.   He held it out and I looked.

Q.   Did you touch it?

A.   I can't recall.

Q.   Did you touch his hand like this and feel it for tenderness or anything like that?

MR. WILLFORD:   I think she just testified you can't recall.

Q.   Do you recall touching his hand?

A.   I can't recall.   I mean, I was warned that this inmate could harm me.

Q.   You were warned that he could harm you?

A.   In -- not in those exact words.   That he had been yelling, cursing, hitting the walls, basically since he got there and --

Q.   I understand.

A.   -- being argumentative.

Q.   I understand.   But he didn't exhibit any of that activity in front of you, did he?

A.   Not whenever I was in there.

Q.   Okay.   Can you read Dr. Vance's writing?

A.   I will try.

Q.   Are you familiar with his writing?

A.   Yes.

1    Q.  I'm going to ask you if you can interpret

2 some of that for us.  If you would just read through it.

3    A.  "The chief complaint," and it says in the

4 offset, "Friday broke right thumb.  Had cast on.

5 Removed cast himself, and complains of right thumb

6 pain."  And then as below, the doctor has -- that was my

7 documentation of why he was there seeing the doctor, and

8 as below --

9    Q.  So what you're saying is that was your note?

10    A.  Right.

11    Q.  Your handwritten note?

12    A.  Right.

13    Q.  On that form?

14    A.  Right.

15    Q.  That's a copy isn't it?

16    A.  Copy of?

17    Q.  Of the original.  You don't have the

18 original?

19    A.  This is the original.

20    Q.  That's the original form?

21    A.  Right.

22    Q.  Can I see that?

23    A.  (Witness complies.)

24    Q.  Show me where your writing is.

25    A.  (Witness complies.)

Q.  Up here, okay.

A.  The doctor has written, "Has a swollen right middle finger, zero recollection of how this happened." It has his blood pressure.  And, of course, I listed his routine medications that his brother brought to him. And he's wrote, increased edema.  Ecchymosis, which is bruising.  Increase middle -- I'm not for sure -- I think it says finger.  And it says, "Vascular intact," and basically he ordered an x-ray and something for pain, but since the patient was currently taking pain medications, they were held, the pain medications prescribed were held.  Prescribed Darvon, and he was currently taking Darvocet, which Darvocet is Darvon with Tylenol.

Q.  It says that an x-ray was ordered?

A.  Right.

Q.  By Dr. Vance?

A.  Right.

Q.  Do you have the results of that x-ray?

A.  X-rays would be obtained in the morning.  We have a company that we retain x-rays who was scheduled for an x-ray, and we send all x-rays at 10:00 a.m.

Q.  Where would he have -- how would that process occur, how would that happen with him being an inmate to go take an x-ray?

1        A.  We transport them to Family Health

2  Associates.

3        Q.  Where is that located?

4        A.  Here in Jasper.

5        Q.  Do you have any indication or notes or

6  records that he was, in fact, transferred to have an

7  x-ray?

8        A.  No.  It's just standard when an x-ray is

9  ordered the night, the morning of we take them and get

10  their x-rays.

11        Q.  All right.  Do you know when Mr. Barron was

12  released?

13        A.  He was released before he was taken.

14        Q.  So he never did go get the x-ray, but an

15  x-ray was ordered?

16        A.  Right.

17        Q.  Now before -- when did you receive your

18  subpoena to come to this hearing?

19        A.  The first one?

20        Q.  Yes, ma'am.

21        A.  Let's see here.  The first one here is July

22  12, but the date on it is 2002.  We assumed that was a

23  typing error.

24        Q.  You received a second subpoena?

25        A.  Actually it's not really a subpoena.  It's

just a letter stating that the hearing would be continued.

Q. All right. Now, after you received the subpoena and the notice to come -- that the hearing was going to be continued, had you discussed this matter with anyone?

A. I didn't feel a need to discuss this situation with anyone. As opposed to the attorney has asked me --

MR. WILLFORD: I'm going to instruct you not to discuss what we talked about.

Q. Other than the county attorney, have you discussed the case with anyone else?

A. No, not that I'm aware of, no.

Q. Have you discussed the case with Deputy Ingle?

A. No. I haven't met him until actually tonight when I passed him in the hallway.

Q. And how long have you been a nurse there at the jail?

A. Six years.

Q. And you've never met Deputy Ingle?

A. No. He's a road deputy. They're not someone I have contact with.

MR. PIAZZA: That's all the questions I

have.

