FILED

2008 Jul-28  PM 05:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit I
# Transcript of Walker County Civil Service Board
# Hearing dated 12/6/04
# (Part I)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CIVIL SERVICE BOARD

OF WALKER COUNTY

GRIEVANCE HEARING

DECEMBER 6, 2004

REGARDING TAZ DAY BURCH

A.K.A. TOMMY BARRON


HEARING BEFORE

CHARLES STEPHENS, SR.


APPEARANCES

REPRESENTING THE HIRING AUTHORITY:

    HANK WILEY

    GARY WILLFORD

REPRESENTING THE GRIEVANT:

    ANTHONY J. PIAZZA

BOARD MEMBERS:

    ANDREW ARCHIE, Chairman

    DAVID KELLY

    ELLIS NICKLAUS

    MORRIS STUDDARD, JR.

    DOYLE CUMMINGS


    SHARON TUCKER, CLERK

REPORTED BY:   Rhonda G. Woods, CSR

Certificate No. AL-CSR-228

I N D E X

PAGE

WITNESSES:

CHRISTOPHER DALE KENDRICK

Direct by Mr. Piazza                    8, 28

Cross by Mr. Willford                 14, 28

PATRICIA WILKERSON BARRON

Direct by Mr. Piazza                   36, 88

Cross by Mr. Willford                       71

ALAN GENE BARRON

Direct by Mr. Piazza          102, 124, 126

Cross by Mr. Willford              118, 125

LONNY DEVITO

Direct by Piazza                   126, 137

Cross by Mr. Willford                   135


CERTIFICATE                          141

<u>December 6, 2004</u>

THE COURT:    Today is December 6, 2004.
We're reconvening for the purpose of continuing the
hearing on the complaint of Taz Burch.

And a couple of preliminary matters before
we actually get on the record with testimony.  Mr.
Piazza, you had subpoenaed some -- or requested subpoena
of some documents.  We have a response.  Where is that
information, Sharon?  And I think that the best I can
tell, I haven't looked at it, but from talking with
Sharon, it appears that we've got a response from
everyone except the City of Carbon Hill.  We did not get
any records from them.  She called them today and
they --

MS. SHARON TUCKER:  This is the Civil
Service Board and this is from the Sheriff's Department.
Did Trent have his from the jail or was it --

SHERIFF TIREY:  It's all combined.  The only
thing on that that I would like for y'all to do on the
record -- I mean, is he wanting to carry that policy
manual with him?  I don't have any problem of
reproducing it.

THE COURT:    Well, what we'll do is let
him look at it and any parts he wants out of it -- it
looks like you might need to reproduce it anyway.  Go

1  out to UPS or whatever it is out there and they will

2  duplicate it pretty -- or you might do it in the office.

3           MR. PIAZZA:    I would like it all produced

4  if that's possible.

5           SHERIFF TIREY:  We copied the other.  I

6  don't have any problem with it, but that document is a

7  policy manual.

8           MR. PIAZZA:    This is a copy here?

9           SHERIFF TIREY:  As far as I know.

10          MR. PIAZZA:    How about this, is this a

11  copy also?  No, these look --

12          THE COURT:    This is from the Civil

13  Service Board.  Those are copies.

14          MR. PIAZZA:    Okay.  So that's a copy.  I

15  can keep that.  So the only thing in question would be

16  this here, right, the policy manual, policies and

17  procedures?  And you can make a copy of that if I need

18  one?

19          SHERIFF TIREY:  Somebody can.  If we do it,

20  it's going to be pretty expensive, because I'm going to

21  charge somebody for my hired help and the copying fee.

22          THE COURT:    What we've started doing in

23  our office, any time we have to reproduce a volume of

24  material like that, we just send it out to UPS and they

25  do it for us a lot cheaper than we can do it in our own

1  office.

2          Gary, have you had an opportunity to look at

3  any of the subpoenaed material that's just been --

4          MR. WILLFORD:   No, sir, I haven't, but I'm

5  familiar with the Sheriff -- I saw something with Ingle,

6  D on it that I would like to look at.

7          THE COURT:    We're just talking in general

8  terms.  Why don't we, at least so the record won't be

9  completely devoid of any descriptive information, Sharon

10 what is this in the Manila folder that looks like it may

11 have come from the Sheriff's Department?

12          MS. SHARON TUCKER:  I didn't look at that.

13          MR. WILLFORD:  Do you know what this is,

14 Sheriff?

15          SHERIFF TIRE:  Yes, sir.

16          THE COURT:    Is that his personnel file?

17          SHERIFF TIREY:   Basically his personnel

18 file with application, schooling.  I don't know.  They

19 asked for everything in the world, but everything that

20 we had that we complied with it.

21          THE COURT:    Let's keep it intact and as

22 soon as Mr. Willford has an opportunity to look at it,

23 what we'll do is identify it as one exhibit.   I'm

24 assuming -- since we've been talking about it, it's not

25 necessarily going to be in evidence but we'll at least

1    identify it so the record will know what we've been

2    talking about. And that will be the personnel file of

3    Mr. Derane Ingle, and it's all contained in one Manila

4    folder, and we'll just mark that as an exhibit.

5              MR. WILLFORD:    Deputy Ingle raised a

6    concern about his Social Security number, date of birth,

7    and some other information that could be used as far as

8    identity theft. Can we redact those from these records?

9              THE COURT:    I certainly think that would

10   be appropriate. Any problem with that?

11             MR. PIAZZA:    I wouldn't have a problem

12   with that. I think the law allows at least the last

13   four, I mean, and there is no violation, from what I

14   understand, of divulging the last four.

15             MR. WILLFORD:    We have a N.C.I.C. check in

16   here that I don't think would be appropriate for an

17   administrative hearing like this to release. This is

18   for criminal justice use only.

