FILED

2008 Jul-28  PM 05:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit I
# Transcript of Walker County Civil Service Board
# Hearing dated 12/6/04
# (Part II)

1   A. Yes, just his underwear.

2   Q. And then Mr. Ingle started spraying him?

3   A. Yeah, over my shoulder.

4   Q. What happened to Taz once that happened?

5   A. Well, he was spraying him, and I reached

6 over to get the phone like this right here on this

7 table. It would be right here. I reached over there

8 and picked up the phone to call Gene for some help. I

9 didn't know what was going on, so I called Gene. And he

10 was handcuffing him, and he told me to get his damn

11 clothes, he was going to jail.

12   Q. Did you see him handcuff him?

13   A. He was handcuffing him, yeah, when he told

14 me to go get his clothes.

15   Q. Where was your husband in reference to the

16 phone?

17   A. He was right here.

18   Q. All right.

19   A. Standing this way (indicating).

20   Q. Could you see him from the time you were

21 trying to dial the phone? Did you have the phone in

22 your hand trying to dial it?

23   A. See, I was like this, yeah, and when he --

24 his arm come over my shoulder like this right here,

25 pshhhhhh.

1          Q.   All right.

2          A.   I was this close to him, touching him.

3          Q.   Okay.

4          A.   And his arm came over my shoulder right

5    here, spraying him in the eyes.

6          Q.   Let me ask you a question.  Were you able to

7    pick up the phone in your hand and dial the number?

8          A.   Yes.  When he started, like, coming over my

9    shoulder right here and spraying him like a can of hair

10   spray, I reached over here and got the phone like this

11   and got back up.

12         Q.   And you started dialing the number?

13         A.   Yeah.

14         Q.   Could you see Taz?

15         A.   Yes.

16         Q.   Was he on the floor or was he standing?

17         A.   He was standing.  He was spraying him.  He

18   sprayed him a long time.

19         Q.   What happened after he sprayed him?

20         A.   He told me to go get his damn clothes, he's

21   going to jail.

22         Q.   How did Taz react to the spray?

23         A.   What I seen he was just standing there.  I

24   don't know what you're asking.  He was just standing

25   there.

1        Q.   Was he rubbing his eyes or anything?   How

2  did the spray affect him?

3        A.   He couldn't see, yeah.   It blinded him.

4        Q.   Was he pretty disabled by the spray?

5        A.   Yeah.

6        Q.   And then what did Mr. Ingle do?

7        A.   He started handcuffing him and he told me to

8  go get his damn clothes, he was going to jail.   So I was

9  trying to dial the phone.

10       Q.   Patsy, let me ask you, did he handcuff him

11  in the front or in the back?

12       A.   I think it was in the back because after I

13  got his clothes and I got back in there, Tommy -- he was

14  in my recliner turned over and face down on the floor.

15  This is the way I'm remembering it now.

16       Q.   So you left the room --

17       A.   The best of my judgement.

18       Q.   You left the room --

19       A.   I left the room and grabbed his clothes out

20  of the floor and ran back in there.

21       Q.   Okay.

22       A.   And I was talking to Gene on the phone.

23       Q.   And when you came back in, you found him

24  with all fours on the floor?

25       A.   He was down on the floor like right here by

1    -- laying down on the floor face first and he was

2    standing up over him.

3         Q.   Was he in like a kneeling position?

4         A.   Huh?

5         Q.   Was he in a kneeling position?

6         A.   No.  He was all the way flat on the floor.

7         Q.   Okay.  And where was his arms, were they out

8    or were they in his back, or where were they, under his

9    belly?  Was he already handcuffed?

10        A.   Yes.

11        Q.   So he was handcuffed in the back?

12        A.   Yes, I'm pretty sure of that, because when

13   he was helping him up -- I'm pretty sure he got -- I

14   know he got under this arm and back here helping him up.

15   And then he pushed him on out the door.  He said, "Just

16   forget his something clothes," whatever he was saying,

17   "he's going just like this."  We've only got three

18   little steps at that trailer, and he fell down the

19   steps.  And then I was begging him --

20        Q.   Did you witness him falling down the steps?

21        A.   Oh, yeah.

22        Q.   Was he pushed or could he even see?

23        A.   No, he couldn't see, and he fell, thump.

24        Q.   What happened next?

25        A.   Well, Gene said, "You better get off that

1    phone and take care of Tommy." So I hung up the phone

2    from Gene and threw it down somewhere. And I begged him

3    to let -- I said, "It's cold outside. He needs on his

4    clothes." And he helped him like under the arm again

5    and back here and got him back -- helped him up the

6    steps back in the house, and I put his pants and his

7    shoes on him.

8         Q.  At any time was he -- was your husband

9    threatening or uncooperative?

10         A.  No, not when I was in the room, and I was

11   only out for a split second, to pick up his clothes and

12   run back in there.

13         Q.  But did you hear any arguments while you

14   were outside the room?

15         A.  No.

16         Q.  Did you hear any shouting?

17         A.  No.

18         Q.  Did you hear any threats?

19         A.  No, by neither one of them.

20         Q.  Was his gun pulled?

21         A.  No.

22         Q.  He only had his can of spray?

23         A.  Yeah.

24         Q.  So after you got his clothes on, what

25   happened next?

1          (Short interruption.)

2          Q.   After you got his clothes on, what happened

3   next?

4          A.   He helped him, you know, had a hold of him

5   and taking him back down the steps to the car, and I

6   don't know what all happened outside.  He couldn't find

7   a way to the car, because he was blind and he couldn't

8   see, and he was about to trip over stuff and you know --

9          Q.   So Mr. Ingle didn't have him by the arm when

10  he was going out to the car?

11         A.   Yeah, he was leading him around but he was

12  still stumbling over stuff --

13         Q.   So he was staggering and stumbling?

14         A.   -- and he couldn't see where he was going.

15         Q.   When was the next time you saw your husband?

16         A.   When I came down here to get him out of

17  jail.