CROSS-EXAMINATION

BY MR. WILLFORD:

Q. Nurse Gold, did Mr. Barron appear to be intoxicated to you when you saw him that morning on the 16th?

A. He didn't appear to be under the influence; slurred speech, unsteady gait.

Q. And you testified that the jailers had told you he had been combative?

A. Yes. Really yelled and banged his head and hit the walls.

Q. Hit the walls with what?

A. I didn't --

Q. Did they say punch the walls by any chance?

A. For what I was told that he really was irate and argumentative.

Q. Did you see any markings on his hands that would be indicative of someone who had been striking a hard surface?

A. When I appeared to look at his thumb, I did see some swelling and bruising.

Q. That would be indicative of somebody hitting something hard?

A. Could be.

Q. I think you covered the treatment. He didn't tell you anything about that middle finger on his left -- I'm sorry, right hand?

A. No.

Q. Do you still have that medical record from Dr. Vance? You said something in there that kind of peaked my interest. I want to make sure that I understood it. This part right here (indicating). What is this part right here?

A. "Basically no recollection of how this happened."

Q. Of how his middle finger was injured?

A. Right. It has broken right middle finger.

Q. And the date on this record is the 16th of '04, correct, February 16?

A. Right.

Q. I think this examination occurred at 4:45 on the 16th?

A. Approximately after that. I was with his brother at 4:45.

Q. So, right around 12 hours after you first saw him, roughly, he saw Dr. Vance?

A. (Witness nods head.)

Q. On the same day that this injury supposedly occurred, correct?

1      A.  Right.

2      Q.  And he had no recollection of how the injury

3  occurred 12 hours later?

4      A.  That's what's documented by the doctor.

5      MR. WILLFORD:   I have no further

6  questions.

7      THE COURT:   Any redirect?

8      MR. PIAZZA:   There is one thing that kind

9  of peaked my interest on that too.

10             REDIRECT EXAMINATION

11 BY MR. PIAZZA:

12     Q.  You mentioned you couldn't read what was the

13 third finger --

14     A.  I assume it's finger, looks like x-ray

15 finger.

16     Q.  I think you said that increased -- what is

17 this word here?

18     A.  Range of motion.

19     Q.  What does that mean?

20     A.  Decrease range of motion.

21     Q.  Decrease range of motion.  What is this

22 word?

23     A.  Edema, which is swelling.

24     Q.  What's this word?

25     A.  Ecchymosis, which is bruising.

1    Q.  So he had bruising, decreased range of
2 motion on his right middle finger.  What is this word
3 right here?

4    A.  Vascular intact, but I don't recall why this
5 word is written there, basically he has had blood flow.

6    Q.  Okay.  And these are all the records you
7 have concerning this particular visit to the jail?

8    A.  Right.

9    MR. PIAZZA:  Do you have any objection to --

10   MR. WILLFORD:  Well, those are originals.
11 What we're going to have to do is get copies.
12 Those are going to have to go back in her files,
13 the originals.

14   I'm not sure logistically, Charlie, how we
15 do that.

16   THE WITNESS:  Well, first of all they have
17 not been subpoenaed, those records.

18   MR. WILLFORD:  That sort of goes to my
19 question about getting some kind of a medical
20 release from your client.  I don't think this Board
21 frankly has the authority to subpoena those
22 records.

23   MR. PIAZZA:  I would like at least for the
24 Board to view these while they're here tonight, and
25 she's certainly welcome to take them back.

1   MR. WILLFORD:  If Mr. Burch, the patient,

2   has no objection, I have no objection.

3   THE COURT:  I think it would be

4   appropriate since they've been testified to.

5   MR. PIAZZA:  I do too.

6   THE COURT:  It would be meaningful for the

7   Board to look at them.  Mr. Burch, and you as

8   counsel, if y'all don't object to it, then

9   certainly --

10   MR. PIAZZA:  Do you object?

11   MR. BURCH:  No.

12   MR. PIAZZA:  Before I show them to the

13   Board --

14   MR. BURCH:  They need to get to that

15   evidence so go get it.

16   THE WITNESS:  You have no problem with them

17   viewing your medical records?

18   MR. BURCH:  I have no problem.

19   Q.  (By Mr. Piazza)  When did you write your

20   note at the top of this record here?  When did you write

21   this note?  It's obviously a different handwriting.

22   A.  I usually arrive at the jail an hour or so

23   before the doctor arrives to pull charts and get all

24   the --

25   Q.  So you wrote this before the doctor made his

1   notes on the bottom of it?

2       A.  Right.  I had documented it and explained

3   the thumb and that he needed to see him on that, and so

4   he usually keeps a little note pad in a pocket to

5   document what he needs to see and why as I go through

6   it.