19             MR. PIAZZA:    Can I suggest that we take

20   about a half hour, 45 minutes, and go over all this, see

21   if he has any objections, see if I want to introduce it,

22   and have you decide before we put this in front of the

23   Board?

24             THE COURT:    Sure, that would be

25   appropriate to do that.

```
 1              MR. PIAZZA:    That would give him and me a
 2    chance to talk about it.
 3              THE COURT:    I think that would be fair
 4    and appropriate.  Let's just take whatever time to look
 5    through it and neither of you had an opportunity to see
 6    it before so that will be good.
 7              (Short break.)
 8              THE COURT:    We'll go ahead and there is
 9    going to be a gap in the tape and in the stenographer's
10    notes, and basically what we've been doing is reviewing
11    the discovery material, and we'll go ahead now and
12    commence with the taking of testimony.
13              Mr. Piazza, you still have the case.
14              MR. WILLFORD:    Excuse me just for a minute.
15    Were we going to take Officer Kendrick out of order,
16    because we're getting close to -- actually I think we're
17    right at 6:30.
18              MR. PIAZZA:    Okay.  Why don't we take
19    him?
20              THE COURT:    That will be fine.  For the
21    Board, what we're doing, we have a witness that was
22    scheduled to testify tonight by the Hiring Authority.
23    He has another scheduled appointment, so they're going
24    to take him out of order.  So that will be just for your
25    information.  And once he's testified, of course, he'll
```

1    be excused, and then Mr. Piazza will continue with his

2    witnesses.

3                    CHRISTOPHER DALE KENDRICK

4          called on behalf of the Hiring Authority, having

5    been duly sworn by the Judge, was examined and testified

6    as follows:

7                      DIRECT EXAMINATION

8    BY MR. WILLFORD:

9          Q.   Please state your name for the record, sir.

10         A.   Christopher Dale Kendrick.

11         Q.   How are you employed?

12         A.   At the Walker County Sheriff's Department

13   under sergeant on third shift.

14         Q.   Third shift of the jail?

15         A.   Yes.

16         Q.   On February 16 of this year, were you

17   employed in that capacity as well?

18         A.   Yes, sir.

19         Q.   At approximately 2:00 o'clock in the

20   morning, did you have you opportunity to come into

21   contact with the complainant in this case, Mr. Taz

22   Burch?

23         A.   Yes.

24         Q.   Would you please tell the Board how it was

25   that you came into contact with Mr. Burch?

A.   Deputy Ingle had brought him in and I think it was D.V.A.  He was intoxicated, and we were booking him.  He was very unruly with us, and we had to put him in a cell.  He wouldn't give us no information.  That's why we had to put him in the cell.

Q.   Would you please describe the specifics of how it was that he didn't give you any information?

A.   He was threatening Deputy Ingle from the time he walked through the door until Deputy Ingle left. We asked him Social Security number, date of birth, things of that nature, and he would not give us no information at all.  And I told him, I said, "You can't get out of jail until we get this information."  And he told Ms. Chapman, which was booking him, "I want my G.D. lawyer up here."  So at that point I told him -- I popped the door and I said, "You need to come over here and come in this cell."  And I went over there to open the door, and he turned around and waved to me as to walk out of the jail and under his breath he mumbled he was leaving.  At that point I had to get him and put him in the cell, and when I put him in the cell, there was a chair in the cell and I had to get the chair out.  So I told him, "When I get back from getting this chair out of here, you need to have your clothes off."  So I got the chair out and went and got --

1          MR. PIAZZA: I'm going to object to his

2    further narrative.

3          THE COURT: Just respond to his questions

4    and he'll give you an opportunity to say what you

5    feel like you need to say. Why don't you just

6    listen to him and let him ask you some questions.

7       A. Okay.

8       Q. I think it was pretty good testimony. You

9  were attempting to get him into prison uniform, is that

10  correct, or jail uniform?

11       A. Yes.

12       Q. And you told him he needed to go ahead and

13  take his clothes off; is that correct?

14       A. Yes.

15         MR. PIAZZA: Object to leading.

16         MR. WILLFORD: I'm just recapping where we

17   were.

18       Q. Did he comply with your instructions to get

19  undressed?

20       A. No.

21       Q. When you returned to the cell, was he still

22  clothed?

23       A. Yes, sir.

24       Q. What did you do at that point in time?

25       A. I took his shirt, his pants, and his shoes

1    from him.

2         Q.   And did you provide him with any other

3    clothing?

4         A.   Yes, sir, I did.   I give him a uniform.

5         Q.   Did you notice anything physically wrong

6    with Mr. Burch that evening?

7         A.   I noticed he had a cast on his arm.

8         Q.   Do you recall which arm it was?

9         A.   I believe it was the right.

10        Q.   Will you please describe that cast to the

11   members of the Board?

12        A.   It was a cast as if you had went to the

13   doctor and had a cast put on it, and it was cut in two

14   or three ways down it, like it had be taken off, and

15   then there was an ace bandage wrapped around it as if,

16        you know, I shouldn't have took this off, I better put

17        it back on.

18             MR. PIAZZA:    I'm going to object to his --

19             THE COURT:    Sustained.

20        Q.   There was a cast in pieces with an ace

21        bandage holding it together; is that fair?

22        A.   Yes, sir.

23        Q.   What happened with that cast that evening?

24        A.   Well, when I took his shirt off, the sleeve

25   of the shirt caught the bottom of the cast about the

1　　elbow and it come off his arm and it hit in the floor.

2　　　　　Q.　At any time while Mr. Burch and Deputy Ingle

3　　were in your presence, did you see Deputy Ingle strike

4　　Mr. Burch?

5　　　　　A.　No, sir.

6　　　　　Q.　At any time while the two men were in your

7　　presence, did you hear Deputy Ingle threaten Mr. Burch

8　　　　　A.　No, sir.

9　　　　　Q.　Did you hear Mr. Burch threaten Mr. Ingle?

10　　　　　A.　Yes, sir.

11　　　　　Q.　What did he threaten him with?

12　　　　　A.　He told him, I'll get you, I'll get you back

13　　for this, the usual.

14　　　　　Q.　Did Mr. Burch tell you what was wrong with

15　　his arm that would require him to have a cast?

16　　　　　A.　No, sir.

17　　　　　Q.　Did he make any complaints about Deputy

18　　Ingle doing anything to him?

19　　　　　A.　No, sir.

20　　　　　Q.　At some point you got Mr. Burch into the

21　　jail uniform; is that correct?