18         Q.   When was that?

19         A.   Tuesday morning.

20         Q.   Tuesday morning the 17th?

21         A.   Yeah.

22         Q.   What time was that, do you recall?

23         A.   I was down here a long time.  I sat in John

24  Mark's office a long time, and he had to sign some kind

25  of paper.

```
 1        Q.  Tell me, prior to your seeing him for the
 2   first time that Tuesday morning, were you able to talk
 3   with him over the phone?
 4        A.  Yes.
 5        Q.  When did you talk to him?
 6        A.  Monday sometime he called.
 7        Q.  He called you?
 8        A.  Yes.
 9        Q.  Do you recall what time it was?
10        A.  No.
11        Q.  Was it before or after you had your coffee?
12        A.  Well, I don't drink coffee, but it was -- it
13   was pretty early, it was early.
14        Q.  What did he tell you when you talked to him?
15   What did you talk to your husband about when he called
16   you?
17        A.  He told me that he had been beat up, and I
18   said, "Who beat you up?"
19        Q.  What did he say?
20        A.  He said Derane Ingle -- well, he said
21   Derane.
22        Q.  Did he give you any details about how it was
23   done?
24        A.  Yeah.
25            MR. WILLFORD:   I'm going to object this.
```

1     It's hearsay.

2                THE COURT:     It is.   Sustained.

3                MR. PIAZZA:     Well, the witness is here,

4     she's here, they can collaborate his testimony.

5                MR. WILLFORD:     There is no exception.

6                THE COURT:     It's still hearsay as to what

7     they said outside the presence of this officer.

8          Q.   What did you do after you got the phone

9     call?

10         A.   I told his brother and told him what he

11    said.

12         Q.   You called Gene?

13         A.   Yes.

14         Q.   What did you tell him?

15         A.   That --

16                MR. WILLFORD:     I'm going to object to

17    hearsay again.

18                MR. PIAZZA:     She can state what she told

19    another person.

20                MR. WILLFORD:     Still an out-of-court

21    statement offered for the truth of the matter

22    asserted therein.

23                MR. PIAZZA:     The other person is here to

24    testify.

25                THE COURT:     As to any conversation between

1           --

2                MR. PIAZZA:    And it goes toward the

3        veracity -- you know, it goes to res gestae of this

4        case.

5                THE COURT:    Any conversation between her

6        and another party outside the presence of the

7        officer.

8                MR. PIAZZA:    Is that an overrule?

9                THE COURT:    Yes -- no.   It's sustained.

10       The objection is sustained.

11               MR. PIAZZA:    Can we have a debate over this

12       issue outside the hearing?

13               THE COURT:    Sure.

14               MR. PIAZZA:    Because I feel like this

15       testimony should be on the record.

16               THE COURT:    Okay.   State your position.

17               MR. PIAZZA:    It goes toward the veracity

18       of this witness, the veracity of this witness, and

19       I think that is definitely an issue in this case.

20       And, you know, even though -- I don't even --

21       personally I don't think it comes within the

22       classification of hearsay because all the parties

23       are here, the witnesses are here, they can testify.

24       She can testify to what she told another witness.

25       The witness can testify to what they told her, and

1    everybody is here.  He has the right to cross

2    examine.  It's totally open to his

3    cross-examination, but his veracity, you know,

4    tendency to tell the truth or not to tell the truth

5    is definitely an issue in this case.

6         THE COURT:   I agree with that.  As far as

7    conversations with this witness and another

8    witness, I consider that to be hearsay.

9         MR. PIAZZA:   And since his testimony is

10   contrary to his, her testimony would corroborate

11   with his testimony.

12        THE COURT:   What this witness talked to

13   this another witness about outside the presence of

14   either one of these parties, I think it would be

15   hearsay.

16        MR. PIAZZA:   Well, maybe we need to get the

17   book on evidence.

18        MR. WILLFORD:  I think we've got a ruling.

19        MR. PIAZZA:   I guess we do.

20        Q.  Patsy, after you talked with your husband,

21   what -- after you had your conversation with her husband

22   here, did he ask for any medications?

23        A.  No.  He said he was hurt.

24        Q.  He said he was hurting?

25        A.  Yes.

```
1          Q.   And he said he had been beaten up?

2               MR. WILLFORD:    Objection.

3               THE COURT:    She's already testified to

4     that.  Go ahead.  Overruled.

5          Q.   Did he say where he was hurting?

6               MR. WILLFORD:  We're still under hearsay.

7          A.   His fingers and his elbows.

8               THE COURT:    I'm going to overrule.  Go

9     ahead.

10         A.   His fingers and his elbows.  He was hyper

11    and hollering at me, telling me, "I've been hurt," and

12    all this stuff.

13         Q.   All right.  When did you see him?

14         A.   Not till Tuesday.

15         Q.   The next day?

16         A.   Yeah, when I came down to get him out.

17         Q.   Is that the only phone conversation you had

18    with him?

19         A.   Yes.

20         Q.   Prior to February 16, the morning of

21    February 16, which was a Monday, the previous day,

22    February 15, which was a Sunday, do you recall that

23    date?

24         A.   Sunday?

25         Q.   Yes.
```

1       A.  Yes.

2       Q.  Did you have an occasion to take your

3   husband to the emergency room?

4       A.  Yes.

5       Q.  What was the occasion?

6       A.  He got up complaining that his thumb was

7  still throbbing, this one right here, his thumb

8  (indicating). "It's still throbbing.  I think it's

9  broke."  And I said, "Well, let's just ride to the

10  hospital and we'll see if it's broke.  I'm tired of you

11  complaining about it.  You need something done about it

12  if it's hurting."  So we rode to the hospital and got it

13  x-rayed.

14       Q.  What hospital was that?

15       A.  Winfield.

16       Q.  Winfield?

17       A.  Yeah.

18       Q.  Did they put a cast on it at that time?

19       A.  A little temporary splint thing around here

20  and right here (indicating).

21       Q.  When you saw your husband on Tuesday

22  morning, was that splint or cast still on?

23       A.  No, it wasn't on then.

24       Q.  It was not on him?

25       A.  Nuh-uh.

1          Q.   Did you -- you had an opportunity to observe

2     your husband when you picked him up?