7       Q.  It's is your testimony then -- and what's

8   this initial here on the left-hand corner?

9       A.  He's a male, white.

10       Q.  And it's your testimony that you made your

11   handwritten note on this form before the doctor put his

12   notes on here; is that correct?

13       A.  That's correct.

14       Q.  I'll tell you if this is -- and I'm not

15   trying to be argumentative.  I just want you to be sure

16   of what your testifying to, okay.  That this is

17   obviously an original, your writing?

18       A.  Uh-huh.

19       Q.  It appears to me, and I don't know about

20   your attorney, but it appears to me that this is a

21   Xeroxed copy of the doctor's notes.  Is it possible?

22       A.  He has a different ink pen than mine, but

23   it's a Xerox copy, no.

24       Q.  So it's impossible that this could be a

25   Xerox copy and that you would have added your notes at a

```
1    later time after the doctor makes his --

2         A.   That's falsifying information, and that's

3    why I'm watching because these are my medical records.

4         Q.   Right.   This is obviously an original.   I

5    still don't understand how you get Gold, and I'm not

6    trying to be argumentative.   I can't get Gold out of

7    that as hard as I try, but I'm not going to argue with

8    you because I've got a terrible signature too.   But

9    thank you.

10              THE COURT:   Ms. Gold, as soon as you can

11   get your records back you'll be excused, and let's let

12   the Board peruse them just a minute and then we're going

13   to recess.

14              (Short recess.)

15              THE COURT:   This is a question by Morris

16   Studdard of Nurse Gold.

17              BOARD MEMBER STUDDARD:   Where I work we do

18   this a lot; we've got an original form, we may take that

19   and put it in the Xerox and run 25 more off.   Is that

20   the way that's reproduced?

21              THE WITNESS:   Yes.

22              BOARD MEMBER STUDDARD:   I mean, it's not

23   just a form that's ordered in?

24              THE WITNESS:   No, that would be --

25              BOARD MEMBER STUDDARD:   You just keep
```

1   reproducing them?

2         THE WITNESS:  Right.  We have one and Xerox

3   a hundred off of that one.

4         THE COURT:   But that would be the blank

5   form?

6         BOARD MEMBER STUDDARD:   Yes, just the blank

7   form itself?

8         THE WITNESS:  Yes.

9         THE COURT:   Now we have a question by Mr.

10  Andrew Archie.

11       BOARD MEMBER ARCHIE:  Still on the form, I

12  think you testified that you wrote your information

13  first?

14       THE WITNESS:  Right.

15       BOARD MEMBER ARCHIE:  Then he come back and

16  put this in the document?

17       THE WITNESS:  Right.  The darker

18  handwriting, which is the doctor's.  I have wrote the

19  medication though.

20       THE COURT:   Anything else?  Board, do you

21  have anything?  David?

22       BOARD MEMBER KELLY:  I don't have anything.

23       MR. PIAZZA:   Let me see that form for one

24  second.

25       THE COURT:   Anything else for Nurse Gold

 1  before she's dismissed?

 2              MR. WILLFORD:  No, sir.

 3              MR. PIAZZA:  Is there any way I can get a

 4  copy of those before she leaves?

 5              SHERIFF TIREY:  Not without a subpoena.

 6              THE WITNESS:  When I receive the subpoena,

 7  I'll be glad to make you copies.

 8              SHERIFF TIREY:  I have to be ugly but

 9  there's a federal judge that carries a little more

10  weight than all this and that's why they're separate

11  medical records.  I can explain that to y'all, but I

12  want a subpoena.

13              THE COURT:  Even though he's your client

14  and he's sitting here wanting that, that would still

15  have to go through that procedure from what I

16  understand.

17              We're obviously not going to be able to

18  finish.  We've got some folks tonight under some time

19  constraints.

20              You can close the record and be excused, and

21  we're just going to talk about reconvening.

22

23

24

25

```
                    C E R T I F I C A T E

STATE OF ALABAMA      )

WALKER COUNTY         )

     I hereby certify that the above and foregoing

proceeding was taken down by me by stenographic means,

and that the questions and answers therein were produced

in transcript form by computer aid, and that the

foregoing represents a true and correct transcript of

the proceedings occurring on said date.

     I further certify that I am not of counsel, nor

related to any of the parties to this action; nor am I

in anywise interested in the result of said cause.


                    _____

                         RHONDA G.  WOODS


Notary Public, State of Alabama at Large

My commission expires December 21, 2008.
```