22　　　　　A.　No, sir, he never did get into the jail

23　　uniform.

24　　　　　Q.　Did he remain in the cell where you had

25　　asked him to take off his clothes?

```
 1          A.   Yes.

 2          Q.   Did you provide him with a jail uniform?

 3          A.   Yes, sir.

 4          Q.   What did he do with that uniform?

 5          A.   He tore it up like a sheet and laid it in

 6   the floor and sat on it.  He never would put the uniform

 7   on.

 8          Q.   Did he remain in that cell for the rest of

 9   the evening?

10          A.   Yes, sir.

11          Q.   Did you have any other cause to have any

12   contact with Mr. Burch that evening?

13          A.   Well, he was beating his head on the wall

14   from side to side and I had to go in there and tell him,

15   "Look, if you don't stop, I'm going to put you in a

16   chair."

17          Q.   Did he comply?

18          A.   Somewhat.  It wasn't, you know as bad.  He

19   was still kicking the door and stuff like that, but it

20   wasn't as bad as what it was to begin with.

21          Q.   Did you ever see him strike anything with

22   the hand that was in the cast?

23          A.   No.

24          MR. WILLFORD:   No further questions.

25
```

<u>CROSS-EXAMINATION</u>

<u>BY MR. PIAZZA</u>:

     Q.  Mr. Kendrick, how long would you judge the time period in which you were in contact with Mr. Burch?

     A.  2:00 o'clock to 7:00 o'clock.  Whenever he come in to 7:00 o'clock, when I left work.

     Q.  So that was some five-hour period?

     A.  Yes.

     Q.  Is that what your testimony is?

     A.  Somewhat.  Whenever he come in until 7:00 o'clock that morning.

     Q.  You had ample opportunity to observe him; is that correct?

     A.  Yes.

     Q.  And you observed that there was a bandage on his right arm?

     A.  No, sir, there wasn't a bandage.  There was a cast on his arm.

     Q.  A cast?

     A.  A cast with an ace bandage wrapped around it.

     Q.  And you testified that that cast came off at some point in time when you were trying to get clothing on him; is that correct?

     A.  That's correct.

Q. And I believe it was your testimony, correct me if I'm wrong, I thought you said that he actually did put the jail uniform on?

A. No, he did not. You're wrong I did not say that.

Q. Was your testimony that the cast came off while he was removing clothes or while you were removing his clothes?

A. When I took his shirt off, the sleeve caught the back of the cast and pulled the cast off of his arm. He never did put the uniform on, because he tore it up immediately and laid it out in the floor like a sheet.

Q. Did he ever put on a uniform, jail uniform?

A. He didn't while I was there.

Q. So for five hours --

A. I give him one and he tore it up. Obviously I'm not going to give him another one and let him tear another one up.

Q. For five hours, your testimony is, he did not have a uniform on?

A. No.

Q. What clothing did he have on in his cell?

A. He had on his underwear.

Q. He on his underwear.

A. And socks.

1      Q.   And where was his other clothing?

2      A.   They were sitting outside the door there.

3      Q.   Did he have access to that clothing?

4      A.   No.

5      Q.   And was there -- what kind of a cell was

6   this?

7      A.   It was our detox.

8      Q.   A detox, okay.  So it was your impression --

9   who made the decision to put him in the detox there?

10     A.   I did.

11     Q.   What basis did you make that decision?

12     A.   Because he was threatening officers.  He was

13  uncooperative.  He wouldn't do what he was told.  I put

14  him in there, which is standard procedure when a man is

15  intoxicated to put him in there.  There was no mat and

16  no blanket given because he was threatening.  I didn't

17  know what he was going to do.  If he ain't got nothing,

18  he can't do nothing.  He can't hurt himself or anybody

19  else.

20     Q.   What was the temperature in that cell?

21     A.   I don't know.  I didn't know about the

22  temperature in there.

23     Q.   Was it a heated cell?

24     A.   It was detox.  Whatever it is in there.  I

25  don't know that.

1          Q.  How long have you worked there?

2          A.  Four years.

3          Q.  You don't know the temperature in that cell?

4          A.  No.  I never seen fit to see.

5          Q.  Is it within the heating area of the jail --

6 the heated area of the jail?

7          A.  I'm sure.  The whole facility is heated.

8 It's got to be of some temperature.

9          Q.  Was he allowed to make a telephone call?

10         A.  No, sir, he wasn't, because the booking

11 process was not completed and they do not get to call

12 until the booking process is completed.

13         Q.  At what time did you -- did you do the --

14 who did the medical screening?  Was that you?  It says

15 duty book officer; is that you?

16         A.  I don't remember doing that.

17         Q.  Do you remember doing a medical screening?

18         A.  If my name is not on the -- C. Kendrick, it

19 wasn't me that done it.  And the best of my knowledge,

20 it was not done and it was not booked in on our shift

21 because he would not give us any information at all.

22         Q.  Well, let me ask you this:  What do you

23 consider being booked in?  Would medical screening be

24 part of that booking process?

25         A.  Yes.

1          Q.   Okay.   Now, I'm going to show you a medical

2    screening that took place apparently at 2:16 in the

3    morning or 2:28 in the morning, and it's got booking

4    officer, Duty, I think that's what it says; is that

5    correct?

6          A.   That's Darty.

7          Q.   Darty?

8          A.   And that's 10:37 in the morning.  What we

9    did is we had had him several times, and we just booked

10   him on the information we had.  We could not update our

11   information.  If you'll look right there, that is J.

12   Darty, and he did this medical screen at 10:37 in the

13   morning.

14         Q.   What about this time up here?

15         A.   That's when it was printed.

16         Q.   Okay.  So it was printed out at 2:20 a.m.

17         A.   Yes.

18         Q.   But the actual screening wasn't done until

19   10:00 o'clock?

20         A.   That's right.  On our screen -- our first

21   screen in the booking process is name, address, Social

22   Security number.  We could not get past that part.  If a

23   man can't give me his Social Security number, he sure

24   ain't going to tell me nothing else.

25         Q.   So it's your testimony --

1    A.   And when he goes to cussing my officers to

2    begin with, it's over.   He's going in the tank.