3          A.   Yes.

4          Q.   What kind of condition was he in?

5          A.   He looked bad.

6          Q.   Would you describe to the Board what that

7     means?

8          A.   Well, the first thing I noticed was his

9     elbows was black and swelled like out here, like this,

10    both of them, his elbows was like that, black

11    (indicating).  And the second thing I noticed, something

12    was a matter with his face all across here, I guess,

13    where he had sprayed that sprayed.

14         Q.   What did it look like?

15         A.   It looked like it was burned, blistered,

16    real bad, right all over here.  That's the side, not

17    just his elbows.  And then I noticed his face.  I looked

18    at him and then I noticed his hand.  He showed me his

19    hand was killing him.

20         Q.   What did his hand look like?  His right

21    hand?

22         A.   Yes.  This finger right here was hurt real

23    bad (indicating).

24         Q.   Middle finger?

25         A.   Yes.  He was just like that, you know, like

1      (indicating).

2              Q.   So, was he in pain, he was expressing pain

3      to you?

4              A.   Yes.

5              Q.   What did you do after you got him out of

6      jail?

7              A.   I went straight --

8              Q.   Did you have to sign a bond?

9              A.   Yes.

10             Q.   Property bond?

11             A.   Yes.

12             Q.   Did you have to bring your title to your

13     land?

14             A.   No.   They just let us sign it.

15             Q.   An appearance bond?

16             A.   His brother Gene had to sign it, I signed it

17     first.

18             Q.   Was Gene with you?

19             A.   No.   He signed it at home and I signed it at

20     home at Gene's house, and then I took it down there.

21             Q.   Okay.   And you apparently picked it up --

22             A.   From Gene's house and brought it down here.

23             Q.   All right.

24             A.   On Monday he brought Tommy's medicine down

25     here to him, his heart medicine, because he has to have

1    that.

2         Q.   So after you --

3         A.   Different medicines that he has to have.

4         Q.   After you picked him up from jail, what did

5    you do?

6         A.   I took him straight on to the hospital.

7         Q.   What hospital?

8         A.   Walker.

9         Q.   Emergency room?

10        A.   Yes.

11        Q.   Was he treated for his right hand?

12        A.   They took several x-rays out there.

13        Q.   All right.  Did they put it back in a cast?

14        A.   Yes, a temporary thing on his thumb.

15        Q.   On his thumb.  What did they do about his

16   middle index finger, or middle finger?

17        A.   They x-rayed it, and they said the swelling

18   was so bad that they couldn't really tell or something

19   like that, something like that.  Now, I'm not positive

20   about this.

21        Q.   But did they -- they didn't wrap it, in

22   other words.  They wrapped his thumb, but they didn't

23   wrap the middle finger.

24        A.   Right.

25        Q.   Did you have occasion take photographs of

1  his hand?

2        A.  After I got him home from the hospital, yes,

3  I did.

4        Q.  Is this a photograph you took of his elbows?

5        A.  Yes.

6        MR. PIAZZA:  You've seen these haven't you?

7        MR. WILLFORD:  Yes, last time.

8        Q.  Is this a photograph you took of his hand,

9  his right hand?

10       A.  Yes.

11       Q.  Right after you removed the cast?

12       A.  Yes.  When we got home, he took it off.

13       Q.  You've got a photograph in here with the

14  cast on; is that right?

15       A.  Uh-huh.

16       Q.  That's a photograph of the mark on his back?

17       A.  Uh-huh.

18       Q.  That's another photograph of his hand?

19       A.  Uh-huh.

20       Q.  Is that a photograph of the marks on his

21  arm?

22       A.  Yes.

23       Q.  Is that a photograph of his back; is that

24  correct?

25       A.  Yes.  He had several bruises back there.

1          Q.   This is a photograph of the bandage on his

2     right hand after you left the hospital after you picked

3     him up from jail; is that correct?

4          A.   Yes.

5          Q.   What is this a photograph of that's got a

6     circle on it?

7          A.   That's some spray that was outside.

8          Q.   In your yard?

9          A.   Yes.

10         Q.   What about that?

11         A.   And that too.

12         Q.   That photograph there --

13         A.   Uh-huh, that was his back, where he bruised

14    all over him.

15         Q.   And that one?

16         A.   Yes.   That's what he was --

17         Q.   Are some of these duplicates?

18         A.   Yes.   That's what he was screaming about,

19    his hand hurting.

20              MR. PIAZZA:   Do you want to take a look at

21         these before I hand them to Board?

22              MR. WILLFORD:   No.   I've seen them before.

23         Q.   Now, after you came -- you left the Walker

24    emergency room; is that correct?

25         A.   Uh-huh.

1          Q.   Did you have occasion to take him back to

2  the doctor?

3          A.   Yes.  In a -- I don't know when, two or

4  three days.

5          Q.   What was the occasion?

6          A.   He was having pain, severe pain.

7          Q.   So you took him back to the same place?

8          A.   Yes.

9          Q.   Walker Regional?

10        A.   And they x-rayed it different that time.

11  They said they x-rayed it different from the time when

12  we was there.

13        Q.   Now, what day was that?  Was that the same

14  week?

15        A.   Yeah, I'm sure.  I'm not --

16        Q.   You got him out of jail on Tuesday 17; is

17    that correct?

18        A.   Yes.

19        Q.   To the best of your recollection?

20        A.   Yes.

21        Q.   Several days later you took him back to the

22  hospital?

23        A.   Yes.

24       Q.   Did they do anything at that time or did

25  they refer him somewhere else?

1     A.   They x-rayed him again and this time they

2   mashed it down as much as they could and took pictures

3   of it different ways than they did before, got different

4   views of it.  And there was a little girl that tried to

5   set it and she couldn't do it.  So she went and hunted

6   up Dr. Shipman, and he came in there and tried to do it,

7   and he said no matter what we do it's not going to

8   work.  So the little girl, whoever she was, the nurse,

9   doctor, whatever she was, she said that she would go to

10  Princeton and see a Dr. Bugg.

11     Q.   Did they make a referral for you at his

12  office?