3    Q.   So it's your testimony with the information

4    that you pulled up on the screen, when he originally got

5    to the jail, you could not book him with that

6    information, even though he had been in the jail before

7    and had been booked before and all of you knew him?

8    A.   I don't know him.   There's people that's

9    been in that jail four or five or six times that I've

10   never seen before.

11   Q.   Well, let me ask you this --

12   A.   This was the first time to my knowledge

13   since I've been at the Walker County jail that this man

14   has been in.

15   Q.   Would you please answer my questions?   Who

16   pulled this information up on the computer at 2:16 a.m.

17   or 2:28 a.m.?

18   A.   That would probably be Ms. Chapman.   She was

19   running the computer.

20   Q.   So someone in that jail recognized Mr. Burch

21   or Mr. Barron?

22   A.   No.   We don't have to recognize him.   We

23   don't have to know him.

24   Q.   Well, someone recognized him enough to pull

25   all this information up here on him at 2:28 a.m.

1       A.  When we get an arrest report and stuff, it's

2  got somewhat information on it.

3       Q.  You're saying that you couldn't book this

4  man until 10:00 o'clock the next morning?

5       A.  No.  He was intoxicated.  He would not

6  cooperate.  He would not cooperate at all.

7       Q.  Who is the -- you mentioned a person by the

8  name of Darty?

9       A.  Yes.

10       Q.  What's his first name?

11       A.  Joey Darty.

12       Q.  Joey?

13       A.  Yes.

14       Q.  How do you spell his last name?

15       A.  It's on there, D-a-r-t-y, I think.

16       Q.  Darty?

17       A.  He might not even had been in our jail.  The

18  system changed and we might have just booked him off the

19  arrest report.  We have to put him in our system and put

20  him on our board and keep a log on him.  He don't have

21  to give us any information.  He can sit there until he

22  does.

23       Q.  What if he had been unconscious when he came

24  in?

25       A.  Do what?

1    Q.   What if he had been unconscious if he had

2  come in?

3    A.   I was the supervisor --

4    Q.   How would you go about booking someone

5  unconscious?

6    MR. WILLFORD:    I'm going to object to this

7    on relevancy grounds.   What does the procedure have

8    to do with either Mr. Burch's condition or what Mr.

9    Ingle --

10    THE COURT:    This is cross-examination.

11    I think he can go into it.

12    Q.   If someone came in your jail facility

13  unconscious, how would you proceed, how would you book

14  that person?

15    A.   With me being the supervisor on duty, when

16  an inmate comes in, the first thing I do is I look at

17  the inmate.   If the inmate can't stand up or for any

18  other reason, I don't take the inmate.   I'll tell the

19  deputy, you've got to take him to the hospital.   If I

20  accept the man, it's my responsibility.   I won't accept

21  the inmate.   I don't have to take him in there before he

22  has medical treatment.

23    Q.   So, in other words, when he first came in

24  that morning, you didn't see any anything -- it's your

25  testimony that you didn't see anything that would give

1   you -- that would alert you to the fact that he may need

2   medical treatment?

3           A.   No.

4           Q.   I'm going to show you a release sheet

5   stating that there were remarks that he had a busted

6   lip.  Do you know when that was made?

7           A.   This is Lonny Devito right here.

8           Q.   Who made that report?

9           A.   This was done at -- it was printed out at 11

10  minutes after 10:00 the following morning.

11          Q.   On February 16 or 17?

12          A.   The 17th.

13          Q.   He was brought in on the morning of the

14  16th; is that right?

15          A.   I guess.

16          Q.   And it's stating that that was made out on

17  the morning of the 17th upon his release?

18          A.   Whenever he got out.  I mean I'm not there

19      24 hours a day, so I don't know when he was released.

20          Q.   Does it state who made that report there?

21          A.   Lonny Devito it's got down there as the

22      booking officer.  He was released at -- this was print

23      at 10:11:09.

24          Q.   All right.  Now, at the -- on the morning of

25  the 16th in which this medical screening was report --

1    was made, it's got written down here, "Finger appears

2    blue and swollen," and it also has "finger appears to be

3    broken." Do you know anything about that?

4        A. No. Joey Darty done that. That was 10:37

5    when that was done.

6        Q. You said that Mr. Burch was threatening, he

7    made threatening remarks. Did he make any threatening

8    remarks to you personally?

9        A. No.

10        Q. How did he react to you?

11        A. He just would not give us any information at

12    all, he wouldn't answer none of our questions.

13        Q. What kind of questions were you asking?

14        A. The booking questions.

15        Q. Did he tell you he wanted to talk to a

16    lawyer?

17        A. No.

18        Q. He told you that when he first came in,

19    didn't he?

20        A. No. He told my booking officer when she

21    asked him if any of his information had changed --

22    that's what we do. When we go through we redo

23    everything, make sure -- get all updated information,

24    and he told her that he wanted to speak with his G.D.

25    lawyer.

```
 1          Q.   Okay.   And at that point was he given an

 2    opportunity to speak with his lawyer?

 3          A.   Not then.

 4          Q.   And that was because he was being

 5    uncooperative?

 6          A.   No.   It's probably because --

 7          Q.   Why was that?

 8          A.   It was probably 2:00 o'clock in the morning.

 9    He hadn't been booked, and it's just not procedure to

10    talk to a lawyer at 2:00 o'clock in the morning.   I've

11    never seen one --

12          Q.   What was his charge -- did you know what his

13    charges were at that time?

14          A.   No.

15          Q.   You had no idea what he was being brought in

16    for?

17          A.   I knew he was being bought in for P.I.

18    That's all I knew.

19          Q.   Was his face red when he was brought in?

20          A.   Yes, it was.

21          Q.   So you knew he was being brought in for

22    public intoxication?

23          A.   Yes.

24          Q.   How did you know that?

25          A.   Well, I'd seen the report.
```

```
 1          Q.   What report?

 2          A.   The arrest report.  I asked Deputy Ingle

 3     what he was, you know, and he said P.I.

 4          Q.   Is that what Deputy Ingle told you?  But he

 5     was not charged with P.I., was he?

 6          A.   Well, you know, I see --

 7          Q.   Are you confusing this jail period with some

 8     other jail period in the past?

 9          A.   No, I am not.  I remember very vaguely what

10     happened.  It's simple cut and dry.

11          Q.   So he was brought in for public

12     intoxication?

13          A.   Well, you know, I see a lot of people.  The

14     charges, I mean, I booked in ten people last night.  I

15     can't tell you their charges.  I don't have any

16     paperwork on this at all.

17          Q.   But it was your testimony that Deputy Ingle

18     told you he was being brought in for public

19     intoxication?

20          A.   It was either public intoxication or D.B.A,

21     one or the other.

22          Q.   D.B.A.?

23          A.   I believe so.  I'm not sure of the charges.

24          Q.   What are you saying D.V.A.?  What does

25     D.V.A. stand for?
```