13     A.   I don't know now.  I think they just told us

14  to go over there and see Dr. Bugg, said call over there

15  and make an appointment to see Dr. Bugg.  I don't

16  actually think they called up there or anything.

17     Q.   Did you go see Dr. Bugg?

18     A.   Yes.

19     Q.   That day or another day?

20     A.   Another day.  I called and got an

21  appointment and we went over there and he was screaming

22  with his finger.  You know how you do with a toothache,

23  like when you want your tooth pulled?  Like he was doing

24  it with his finger.

25     Q.   All right.

1        A.   "Oh my God.   It's killing me.   Something's

2   got to be done."   And all this stuff like that.

3        Q.   So he was in constant pain --

4        A.   Yes, bad.

5        Q.   -- is what your testimony is?  What did --

6   did Dr. Bugg treat his hand?

7        A.   Yes, and he said that he didn't do -- he

8   said that that finger might could be saved but it would

9   be fused like that and it was going to take a bunch of

10  work.

11       Q.   It would be a permanent limb that he

12  couldn't use; is that correct?

13       A.   Right.  Sticking out straight.

14       Q.   Okay.

15       A.   And he referred him to go to doctor --

16  another doctor at Brookwood.

17       Q.   Who would that doctor have been?

18       A.   Ostrowski.

19       Q.   Is that Dr. Ostrowski?

20       A.   Yes.

21       Q.   What was his treatment?

22       A.   He said that it would take so many surgeries

23  to fix that finger if it could be fixed.  It would be

24  fused straight if they could do that, and he showed us

25  and explained to us why, you know, why he said that, if

1    it could be fixed like -- I don't know, like that.  It

2    was broken so bad that if it could possibly be fixed it

3    would take surgery after surgery after surgery and it

4    would mean trips to Birmingham like every week and for

5    months and months after that.

6         Q.   What was his recommendation?

7         A.   His recommendation was -- he said that he

8    didn't like to amputate anybody's finger, body parts,

9    that he was in the business of fixing them.  And Tommy

10   said, "If it can't be fixed, something has got to be

11   done because it's killing me."  And they discussed it

12   among themselves.  I went out in the waiting room and

13   they discussed it among themselves, and then I went back

14   in and they had agreed that that would be the best thing

15   to do because it was only -- he told me that, what the

16   doctor said personally to me, that if he fused it that

17   he could not guarantee us every time he touched that

18   finger on something that he was going to be in pain,

19   that he would almost guarantee that.

20        Q.   Did he remove the finger that day?

21        A.   No.

22        Q.   You had to go back to Birmingham?

23        A.   Yes.

24        Q.   How long afterwards?

25        A.   I'm not sure.  Like a week or so after that

1    I guess.  Now, I'm not -- I'm not no brain scientist.  I

2    can't remember every date and every time.

3         Q.  We're not asking you to.

4         A.  Okay.

5              MR. PIAZZA:   That's all I have.

6                   CROSS-EXAMINATION

7    BY MR. WILLFORD:

8         Q.  Ms. Wilkerson, my name is Gary Willford and

9    I represent the Sheriff and the Hiring Authority in this

10   matter and I would like to ask you a few questions.

11        A.  Okay.

12        Q.  Isn't it true that before this incident you

13   knew Deputy Ingle?

14        A.  I don't know.

15        Q.  Didn't he arrest your son for burglary?

16        A.  Not that I -- well, see, no.  I wasn't --

17   nuh-uh.  See me and my husband got a divorce, Tommy

18   Wilkerson.

19        Q.  Okay.

20        A.  Okay.  I was married to him for exactly 20

21   years, okay, and we got a divorce.  And I didn't know

22   anything about my son or about him either.

23        Q.  So is it your testimony that you didn't know

24   that or that --

25        A.  I didn't find out that until way later after

1   it happened.

2           Q.   So you found out your son was arrested for

3   burglary after this incident on February 16; is that

4   correct?

5           A.   Oh, no.  I knew it prior to that, but I

6   didn't know that Deputy Ingle arrested him, no, sir.  I

7   knew that he got arrested for selling some stuff that

8   somebody else had stolen or something like that.  And

9   him and his girlfriend came and told me that a long time

10  after it happened.

11          Q.   So it's your testimony you never met Deputy

12  Ingle before February the 16th?

13          A.   Now, I don't know that.  We were both in

14  that town, I guess, and it was a small town.

15          Q.   You testified that --

16          A.   I don't know if I did or not.

17          Q.   -- Mr. Burch had had something to drink that

18  night.  Alcoholic?

19          A.   Yes.  Beer.

20          Q.   Did he have anything else to drink that

21  night?

22          A.   No.

23          Q.   And how many did he have?

24          A.   Well, I'm not sure about that either.  It

25  wasn't many because he didn't drink until after his

```
 1   friend had left and then he drank some beer, but then he
 2   took his night medicine and he changed.
 3          Q.  What was that, night medicine?
 4          A.  Yeah.  The medicine he takes at night.
 5          Q.  What was it?
 6          A.  I'm not sure what all he takes at nighttime.
 7          Q.  Do you know what it's for?
 8          A.  Yes.  For his nerves, for sleep.
 9          Q.  Do you know the name of the doctor who
10   prescribed it to him?
11          A.  He was going to mental health and he was
12   going to Dr. Miller.
13          Q.  What was he doing at mental health?
14          A.  I took him down there.
15          Q.  For what?
16          A.  Well, he's got some mental problems, I would
17   say.
18          Q.  Like what?
19          A.  He's just got mental problems.
20          Q.  Does he have problems telling the truth?
21          A.  Well, no.
22          Q.  Is he violent?
23          A.  No.
24          Q.  How do his mental problems manifest
25   themselves, let me ask you that?  How do you know that
```

```
 1   he has mental problems?
 2          A.   Because I can just tell by being around him.
 3          Q.   What is it about the way he acts that let's
 4   you know he has a mental problem?
 5          A.   Well, at the time he was overactive.  He
 6   couldn't sleep.
 7          Q.   Anything else?  You say he was hearing
 8   voices?
 9          A.   No.
10               MR. PIAZZA:   I object to that.
11               THE COURT:   It's cross.  He can ask it.
12          Q.   Did he see things?
13          A.   It was just the way he was acting, and I
14   couldn't get any sleep.  He couldn't go to sleep.  He
15   was hyperactive, he was overactive.  He stayed awake for
16   periods of time.
17          Q.   How long?
18          A.   He could stay awake two or three days at a
19   time.
20          Q.   Had he stayed awake for a long period of
21   time on February 16?
22          A.   No.
23          Q.   When was the last time he had slept prior to
24   that evening?
25          A.   The night before.
```

1       Q.  And it's your testimony you don't know how

2  much he had to drink?