A.   Domestic Violence Act.

Q.   Did he also tell you he was being charged
with domestic violence?  That was your earlier
testimony.

A.   I can't remember exactly what he told me as
far as the charges.  The charges are on the arrest
report.  When we book them in, we put the charges on the
screen.  The charges don't matter to us.  An inmate is
an inmate.  I knew he was intoxicated because I could
smell --

Q.   I don't recall asking you a question.

THE COURT:   Just respond to his question.

Q.   I'm going to show you what his appearance
bond and charges on that appearance bond.  Do you see
anything about a domestic violence charge or a public
intoxication charge?

A.   Like I said, I don't know the exact charges.
I knew the ballpark somewhere in there.  I see a lot of
different charges.  I have 250 inmates in that jail and
12 officers I've got to keep up with.  I see charges
everyday.  I can't tell you the charges on the folks I
booked in last night, because they run together.  This
has been since February.

Q.   Let me ask you this:  Who did you talk to
prior to coming here tonight?

1      A.  I didn't talk to nobody.  I got straight up

2  out of bed at 4:30 and come took a bath and come up

3  here.

4      Q.  Anybody talk to you about your testimony?

5      A.  No.

6      Q.  Did you review any records before coming

7  here today?

8      A.  Just what I know in my mind.

9      Q.  Did I ask you if you knew Mr. Burch prior to

10  that morning?

11      A.  No.

12      Q.  Did you know Mr. Burch prior to that

13  morning?

14      A.  No.

15      Q.  Never met him before in your life?

16      A.  No.

17      Q.  Did you happen to have an occasion over the

18  period of five hours to observe -- with him not having

19  any clothes on -- to observe any marks on his body?

20      A.  No.

21      Q.  Did you observe that finger?

22      A.  No.

23      Q.  Did you observe that mark on his right arm?

24      A.  No.

25      Q.  Did you observe that mark on his back?

```
 1         A.   No.

 2         Q.   But it is your testimony he made no

 3    threatening remarks to you personally?

 4         A.   No, he did not.

 5              MR. PIAZZA:    That's all I have.

 6              MR. WILLFORD:  I just have one follow-up

 7         question.  I want to give you an opportunity to

 8         answer the question that -- or to finish your

 9         statement that Mr. Piazza cut you off on.

10                   REDIRECT EXAMINATION

11    BY MR. WILLFORD:

12         Q.   How did you know Mr. Burch was intoxicated?

13         A.   Well, he staggered around.  He was

14    uncooperative.  He was laying all over the counter.  I

15    smelled the smell of an alcoholic beverage on him.  It

16    was very -- apparently he was drunk.  I see drunks every

17    night.  I know a drunk when I see one.

18              MR. WILLFORD:    That's all I have.

19                   RECROSS EXAMINATION

20    BY MR PIAZZA:

21         Q.   You say he was staggering when he was

22    brought in?

23         A.   Yes.

24         Q.   Would that be --

25         A.   Just standing there he couldn't even stand
```

1   up straight.

2        Q.  Would that be -- have you ever seen or

3   witnessed anyone sprayed with Freeze Plus?

4        A.  A few.

5        Q.  Have you ever sprayed anyone with Freeze

6   Plus?

7        A.  Yes.

8        Q.  Tell the Board what they could expect to see

9   if a person was sprayed with Freeze Plus.

10       A.  Probably just be holding his eyes and doing

11   that (indicating), that's probably what he would do.

12   His open were open.  It had been a lengthy time since he

13   had been sprayed before he got to us.

14        Q.  How do you know that?

15        A.  His eyes were opened.

16        Q.  So if you're sprayed with Freeze Plus,

17      you're going to close your eyes?

18        A.  Oh, yeah.

19        Q.  How else is it going to affect you?

20        A.  Your mucous membrane in your nose, your

21   sinuses, and that's about it.  It takes your breathing

22   away.

23        Q.  How long does it affect your sight?

24        A.  It has different affects on different

25   people.

Q.   About how long could one expect for their sight to be affected after being sprayed with Freeze Plus?

A.   It affects people in different ways.  We can spray people, they not even blink their eyes and not even bat their eyes, and we've sprayed them and they've been -- had their eyes closed for two or three hours.

Q.   Did he appear to be in any pain when he was brought in?

A.   No, and he did not state to me that he was or had any medical problems at all.

Q.   Was he in handcuffs when he was brought in?

A.   I can't remember that.  I'm pretty sure he was.

Q.   Was he escorted by Officer Ingle?

A.   Yes.

Q.   Was Officer Ingle the only one escorting him?

A.   To the best of my knowledge.

Q.   What kind of appearance -- what do you recall about the condition of Officer Ingle?

A.   About like he is now.

Q.   Was my client, Mr. Burch, fully clothed when he was brought in?

A.   Yes, to the best of my knowledge.

Q.   Who took his clothes off of him?

A.   I did.

Q.   How do you take clothes off an uncooperative person?

A.   You just take them off.

Q.   Did he still have his handcuffs on?

A.   No.  See we -- never mind.  You didn't ask me a question.

Q.   Did you ask him if he needed any type of medical treatment?

A.   We didn't get that far.  We didn't get to the medical treatment.

Q.   You had five hours with him.

MR. WILLFORD:  Is that a statement or a question?

MR. PIAZZA:   It's a fact that he testified to himself.

MR. WILLFORD:  I think he's answered it.

THE COURT:   There's no question on the floor.