3       A.  Well, I can estimate.

4       Q.  And your estimate is?

5       A.  Not but like three or four, five, not over

6  that.

7       Q.  We're talking about 12 ounces, tall boys?

8       A.  No.  The little cans of Bush.

9       Q.  Little cans of Bush?

10      A.  Yes.

11      Q.  And he started drinking after his friend

12  left?

13      A.  Yes.

14      Q.  He hadn't had anything to drink while his

15  friend was there?

16      A.  Not that I know of.

17      Q.  Were you present the entire time his friend

18  was there?

19      A.  Yes. I was in the living room watching TV.

20  It's just, you know, right here.  They were sitting at

21  the table playing cards, but after he left he had some

22  beer.  I guess he didn't want his friend drinking up his

23  beer so he waited until he left, is what I think.

24  That's my opinion.

25      Q.  Do you know a lady by the name of Lucille

1   Armstrong?

2         A.   Yes.

3         Q.   Didn't you tell her at the emergency room

4   that Taz had hurt his finger prior to the 16th?

5         A.   No, I didn't.

6         Q.   Didn't you tell her that y'all were going to

7   come here and tell this Board that Deputy Ingle did it

8   and it wasn't true?

9         A.   No, I did not.

10         Q.   So if she says that, she's a liar?

11         A.   That's right. Now, I talked to her. I'll

12   tell you what I talked to her. We was at the post

13   office one day in Carbon Hill, and her daughter came

14   over there and said, "Mother is over here at the doctor,

15   come over here and talk to her." So we walked over

16   there and talked to her, and they asked me why -- they

17   said that T.J. said that he was -- that's Lucille's son.

18   Said that T.J. said that he wasn't in jail for nothing,

19   is what his mother told me, Lucille. Told me, said,

20   "T.J. told me that he wasn't in jail for nothing." Said

21   Patsy's husband was in jail and I asked him why, and he

22   said, "He's in there for nothing, for no reason." And I

23   said, "Well, he come and got him out of bed and took him

24   to jail," is what I told her and that's all I told her.

25         Q.   Okay. Let me ask you about the spray. You

1   said that Deputy Ingle, if I recall your testimony

2   correctly, sprayed over your right shoulder to get to

3   Taz.

4           A.   His arm came over my shoulder.

5           Q.   His arm came over your shoulder?

6           A.   Yeah.

7           Q.   How far out in front of your face did the

8   can get?

9           A.   I would say like that (indicating).

10          Q.   As far out as your own arm?

11          A.   Well, when I seen him come over across me

12  when he started spraying him, he was very close to his

13  face, like that, (indicating), and I ducked down and got

14  the phone.

15          Q.   If I recall your testimony, though, you

16  testified that you had your hand on Taz's chest pushing

17  him back?

18          A.   Uh-huh.

19          Q.   And that Deputy Ingle came over?

20          A.   Uh-huh.

21          Q.   Did any part of Deputy Ingle's front touch

22  you?

23          A.   Not that I recall.  I just saw his arm come

24  right here (indicating), and he started spraying him,

25  and I ducked down out of the way and got the telephone.

1        Q.  I want you to listen to my entire question

2  before you answer, okay.  When did he start to spray;

3  was it as he was coming or once he got fully extended?

4          MR. PIAZZA:   I'm going to object to that

5     because she doesn't have eyes in the back of her

6     head.  She testified --

7          MR. WILLFORD:   She testified she heard

8     pshhhhh, and I'm trying to figure out when it was

9     that he started spraying.

10       A.  He came over -- I seen him.  I was standing

11  here looking at Tommy or Taz or whoever.  I was standing

12  here looking at him, and I saw him come, his arm came

13  over my -- over this way with the can, like that.  And

14  then he started spraying.  I ducked out of the way when

15  I saw him coming over me.  I ducked out of the way and

16  got the phone.

17       Q.  Did any spray get on you?

18       A.  No.  I got out of the way.

19       Q.  It's your testimony that no part of his

20  front contacted your body?

21       A.  Not that I recall.

22       Q.  He didn't knock you out of the way to get to

23     Taz?

24       A.  No.  He just came up beside me right here,

25     stuck his arm out with the can, and I ducked down to

1        get -- I went over and got the phone.

2            Q.   So you weren't affected by the spray at

3        all?

4            A.   No.

5            Q.   Your eyes didn't tear up?

6            A.   No.

7            Q.   You had no problems with it whatsoever?

8            A.   No.

9            Q.   Now, the hand we're talking about that was

10       injured allegedly, was on his right hand, correct, the

11       middle digit on his right hand; is that correct?

12           A.   That one that was -- what?

13           Q.   The one that you're claiming -- that Taz is

14       claiming that Deputy Ingle injured was on his right

15       hand?

16           A.   Yes.

17           Q.   We're talking about the middle digit, the

18       middle finger?

19           A.   Yes.

20           Q.   Had he ever been to the doctor for that hand

21       before?

22           A.   Yes.

23           Q.   When was first the time he went to the

24       doctor on his right hand?

25           A.   Sunday -- the day that he come out there

1   that night.

2          Q. Now, let me make sure you understand my

3   question. I'm talking -- to your knowledge now, the

4   first time he had ever gone to the doctor about his

5   right hand?