Q.   So it's your testimony that you didn't have an opportunity within the five hours to ask him if he needed medical attention?

A.   He had that opportunity, yes.  He was in booking, standing at the counter.  We asked him

1    questions to get started with the booking process.  He
2    did not get that far.  He did not state -- I would say
3    for the period of about 15 or 20 minutes, we more or
4    less begged the gentleman for this information, basic
5    information.  Like one, who can we call in case of an
6    emergency.

7         Q.  Did you already have that information on
8    file?

9         A.  Okay.  If I come to jail -- if we had him in
10   our system before, I might be divorced and it won't be
11   my wife that I want you to call if anything happens to
12   me.  Things change.  That's why we go over it.  That's
13   why we book him in and do these questions every time
14   they come in.  He had the length of about 20, 15 or 20
15   minutes to tell us that he had medical issues.  When I
16   went in the cell when he was beating his head, he could
17   have told me I have a --

18             THE COURT:    Just wait until you have a
19        question.  We'll get through a lot quicker if
20        you'll just wait until he asks you a question.

21         Q.  Let me ask you this, Officer:  What records,
22   if any, would you have made, and I'm going to ask you on
23   two different levels; one, with an uncooperative inmate,
24   and two, with an -- we'll say an unconscious inmate,
25   what reports, what schedules, what information would be

1   made at that time upon his being brought into the jail

2   with the time placed on it?

3            MR. WILLFORD:   I'm going to object to this

4        line of questioning on the grounds that it's

5        outside the scope of a redirect, way outside the

6        scope.

7            THE COURT:   It is.  Let's move along.

8        I'm going to let you ask this question.  Go ahead

9        and answer the question if you can.

10           A.   What was the question again now?

11           Q.   Let me just show you this.  I've got a

12   packet of information that we subpoenaed from the jail.

13   And as far as I can tell there is nothing in here that

14   shows it being made out or recorded contemporaneously

15   with this gentleman brought into the jail.  I want to

16   let you look this over and be sure I'm not missing

17   anything.  Okay.  But there is nothing that I've got in

18   my hand that was documented when this man was brought

19   into the jail at 2:00 o'clock in the morning other than

20   some printouts that were made.

21           A.   About what?

22           Q.   Anything that would have been done in the

23   ordinary course of booking someone in the jail;

24   questions, screens, that sort of thing.

25           A.   Right there.  That was printed out 3:05.

1    Right there is one, right there, 3:05.

2         Q.   Okay.

3         A.   In fact, right here at 3:05 was his medical

4    thing that we do, his medical screen.  We printed it out

5    at 3:05, and he would not give us no information, so the

6    booking officer on the day shift had to do that before

7    we released him at 10:37 that morning.

8         Q.   That's what I'm asking you.  Do you see

9    anything that was actually completed by anyone in the

10   jail either prior to the time -- prior to that morning

11   at 10:00 o'clock?  In fact, all these documents you've

12   just handed me which were printed out as you say on the

13   computer at 2:00 o'clock or 3:00 o'clock in the morning

14   were not filled out until some time later on that

15   morning, is that correct, from what handwriting appears

16   on these printed documents?  In other words, nothing was

17   actually filled out, no information taken.

18        A.   No, he refused to give us any information.

19        Q.   Is there anything in the jail house file

20   which would indicate what the prisoner is being charged

21   with?

22        A.   As of when?

23        Q.   As of when he's brought in or until he's

24   discharged.

25        A.   We have the arrest report and it's put on

1  his charge screen on the booking process.

2      Q.  I didn't have an arrest report with the

3  records that I subpoenaed from the jail.  There's no

4  arrest report in here --

5      A.  Let me see that.

6      Q.  -- unless I missed it.  What's he charged

7  with?  Disorderly conduct.  When was this arrest report

8  made?

9      A.  Date and time is on it.  2/16/04, 2:06 a.m.

10      Q.  This was at some point after he was brought

11  into the jail; is that correct?  You said he was brought

12  in at about 2:00 a.m.

13      A.  I didn't say that.  I don't remember exactly

14  when he was brought in.  Sometimes the deputies they do

15  their reports in the car and they got it in, they just

16  bring the inmate to us and we accept them, and then they

17  turn around and leave.  Sometimes they have to fill the

18  report out there.  I don't know which way it happened

19  that night.

20      Q.  Well, some of these printouts that we were

21  talking about and discussing were made immediately

22  after, at 2:28.  But Mr. Ingle did not tell you that he

23  was arresting this man.  When he brought him in, he did

24  not tell you he was arresting him for disorderly conduct

25  and resisting a police officer.

1    A.  I don't remember all that.  There again,

2  it's on the arrest report and he give me the arrest

3  report.

4              MR. PIAZZA:    That's all I have.

5              MR. WILLFORD:  Nothing further.

6              THE COURT:     You're excused.

7              MR. PIAZZA:    Has she been sworn in?

8              THE COURT:     Were you sworn earlier?

9              THE WITNESS:   Uh-huh, before.

10              PATRICIA WILKERSON BARRON

11        called on behalf of the grievant, having

12  previously been duly sworn by the Court, was examined

13  and testified as follows:

14              DIRECT EXAMINATION

15  BY MR. PIAZZA:

16        Q.  Would you please state your full name for

17  the record?

18        A.  Patricia Wilkerson Barron.

19        Q.  Are you the wife of Tommy Barron?

20        A.  Yes.

21        Q.  And how long have you been married?

22        A.  A year.

23        Q.  Do you live with Mr. Barron?

24        A.  Yes.

25        Q.  What's your address?

```
1              A.   161 Leonard Chapel Road, Carbon Hill, 35549.
2              Q.   Were you living at that address with Mr.
3    Barron on the evening of February 15, 2004?
4              A.   The evening of this, yes.
5              Q.   Now, did you have an occasion to make a 911
6    call that evening?
7              A.   No.  No, I didn't.
8              Q.   Did Mr. Barron, or Taz Burch, make the call?
9              A.   He did.
10             Q.   What time was that call made?
11             A.   I'm not certain.  I'll say around 2:00
12   o'clock in the night, morning.
13             Q.   2:00 o'clock in the morning?
14             A.   Yes.
15             Q.   And what -- as far as you know what
16   precipitated him making the call?
17             A.   Okay.  I --
18             Q.   Let me just ask, had you and he had an
19   argument?
20             A.   No.
21             Q.   Had you and he been fighting?
22             A.   No.
23             Q.   What kind of activity were you and he
24   involved in just prior to him making this call?
25             A.   I was fixing him a sandwich and some milk
```

1    and I said, "Here's your sandwich and milk, and I'm

2    going to bed." It was like night, you know. I was

3    sleepy. I was going to bed.