6          MR. PIAZZA: I'm going to object. I don't

7   think she can testify --

8          A. I don't know now. Years and years ago he

9   got hurt. He thought he got hurt.

10         MR. PIAZZA: She can testify what she knows

11   but --

12         A. But I wasn't around him then.

13         THE COURT: That's all he's asking, just

14   what you know.

15         Q. You said years and years ago he got his hand

16   hurt?

17         A. No, his arm.

18         Q. His arm.

19         A. I wasn't around him.

20         Q. Are we talking about his right arm?

21         A. Yes.

22         Q. What -- how did his arm get injured?

23         A. He put it through the glass plate window,

24   that I know of. Now, that's hearsay too, because I

25   wasn't there. I don't know nothing about his arm

1  getting hurt, but I've seen it.

2      Q.  This was years before the incident?

3      A.  Yes.  I don't know what he's talking about.

4  Are you talking about the day that I took him up to

5  Winfield Hospital?

6      Q.  Well, I'm trying to find out the extent of

7  the injuries that he might have had to his right arm at

8  any time prior to your contact with Deputy Ingle that

9  night.

10     A.  He had a hurt thumb right here.  It was a

11  little fracture.

12     Q.  So we've got the arm several years ago?

13     A.  Yes, I guess.

14     Q.  We've got the thumb that morning?

15     A.  No, a couple of day before that.

16     Q.  A couple of days before that?

17     A.  Yeah.

18     Q.  Any other injuries to that right hand that

19  you're aware of?

20     A.  No.

21     Q.  Those are the only two?

22     A.  That's right.

23     Q.  What did he do to that right thumb?

24     A.  The hot water heater was messing up and he

25  was messing with it, and that's all I know.  I don't

1  know what he did to it.

2       Q.  So you didn't see him injure it?

3       A.  No.

4       Q.  He didn't say what he did to injure it?

5       A.  I don't recall.

6       Q.  Did he tell you what he did years before to

7  injure his arm?

8       A.  He put it through a glass plate window.

9       Q.  How?

10      A.  I don't know how.  I wasn't there.

11      Q.  I'm not asking if you were there.  I'm

12 asking if he told you how he put he arm through a plate

13 glass window.

14           MR. PIAZZA:   I don't see where that has --

15           THE WITNESS:  I don't know.

16           MR. PIAZZA:   Where that's relevant.

17           THE WITNESS:  I just know it went through

18      the window.

19           MR. PIAZZA:   Will you be quiet.  That's

20      really -- I mean he's had the opportunity to ask

21      Mr. Barron that question.

22           THE WITNESS:  See that was years before I

23      got involved with him.  I don't know anything about

24      it.

25           MR. PIAZZA:   It's totally irrelevant to

1    what --

2         THE WITNESS:  Other than I can tell it's

3    been hurt right here.

4         MR. WILLFORD:  She just testified at length

5    about his medical treatment on that right arm.   I

6    think I'm entitled to inquire what she knows about

7    --

8         THE WITNESS:  I don't know anything about

9    it.

10        MR. WILLFORD:  -- the entirety of his arm.

11        MR. PIAZZA:   It's not even an issue here.

12        THE COURT:  Well, she testified about the

13   injuries that he had --

14        THE WITNESS:  I thought that was what he

15   was asking me, but I don't know anything about it.

16   I didn't know him at that time.

17        THE COURT:   She talked about the injury to

18   the finger, to the thumb, to the arm, she can tell

19    about her knowledge of it.  This is

20   cross-examination so I'm going to let him go ahead.

21        THE WITNESS:  Okay.

22        THE COURT:   Just tell him what you know.

23        THE WITNESS:  I don't understand the

24   question.

25        Q.  The question is:  What did he tell you about

1    how he put his arm through a plate glass window?

2            MR. PIAZZA:   I'm going to object to the

3        relevancy of that again.   It has nothing,

4        absolutely nothing, to do with what we're here

5        about --

6            THE WITNESS:   I didn't even know him when

7        that happened.   That was years ago.   I was married

8        and had three kids and I wasn't even around him.

9            THE COURT:   It's been several months ago

10       but I think you testified about some of these

11       injuries and all, and I think if he did, then he's

12       got a right to ask her if he said anything

13       inconsistent with that to this lady.   So go ahead.

14           A.   All I understand he went through a glass

15   plate window.

16           Q.   What did he say about it, what did he say

17   about how it happened?

18           A.   That he put his arm through the window.

19           Q.   On purpose?

20           A.   I don't know.

21           Q.   Did he say he put his arm through the window

22   on purpose?

23           MR. PIAZZA:   I've got to object, because,

24       you know, we're talking about something that

25       happened a long time ago and regardless of what he

1    said to her, what she said to him in connection

2    with this arm has absolutely nothing to do.

3           THE COURT:   I think that it does, because

4    he's complaining of an injury that's been caused by

5    the Hiring Authority or by the deputy.

6           MR. PIAZZA:   Not to the arm though.

7           THE COURT:   If he testified about the

8    injured arm on a previous occasion, then I think

9    he's got a right to inquire about it, and if he's

10    made any kind of emphasis, I think the Board would

11    be interested.  I don't remember the testimony but

12    I'm assuming that's what is the purpose.

13           THE WITNESS:   I don't know anything about

14    it.  I wasn't there.

15           MR. WILLFORD:  Not to mention the fact that

16    we could be talking about a preexisting injury

17    here, putting one's arm through a plate glass

18    window would entail that same finger going through.

19           THE WITNESS:   No.

20           THE COURT:   We've already established that

21    he put his arm through the window, so let's move

22    on.

23           THE WITNESS:   That was not preexisting.  He

24    had his hand x-rayed at Winfield.

25           THE COURT:   Just wait for the question

1    now.

2         Q.   You testified earlier on direct about

3    these --  taking these pictures of your husband.   There

4    are some pictures in here of his finger.

5         A.   Yes.

6         Q.   And let's see, we've got some marks on his

7    back.