4          Q. Had y'all been doing something other -- what

5    had y'all been doing prior to your making a sandwich?

6          A. Playing cards.

7          Q. How long had you been playing cards?

8          A. He had a friend over and they played a few

9    hands of cards, and him and his girlfriend was fussing

10    over the cell phones. And he jumped up and threw the

11    chair down in the floor and said, "I'm going to go kill

12    her," and a bunch of fussing going on.

13          Q. Who was that?

14          A. But not me and him.

15          Q. But his friend --

16          A. His friend. And his friend and his

17    girlfriend were fussing over cell phones.

18          Q. What time was that?

19          A. Around 9:00 or 10:00.

20          Q. 9:00 or 10:00 o'clock?

21          A. I think. This is -- I'm not perfect.

22          THE COURT: Just give your judgment.

23          Q. To the best of your recollection.

24          A. Okay. And then he left.

25          Q. What time did they leave?

1    A. I don't know what time he left. It was just
2  a man. I'm not sure what time he left.
3    Q. Was his girlfriend with him?
4    A. Do what?
5    Q. Was his girlfriend with him?
6    A. No. They were on the cell phone talking.
7    Q. Okay. He was on the phone with her?
8    A. Yeah.
9    Q. He was arguing with some person you thought
10  was his girlfriend?
11    A. His girlfriend over the cell phone.
12    Q. Now, after they left what did you and Mr.
13  Burch do?
14    A. Well, they started calling. They called
15  back over there and wanted him to come over there, and
16  his girlfriend -- this woman called and wanted him to
17  come over there and help with their fussing and
18  fighting. And he called the police station at Carbon
19  Hill and told them, "You go over there and help her.
20  They're in a fight over there."
21    Q. What time did he call the Carbon Hill Police
22  Station?
23    A. I'm not sure.
24    Q. But he did make a call to them?
25    A. Two times. Derane said if they need the

1  police, they'll come over there -- they'll call us

2  themselves.

3      Q.  Okay.

4      A.  And then we sat down and we played cards,

5  and Gene Barron, he called.  Tommy's brother called us

6  and was talking to us, and Tommy said, "I've got to go,

7  Gene, because I'm trying to spend some time with Patty,"

8  that's what he calls me, said, "we're playing cards."

9  That was like midnight or so.

10     Q.  Now, Taz he had a few beers; is that

11  correct?

12     A.  He had had two or three, but I think -- he

13  took his -- he's on medication from the doctor.

14     Q.  All right.  What kind of medication is he

15  on?

16     A.  Different kinds.  I don't really know that.

17  But when he took his medication, he changed.

18     Q.  Tell me what you mean by that.

19     A.  He told me he didn't want his supper and he

20  didn't want me to go to bed.

21     Q.  What did he want you to do?

22     A.  Stay up and talk to him.

23     Q.  So he wanted to stay up and talk with you?

24     A.  Yes.

25     Q.  Did he get upset when you didn't want to

talk -- stay up and talk with him?

    A.  Yes, sir.

    Q.  At that point in time did he make the call?

    A.  Yes.

    Q.  Was he arguing with you?

    A.  He told me, he said, "I want you to stay up." And I said, "It's late and I don't care. I'm going to bed." And he said something like if you want to -- if you're going to go to bed and leave me, just go ahead and leave me." And I said, "No, I'm not going anywhere. It's dark outside."

    Q.  Were you aware that he had made a 911 call?

    A.  Well, I went in the bedroom to -- I sat down on the couch and he came and sat in his recliner and he picked up the phone and was trying to call somebody. I said, "Oh, good night." And I went in the bedroom putting on my nightgown, and then I heard him on the phone and realized what he was doing, so I picked up the phone in the bedroom and was talking to the lady in the bedroom on the phone.

    Q.  So you were on the phone with the 911 dispatcher?

    A.  And he was on the phone in the living room and I was on the phone in the bedroom.

    Q.  He was on the phone?

1   A.   Yes, both of us was on the phone with the

2   operator.

3        Q.   What was said?

4        A.   He said something about we were fussing and

5   fighting -- I had been bitching at him all day.  And I

6   told that lady, I said, "No, ma'am.  We have not been

7   fighting, nothing is going on here at this house."  And

8   she said, "Well, we've already got an officer on the

9   way."

10       Q.   What was said after that --

11       A.   Then he said --

12       Q.   -- by either side?

13       A.   He told her something like, "Well, if we

14  don't need no help, then just forget it."  And he hung

15  up.  He came in the bedroom where I was at and laid down

16  on the bed.  And I --

17       Q.   What time was that, do you recall?

18       A.   I can't remember all the times now.

19       Q.   The 911 call.

20       A.   I can't remember all that.

21       Q.   All right.  But it was some time after --

22  that was some time after 12:00 o'clock?

23       A.   Yes.  I'm pretty sure of that.

24       Q.   So, he went on to bed, and what did you do?

25       A.   I was sitting on the bed talking to the lady

1  trying to tell her we didn't need no help.

2      Q.  And this is after he had gotten off the

3  phone?

4      A.  Yeah.  He hung up the phone in the living

5  room and came to the bed and laid down on the bed and

6  was laying there, and I hung up the phone with the lady.

7  I tried to tell her we didn't need no help and she said,

8  "We've already got somebody coming."

9      Q.  Did anybody from the Sheriff's Department

10  show up at your house?

11      A.  Yes.  So I --

12      Q.  What time did they show up?

13      A.  I laid there a few minutes with him and I

14  said, "Why did you do that for?"  And he said, "Hun, I

15  don't know."  He was just going to sleep.  So I got up

16  and went in the living room to wait on the officer to

17  come.