8         A.   Yeah.

9         Q.   The cast.

10        A.   Yes.

11        Q.   And the elbows.

12        A.   Yes.   Under his arm right there

13   (indicating).

14        Q.   Under his arm, okay.   Now, you didn't

15   actually see any of the marks get put on his body, did

16   you?

17        A.   No.

18        Q.   So, you have no idea how he got --

19        A.   When he left home, he did not have a mark on

20   his body that I know of.

21        Q.   But he spent some time at the jail, did he

22   not?

23        A.   Yes.

24        Q.   He could have gotten those injuries at the

25   jail?

```
 1          A.   I don't know.

 2          Q.   Is it possible that he could have gotten

 3   those injuries at the jail?

 4          A.   How would I know that?  I don't know.

 5          Q.   I'm not asking if you know.  I'm asking if

 6   it's possible.

 7          A.   I don't know.  I wasn't there.

 8          Q.   Have you ever been a law enforcement

 9   officer, ma'am?

10          A.   No, I haven't.

11          Q.   So you've never been certified on the use of

12   Freeze Plus spray, have you?

13          A.   No, I haven't.  That's the first experience

14   I've ever been around it.

15          Q.   So you have no basis for testifying then

16   that these marks in these pictures were made by the

17   spray, do you?

18          A.   That's where they were at.

19          Q.   That's not what I asked you.

20          A.   The spray wasn't there before.

21          Q.   You don't know if this spray leaves any

22   marks on the ground at all, do you?

23          A.   Well, that's where they were at standing and

24   that's where the spray was after that.

25          Q.   I may be wrong but I thought you testified
```

that you didn't go outside with them.

    A.  Oh, yes, I did.

    Q.  You went outside?

    A.  I did not testify to that.

    Q.  Okay.  I could very well be mistaken.

    A.  I think you are.

    Q.  Did you see Deputy Ingle spray him outside?

    A.  He was falling all over the place.  He was trying to make him get in the car and he couldn't see to get in the car.  I'm not sure.

    Q.  So then you don't know where they were or how that spray could have gotten there, do you?

    A.  Not actually I don't.  He was scuffling with him, trying to get him in the car there, and he couldn't see how.  He was falling over things and stuff like that.

    MR. WILLFORD:  Thank you.  I have no further questions.

REDIRECT EXAMINATION

BY MR. PIAZZA:

    Q.  Ms. Barron, when Taz got out of jail, did he tell you that Mr. Ingle had sprayed him while he was in the car with him?

    MR. WILLFORD:  Objection.  Hearsay.

    MR. PIAZZA:  I don't think that's hearsay if

    1          he's already testified to it.

    2               MR. WILLFORD:   Hearsay is an out-of-court

    3          statement offered for the truth of the matter

    4          asserted.

    5               THE COURT:  Go ahead with it.

    6          Q.  Did he make a statement to you that Mr.

    7     Ingle had sprayed him while he was in the car?

    8          A.  Yes.

    9          Q.  Did he tell you what transpired between the

   10     time he left the trailer and the time he arrived at the

   11     jail house?

   12          A.  Number one, they were still outside when I

   13     went back in the house.  I got cold.  I only had on my

   14     nightgown.

   15          Q.  When your husband got out of jail did he

   16     tell you what happened between the time he left your

   17     trailer --

   18          A.  He told me that Monday when he called me on

   19     the phone.

   20          Q.  He told you that Monday?

   21          A.  Yes.

   22          Q.  And what did he tell you?

   23          A.  That he had been beat up, that he had been

   24     hurt.

   25          Q.  And did he tell you where it happened?

1        A.    Somewhere in between there and jail.

2        Q.    And let me ask you this:  You got some

3   photographs of some pink spots on the ground.  What

4   caused you to make these photographs?

5        A.    Because that's where they were when he was

6   trying to force to put him in the car and he couldn't

7   see and he was stumbling all over the place outside,

8   tripped over a stump.

9        Q.    You're not testifying that you actually know

10  what this is other than the fact that you believe that

11  it's the Freeze Plus?

12       A.    I believe it was, yes.  I'm not positive,

13  but I believe it was.  That's the same spot that they

14  were in.

15       Q.    You've not had it tested or anything by a

16  lab?

17       A.    No.

18       Q.    Does your husband take Ambien to help him

19  sleep, do you know?

20       A.    I'm not sure what the name of it is.  He

21  takes something.

22       Q.    Now, you took some photographs of your

23  husband; is that correct?

24       A.    As soon as we got home.

25       Q.    Was his brother, Gene, with you when you got

```
1   home?
2            A.   No.
3            Q.   Did he come over later?
4            A.   Yeah.
5            Q.   And I want to ask you again, did you notice
6   your husband's lip busted after he got -- after you
7   picked him up from the jail, could you tell?
8            A.   I don't remember.
9            Q.   Do you have any photographs of his face?
10           A.   No.  Well, some, but I don't remember.  I
11  remember bruises on his forehead right here
12  (indicating), right here in his hairline.  He had bumps
13  on his head.  I don't recall the bruises.
14           THE COURT:   Wait and let him ask you a
15      question.
16           MR. PIAZZA:   I don't have any further
17      questions, unless you have questions and the Board
18      has some.
19           MR. WILLFORD:   I have nothing further.
20           THE COURT:   Anybody for the Board?
21           BOARD MEMBER ARCHIE:   I've got one.  I think
22      she testified that -- I may be wrong.  You said
23      that when he got to your house, you went outside to
24      meet him.
25           THE WITNESS:   Uh-huh.
```

BOARD MEMBER ARCHIE:  You told him that --
you said that you told him that you didn't need
him?

THE WITNESS:  Right.  I said, "Listen.  I'm
sorry you came out here.  We don't need any help
out here.  We're just fine."

BOARD MEMBER ARCHIE:  He followed you in the
house, you say he followed you in the house?

THE WITNESS:  Uh-huh.

BOARD MEMBER ARCHIE:  You never did tell him
he couldn't come in your house; is that right?

THE WITNESS:  No.  He didn't ask me.  I
just went in the house.

BOARD MEMBER ARCHIE:  You never told him he
couldn't come in, you never did say, please don't
come in my house?