18      Q.  What time did the officer come?

19      A.  I don't know that, I mean, not exactly.

20      Q.  Do you have a judgment as to the time he

21  arrived?

22      A.  Maybe 2:00 or 2:30, I don't remember.

23      Q.  How long was it after the call, do you have

24  a judgment?

25      A.  Well, it wasn't very long.

```
 1        Q.   Would you say 20 minutes, half hour?

 2        A.   No, not that long.

 3        Q.   20 minutes, 15 minutes?

 4        A.   Probably.  I'm not sure.

 5        Q.   Short period of time?

 6        A.   Short period.

 7        Q.   Under a half hour?

 8        A.   Not that long.  Under that, yes.

 9        Q.   Under a half hour?

10        A.   Yes.  I'm pretty sure of that.

11        Q.   The police officer here, Mr. Ingle, is he

12   the officer that was dispatched?

13        A.   He's the one that came.

14        Q.   And when he pulled up in the yard, did you

15   go out to greet him?

16        A.   I went outside to the car, yes.

17        Q.   You went out to his car?

18        A.   Yes.

19        Q.   Before he got out?

20        A.   He got out and I was already out there, yes.

21        Q.   What did you say to him and what did he say

22   to you?

23        A.   I said, "We don't need any help.  I'm sorry

24   you came out here, but he's already gone to sleep, and

25   we don't need any help."  I held out my arms, I said,
```

"There is no fussing and no fighting going on at this
house, and we don't need any help." I went like that
(indicating). I don't know why.

Q. Had you ever see Mr. Ingle before, Derane
Ingle?

A. I didn't recognize him. It was dark outside
and, you know, I didn't know who he was at the time.

Q. But since then you've learned who he is?

A. Well, when he came in my house, yeah, I
realized who he was.

Q. When you say you "realized who he was," tell
the Board what you mean by that.

A. Well, he came in and he said, "I don't need
to talk to you. I need to talk to -- you didn't make
the phone call, like Tommy Barron made the phone call."
And I turned around and walked back in the house, and he
came in behind me and started screaming for him to get
out of bed. I told him he was asleep but he started
screaming at him to get out of bed.

Q. Where was he at the time when he started
screaming?

A. Him?

Q. No, Mr. Ingle.

A. He was standing by the door and I was
standing in front of him.

Q.   All right.   And where was Taz?

A.   He was in the bed, probably asleep.

Q.   How far is that from the front door?

A.   Well, we've got a small trailer, about 52 feet, I mean, so he was in the bedroom in the back of the trailer.

Q.   Did you ask Mr. Ingle to leave?

A.   Well, when he come up there I told him we didn't need no help and I'm sorry you came out here but we don't need you.

Q.   Did you explain that you tried to tell the dispatcher that?   Did you explain to Mr. Ingle that you told the dispatcher that?

A.   Yes, I guess, because I told him, I said, "I'm sorry you made the trip.   We don't need you."

Q.   What happened next?

A.   He started screaming for Tommy to get out of bed and come in there, and then after we -- now, I hollered at him too.   After he started hollering at him, I called him and told him to come in there.   And he came in there about -- we got a little bitty -- now, we're dealing with a little spot, from the door, I was here, he came down the hallway --

Q.   Are you talking about your living room?

A.   Yes.   It's a very small area, about like

this right here.

      Q.  With reference to this space here, how big is it?  Would it be half this space?

      A.  Say from this wall to that wall.  It's a very short space.

      Q.  The end of this table or this end of it?

      A.  Derane was standing right there in front of the door.

      Q.  Okay.  Assuming this --

      A.  I was standing right here (indicating). Tommy came to right here, Taz, whoever, came to right here, and was standing right there and he walked on over here, and he said, "Oh, Lord.  My past has come to haunt me."  And when he did, I knew it was Derane Ingle.  So I looked at him and I said, "You're Derane Ingle?"

      Q.  Did he not have a name tag on?

      A.  I don't know.  I didn't see one.

      Q.  Was he dressed in his officer uniform?

      A.  Yes.  So I put my hand on Tommy's chest and I scooted him back.  I said, "Nuh-uh, don't get by him, don't get in his face.  Stay back here."  Me and him was right there.

      Q.  And why did you do that?  Was Tommy making any kind of threatening remarks?

      A.  No.  He just said, "Oh, my God.  My past has

1  come to haunt me." So I knew who he was, so I wanted

2  him to get away. I put my hand on his chest and we

3  walked back over to right here. And I had my hand on

4  his chest.

5      Q.  So you knew from what Tommy had told you --

6      A.  That that was Derane Ingle.

7      Q.  That this was the guy he had problems with

8  in the past?

9      A.  That's right.

10      Q.  And so you got between them basically?

11      A.  I was always between them, from the time he

12  was right here and I was right here.

13      Q.  Tell the Board what happened next.

14      A.  Well, I had my hand on Tommy, and I told him

15  "You scoot. Don't get in his face. You scoot back."

16  And we was right here like this. Derane, I think he

17  told Tommy to sit down, but Tommy didn't hear him. I

18  was talking to him, telling him to scoot back. And he

19  came over my shoulder right here and went pshhhhh.

20      Q.  He being Officer Ingle?

21      A.  Yes.

22      Q.  Sprayed your husband?

23      A.  Over my right shoulder right here, see. And

24  when I realized what was going on, I ducked down and got

25  the phone right here.

         Q.   Now, tell me this:  How was he dressed when
he came into the --

         A.   In his underwear.

         Q.   In his underwear.  He had gotten up out of
bed?

         A.   Yes.

         Q.   Did he have a weapon?

         A.   No.  He was in his underwear.

         Q.   Did he have a knife?

         A.   No.  When I told him to scoot back, he was
standing there like this.

         Q.   Did he have a brick?

         A.   No, he didn't have nothing.

         Q.   Did he have a stick?

         A.   No.

         Q.   A lamp?

         A.   Nuh-uh.

         Q.   A board?

         A.   No.

         Q.   A pipe?

         A.   No.

         Q.   Anything at all that could be used as a
weapon?

         A.   No.

         Q.   Dressed in his underwear?