THE WITNESS:  No, I didn't tell him not to
come in.  I didn't tell him to come in.  I went in
the house and then he came in behind me.  He didn't
ask me if he could come in, and I didn't tell him
to.

BOARD MEMBER ARCHIE:  You didn't --

THE WITNESS:  I didn't tell him either way.

THE COURT:  Anybody else?

BOARD MEMBER KELLY:  I have one question.

1    At the time Deputy Ingle entered the house and Mr.

2    Barron come through the hallway and you had already

3    -- Mr. Ingle was already in the house and during

4    the time that you said that he was sprayed with

5    this Mace, pepper, Freeze Plus, whatever --

6        THE WITNESS:  Yeah, I don't know what it

7    was.

8        BOARD MEMBER KELLY:  You got down to get the

9    phone and make a phone call, okay.  Did Mr. Ingle

10   ever tell you why he was arresting Mr. Barron?

11       THE WITNESS:  No.  You want me to tell you

12   what I thought?  I thought he was getting arrested

13   because he called 911 for no reason.

14       BOARD MEMBER KELLY:  And you cooperated by

15   going and get his clothes on at the request of

16   Deputy Ingle and brought them back to him, but you

17   never did from that point until the time that Mr.

18   Barron was being taken outside and asked him why is

19   my husband -- why are you arresting him?

20       THE WITNESS:  I thought he was -- no,

21   because I just thought he was getting arrested for

22   calling 911.

23       BOARD MEMBER KELLY:  You never questioned

24   any arrest procedure?

25       THE WITNESS:  No.  I just -- I thought he

1    was getting arrested because he had called 911.

2        BOARD MEMBER KELLY: Okay. That's all.

3        THE WITNESS: I didn't know why he was

4    getting arrested, but that's what I thought.

5        THE COURT: Anybody else?

6        BOARD MEMBER ARCHIE: When you went down, he

7    was come over your shoulder and you said -- did he

8    spray the spray before he went down or when did he

9    spray the spray? Did you go down first, when did

10    he spray it?

11        THE WITNESS: When I seen him, he was right

12    here like this, right somewhere here (indicating).

13    And his arms took out with the spray. I jumped

14    down at the table to get the phone and he started

15    spraying. He was spraying him, yes, before I got

16    down and got the phone.

17        BOARD MEMBER ARCHIE: When you got down, he

18    was spraying?

19        THE WITNESS: I think so, yes.

20        BOARD MEMBER STUDDARD: You testified later

21    that the spray or spots outside you thought that

22    was -- that you really believed it was from the

23    Freeze Plus?

24        THE WITNESS: Yes, I did. I believe it but

25    I can't prove it.

```
1          BOARD MEMBER STUDDARD:  Were there any spots

2     after he sprayed in the house, was any kind of

3     spots or anything on the carpet or floor or inside

4     the house?

5          THE WITNESS:  Not that I could tell.  He

6     was very close to his face when he sprayed that

7     spray like this.  And he didn't just spray one

8     time.  He just kept on.  He done it several.

9          BOARD MEMBER STUDDARD:  Enough that it maybe

10    would have drift or --

11         THE WITNESS:  I don't know.  Maybe.

12         BOARD MEMBER CUMMINGS:  Did the officer take

13    him to the car and he was falling all over the

14    place,  he had to put his hands under his arms to

15    take him to the car, right?

16         THE WITNESS:  Yes.  He was sort of leading

17    him.  Like when I seen him help him up, he had his

18    arms from behind him, you know, like when he fell

19    off the door steps, he got him by the arm, by the

20    handcuffs and got him back in the house.  Is that

21    what you're asking?

22         BOARD MEMBER CUMMINGS:  Did this bruise him

23    from him falling around and him trying to help him

24    in the car?

25         THE WITNESS:  Under the arms?
```

```
 1              BOARD MEMBER CUMMINGS:  Uh-huh.

 2              THE WITNESS:  Yes, I guess so, under the

 3        arms.

 4              BOARD MEMBER CUMMINGS:  Because when a man

 5        is drunk, he is limber.

 6              THE WITNESS:  Yes.  He was falling, but he

 7        was falling because he couldn't see.

 8              BOARD MEMBER CUMMINGS:  He was just like a

 9        dish rag?

10              THE WITNESS:  He had his eyes closed.  He

11        couldn't see where he was going, and so when he was

12        -- when he would try to go down the step, he had

13        his eyes closed.  He couldn't see where he was

14        going, and he was leading him around by his arm and

15        his handcuffs sort of, you know.  That's all I

16        know.

17              THE COURT:  Anything else by the Board?

18                   FURTHER REDIRECT EXAMINATION

19   BY MR. PIAZZA:

20         Q.   Prior to his being sprayed, your husband

21   wasn't falling around or staggering, was he?

22         A.   No.

23         Q.   He wasn't that drunk, was he?

24         A.   No.

25         Q.   And --
```

```
1          A.   No.  He was standing still like --
2          Q.   Was there any -- could you see any
3    justification for Deputy Ingle to use this Freeze Plus
4    on your husband?
5          A.   I didn't understand it.
6          Q.   Did your husband provoke him in any kind of
7    way?
8          A.   No.  All I know is I was in between them two
9    until I bent down over here and got the phone.  After he
10   started spraying him, I bent over and got the phone.
11   And he was just standing there in his underwear with his
12   hands in front of him like this (indicating).
13         Q.   You say with his hand -- you mean before he
14   had the handcuffs on him?
15         A.   Yes.  I told him to scoot back and I said,
16   "Don't come over here and get in his face.  Scoot back."
17         Q.   Oh, so he was standing up there in his
18   underwear like this (indicating)?
19         A.   Yes.  He was standing stiff like that.
20         Q.   How long did it take them to get into the
21   car?
22         A.   Quite a while.  Well, I don't know.  A few
23   minutes.  I don't know.  He was falling.  He had his
24   eyes closed tight, and he was trying to lead him around.
25         Q.   Was he -- did you observe him exclaiming
```